No. 21-2166

# United States Court of Appeals for the Seventh Circuit

Joseph C. Booker
(B75795),

*Petitioner-Appellant,*

- v. -

Dorothy Brannon-Dortch,
Warden, Hill Correctional Center,

*Respondent-Appellee.*

───────────────────────

On Appeal From the United States District Court
For the Northern District of Illinois, Eastern Division Case No. 1:10-C-03995
The Honorable Judge Charles P. Kocoras

## CIRCUIT RULE 30(b) APPENDIX OF PETITIONER-APPELLANT, JOSEPH C. BOOKER

Michael A. Scodro
Brett E. Legner
Denis I. Yavorskiy
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
312-782-0600

*Attorneys for the Petitioner-Appellant, Joseph C. Booker*

## TABLE OF CONTENTS TO APPENDIX

### Bound With Brief (Rule 30(a))

Page

Memorandum Opinion, Dkt. No. 46, 5/13/2021 ....................................................................... SA 1

Rule 58 Judgment, Dkt. No. 47, 5/14/2021 .......................................................................... SA 29A

### Bound Separately (Rule 30(b))

Motion for Judicial Review, Dkt. No. 18, 10/25/2018 ........................................................... SA 30

Motion to Strike First Amended Petition, Dkt No. 19, 10/25/2018........................................ SA 93

Response to Amended Habeas Corpus Petition, Dkt. No. 27, 1/14/2019............................ SA 302

Order, Dkt. No. 28-1, 1/14/2019 (pages 1-6 only)................................................................ SA 313

Defendant's Reply Brief, Dkt. No. 28-2, 1/14/2019 ............................................................. SA 319

Exhibits, Dkt. 28-3, 1/14/2019 (pages 99-110 only) ........................................................... SA 341

Brief and Argument for Petitioner-Appellant, Dkt. 23-4, 1/14/2019 ................................... SA 353

Petition for Leave to Appeal, Dkt. 23-5, 1/14/2019 (pages 52-53 only) ............................. SA 484

Sworn Affidavit of Antione Ford, Dkt. 28-6, 1/14/2019 (pages 1-7 only)........................... SA 486

Notice of Appeal ................................................................................................................... SA 493

**FILED**

AM

10/25/2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA,

ex Rel.,

Joseph Booker,

Petitioner,

V.

WARDEN HARDY,

Respondent.

Case No.: 10 C 3995

Honorable Judge
Blanche M. Manning

Magistrate Judge
Martin C. Ashman

## MOTION FOR JUDICIAL REVIEW

Joseph C. Booker
B75795
P.O. Box 1000
Menard, IL 62259
Petitioner, PRO Se

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

# QUESTION(S) OF LAW

Whether hybrid representation is an "adequate" and "independent" state law ground?

Whether the state procedural bar comports with the Due Process principles of the State and Federal Constitutions?

Whether the State uses hybrid representation as a state procedural bar in post conviction proceedings to evade constitutional guarantees - to discriminate against claims of federal Rights?

Whether state prisoner's First Amendment rights to petition and seek Redress is violated due to there being no remedy or vehicle to challenge the state court's basis of decision or contest the adequacy of representation of post conviction appellate counsel, whom causes the procedural defaults, in post conviction appeal process?

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . i – ii

OPINIONS BELOW . . . . . . . . . . . . . . . . . . . . . iii

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . iii

CONSTITUTIONAL AND STATUTORY PROVISION
INVOLVED . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF CASE . . . . . . . . . . . . . . . . v – xvi

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . 1 – 4

CONTENTION(S) . . . . . . . . . . . . . . . . . . . . . 4 – 44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 44

TABLE OF EXHIBITS

INDEX TO APPENDICES

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

Case: 292166 Document: 28 Filed: 09/19/2022 Pages: 469

# TABLE OF AUTHORITIES CITED

Beard v. Kindler, 558 U.S. 53, 60, 130 S. Ct. 612, 175 L.Ed 2d 417 (2009) ... 11

Franklin v. Gilmore, 188 F. 3d 877, 882 (7th Cir. 1999) ............... 10

Hogan v. McBride, 74 F. 3d 144 (7th Cir. 1996) ................. 9

Johnson v. Pollard, 559 F. 3d 746, 751 (7th Cir. 2009) ........... 24

Liegakos v. Cooke, 106 F. 3d 1381 (7th Cir. 1997) ............ 10

Murray v. Carrier, 477 U.S. 478, 495-496 (1986) ............. 25

People v. Booker, 02 CR 25224 ............... 42

People v. Lawton, 212 Ill. 2d 285, 818 N.E. 2d 326, 288 Ill. Dec. 638 ...... 22

People v. Mahaffey, 165 Ill. 2d 445, 458-59, 209 Ill. Dec. 246, 651 N.E.
2d 174 (1995) ............... 23

People v. McIntosh, 02 CR 3003 ........... 42

People v. Pleasant, (case number/citation unknown) ............ 42

People v. Young, 02 CR 16057 ........... 42

Schlup v. Delo, 513 U.S. 298, 327-329 (1995) ............ 25

Sellers v. Bragg, 04 C 3663 (N.D. Ill 2005) .......... 42

Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed. 2d 674
1984) ............... 3, 16

U.S. ex Rel. Smith v. Pfister, 2013 WL 1568063 ............ 10

## STATUTES AND RULES

725 ILCS 5/116-3 ............... 2

725 ILCS 5/122-1 et seq. ............ 2, 23

Illinois Supreme Court Rule 341 ............... 8, 16

SA 033

# STATUTES AND RULES (Cont.)

Illinois Supreme Court Rule 651 (c) ............................... 11

Illinois Appellate Court Local Rule 31 (cc) ............ 3, 4, 6, 7, 13, 24

Miscarriage of Justice Exception ..................... 5, 25, 43, 44

28 U.S.C. 2241 ................................................. iii

28 U.S.C. 2254 ................................................ iii

28 U.S.C. 2254 (b) ............................................. 24

# OTHER

First Amendment of the U.S. Constitution .................... 4, 6

Fifth Amendment of the U.S. Constitution ................. 4, 6, 43

Sixth Amendment of the U.S. Constitution ..................... 43

Fourteenth Amendment of the U.S. Constitution ........... 4, 6, 43

Article 1, Section 2 of Illinois Constitution of 1970 ...... 4, 6, 43

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

SA 034

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

## OPINIONS BELOW

For cases from state courts:

The opinion of the highest state court to review the merits appears at Appendix A, B, C, and Exhibit C to this habeas petition and motion for federal review, and is unpublished.

The opinion and decision of the First Judicial District Appellate Court of Illinois appears at Appendix A, B, C and Exhibit C to this habeas petition and motion for federal judicial review, and is unpublished.

## JURISDICTION

This Honorable Court's jurisdiction to entertain Booker's petition for habeas corpus relief and attached motion for judicial review is authorized by 28 U.S.C. 2241 and 2254.

iii

SA 035

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

# CONSTITUTIONAL AND STATUTORY PROVISION INVOLVED

First Amendment of the United States Constitution

Fifth Amendment of the United States Constitution

Sixth Amendment of the United States Constitution

Fourteenth Amendment of the United States Constitution

Article 1, Section 2 of Illinois Constitution of 1970

SA 036

## STATEMENT OF THE CASE

Joseph Booker was found guilty of first degree murder based primarily on testimony of Kenneth Williams, a high-ranking Gangster Disciple whom other witnesses have since identified as the actual shooter. People v. Booker, No. 1-06-2581, 5-6 (Unpublished order of March 31, 2008). The state presented no forensic evidence linking Booker to the gun or crime scene, and no inculpatory statement. The jury was issued a PRIM instruction before returning its verdict. Booker, No. 1-06-2581 at 6. In the post conviction proceedings below, Booker maintained his innocence and presented evidence from two new eyewitnesses who were too scared to accuse Williams earlier. (PC4. R3. X14; PC1. C1. 238-40; PC4. C. 139-44; PC4. R2. V 7-118). The Circuit Court of Cook County dismissed Booker's innocence claim after an evidentiary hearing (PC4. R3. Y8).

<u>Trial and Direct Appeal</u>

Kenneth Williams testified that, around 9:00 p.m., on September 8, 2002, he was at the corner of West 38th and South Princeton, near Mellssa Westmoreland's home in the Wentworth Gardens Housing Project, when he saw Joseph Booker and several friends arrive in four cars. (Tr. 179-80, 209, 183-86, 212-13); People v. Booker, 2017 IL App (1st) 130177-U, ¶6 (unpublished order of August 8, 2017).

V.

STATEMENT OF THE CASE

Booker's group argued with Williams's group before entering Westmoreland's home. (Tr. 186) ; Id. Around 10:30 p.m., Booker and his friends emerged and words were again exchanged. Booker drove off. (Tr. 188-89); Id.

Around 11:00 p.m., Charles Rials approached. (Tr. 180, 190). Minutes later, Booker ran toward Rials with a gun, but Williams did not alert Rials of Booker's approach. (Tr. 190-91, 216, 228-29). Booker fired at Rials. (Tr. 192); Booker, 2017 IL App (1st) 130177-U at ¶6. Williams saw Booker standing over Rials, and heard more shots. (Tr. 193); Id. He did not talk to police that night, but identified Booker from a lineup two days later (Tr. 195-202, 226-28); Id.

Darnell Brown testified that, on the night of the shooting he walked down West 38th Place with Rials while Williams sat on some stairs nearby. (Tr. 249-50); Booker, 2017 IL App (1st) 130177-U at ¶7. Brown stopped to talk to a woman named Ella while Rials continued towards Williams. (Tr. 250, 268); Id. When Brown turned to leave he heard a shot behind him, and then four more shots. (Tr. 251-52); Id. He did not see the shooter's face. (Tr. 252-53, 272, 278-79). Brown did not tell police that night that he saw the shooting. (Tr. 287). Two days later, he went to a police station at William's request and identified Booker as the shooter from a lineup. (Tr. 287, 278); Id.

SA 038

## STATEMENT OF THE CASE

Fourteen year old Louis Dean testified that, around 11:30 p.m., he looked out his window and saw someone walk up behind Rials and shoot him. (Tr. 302-304B); Booker, 2017 IL App (1st) 130177-U at ¶8. Dean did not positively identify Booker in a lineup, but described him as someone who looked like the shooter. (Tr. 314-15). On direct examination, Dean testified that Booker was the shooter; on cross-examination, he admitted giving a signed statement indicating he did not see the first shot. (Tr. 304B, 309-10); Id. Dean was also impeached with his grand jury testimony. (Tr. 323-24); Id.

On direct appeal, Booker argued that the eyewitness identification testimony was too unreliable to prove him guilty beyond a reasonable doubt, and that issuance of a Prim instruction pressured the jury to convict. Booker, 2017 IL App (1st) 130177-U at ¶12. The First District Appellate Court affirmed. Id.; People v. Booker, No. 1-03-3533 (unpublished order of September 22, 2005).

### Initial Post Conviction Proceedings

Booker filed a pro se post conviction petition in May of 2006, alleging, inter alia, that he is actually innocent, and that counsel was ineffective at trial and on appeal. Booker, 2017 IL App (1st) 130177-U at ¶14. Booker attached an affidavit from Ellen Anderson stating that she saw the shooting in 2002, and that Kenneth Williams was the shooter. (PC2. C2. 193-94). On appeal from summary dismissal, the appellate court remanded for further proceedings, finding Booker alleged the gist of an actual innocence claim, the identification evidence was "weak"

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

STATEMENT OF THE CASE

in light of Anderson's affidavit, and that the probability of a different verdict was "bolstered" by the jury's difficulty in reaching its verdict. People v. Booker, No. 1-06-2581 (unpublished order of March 31, 2008).

## Post-Remand Post Conviction Proceedings

Booker proceeded pro se on remand. (PC2. R, C2; PC2. C2. 300-01). The circuit court denied him leave to file pro se amended and supplemental pleadings (PC2, C2. 346; PC2. R1. C4), and dismissed the ineffective-assistance claims raised in the initial petition. Booker, 2017 IL App(1st) 130172-U at ¶17.

Booker filed a pro se motion for forensic testing of DNA from fingerprints left on recovered cartridge casings. (PC3, C. 25-33; PC2. C2. 474-86; PC2. R. L4-6). After a hearing, the court concluded that, because of the "way" the "cartridges" were "handled" in 2002, "DNA testing would not yield probative results. (PC3. R. 728-29); Booker, 2017 IL App (1st) 130177-U at ¶29.

## Third Stage Evidentiary Hearing

In October of 2014, the State revealed it had received 185 pages of reports relating to Booker's case from the Chicago Police Department. (PC4. R1. N2-3). Among the new discovery was a handwritten statement from Melissa Westmoreland given to an ASA and a detective, indicating that Booker left her

viii

Case: 21-2166   Document: 28   Filed: 08/19/2022   Pages: 469

STATEMENT OF THE CASE

house about 30 minutes before she heard gunshots, and that Westmoreland's neighbor, a woman named "Teda", said she saw Kenneth Williams argue with a man named W.K. before the shooting. (PC4. c. 128-33; PC4. R.l. 03-5); Booker, 2017 IL App (1st) 130177-U at ¶18. Booker then supplemented his petition with an affidavit from Teda's fiance at the time, Antione Ford. (PC4. R.l. 03).

## Antione Ford's affidavit and testimony

Antione Ford's affidavit stated that he and Teda were on their front porch around 6:30 or 7:00 p.m., when Booker arrived and briefly spoke to them before entering their neighbor, Melissa Westmoreland's, house. (PC4. c. 139-40); Booker, 2017 IL App (1st) 130177-U at ¶18. About 30 minutes later, two men arrived in a white Chevy Tahoe, and walked past Kenneth Williams, a senior regent for the Gangster Disciples known as "Godzilla". One of the men asked Williams "what the fuck he was looking at", and Williams told him to straighten his hat. The men entered Westmoreland's house. (PC4. c. 139-40).

Ford saw Williams and about 20 Gangster Disciples "drinking and smoking weed" across the street. (PC4. c. 140); Booker, 2017 IL App (1st) 130177-U at ¶18. At some point, Williams yelled, "who the fuck putting on for the 'omegas' and 'blue dolphins'?", which Ford explained were ecstacy pills. Williams sent some guys to buy the ecstacy and liquor,

IX.

STATEMENT OF THE CASE

and when they returned, "Everybody that drink was drinking, everybody that pop pills was popping pills and everybody that ▓▓▓▓▓▓▓▓▓ smoked weed was smoking weed." (PC4, C. 141).

Around 10:15 p.m., Ford saw Booker drive off without talking to Williams or the other Gangster Disciples. The men from the Tahoe entered their car and did the same. About 15 or 20 minutes later, Charles Rials arrived. Williams and the other gang members were happy to see Rials because he had just gotten out of prison, but Rials was upset the Gangster Disciples had failed to post bond for him, provide him with a lawyer, or send him money while he was in prison. (PC4, C. 140-42); Booker, 2017 IL App (1st) 130177-U at ¶18. Rials said he "was gone cooperate with the police and send them all to jail, from the top to the bottom", meaning "from the shot callers to the foot soldiers". Williams swung at Rials but missed. A woman removed Rials from the fray. (PC4, C. 142).

Sensing tension, Ford and Teda went inside. Ford looked out the window and saw Williams walk towards West 37th and out of sight while the other gang members continued partying. Shortly thereafter, Ford saw Williams walk back toward the crowd with Darnell Brown. (PC4, C. 142). Williams, Brown, and Rials then met in the middle of the block. A woman yelled to Brown and he crossed to the side of the street on which Ford lived. Williams and Rials "stepped off a few paces" before Williams shot Rials in the head and again while he was on the ground. (PC4, C. 143); Booker, 2017

x.

Case: 21-2166          Document: 28          Filed: 08/19/2022          Pages: 469

STATEMENT OF THE CASE

IL App (1st) 130177-U at ¶ 19.

At the evidentiary hearing, Ford acknowledged that he was serving a 60 year sentence for an unrelated murder and armed robbery (PC4. R2. V48), and that he was a Black Disciple until 2001. (PC4. R2. V11); Booker, 2017 IL App (1st) 130177-U at ¶22. Ford then described the scene and the shooting consistent with the allegations in his affidavit. (PC4. R2. V7-27). Ford did not tell police he saw the shooting because he was scared for himself, Teda, and her children. (PC4. R2. V28); Booker, 2017 IL App (1st) 130177-U at ¶ 22.

Two days later, Ford told Westmoreland that Booker was not one of the people he had seen argue with Williams. Williams first argued with one of the men from the Tahoe, and the second argument was ~~amongst themselves~~ "amongst themselves". (PC4. R2. V29-31). Ford did not say the second argument was between Williams and Rials, or what it was about, because he was scared of Williams. (PC4. R2. V31-32). On cross-examination, Ford testified he had no contact with Booker from the day of the shooting until the morning of the hearing. (PC4. R2. V49, 60, 64).

Ellen Anderson's affidavit and testimony

Ellen Anderson testified she and Booker started an off-and-on relationship in 1995 that lasted about 10 years. (PC4. R2. W10); Booker, 2017 IL App (1st) 130177-U at ¶21.

xi.

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 469

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

*STATEMENT OF THE CASE*

On January 12, 2006, Anderson submitted a sworn affidavit stating she saw Kenneth Williams shoot Charles Rials. (PC4, R2. W7). Anderson testified the affidavit was false, and that she signed it because she did not want Booker in prison. (PC4, R2. W47); *Id.*

In her affidavit, Anderson averred that she had arrived at a friend's house in Wentworth Gardens around 8:00 p.m., on September 8, 2002. She left her friend's house around 11:05 p.m., and walked west on West 38th Place to meet a cab. Anderson saw Kenneth Williams and Darnell Brown talking to a man she later identified as Charles Rials (PC1. C1. 238; PC2. C1. 193); *Booker, 2017 IL App (1st) 130177-U at ¶ 15.* Anderson talked to Brown while Williams and Rials walked away. Anderson heard a gunshot, ducked behind Brown, and looked to see Rials's body on the ground. Williams was standing over Rials firing more shots into his body. (PC1. C1. 239; PC2. C1. 194); *Id.*

Brown told Anderson "to keep her mouth shut if she didn't want to get herself hurt," and that she didn't see nothing" and "don't know nothing." (PC1. C1. 239; PC2. C1. 194); *Booker, 2017 IL App (1st) 130177-U at ¶ 15.* Anderson was "traumatized" and "feared for her life," so she moved to a different part of town and never returned to Wentworth Gardens. Anderson later ran into Booker's mother at church and told her Booker had been "wrongfully convicted". (PC1. C1. 239-40; PC2. C1. 194-95).

xii

STATEMENT OF THE CASE

In explaining the origins of her affidavit, Anderson testified that, in 2005, Booker's mother called her, and Anderson went to her house, told her Booker was innocent, and went with her to visit Booker at Stateville. (PC4. R2. W14-15, 34-36); Booker, 2017 IL App (1st) 130177-U at ¶21. Anderson denied telling Booker's mother he was innocent while they were at church, as stated in her affidavit, but testified she met Booker's mother at church once. (PC4. R2. W14, 49). Anderson visited Booker about 10 times before drafting her affidavit, but never talked about this case with him. Anderson thought Booker was innocent, so when he asked her to draft an affidavit, she sent one to an investigator named Patti Krashesky. (PC4. R2. W36-38, 16); Id. In 2006, Anderson met Krashesky and told her the averments were true. Krashesky typed up Anderson's affidavit without making changes, gave Anderson a copy, and told her she would have to testify about its contents. (PC4. R2. W17-18, 39-40).

In August of 2014, after the appellate court remanded Booker's pro se petition for further proceedings, ASA Reilly and Detective Brannigan "kept coming to Anderson's job", wanting to discuss the case. Even after Anderson "switched her number", Reilly and Brannigan came "to look for her again." Anderson "just got tired", so she "finally talked to them." (PC4. R2. W23). Anderson sat in Brannigan's car and told them she did not see the shooting. (PC4. R2. W24, 41). She agreed to make a videotaped statement recanting her affidavit because she thought it would end her involvement.

Pages: 469   Filed: 08/19/2022   Document: 28   Case: 21-2166

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

*STATEMENT OF THE CASE*

Anderson was promised nothing in exchange for her statement. (PC4. R2. W42).

Anderson confirmed that, in September 2002, she visited a girlfriend who lived in Wentworth Gardens more than once, and that she, her girlfriend, and Darnell Brown went to highschool together. (PC4. R2. W18, 29). Anderson denied being at Wentworth Gardens the night of the shooting and talking to Brown. (PC4. R2. W31). Anderson testified she had seen Brown several times since the shooting, most recently at a nightclub in 2012. (PC4. R2. W28). She denied that Brown or "anybody on the streets" had talked to her about her affidavit since she submitted it. (PC4. R2. W28). Anderson testified she did not know Kenneth Williams, and that she did not recall the names Monica Ramsey or Melissa Westmoreland. Booker sent Anderson information about two people but she could not remember if they were Ramsey and Westmoreland, or if the information influenced her affidavit. (PC4. R2. W18-20).

On cross-examination, Anderson testified that Booker sent her police reports containing details about what happened, who was shot, and who the witnesses were. (PC4. R2. W37). She did not write her affidavit based on those reports. (PC4. R2. W38). On re-direct examination, Anderson testified she was unsure what details were in those reports, and that she did write her affidavit based on them. (PC4. R2. W47-48). Anderson also testified that the reports did not contain information appearing in her affidavit, and that her affidavit must have been based on information obtained

xiv

SA 046

STATEMENT OF THE CASE

from Booker, either on the phone or during their prison visits. ~~(Crossed out)~~ (PCH. R2. W48-49). Anderson then repeated that she did not remember discussing this case with Booker in prison. (PCH. R2. W51).

## Joseph Booker's Testimony

Booker proclaimed his innocence, stating, "I did not shoot Charles Rials." (PCH. R3. X14). He testified that, on September 8, 2002, he visited Melissa Westmoreland's house to conduct a drug deal. On his way inside, he greeted her neighbors, Belinda "Teda" Brown and Antione Ford. A man named W.K. and his associate arrived in a white Chevy Tahoe for the deal. Booker did not know W.K. had exchanged words with Williams before entering Westmoreland's house until December of 2014, when the State tendered Westmoreland's ~~(crossed out)~~ handwritten statement of September 2002. (PCH. R2. WX15-16). After the deal, W.K. and his associate left in their Tahoe and Booker left in his car. (PCH. R2. W16-17).

Booker further testified he had an intimate relationship with Ellen Anderson in 1995 that only lasted a couple of months. (PCH. R3. X19). In late 2005, Booker asked Anderson to submit an affidavit based on an independent statement she had made to his mom that he was innocent. (PCH. R3. X20). Had Anderson not come forward, Booker would never have known she visited Wentworth Gardens, or that she

xv

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

*STATEMENT OF THE CASE*

Knew Brown and Williams. (PC4. R3. X21-22). Booker never discussed the details of his case with Anderson in person, by phone or mail, or otherwise. He sent her police reports relating to Monica Ramsey and Melissa Westmoreland so she could give them to investigator Pattie Krashesky, who Booker hoped would get affidavits from them. (PC4. R3. X21-22).

Booker asked the Court to watch Anderson's video interview with ASA Reilly in which she denied that Booker told her what to write in her affidavit, but the court declined. (PC4. R3. X22, 57). The court also denied Booker's request to admit Westmoreland's handwritten statement into evidence. (PC4. R3. X 7-8, 62). On cross examination, Booker testified he had not seen Ford from the time of the shooting until July of 2015. (PC4. R3. X 55-56).

The circuit court found Ford incredible because he was in prison for murder, and he had misidentified the location of the shooting. The court held there would be no possibility of a different verdict on retrial. (PC4. R3. Y8).

<u>Direct Appeal from Post Remand Post Conviction Proceedings</u>

Booker argued, inter alia, that Antoine Ford's new testimony warranted a new trial, and that Ellen Anderson's recanted affidavit, and other evidence improperly excluded from the evidentiary hearing, bolstered the likelihood of a different verdict on retrial. The First District Appellate Court found "no reason to disturb the post conviction trial judge's credibility determinations" where Ford was a convicted felon and waited 12 years to submit his affidavit. Booker, 2017 IL App (1st) 130177-U, ¶¶ 39, 35-36 (unpublished order of August 8, 2017). Further, "the trial judge heard Anderson, both in person and on video, discuss her reasons for recanting the statements in the affidavit." Id. at ¶ 38.

xvi

SA 048

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

IN THE UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA,

ex rel.,          Case No.: 10 C 3995

Joseph Booker,

                    Petitioner,          Honorable Judge
                                          Blanche M. Manning

           V.
                                          Magistrate Judge
WARDEN HARDY,                             Martin C. Ashman

                    Respondent.

## Motion For Judicial Review

## INTRODUCTION

Now Comes Petitioner Joseph Booker (Booker), pro se,
Respectfully motions this Honorable Court to request
judicial review of a first impression matter involving
a challenge to the practice of an "inadequate" state
procedural Rule — hybrid representation — in Illinois

1.

SA 049

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

state courts.

In support of this motion, Petitioner Booker states as follows:

On September 8, 2002 Charles Rials died due to a fatal shooting that occurred in the Wentworth Gardens Housing Complex in Chicago, Illinois. Petitioner Joseph Booker (Booker) was convicted for the first degree murder of Charles Rials. Booker was found guilty by jury. Booker's conviction was affirmed on direct review.

In Booker's case, a petition for Post Conviction Relief pursuant to 725 ILCS 5/122-1 et seq. was filed in the First Judicial District Circuit Court (Cook County) alleging 13 claims of constitutional deprivations. Amongst the claims was several ineffective assistance of counsel, actual innocence, police fabrication of evidence, and perjury claim. Booker also filed a post conviction motion pursuant to 725 ILCS 5/116-3 - Motion For Forensic Testings on a baseball cap and cartridge casings recovered from the crime scene.

Booker's motion for forensic testings was denied;

2.

SA 050

his ineffective assistance of counsel claims were dismissed, stating, "that Booker's issues are "waived" and does not satisfies the 2 prong test of Strickland v. Washington. Booker's perjury and police fabrication of evidence claims were summarily dismissed. The Circuit Court conducted an evidentiary hearing on the actual innocence claim, however, dismissed this claim as well, and ultimately denied Booker post conviction relief. Booker filed a notice of appeal and a motion for appointment of counsel.

Counsel was appointed, post conviction appeal was taken, however, post conviction appellate counsel decided that he was 'only' gone raise and argue Booker's actual innocence claim, and the issue of the court denying Booker's motion for DNA testings on the cartridge casings recovered from the scene. Booker prepared and filed a supplemental brief raising the remaining issues, the First District Appellate Court of Illinois rejected Booker's filing, returned the documents back to Booker telling him that according to Local Rule 31(c) such document must be sent to counsel of record for filing. Booker sent the brief to post conviction appellate counsel for filing pursuant

SA 051

to Local Rule 31(c). Post conviction appellate counsel filed the supplemental brief. The State did not file an opposing motion. The First District Appellate Court of Illinois summarily denied the supplemental filing on grounds of hybrid representation. On appeal to the Illinois Supreme Court, Booker again submitted a supplemental brief. The Illinois Supreme Court summarily denied both, Booker's Petition for Leave to Appeal and motion to supplement.

## <u>CONTENTION(S)</u>

Hybrid representation is not an "independent" and "adequate" state law ground that has been "firmly established" or "Regularly followed" by Illinois state courts; it discriminates against claims of federal Rights; violates the First Amendment; evades constitutional guarantees; and does not comport with the DUE PROCESS principles of either the State of Illinois or United States Constitutions.

Hybrid representation being utilized in post conviction proceedings to procedurally bar

4.

SA 052

state prisoners from federal review is a procedural and substantive due process violation. The State court uses this procedural rule to assert a claim premised on state law ground to evade adjudicating the constitutional guarantees of state prisoner's claims of federal rights presented in post conviction relief petitions. This state procedural rule also causes the Federal Courts to "SLAM" and "Lock" its doors in the faces of state petitioners, on issues the Federal Court is led to believe were not fairly presented to the state court in a manner required by state law, warranting bar of federal review. This procedural deficiency leads to a grave fundamental miscarriage of justice.

Whether Illinois state courts will continue to be allowed to infringe and trample on state prisoner's constitutional rights through the exercise of an "inadequate" state procedural bar, as it did in Booker's case, is an issue of first impression in this Court. This Honorable Court has the Jurisdiction and Authority to discontinue the ongoing constitutional deprivations suffered by Illinois state prisoners; Jurisdiction and Authority to provide a remedy for state prisoners to receive federal review on the merits of their

5.

Claims Regardless of the State's assertion and claim of procedural default on its "defected" state law grounds.

## Due Process

Illinois State courts does not provide a Remedy to challenge the erroneous decisions the Illinois Appellate Courts render on filings submitted under Local Rule 31 (c) or on the adequacy of representation received by state prisoners on post conviction appeal.

The state court's application of the "inadequate" state procedural rule disfavoring hybrid representation deprives state prisoners/petitioners of their rights to petition and seek redress, and of their procedural due process rights.

All State and Federal prisoners have a First Amendment "Right to petition, and seek redress" from reviewing courts.

"... No state shall make or enforce any law which shall abridge the privilege or immunities of citizens of the United States nor shall any state deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

6.

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

SA 054

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

It is Booker's position that:

" If state prisoners can't petition and seek redress then it don't comport with principles of due process, If it don't comport with principles of due process then its trash, and must be thrown in the garbage."

## ARGUMENT

## Hybrid Representation / Local Rule 31(c)

The state procedural rule against hybrid Representation is ambiguous. Its ambiguity contributes to the "Inadequacy" of the rule itself; contributes to its malpractice as a state law ground, which demonstrates that this state procedural rule is not a <u>firmly established</u> and <u>regularly followed</u> state practice.

`Local Rule 31(c) : Requires pro se documents [supplemental briefs] by persons represented by counsel to be sent to the court through counsel.´

7.

SA 055

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

## Ambiguity :

1) The language of Local Rule 31(cc) leads one to believe supplemental briefs are accepted as long as they are submitted by counsel! This is a reasonable belief, considering the fact Illinois Supreme Court Rule 341 is silent in this respect, and does not explicity state that supplemental filings are 'not' allowed on appeal;

2) The Rule, itself, contradicts a hybrid representation.

Sending supplemental briefs to counsel for filing on behalf of the client contradicts hybrid representation. Such filings in accordance with Local Rule 31(cc) simply constitutes a supplemental filing of the initial brief, By Counsel, on behalf of the client. In order for there to be a true hybrid representation, by definition, the court would have to 'accept' the supplemental filings 'directly from the pro se litigant' while he or she are currently represented by counsel, then deny the supplemental filings on grounds of hybrid representation.

Summarily denying supplemental briefs submitted

8.

SA 056

under Local Rule 31(c) due to hybrid representation, which by the Rule itself _does not_ constitutes hybrid representation, is manifest err.

The State rely upon those erroneous decisions to assert a claim of independent and adequate state law ground to bar state prisoners from federal review, without so much as providing a remedy or vehicle to challenge such erroneous decisions at this level in proceedings (Post Conviction Appeal). This constitutes a procedural deficiency and procedural due process violation.

## Independent Ground

The State's basis of decision, under such circumstances, is not an "independent" one due to the fact that state prisoners are in fact making 'fair presentments' of their claims in a manner required by state law, when such filings are in accordance with Local Rule 31(c) (See Hogan v. McBride, 174 F. 3d 144 (7th Cir. 1996).

## Adequate Ground

Whether the State's basis of decision is "adequate"

9.

is a matter of federal law (See Liegakos v. Cooke, 106 F. 3d 1381 (7th Cir. 1997)). "State court decisions are not adequate to bar federal review unless they rest upon firmly established and regularly followed state practice." See Franklin v. Gilmore, 188 F. 3d 877, 882 (7th Cir. 1999).

In 2013 the Honorable Rebecca R. Pallmeyer, U.S. District Judge of this Honorable Court, dealt with a matter pertaining to the application of hybrid Representation as an "independent" and "adequate" state law ground to bar a state prisoner from federal review in U.S. ex rel. Smith v. Pfister, 2013 WL 1568063. In Rendering her decision NOT to bar Smith, the Honorable Judge highlighted the fact that "she was unable to locate any authority "firmly establishing" a Bar to filing a supplemental brief on appeal (See Smith v. Pfister, 2013 WL 1568063). Judge Pallmeyer's Recognition maintains relevance and substance to this day, there's still no precedential authority that firmly establishes a bar [hybrid Representation] to filing a supplemental brief on appeal.

Just because the State regularly followed a practice that violated the rights of many state

10.

SA 058

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

prisoners, over a substantial period of time, does not mean that practice is "firmly established", and vice versa. Both components must function as a unit in order for the state law ground to be deemed "Adequate". "For a state law ground to be "adequate" it must be firmly established *and* regularly followed." See Beard v. Kindler, 558 U.S. 53, 60, 130 S. Ct. 612, 175 L. Ed. 2d 417 (2009). This can not be said about the hybrid representation rule.

## Novel and Unforeseeable Requirements / Discriminatory Rule

No fair or substantial support of this state procedural rule in prior state law illustrates that hybrid representation is being applied in a manner that imposes novel and unforeseeable requirements of state prisoners, and thus is an "Inadequate" state procedural rule. See Beard v. Kindler, 558 U.S. 53, 60, 130 S. Ct. 612, 175 L. Ed. 2d 417 (2009).

Under Illinois Supreme Court Rule 651(c) state prisoners have a statutory, and not a Constitutional right to representation in post conviction proceedings. Rule 651(c) provides a mechanism for post conviction appellate counsel to raise an 'unreasonable level of assistance' on post conviction counsel. However, and where lies the problem, is that there is no

lll.

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

mechanism or Remedy to challenge the level of Representation provided by post conviction appellate counsel. Hundreds, if not thousands, of state prisoners suffer procedurally defaulted claims at this point in proceedings due to there being no mechanism to challenge post-conviction appellate counsel's representation.

It does no harm or doesn't serve prejudicial to the state for the courts to allow a state prisoner to file a 'timely' supplemental brief, pro se, to Raise and preserve constitutional claims for federal Review when post conviction appellate counsel elects not to do so, for whatever reason. The only purpose it serves to force a procedural default upon a state petitioner's claim through the exercise of the state procedural rule - hybrid Representation - is to discriminate against the claims of federal Rights presented in post conviction petitions, and to avoid constitutional guarantees.

Hybrid representation Rule is a discriminatory Rule, and application of this Rule in post conviction proceedings serves no other purpose than to discriminate against claims of federal Rights.

## Fair Presentment Regardless of Representation

Considering the fact that hybrid representation

12.

is a "discriminatory" and "inadequate" rule, state prisoner's diligent efforts - filing supplemental briefs to preserve federal constitutionally protected issues - should be deemed sufficient to satisfy the state exhaustion requirement, irrespective of Representation on the filings, by this Honorable Court.

Claims presented in postconviction petitions that were adjudicated by the circuit court but was later deemed procedurally defaulted on post conviction appeal because post conviction appeal counsel refuse to Raise said claims should not bar federal Review. Claims that were dismissed on improper grounds and not properly preserved due to post conviction appellate counsel Refusal to contest the circuit court's erroneous decisions should not bar federal Review of those claims. Claims fairly presented to the Illinois Appellate court pursuant to Local Rule 31(c) shouldn't be barred from federal Review.

Booker's federal constitutional claims fell victim to the Illinois state court's defected post conviction appeal process, and the "inadequate" state procedural Rule - hybrid Representation.

13.

SA 061

Booker's federal constitutional claims were denied review by the Illinois Appellate Court on grounds of hybrid representation, in essence, labeled "procedurally defaulted".

Review of Booker's "procedurally defaulted" post conviction claims is imperative to prevent a 'miscarriage of justice' to him, and other state prisoners that follow; also, review is paramount to settling precedential authority on the first impression matter before the Court.

## BOOKER'S CASE

Booker concedes that "on the surface" it would appear that all of his claims, that are cognizable for federal review, are procedurally defaulted. However, Booker contends that upon review of the circumstances surrounding the disposition of his federal claims, this Honorable Court will find : 1) that Booker fairly presented his federal claims to the state court ; 2) that dismissal of his federal claims does not rest on "adequate" and "independent" state law ground, and thus Booker's federal constitutional claims are not procedurally defaulted ; 3) that dismissal of

14.

Booker's federal claims rest on a decision that was based on an unreasonable determination of facts, and a misapplication of well established federal law to the facts of his case; and 4) that Booker did not receive adequate representation where post conviction appellate counsel refused to contest the circuit court's erroneous decision, refused to preserve the post conviction claims for federal review through his post conviction appeal briefing.

## Facts

The Circuit Court had a mistaken belief that Joseph Booker's trial attorney and direct appeal attorney were different lawyers, and when the court adjudicated Booker's claims of ineffective assistance of counsel he deemed Booker's claims "Waived" with the mistaken belief Booker could've raised his claims of ineffective assistance of 'trial' counsel on direct appeal. The actual facts of Booker's case is that his trial attorney and direct appeal attorney is the same lawyer.

The Circuit Court also ruled that "Booker's ineffective assistance of counsel claims does not

15.

SA 063

satisfy the 2 prong test of Strickland v. Washington."

In June of 2016, prior to post conviction appeal briefing, Booker received a legal call from the court appointed appellate counsel, where a discussion was held on the issues that will be raised on post conviction appeal. Counsel decided that he only was gone raise 2 of Booker's claims because of the page limitation of Illinois Supreme Court Rule 341. Booker explained to counsel that his case consisted of 13 issues, and involved a 'consolidated appeal', case numbers: 1-13-0177; 1-13-2279; and 1-15-2995. Booker explained the fact that his ineffective assistance of counsel claims were improperly dismissed by the circuit court's mistaken belief of what the facts were. Booker suggested that counsel file a motion for an extention of page limitation under Illinois Supreme Court Rule 341 for the sake of raising and preserving his other issues (See Exhibit A). Counsel then stated that he didn't want to deviate from the strength of Booker's actual innocence claim by filing a lengthy brief. Booker used the circumstances surrounding the ineffective assistance of counsel he received to demonstrate to post conviction appellate counsel that his claims have merit, and ~~then~~ then

16.

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

demonstrate the claims were dismissed on improper grounds.

## Merits

For Example, [Booker explained]:

Trial counsel was ineffective for failing to investigate and call Melissa Westmoreland, Belinda "Teda" Brown, and Antione Ford to provide exonerating testimony at his trial.

In his initial filed post conviction petition Booker contended his trial lawyer provided ineffective assistance for failing to investigate and call Melissa Westmoreland; for failing to put the States case to a meaningful adversarial testing.

Booker explained that Kenneth Williams testified that he argued with Booker, and that Melissa "Missy" Westmoreland came out of her house, intervened on the argument telling Booker "don't start this over here and to go in the house, something to that effect." (See Group Exhibits #8, pg. 1-2 or Tr. 187). Kenneth Williams then testified that the "guy we was arguing with came out and shot him."; referring to Booker coming out and shooting the victim Charles Rials (See Exhibit L7).

Kenneth Williams' trial testimony on this material

17.

SA 065

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

and critical <sup>POINT</sup> was a LIE, Booker never argued with Kenneth Williams, and Melissa Westmoreland never intervened on any argument (See Exhibits G8; Group Exhibits #6, pg. 3; Group Exhibits #7 pg. 1-2; Group Exhibits #9, pg. 1) In fact, Booker's trial lawyer was in possession of evidence that illustrates that Melissa Westmoreland was not even aware of any arguments See Exhibit G8 and compare it to Group Exhibits #6, pg. 3, where Melissa Westmoreland explained that she was informed by her friend "Teola" on September 10, 2002 (two days after the incident), that Kenneth Williams had words - meaning a verbal altercation with W.K. (the individual that arrived at Melissa Westmoreland's house in the white chevy tahoe to buy drugs from Booker)

Identification is the Central Issue in Booker's case, and trial counsel's deficient performance in allowing Kenneth Williams false testimony to go unrefuted prejudiced Booker during trial proceedings. The unrefuted testimony that Kenneth Williams argued with Booker, that the guy he argued with [Booker] came out and shot the victim Charles Rials, combined with the prior "positive" line up identification, and "positive" in-court identification is the key contributor to Booker's wrongful conviction.

Trial counsel deficient performance, his failure to

18.

SA 066

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

put the State's case to a meaningful adversarial testing, undermines the confidence in the outcome of Booker's trial proceedings. The result of Booker's trial probably would have been different had trial counsel investigated and called Melissa Westmoreland to refute the identification testimony of Kenneth Williams, which was predicated on this alleged argument that he had with Booker; an argument Melissa Westmoreland 'supposedly' intervened on.

Trial counsel was ineffective for failing to present witnesses and documented evidence that illustrate that Kenneth Williams had a verbal altercation with W.K. and not Booker, which contradicted Kenneth Williams trial testimony that he argued with Booker (See Group Exhibit #6).

Booker further explained that his next contention of ineffective assistance of trial counsel was submitted to the circuit court in his supplemental post conviction petition, which was filed after Booker received and reviewed the "hidden basement file".

In October of 2014 an attorney from Loevy & Loevy's Exoneration Project made a court appearance in support of Booker, and also to compel the State to turn over a 185 page Chicago police file related to Booker's case. The file was hidden in a basement at the 51st and Wentworth Police Station in Chicago, Illinois by the corrupt and crooked officers: David Evans 20927

19.

Case: 21-2166   Document: 28   Filed: 08/19/2022   Pages: 469

and Chester Bach 20438 (See Group Exhibits #5, Appendix D).

Discovered in the file was evidence that was disclosed to trial counsel, and evidence that was not disclosed to counsel through discovery.

Evidence demonstrating that the corrupt cops feabricated line-up evidence via coercing witness identifications, manufactured documents to indicate Booker was positively identified, when Booker actually wasn't, was disclosed to trial counsel. However, Detective David Evans and Chester Bach hid the line-up results that was not approved or signed by their Supervising Officer, which is procedure and a requirement to be submitted for Discovery purposes (See Group Exhibits #13, 1-3; Appendix D, pg. 26 and compare to pg. 28).

A statement, generated by Assistant State's Attorney Dan Klapman, given by Melissa Westmoreland was also disclosed to trial counsel through discovery (See Group Exhibits #6).

In her handwritten statement, Melissa Westmoreland told ASA Klapman that Booker was at her house the night of the shooting, and that he left about 30 minutes before she heard gunshots. Melissa Westmoreland also told ASA Klapman that "she heard from a friend

20.

named "Teda" that Kenny (Kenneth Williams) had some words, meaning a verbal altercation, with W.K. outside (See Group Exhibits # 6, pg. 3).

Booker explained, the significance of this information is that Melissa Westmoreland revealed that there were witness(es) to a verbal altercation that involved Kenneth Williams and an individual that was not Booker, as Kenneth Williams claimed at trial. Kenneth Williams "claimed" that he didn't get the opportunity to talk to the victim Charles Rials because someone came after him, a guy that 'we' was arguing with came out and shot him." (See Exhibit C4).

Booker further explained, had his trial lawyer conducted an investigation on the lead provided by Melissa Westmoreland he would have discovered the fact that "Teda" who's real name is Belinda Brown, was sitting on her front porch with her fiance' Antione Ford, and both of them bear witness to 2 altercations. Both altercations involved Kenneth Williams, and none involving Booker. The first altercation was between Kenneth Williams and W.K. (the individual from the white Chevy Tahoe). The second altercation was between Kenneth Williams and the victim Charles Rials. (See Group Exhibits # 7).

21.

Trial counsel would've learned that, according to Antione Ford, the altercation between Kenneth Williams and Charles Rials led to the fatal shooting of Charles Rials (See Group Exhibits #7). Booker explained that Melissa Westmoreland's hand written statement and Antione Ford's sworn affidavit is sufficient evidence to demonstrate that Booker's trial counsel's failure to investigate led to Booker being wrongfully convicted for the first degree murder of Charles Rials, and thus satisfies the standards of Strickland v. Washington. Booker demonstrated to his post conviction appeal counsel that he substantiates the fact the circuit court made a misapplication of well established law to an unreasonable determination of the 'facts' of his case.

## Dismissal on improper ground

Booker highlighted caselaw firmly supporting his position that the circuit court's dismissal of his ineffective assistance of counsel claims on grounds of waiver was improper. Booker pointed out that in People v. Lawton, 212 Ill. 2d 285, 818 N. E. 2d 326, 288 Ill. Dec. 638, the Illinois's Supreme Court held:

22.

Pages: 469  Filed: 08/19/2022  Document: 28  Case: 21-2166

"Defendants seeking to challenge the effectiveness of the representation they received during their criminal trials have a mechanism for avoiding this problem. If their trial counsel continues to represent them on direct review and does not raise the issue of the effectiveness of the representation he provided, notions of '<u>Waiver</u>' will yield to considerations of fundamental fairness and defendants will still be permitted to challenge 'trial counsel's' effectiveness through proceedings under the Post Conviction Hearing Act (725 ILCS 5/122-1 et seq. (West 2002)), citing People v. Mahaffey, 165 Ill. 2d 445, 458-59, 209 Ill. Dec. 246, 651 N.E. 2d 174(1995)."

Thus, Booker's ineffective assistance of counsel claims could not have been raised on direct appeal, and therefore his claims of ineffective assistance of trial counsel are not waived. In addition, Booker used the proper vehicle, the Post Conviction Hearing Act, to advance his federal constitutional deprivations for adjudication.

Even after making these valid points, post conviction appellate counsel was still adamant about only raising the 2 issues, and reverted to his page limitation position.

23.

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 469

## Diligent Effort / Fair Presentment

Booker incorporates by reference the facts provide in the Introduction Section of this motion in its entirety as if fully stated herein.

Booker demonstrated that he fulfilled his obligation by putting his federal claims through a complete round of the state's established appellate review process, satisfying the fair presentment requirement. See Introduction Section of this motion; Local Rule 31 (c); Section 2254 (b); and Johnson v. Pollard, 559 F. 3d 746, 751 (7th Cir. 2009).

The operative facts and controlling federal legal principles governing the ineffective assistance claims raised in Booker's federal habeas petition were presented in his initial filed and supplemental post conviction petitions. These same claims were argued in the second stage of post conviction proceedings but were dismissed. Booker then presented these claims to the Appellate Court for the First District of Illinois, via supplemental brief, in a manner required by state law, pursuant to Local Rule 31 (c). Booker presented these claims

24.

SA 072

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 469

to the Illinois Supreme Court through supplemental filing as well.

## Actual Innocence/ Miscarriage of Justice

This Honorable Court should grant Booker's motion for judicial review and review Booker's federal constitutional claims on the merits or allow Booker to proceed and advance his claims under the miscarriage of justice exception. See Murray v. Carrier, 477 U.S. 478, 495-496 (1986) and Schlup v. Delo, 513 U.S. 298, 327-329 (1995).

Booker incorporates by reference all of the above facts, points, arguments, and authority in its entirety, in this Motion for Judicial Review as if fully stated herein.

## Facts

Booker's conviction rest entirely on the identification testimony of the man who actually shot and killed the victim, Charles Rials; crime Booker stands wrongfully convicted for. That perpetrator is Kenneth Williams.

25.

SA 073

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

At Booker's 2003 trial, Kenneth Williams testified that "guy we was arguing with came out and shot him." (See Exhibit L4). This is the explanation that Kenneth Williams provided to say that he never had an opportunity to speak to the victim Charles Rials at no time prior to the shooting (See Exhibit L4). To the contrary, another of the State's witness, Darnell Brown, testified that he walked to the end of a parking lot located at West 38th Place in the Wentworth Gardens with Charles Rials, that he [Darnell Brown] stopped to talk to a young lady by the name of Ella (See Group Exhibits #8, pg. 2) When asked what did Charles Rials do?, Darnell Brown testified "he [Charles Rials] kept going and started talking to a guy named Kenny Williams." (See Group Exhibits #8, pg. 2 and Exhibit M4).

Since Booker's trial and conviction, newly discovered evidence has been obtained, and new facts has been brought to light:

1) The young lady named Ella that Darnell Brown stopped to talk to the night Charles Rials was fatally shot, real name is Ellen Anderson. Ellen Anderson came forward and submitted a sworn affidavit to Investigator Patti Krashesky averring that she bear witness to Kenneth Williams shooting the man she didn't know while he was on the ground (See xii-xiii page of Statement of case;

26.

Exhibit R4-3); 2) With the assistance from a representative of Loevy & Loevy's Exoneration Project Booker was able to obtain "the hidden basement file" which contained a handwritten statement submitted by Melissa Westmoreland, which brung facts to light in Post Conviction proceedings that neither Booker nor Booker's jury was privy of (See Group Exhibits #5 and #6); and 3) Again, with the assistance of a representative from Loevy & Loevy's Exoneration Project, Booker was able to procure a sworn affidavit from newly discovered witness Antione Ford (See Group Exhibits #7).

The discovery of Antione Ford stem from a search for Antione Ford's fiance "Teda" whose real name is Belinda Brown, and stem from a lead provided by Melissa Westmoreland in the handwritten statement given to Chicago Police.

Investigators were unable to locate Belinda "Teda" Brown. It has been said that "Teda" was in exile in Cuba, but there's nothing in support of that fact.

An evidentiary hearing on Booker's actual innocence claim commenced on July 15, 2015. At the hearing, Antione Ford provided exonerating testimony stating that "on the evening of September

27.

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 469

8, 2002 he was sitting on his front porch with his now ex-fiance "Teda" (Belinda Brown). While sitting on their front porch they observed 2 altercations involving Kenneth Williams. The first incident was a verbal altercation between Kenneth Williams and W.K., the individual that arrived at Melissa Westmoreland's house in the white chevy tahoe; the second incident was an argument and fist-fight between Kenneth Williams and the victim Charles Rials (See Group Exhibits # 7, pg. 4).

Antione Ford testified that "after the argument and fist-fight, Kenneth Williams, Darnell Brown, and Charles Rials met up in the middle of West 38th Place in Wentworth Gardens. At some point Darnell Brown crossed the street to the side where Antione Ford lived and began talking to some girl that Antione Ford didn't know. While on the opposite side of the street, Kenneth Williams and Charles Rials continued to talk for a short period of time, and when Charles Rials attempted to walk away Kenneth Williams shot Charles Rials (See Group Exhibits # 7, pg. 3).

When Ellen Anderson testified at the evidentiary hearing she admitted that she frequented the Wentworth Gardens at 37th and 38th Place when she visited her girlfriend. Ellen Anderson admitted

28.

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 469

that her, her girlfriend and Darnell Brown all attended Wendell Phillips Highschool in Chicago, Illinois. (See pg. xiv statement of Case). Ellen Anderson admitted that she does in fact know Darnell Brown, and had last seen him at a mutual friend's night club party in 2012. (See pg. xiv Statement of Case).

In other respects Ellen Anderson recanted her sworn affidavit. Ellen Anderson 'now' denied knowing Kenneth Williams, and denied witnessing Kenneth Williams standing over the man she didn't know (Charles Rials) shooting him more times while he was on the ground as she averred in her sworn affidavit. Ellen Anderson denied being in the Wentworth Gardens talking to Darnell Brown on the night of September 8, 2002. Ellen Anderson testified that she was constantly being harassed at her job by the State's Attorney and their investigator to the point where she finally decided to speak with them in hopes it would end her involvement all together. (See pg. xiii Statement of Case).

The State's Attorney's Office dismissed several charges Ellen Anderson had pending after she submitted her video Recantation and after her recantation evidentiary hearing testimony. (See Group Exhibits #9, pg. 1).

29.

SA 077

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

Booker testified at his evidentiary hearing. Booker unequivocally and unwaveringly testified that "he did not shoot Charles Rials. Booker admitted to the court that he was a drug dealer, that this was his modus operandi, and that his background illustrates that (See Group Exhibits #9, pg. 1).

In his testimony, Booker explained to the court that he had an intimate relationship with Ellen Anderson back in 1995 that lasted for only a couple months. Booker explained that Ellen Anderson reached out to him through his partner Chuckwick, who forwarded Ellen Anderson's phone number to Booker's mother. Booker testified that Ellen Anderson told his mother that he was innocent. Booker's mother told him what Ellen Anderson told her. Booker then had his mother call Ellen Anderson, and Booker asked Ellen Anderson to submit a sworn affidavit to her account of events from the night of September 8, 2002 (See pg. XV Statement of Case).

Booker testified that had Ellen Anderson not come forward, he never would have even known that Ellen Anderson visited the Wentworth Gardens; never would have known that she knew Darnell Brown and Kenneth Williams; would not have known she witnessed the murder of Charles Rials (See pg. XV-XVii Statement of Case).

Booker testified that he never discussed the details of his case with Ellen Anderson (See pg. XVi Statement of Case).

30.

SA 078

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

BOOKER further explained to the court that in September of 2002 he was engaged to Carolyn Wilson, the mother of his 3 daughters, and they resided in the Dearborn Homes at 2931 S. Federal in Chicago, Illinois. Booker testified that he also was having an affair with Melissa Westmoreland, who resided in the Wentworth Gardens. Booker testified that on the evening of September 8, 2002 he was at Melissa Westmoreland's house because he had arranged a drug deal with W.K. to take place at Melissa Westmoreland's house. Booker explained prior to that day he had never done that before (conducted drug deals at Westmoreland's house), that that was a one time thing. Booker testified that he never hung out in Wentworth Gardens, and didn't know nobody there but Melissa Westmoreland and her family, also that he never had a problem with nobody in Wentworth Gardens (See Group Exhibits #9, pg. 1-2).

Booker also testified that after the drug deal he left Melissa Westmoreland's house, went home to 2931 S. Federal to put his money up. When Booker got home he learned that his youngest daughter, Jay Millia Booker, who was a new born, was having bowel movement complications. Just prior to leaving for the emergency room Carolyn's mother came and gave Jay Millia some tea. The tea remedied the bowel movement complication (See Group Exhibits #9, pg. 2).

Booker testified that he did not leave the house until some time about 1:00 a.m. on September 9, 2002. Booker called Westmoreland to let her know he was coming

36.

to pick her up as he normally done (See Group Exhibits# 6, pg. 4). Melissa Westmoreland told Booker that someone had been shot in front of her house, that he will not be able to turn in, that the police was everywhere so she will meet him at the corner of 39th and Princeton. Booker went to 39th and Princeton, picked up Melissa Westmoreland and then went to the Amber Finn Hotel as usual (See Group Exhibits # 9, pg. 2).

Booker also testified that he told his trial lawyer about his alibi, but his lawyer was reluctant to, and didn't call his children's mother and grandmother because he [Lawyer] thought they would get impeached on biasness.

## Argument

Joseph Booker stands convicted for a first degree murder that he did not commit.

As highlighted by the preponderance of evidence that supports Booker's innocence, Kenneth Williams 'tried' so desparately to distance himself from the victim, Charles Rials, as far as he possibly could to disguise the fact he shot and killed Charles Rials because Rials threatened to cooperate with the police against Kenneth Williams and the Gangster

32.

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

Disciples (See Group Exhibits #7, pg. 2). Kenneth Williams even denied ever talking to his "friend of 10 years". Booker provides proof from several witnesses, via written statements and testimony, that Kenneth Williams was last seen talking to the victim before the victim was shot: Monica Ramsey, Darnell Brown, Antione Ford, and Ellen Anderson (See Exhibits D4, M4, Group Exhibits #7, pg.3, and R4-3).

## FOUL PLAY- CONSTITUTIONAL VIOLATIONS

There's a combination of foul play and Constitutional violations that led to Booker being wrongfully convicted for the murder of Charles Rials:

## Corrupt Officers

From the beginning Booker's constitutional rights were being violated where Booker was being deprived of life, liberty, and equal protection of the law where corrupt cops illegally arrested and detained Booker for the first degree murder of Charles Rials without so much as having a single witness, under oath or affirmation, accusing Booker of the fatal shooting.

On September 10, 2002 Joseph Booker was kidnapped from his home and illegally restrained by corrupt Chicago Police Officers: David Evans Badge number 20927 and

33.

Chester Bach Badge number 20438, at the 1819 West Pershing Road Police Station, Chicago, Illinois. (See Exhibits G8-9).

Chicago Police Officers David Evans #20927 and Chester Bach #20438 was apart of the corrupt and crooked former Chicago Police Sergeant Ronald Watts' crew. Ronald Watts and his crew ran an extortion ring that targeted drug dealers in the public housing complexes on the South Side of Chicago. Ronald Watts put claim on all the dealers in the Robert Taylor, Ida B. Wells and Harold Ickes housing complex. David Evans and Chester Bach put claims on the dealers in the Dearborn Homes and Stateway housing complex.

Any dealer that refused to comply with the extortion demands these corrupt cops put bogus cases on those individuals (See Appendix E).

Booker fell victim to the corrupt cops penalty for non-compliance with the drug extortion demands and was hit with the bogus first-degree murder charge of Charles Rials, by corrupt cops David Evans and Chester Bach.

Booker was one of the biggest, if not the biggest, heroin and cocaine dealer in the Dearborn Homes in the year 2000 to 2003. Booker was the

34.

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

focal point in the "Rocafella" brand of Heroin and Cocaine investigation of "Operation Snake Bite".

Detectives David Evans and Chester Bach made several attempts to put "the squeeze" on Booker, but Booker wouldn't comply.

In January of 2001 Detectives David Evans and Chester Bach had the intentions to get Booker off the streets then when they threatened and attempted to pend several attempted first degree murder charges on Booker. Booker's mother, Denise Miles, and his now ex-fiance, Carolyn Wilson, bear witness to Detective David Evans being adamant about Booker committing the attempted first degree murders, irrespective of the witnesses in that case saying that Booker was not the culprit. Booker would've been facing bogus charges back in 2001 had the witnesses succumbed to David Evans' pressure for them to identify Booker. Booker's mother and Ex-fiance bear witness to David Evans threatening "to get Booker next time" (See Group Exhibits #11 and 12).

Detectives David Evans and Chester Bach had Booker under surveillance. Detectives David Evans and Chester Bach accused RoadMasters Car Lot, located at 71st and Western, of laundering Booker's money because Booker "spent alot of time at this lot", and because Booker had access to cars and SUVs from this

lot.

Detectives David Evans and Chester Bach also went to the 77th Garage, located at 77th and Vincennes to harass Melissa Westmoreland, who was a CTA Bus driver, and who also was Booker's mistress. Detectives David Evans and Chester Bach threatened to tell Carolyn Wilson about the affair, and to make problems for Melissa Westmoreland at her job if she didn't convince Booker to comply with their extortion demands.

All of these events occurred prior to Booker being framed for the first degree murder of Charles Ruals.

Detectives David Evans and Chester Bach knew Booker's whereabouts.

The corrupt and crooked officers (Evans and Bach) went to Melissa Westmoreland's job again, only this time speaking with desk officials, announcing they were Homicide Detectives, and needed to speak with Melissa Westmoreland. On September 10, 2002 Melissa Westmoreland, who was fed-up with the harassment tactics, went to the 51st and Wentworth Police Station to file a harassment report. The officer who was preparing the report called Detectives David Evans and Chester Bach in to the 51st and Wentworth Police Station where the

36r

SA 084

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

Detectives pretended not to know Melissa Westmoreland. Detectives David Evans and Chester Bach starting asking Melissa Westmoreland questions about Booker as if they didn't know Booker either. Melissa Westmoreland then told the detectives that she didn't know where Booker lived and didn't know his phone number (See Exhibit G8). Melissa Westmoreland told the detectives that she only knew Booker lived with his children's mother.

Melissa Westmoreland then asked the officer handling the harassment complaint to call Evans and Bach supervising officer because "she wanted to be left alone."

Detectives David Evans and Chester Bach, who already knew where Booker lived, not only because of the surveillance, but because they arrested Booker at the 2931 S. Federal address on the bogus attempt first degree murder charges in January of 2001, went to the 2931 S. Federal address with a tactical unit and arrested Booker for the Rials murder without so much as having a witness under oath or affirmation identifying Booker as the culprit of this murder, on September 10, 2002. (See Exhibits G8-9).

While Booker was being illegally detained, at some point Detective Evans and Bach received a phone call from the victim's brother, Michael Rials, telling them that his brother Charles Rials was last seen with

SA 085

Kenneth Williams and Darnell Brown, and believe they had something to do with Charles' murder (See Exhibit Q4). Detectives Evans and Bach fabricated document "Exhibit G9" to make it appear as though Michael Rials submitted Kenneth Williams and Darnell Brown names as witnesses willing to cooperate, and not suspects. (See Exhibit G9). Michael Rials never spoke to Kenneth Williams or Darnell Brown about being witnesses to Charles Rials' murder prior to calling the detectives. Michael Rials had no idea what Kenneth Williams or Darnell Brown knew about his brother's murder because neither of them made themselves available to speak with the Rials family (See Exhibits L15 and M21).

The narrative in exhibit G9 was manufactured for the sole purpose to fabricate evidence against Booker. Detectives Evans and Bach went out on a "fishing" expedition to gather evidence against Booker, i.e., Kenneth Williams and Darnell Brown. Detectives Evans and Bach turned suspects into eyewitness to fabricate evidence to point to Booker.

Kenneth Williams didn't go to the police station on his own accord, Detectives Evans and Bach went out and picked Kenneth Williams up off the streets and brought him to the police station. Now, here's

38.

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

where Christmas came early for Kenneth Williams. Detectives David Evans and Chester Bach provided the opportunity for Kenneth Williams to use Booker as a scapegoat for the murder he actually committed. The detectives D7D to get Booker off of the streets, and because Booker would not comply with the drug extortion demands.

Detectives Evans and Bach made an example out of Booker to send a clear message of what would happened if their demands are not met.

Kenneth Williams, who in actuality did not know Booker, was shown a picture of Booker by Detectives David Evans and Chester Bach prior to viewing a live line-up with Booker as a participant, and subject of the line-up. Along with his fabricated positive identification of Booker came the concocted story that he argued with Booker about "gang banging stuff" and that Booker left in his car, came back, and shot Charles Rials over the argument he [Kenneth Williams] and Booker 'supposedly' had (See Exhibit L4, Group Exhibits #8, pg. 2)

After Kenneth Williams made the bogus positive identification of Booker being the man he witnessed shoot Charles Rials, Detective Evans and Bach release Kenneth Williams. Kenneth Williams then reach out to his accomplice, Darnell Brown, and told him

39.

to go to the police station to back his story and to identify Booker. Brown admitted that he came in contact with the police through Kenneth Williams, and told him [Kenneth Williams] that he would testify to what he seen and what he know (See Exhibit M7). See also, Group Exhibits # 8, pg. 3

Darnell Brown claims that he went back to the crime scene, but when asked did he talk to the police that night Brown said "No". Darnell Brown was asked what happened? Darnell Brown testified "that he went home". (See Exhibit M7)

Both Darnell Brown and Kenneth Williams fled the scene when Charles Rials was shot. All of the people that was at the scene when the police conducted their canvass are listed in the police reports. There is no mentioning of Darnell Brown or Kenneth Williams because they wasn't there.

Its very interesting that Darnell Brown didn't find it of any relevance or importance to tell the 'police' what he seen and know because he considered Charles Rials to be "like a brother" to him and because he actually "witnessed" the murder, but was more than compelled to go to the police station to tell the police what he 'supposedly' seen and know after his Senior

40.

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

Regent of the Gangster Disciples, Kenneth Williams, made a bogus positive identification of Booker, and told him to go to the police station to do the same (See Exhibit M21, Group Exhibits #8, pg. 2-3). Otherwise Darnell Brown never would've spoken with the police because he's the accomplice. Darnell Brown delivered Charles Rials to Kenneth Williams, and knew exactly what was about to happened when he walked Charles Rials to the end of the parking lot at West 38th Place because he had just got done speaking with Kenneth Williams before he went and got Charles Rials for the meeting (Group Exhibits #7, pg. 2&3; Exhibit M4).

Next, Detectives Evans and Bach "again" with their objective to fabricate the evidence to point at Booker, and through it "classical suggestive line-up tactic" to obtain a positive identification, showed Louis Dean a picture of Booker and "tried" to coerce Louis Dean to make a positive identification. Upon speaking with the Assistant State's Attorney, Michelle Wilson, Louis Dean made clear that he did not identify anyone in the line-up but only identified Booker as looking like the man in the picture (See Group Exhibits #8, pg. 3, Group Exhibits #10). ASA Michelle Wilson made the appropriate corrections to Louis Dean's handwritten statement,

41.

Case: 21-2166   Document: 28   Filed: 08/19/2022   Pages: 469

generated by Detective David Evans (See Group Exhibits #10) Even after the corrections, Detective David Evans still manufactured documents indicating that Louis Dean positively identified Booker, when in actuality he didn't, and turned those documents in to the prosecutor's office (See Exhibits F5-6).

Detective Evans and Bach hid the line-up results related to Booker's case, that was not approved or signed by their Supervising Officer, in the basement at 51st and Wentworth Police Station. The basement file wasn't discovered until 12 years after Booker's wrongful conviction (See Group Exhibits #5 and 13; Appendix D, pg. 26, 28-30).

Detectives Evans and Bach's corruption was brought to light in the Kelwyn Sellers case, where David Evans and Chester Bach were sued for falsifying line-up evidence (See Sellers v. Bragg, 04 C 3663 (N.D. Ill 2005); Appendix D, pg. 30-31). In other cases: People v. McIntosh, 02 CR 3003, who has been released due to the fraudulent concealment of fabricated line up evidence, and the discovery of the actual suspect; People v. Young, 02 CR 16057; People v. Pleasant; and 20 other like complaints against David Evans #20927 and Chester Bach# 20438, including Booker's, 02 CR 25224 (See Appendix D at 26, 28-31, Group Exhibits #13).

42.

SA 090

## Summation

In addition to Booker's Fourth Amendment violation due to illegal arrest and detention; Fifth Amendment and Fourteenth Amendment violations due to being deprived of life, liberty, and equal protection of the law (Due Process) - due to police Fabrication of Evidence, Fraudulent Concealment of Evidence, Malicious Prosecution, and Police Misconduct, Booker suffered a Sixth Amendment violation as well - due to ineffective assistance of counsel for trial counsel conducting a poor investigation on the evidence before him and failing to fulfill his obligation to put the State's case to a meaningful adversarial testing which contributed to Booker being wrongfully convicted for the first degree murder of Charles Rials.

Booker served nearly 16 years of his life, thus far, for a crime committed by Kenneth Williams, and his accomplice, Darnell Brown.

It would be a grave Miscarriage of Justice to close the Courts doors to Booker's claims, which are of such magnitude and impact that the integrity of our judicial process is in question, and due to procedural defaults that, first, wasn't due to Booker's own culpable negligence, and second, when Booker has put forth the maximum due diligence one could, and done so in a manner required by state law, in a 'timely' fashion on

43.

each level of the appellate process.

## CONCLUSION

WHEREFORE, Petitioner Joseph Booker Respectfully prays that this Honorable Court will grant his motion for judicial review and Review Booker's federal constitutional claims on the merits; grant Booker to proceed under his "Gateway" claim of Actual Innocence / Miscarriage of Justice exception and Review Booker's federal constitutional claims on the merits; grant Booker federal habeas corpus Relief and a new trial. Lastly, grant Booker any and all Relief this Honorable Court deems just for the constitutional deprivations Booker suffered.

Respectfully Submitted,

Joseph Booker

Joseph Booker
B75795
P.O. Box 1000
Menard, IL 62259
Petitioner, Pro Se

44.

SA 092

FILED
10/25/2018 AM
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

IN THE UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA, ex rel,

Joseph Booker,

Case No. : 10 C 3995

Petitioner,

Honorable Judge
Blanche M. Manning

-vs-

Magistrate Judge
Martin C. Ashman

WARDEN MARCUS HARDY,

Respondent.

Motion to Strike First Amended Petition
And

Motion to File Second Amended Petition

Now Comes Petitioner, Joseph Booker, pro se,
and motions this Honorable Court to Strike
Petitioner's first amended petition, where the first
amended petition was filed on an inordinate delay
and when Petitioner had not exhausted his state
court remedies (See Doc. #11). Petitioner now
submits a Second Amended Petition that provides
a full discription of his state court proceedings
history, additional issues that were fully exhausted
provide dates of the state courts rulings,

1 of 2

highlight procedurally defaulted claims that are attributal to other constitutional deprivations, such as : Ineffective Assistance of Counsel.

In support of this motion the Petitioner Respectfully request that this Honorable Court allow Petitioner to file the _Second Amended_ petition for Federal Habeas Corpus Relief, which adequately present fully exhausted state court issues; present issues that may be procedurally defaulted but meet the 'exception' under the principles of Fundamental Miscarriage of Justice, which this Honorable Court may review the merits of those claims.

In addition, and for the sake of argument, the filing of the Second Amended petition does not prejudice the Respondent in any type of way, whom has yet to file a responsive pleading to Petitioner's Federal Habeas Corpus Petition.

WHEREFORE, the Petitioner, respectfully request that this Honorable Court grant his motion, and strike the first amended petition, file and docket Petitioner's Second Amended petition for adjudication of the constitutional deprivations presented therein.

Respectfully Submitted,

Joseph Booker

Joseph Booker
B75795
P.O. Box 1000
Menard, IL 62259
Petitioner, PRO.SE

SA 094

2 of 2

Case: 21-2166　　　Document: 28　　　Filed: 08/19/2022　　　Pages: 469

IN THE UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

United States of America ex rel.,
Joseph C. Booker #B75795

PETITIONER,

Case No.: 10 C 3995

vs.

Marcus Hardy,
Warden

Case Number of State Court
Conviction: 02 CR 25224

RESPONDENT.

## Second Amended Petition For Writ Of Habeas Corpus Relief

Joseph Booker
B75795
P.O. Box 1000
Menard, IL 62259

Petitioner, Pro Se

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

IN THE UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

United States of America ex rel.
Joseph C. Booker # B75795,

PETITIONER,

Case No.: 10 C 3995

vs.

Marcus Hardy,
Warden

RESPONDENT.

Case Number of State Court
Conviction: 02 CR 25224

Second Amended Petition For Writ Of Habeas
CORPUS - Person In State Custody

1. Name and location of Court where conviction entered: Circuit Court of Cook County, First District, 2650 S. California, Chicago, Illinois 60608.

2. Date of judgment of conviction: October 3, 2003.

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known): First degree murder.

4. Sentence(s) imposed: Consecutive; 30 years for first degree murder, 25 years for personal discharge of a firearm.

SA 096

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

5. What was your plea? (Check one)  (A) Not Guilty (✓)
   (B) Guilty ( )
   (C) Nolo Contendere ( )

If you pleaded guilty to one count or indictment and not guilty to another count or Indictment, give details: N/A.

PART I - TRIAL AND DIRECT REVIEW

1. Kind of trial: (Check one): Jury (✓)  Judge only ( )

2. Did you testify at trial?  Yes ( )  NO (✓)

3. Did you appeal from the conviction or the sentence imposed?  Yes (✓)  NO ( )

   (A) If you appealed, give the

   (1) Name of Court: First District Appellate Court of Illinois

   (2) Result: Affirmance of Conviction

   (3) Date of Ruling: September 22, 2005

   (4) Issues Raised: Sufficiency of Evidence; Trial Court erred by giving a supplemental instruction, "Prim Instruction" to the jury after the Court had been made aware of the numerical division of guilty versus not guilty, and after the jury announced its inability to come to an unanimous verdict.

   (B) If you did not appeal, explain briefly why not: N/A

4. Did you appeal, or seek leave to appeal, to the highest state court?        Yes (✓)   NO ( )

(A) If yes, give the

(1) Result: <u>Denied Petition for Leave to Appeal</u>

(2) Date of Ruling: <u>January 25, 2006</u>

(3) Issues raised: <u>The Appellate Court erred in</u> <u>Ruling that the trial court did not err by giving</u> <u>the Supplemental instruction, "Prim Instruction,"</u> <u>after it had made the court aware of the</u> <u>numerical division of guilty versus not guilty</u> <u>and after the jury had announced its inability</u> <u>to come to an unaminous verdict.</u>

(B) If no, why not: <u>N/A</u>

5. Did you petition the United States Supreme Court for a Writ of Certiorari?    Yes ( )   NO (✓)

If yes, give (A) date of petition: <u>N/A</u>

(B) date certiorari was denied: <u>N/A</u>

## PART II - COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court? Yes (✓)   No ( )

SA 098

3

With respect to each post conviction petition give the following information (use additional sheets if necessary):

A. Name of court: Circuit Court of Cook County

B. Date of filing: Initial Post conviction petition was filed May 31, 2006; First Amended PC petition was filed January 21, 2010; First Supplemented PC petition was filed January 13, 2011; 2nd (Second) Amended and Supplemented PC petitions was filed December of 2014

C. Issues raised: 1) Ineffective Assistance of trial counsel, failure to file meritorious motion to quash arrest and suppress evidence; 2) Ineffective Assistance of trial counsel, failure to file motion challenging suggestive identification; 3) Ineffective Assistance of trial counsel, failure to investigate and call Monica Ramsey; 4) Ineffective Assistance of trial counsel, failure to investigate and call Melissa Westmoreland; 5) Ineffective Assistance of trial counsel, failure to investigate lead on witnesses Belinda "Teda" Brown and Antione Ford and failure to call witnesses for exonerating testimony; 6) Ineffective Assistance of Appellate Counsel, failure to advance Sufficiency of Evidence in Petition for Leave to Appeal to the Illinois Supreme Court; 7) Cumulative Prejudice of Counsel's ineffectiveness; 8) Reasonable Doubt; 9) Perjured Testimony; 10) Police Fabrication of Evidence; 11) Actual Innocence.

D. Did you receive an evidentiary hearing on your petition? Yes (✓) No ( ), but see additional page 4A

<u>Additional Page</u>

<u>Answer : Collateral Proceedings 1-D</u>

All of the above listed issues in 1-C, except for Petitioner's actual innocence claim were dismissed at the Second Stage of proceedings under the Post Conviction Hearing Act. The evidentiary hearing was conducted on the actual innocence claim.

<u>Answer : Collateral Proceedings 1-G (Supplemental/Briefs)</u>

Petitioner, Joseph Booker (Booker), filed a supplemental brief in the First Judicial District Appellate Court of Illinois because court appointed appellate counsel refused to raise and argue issues that were raised and adjudicated in Booker's post conviction proceedings (See Group Exhibits #1 with attachments). Booker's motion for leave to file supplemental brief was stamped filed on October 6, 2016. On October 12, 2016 Booker's motion was denied on grounds of hybrid representation (See Exhibit C).

At the time that Booker filed his supplemental brief, the Illinois state courts had not 'firmly established' a bar, through precedential authority, that refusal to reach the merits of a Petitioner's issues - due to hybrid representation- as an "independent" and "adequate" state ground of decision. At the time Booker sought

UA

_Additional Page_

Answer: Collateral Proceedings 1-G, 1-H (Supplemental Briefs Cont.)

leave to file his supplemental brief, U.S. ex Rel. Smith
v. Pfister, 2013 WL 1568063; Kizer v. Uchtman, 165
Fed. Appx. 465, 467 (7ᵗʰ Cir. 2006); U.S. ex Rel. Murithi
v. Butler, 2015 WL 1399511 was the 'instructive authority'
in regards to the sufficiency of preserving issues
of constitutional deprivations for federal Review
through pro se motions to supplement, irrespective
of court appointed counsel's representation at the
time (See U.S. ex Rel. Murithi v. Butler, 2015 WL 1399511;
U.S. ex rel. Smith v. Pfister, 2013 WL 1568063; Kizer
v. Uchtman, 165 Fed. Appx. 465, 467 (7ᵗʰ Cir. 2006).
Booker put forth more diligent effort than the
individuals in the cases mentioned above in
attempt to file a pro se supplemental brief to
preserve his issue for federal review.

On August 8, 2017 the First Judicial District
Appellate Court of Illinois affirmed the Circuit
Court's Ruling denying Booker Post Conviction Relief.
Petition for Rehearing was filed on August 29, 2017
and denied on September 12, 2017. Court appointed
appellate counsel then filed a Petition for Leave to
Appeal to the Illinois Supreme Court on October
13, 2017. On October 16, 2017 the court appointed

SA 101

<u>Additional Page</u>

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

appellate counsel Returned Booker's pro se supplemental petition telling Booker that if he wanted the supplemental petition filed to preserve his issues, Booker will have to file the pro se supplemental petition himself. (See Group Exhibits D; Exhibit E; Exhibit F; and Group Exhibits G, attached hereto).

Booker then sent his supplemental petition for leave to appeal to the Illinois Supreme Court (See Group Exhibits G). The Illinois Supreme Court rejected Booker's supplemental petition for leave to appeal. The Illinois Supreme Court's Rejection premised on the same grounds as the First District Appellate Court of Illinois: "hybrid Representation" (See Exhibit H).

Persistent and adamant about preserving his issue for Federal Review, Booker sent his supplemental petition for leave to appeal to the court appointed counsel again with a letter highlighting the fact the Supreme Court suggested that "I have counsel file the petition on my behalf" if Booker wanted the supplemental petition to be filed to preserve his issues. Booker Requested 'again' that appellate counsel file the supplemental petition (See Exhibit I). Court appointed counsel refused again and Returned all documents back to Booker (See Exhibit I).

4C

Additional Page

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

Booker incorporates by Reference the facts, points, arguments, and authority in its entirety in his Motion for Judicial Review, and the Actual ~~Innocence~~/ Miscarriage of Justice section within, as if fully stated herein.

40

E. What was the court's ruling? <u>Denied Post Conviction Relief.</u>

F. Date of court's ruling: <u>September 11, 2015</u>.

G. Did you appeal from the ruling on your petition? <u>Yes.</u> (Pro Se Supplemental Brief was filed and denied, See Additional Pages 4A - 4D)

H. (a) If yes, (1) What was the result? : <u>Affirmed.</u>

(2) date of decision: <u>August 8, 2017.</u>

(b) If no, explain briefly why not: <u>N/A</u>.

I. Did you appeal, or seek leave to appeal this decision to the highest state court? Yes (✓) NO ( ) (Pro Se Supplemental Brief was filed and denied, See Additional pages 4A - 4D)

(a) If yes, (1) what was the result? : <u>Denied.</u>

(2) date of decision : <u>January 18, 2018</u>.

(b) If no, explain briefly why not : <u>N/A</u>.

SA 104

5

2. With Respect to this conviction or sentence, have you filed a petition in a state court using any other form of post-conviction procedure, such as coram nobis or habeas corpus? YES ( ) NO (✓)

A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

1. Nature of proceeding : _N/A_.

2. Date petition filed : _N/A_.

3. Ruling on the petition : _N/A_.

4. Date of Ruling : _N/A_.

5. If you appealed, what was the Ruling on appeal : _N/A_.

6. Date of Ruling on appeal : _N/A_.

7. If there was further appeal, what was the Ruling : _N/A_.

8. Date of Ruling on appeal : _N/A_.

3. With Respect to this conviction or sentence, have you filed a previous petition for habeas corpus in federal court? YES (✓) NO ( )

A. If yes, give name of court, case title and case number: _United States District Court, Northern District of Illinois; Booker v. Hardy, 10 C 3996._

B. Did the court Rule on your petition? If so, state

(1) Ruling : _Dismissed without prejudice for purposes of amendment._

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

(2) date: July 15, 2010

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?

YES ( )   NO (✓)

If yes, explain: __N/A.__

PART III - PETITIONER's CLAIMS

1. State _briefly_ every ground on which you claim that you are being held unlawfully. Summarize _briefly_ the _facts_ supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.

(A) Ground One: __14th Amendment Due Process Violation- Denial of a fair jury trial / Coerced Jury.__

Supporting facts: __The trial court violated Petitioner's due process Rights when the trial court gave the jury a supplemental instruction, "Prim Instruction" after the court had been made aware of the numerical division of guilty versus not guilty, and after the jury announced that neither of jurors wanted to change their votes neither way.__

Pages: 469   Filed: 08/19/2022   Document: 28   Case: 21-2166

Pages: 469

Filed: 08/19/2022    Document: 28    Case: 21-2166

(B) Ground Two: 6th and 14th Amendment Violation—
Ineffective Assistance of Counsel.

Supporting facts: Trial counsel failed to file meritorious
pre-trial motions (Motions to Quash Arrest and Motion
to Suppress Evidence—Line-up Identifications) Petitioner
was illegally arrested without sufficient probable cause
and was illegally detained while detectives went
out on a fishing expedition for evidence to provide
probable cause for the already illegal arrest and
detention, trial counsel had readily available evidence
to support motions. (See Petitioner's attached Motion
for Judicial Review, and Actual Innocence/Miscarriage
of Justice argument within)

(C) Ground Three: 6th and 14th Amendment Violation—
Ineffective Assistance of Counsel.

Supporting facts: Trial counsel failed to file meritorious
pre-trial motion challenging the unnecessary and
unduly suggestive identifications. Petitioner was the
'only' individual in the lineup with braids, where it
was alleged that the shooter in the case had braids;
where Petitioner was suggested to witnesses via
showing "single picture" of Petitioner 'prior to'
conducting line-ups; where detectives coerced
witnesses to identify Petitioner; where one "alleged
witness" was allowed contact with another
witness to tell witness who to identify. (See Petitioner's

8.

attached Motion for Judicial Review, and Actual Innocence/
Miscarriage of Justice argument within)

(D) Ground Four : 6th and 14th Amendment Violation-
Ineffective Assistance of Counsel.

Supporting facts : Trial counsel failed to investigate
and secure the attendance of Monica Ramsey, a
witness listed in the police Reports, a witness who
bear witness to the shooting, viewed a line-up
Petitioner was a participant in and did not identify
Petitioner as the person she observed doing the
shooting ; trial counsel failed to call Monica Ramsey
to testify at trial on Petitioner's behalf. (See
Petitioner's attached Motion for Judicial Review,
and Actual Innocence / Miscarriage of Justice argument
within)

(E) Ground Five: 6th and 14th Amendment Violation-
Ineffective Assistance of Counsel.

Supporting facts : Trial counsel failed to investigate
and call Melissa Westmoreland for the Defense as
a rebuttal witness to contradict or refute the State's
Key witness testimony, Kenneth Williams, testimony
that he argued with Petitioner in Melissa Westmoreland's
presence; when the alleged argument supposedly led
to the shooting death of Charles Rials, the victim
in Petitioner's case ; where the State's Key witness
testified that the person he argued with (Petitioner)

SA 108

9.

shot and killed Charles Rials; and where Westmoreland submitted a statement to detectives telling them that she was informed by "Teda" that Williams argued with another individual, not Petitioner. (See Petitioner's attached Motion for Judicial Review, and Actual Innocence/ Miscarriage of Justice argument within)

(F) Ground Six: 6th and 14th Amendment Violation- Ineffective Assistance of Counsel

Supporting facts: Trial counsel failed to investigate the lead provided by Melissa Westmoreland, on other witness(es)- Belinda "Teda" Brown and Antione Ford, witnesses that was sitting on their front porch and bear witness to the first argument between the state's key witness, Kenneth Williams, and an individual named W.K.; bear witness to the second argument and fight between the state's key witness, Kenneth Williams, and the victim, Charles Rials; bear witness to Kenneth Williams shoot and kill Charles Rials from his living room window. (See Petitioner's attached Motion for Judicial Review, and Actual Innocence/ Miscarriage of Justice argument within)

(G) Ground Seven: 6th and 14th Amendment Violation- Ineffective Assistance of Counsel (Appellate Counsel).

SA 109

18.

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 469

Supporting facts : <u>Trial counsel</u>, who acted as appellate counsel as well, presented **2** issues on direct appeal: <u>Reasonable Doubt/Sufficiency of Evidence and Coerced Jury.</u> After the First District Appellate Court affirmed Petitioner's conviction, counsel continued to represent Petitioner and failed to advance Petitioner's Reasonable Doubt/Sufficiency of Evidence claim in Petition for Leave to Appeal to the Illinois Supreme Court, to preserve this issue for federal review under the standard of Jackson v. Virginia. (See Petitioner's attached Motion for Judicial Review, and Actual Innocence/Miscarriage of Justice argument within)

(H) Ground Eight: <u>6th and 14th Amendment Violation — Ineffective Assistance of Counsel.</u>

Supporting facts : <u>Petitioner contends that the effect of the cumulative prejudice of all the above attorney deficiencies, errors, shortcomings, and or omissions claimed contributed to Petitioner's conviction, Petitioner wishes to have counsel's performance/ Representation evaluated collectively, as a whole, instead of each claim isolated, or to have both evaluations done (isolated and cumulative) on the Ineffective Assistance of Counsel claims presented.</u>

(See Petitioner's attached Motion for Judicial Review, and Actual Innocence/Miscarriage of Justice argument within)

SA 110

(I) Ground Nine: Reasonable Doubt / Sufficiency of Evidence.

Supporting facts: Eyewitness identification testimony was too unreliable to prove petitioner guilty beyond a reasonable doubt where two of the three witnesses (Darnell Brown and Louis Dean) didn't even witness / see the shooting or shooter's face, and the remainder, Kenneth Williams, who was shown a single photo – "a picture" of Petitioner – prior to detectives showing Williams a physical line up; and who newly discovered witness, Antoine Ford, identified as the actual murder of the victim, Charles Rials, along with Rebuttal evidence in Melissa Westmoreland's statement that contradicts Williams' trial testimony that he argued with Petitioner and the person whom he argued with shot and killed Charles Rials.

(See Petitioner's attached Motion for Judicial Review, and Actual Innocence / Miscarriage of Justice argument within)

(J) Ground Ten: Perjured Testimony – Due Process Violation.

Supportin facts: Where the State knew or reasonably should have known that its witness's testimony was false; where the state allowed such testimony to go uncorrected at Petitioner's trial; and where the state knowingly used perjured testimony to procure a conviction: Detective David Evans testified that Louis Dean 'positively' identified Petitioner in a line-up when in actuality Louis Dean did not positively

SA 111

identify Petitioner, but stated Petitioner "looked like the man in the picture detectives showed him; where the State called Louis Dean and elicited a positive in-court identification ~~from~~ when they were fully aware of Dean's identification results from the Assistant State's Attorney who interviewed Louis Dean at the police station, and knew from Louis Dean's Grand Jury testimony that he did not make a positive identification of Petitioner because "he didn't see the shooting, just heard it." (See Petitioner's attached Motion for Judicial Review, and Actual Innocence/Miscarriage of Justice argument within)

(K) Ground Eleven: <u>Police Fabrication of Evidence - Due Process</u>

Supporting facts: <u>Where Chicago police detectives had civilians, who did not witness the shooting that led to the death of Charles Rials to identify Petitioner, Joseph Booker, either through suggestive or coercive means or fabricating police documents ~~to~~ read that witness positively identified Petitioner as the shooter; where detectives, shown 'alleged' witnesses a single photo - "a picture" of Petitioner 'prior to' showing alleged witnesses a physical line-up, all of which led to Petitioner being wrongfully convicted for the shooting death of Charles Rials.</u> (See Petitioner's attached Motion for Judicial Review, and Actual Innocence/Miscarriage of Justice argument within)

SA 112

(L) Ground Twelve : <u>Actual Innocence - Due Process</u>

Supporting facts : <u>Petitioner, Joseph Booker,</u>
<u>presented a free-standing claim of actual</u>
innocence in the <u>state courts,</u> where newly
discovered witness provided exonerating
testimony that Petitioner is actually innocent,
and that state's witness, Kenneth Williams is
the actual murderer of the victim, Charles
Rials; Petitioner presents a "Gateway"
claim of actual innocence to prevent the
occurrence of a fundamental miscarriage of
justice, which may result <u>'If'</u> this Honorable
Court deems ( Irrespective of Petitioner's diligent
effort to preserve his claims) Petitioner's claims
are procedurally defaulted, and didn't review
the merits of Petitioner's claims of Ineffective
Assistance of Counsel, Perjured Testimony, Police
Fabrication of Evidence and the cumulative prejudice
of ineffective assistance of counsel and various
constitutional violations that court appointed
appellate counsel failed/Refused to Raise and
preserve for latter review, claims, all of which
undermines the confidence in the conviction
obtained. ( See Petitioner's attached Motion for
Judicial Review, and Actual Innocence/Miscarriage
of Justice argument within)

14.

Pages: 469     Filed: 08/19/2022     Document: 28     Case: 21-2166

Petitioner, Joseph Booker, incorporates by reference all the facts, points, arguments, and authority, in its entirety, of his Motion for Judicial Review, and the Actual Innocence/Miscarriage of Justice section within, as if fully stated herein in support of Grounds Two through Twelve of Federal Habeas Corpus Petition.

2. Have all grounds raised in this petition been presented to the highest court having jurisdiction? YES (✓) NO ( ) (See Additional Pages 4A-D; Group Exhibits F; Exhibit G)

3. If you answered "NO" to question (16), state briefly what issues were not so presented and why not: <u>N/A</u>.

PART IV - REPRESENTATION

Give the names and address, if known, of each attorney who represented you in the following stages of the judgement attacked herein:

(A) At premliminary hearing: <u>Robert D. Kuzas, 222 N. LaSalle, Suite 200, Chicago, IL 60601.</u>

(B) At arraignment and plea: <u>Robert D. Kuzas, 222 N. LaSalle, Suite 200, Chicago, IL 60601.</u>

(C) At trial: <u>Robert D. Kuzas, 222 N. LaSalle, Suite 200, Chicago, IL 60601.</u>

(D) At sentencing: <u>Robert D. Kuzas, 222 N. LaSalle, Suite 200, Chicago, IL 60601.</u>

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 469

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

(E) On appeal: Robert D. Kuzas, 722 N. LaSalle, Suite 200, Chicago, IL 60601,

(F) In any post conviction proceeding: Pro Se; Vanessa Herman (1st PC Appeal); Bryon M. Reina (2nd PC Appeal)

(G) Other (state): N/A

PART V - FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( ) NO (✓)

Name and location of the court which imposed the sentence: N/A.

Date and length of sentence to be served in the future: N/A.

WHEREFORE, petitioner prays that the Court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: October 11, 2018

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Joseph Booker

Joseph Booker
B75795
P.O. Box 1000
Menard, IL 62259

16.

SA 115

# TABLE OF EXHIBITS

Group Exhibits #1 - Supplemental Brief for PC Appeal

Exhibit A - Correspondence sent to Appellate counsel

Exhibit B - Correspondence from Appellate counsel

Exhibit C - Appellate Court Order denying supplemental brief on grounds of hybrid representation

Exhibit D - (Group) - Appellate Court Order affirming Circuit Court's denial of Post Conviction ████ Relief

Exhibit D4 - Canvass - Monica Ramsey's statement

Exhibit E - Appellate Court Order denying petition for rehearing

Exhibit F - Correspondence from Appellate counsel attached to PLA Supplemental brief

Exhibits F5 & F6 - September 10, 2008 Line up Results

Exhibits G - (Group) Supplemental Petition for Leave to Appeal

Exhibits G8 & G9 - Detectives Supplemental Reports

Exhibit H - Correspondence from Clerk of the Illinois Supreme Court

Exhibit I - Correspondence from Appellate Counsel

Exhibits Ls - Excerpts of Kenneth Williams' trial testimony

1 of 2

SA 116

## TABLE OF EXHIBITS

Exhibits M3 - Excerpts of Darrell BROWN's trial testimony

Exhibit Q4 - Excerpt of Detective David Evans trial testimony

Exhibit R1-R3 - Sworn Affidavit of Ellen Anderson

Exhibit #2 - Illinois Supreme Court denial of PLA

Exhibit #3 - Verification of properly filed WRIT of CERTIORARI

Exhibit #4 - U.S. Supreme Court denial of WRIT of CERTIORARI

Exhibits #5 - Correspondence and Article on "Basement File"

Exhibits #6 - Handwritten Statement of Melissa Westmoreland

Exhibits #7 - Excerpts of AntVone Ford's Affidavit & Testimony

Exhibits #8 - Excerpts of Statement of facts/ Trial testimony of Kenneth Williams / Darrell BROWN / and Louis Dean

Exhibits #9 - Excerpts of Joseph Booker's testimony

Exhibits #10 - Louis Dean's Handwritten Statement

Exhibits #11 - Denise Miles' Sworn Affidavit

Exhibits #12 - Joseph Booker's Sworn Affidavit

Exhibits #13 - Unapproved line up Results - Concealed in the "Basement File"

2.

SA 117

Case: 1:10-cv-03995 Document #: 19 Filed: 10/25/18 Page 26 of 209 PageID #:375

Group Exhibit

Nos.: 1-13-0177, 1-13-2279, 1-15-2995
Consolidated.

FILED
APPELLATE COURT 1ST DIST.
OCT 0 6 2016
STEVEN M. RAVID
CLERK

IN THE

Appellate Court of Illinois
First District

People of the State of Illinois,
    Respondent-Appellee,

Appeal from the Circuit
Court of Cook County, Illinois

-vs-

No. 02 CR 25224

Honorable
Arthur F. Hill Jr.,
Judge Presiding.

Joseph Booker,
    Petitioner-Appellant.

Motion For Leave to File A Supplemental Brief

Now Comes Petitioner-Appellant, Joseph Booker, pro se, respectfully bringing the instant motion for leave to file a supplemental brief asking permission to file a supplemental brief in the consolidated appeal of Appellate Court Numbers: 1-13-0177, 1-13-2279, and 1-15-2995 for purposes of adjudication, and preserving

12

SA 118

Group Exhibit #1

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

the list of Post Conviction issues for latter review.

In Support of the instant motion, Petitioner-Appellant states the following:

Although, Generally, Illinois Courts does not allow hybrid Representation, however Petitioners does not have an absolute or constitutional right to counsel in post conviction proceedings. See Coleman v. Thompson, 501 U.S. 722; Pennsylvania v. Finley, 481 U.S. 551.

In an instance, as is in the case sub judice, where the court appoint counsel for Post Conviction appeal, and Post Conviction Appellate Counsel chooses to bypass certain issues that was initially raised in Petitioner's Post Conviction Petitions, the Petitioner would bear the obligation and duty to "fairly present" his claims through State Court proceedings to prevent a procedural default of those claims, See Wainwright v. Sykes, 433 U.S. 72, because Petitioner can not point to the deficiencies in post conviction counsel's Representation as cause for failure to exhaust

(13)

SA 119

Group Exhibit #1

his state court Remedies. Coleman v. Thompson, 501 U.S. 722.

In further support, Appellant states:

1) Petitioner-Appellant was tried by jury, and found guilty of the shooting death of Charles Rials on August 20, 2003;

2) Petitioner-Appellant was sentenced to 30 years for the first degree murder of Charles Rials, and 25 years for personal discharge of a firearm that caused the death of Charles Rials, consecutively, on October 3, 2003;

3) Petitioner-Appellant appealed his conviction, and his conviction was affirmed on September 22, 2005;

4) The Supreme Court denied Petitioner-Appellant leave to Appeal to the Supreme Court January 25, 2006;

5) Petitioner-Appellant filed a timely Post Conviction petition in the first district Circuit Court on May 31, 2006; June 16, 2006 his petition was summarily dismissed as frivolous and patently without merit;

6) Petitioner-Appellant appealed the Circuit Court's dismissal of his Post-Conviction petition under Appellate Court number: 1-06-2581;

GROUP Exhibit #1

7) This Honorable Court Reversed and Remanded Petitioner-Appellant's Post Conviction petition back to the Circuit Court for further proceedings under the Post Conviction Hearing Act;

8) In the midst of second stage proceedings under the post conviction hearing act Petitioner-Appellant elected to proceed pro se, Petitioner-Appellant filed an amended Post Conviction petition on January 21, 2010 which was stricken due to hybrid representation;

9) The January 21, 2010 Amended Post Conviction petition was Re-filed on February 17, 2011, along with a Supplemental Post Conviction petition that was initially filed on January 13, 2011, after the court appointed attorney filed the Requested motion to withdraw as counsel;

10) Petitioner-Appellant's Amended and Supplemental Post Conviction petitions was dismissed, the Circuit Court Refused to Recognize the fillings, no Reason/explanation was provided for the dismissal of these petitions;

11) The State filed a motion to dismiss the first stage PC petition that was filed on May 31, 2006, and chose what issues they wanted to Respond to and not Petitioner-Appellant's petition in its entirety or as pleaded;

SA 121

Group
Exhibit #1

12) Petitioner-Appellant filed a Response to the issues that the State chose to file a responsive pleading to in their motion to dismiss;

13) After filing a responsive pleading to the State's motion to dismiss Petitioner-Appellant filed 2 motions for Forensic Testings under 725 ILCS 5/116-3, in regards to cartridge cases and a baseball hat that was recovered from the crime scene, the 116-3 proceedings took precedent over the post conviction petition proceedings;

14) An evidentiary hearing was conducted in regards to the 116-3 issues, and the Circuit Court ultimately dismissed both motions;

15) Second stage oral arguments was conducted in regards to the Post Conviction petition proceedings, where the Circuit Court ultimately dismissed Petitioner-Appellant's ineffective assistance of counsel claims, thereafter, Petitioner-Appellant's actual innocence claim was advanced to the third stage proceedings (Evidentiary Hearing);

16) Prior to conducting the evidentiary hearing on the actual innocence claim Petitioner-Appellant was tendered an investigative file on his case, that was hidden away in a basement at the 51st and Wentworth Police Station, on December 8, 2014;

16

SA 122

GROUP Exhibit #1

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

17) Petitioner-Appellant reviewed the file and discovered documents containing information he was unaware of, and exculpatory in nature, evidence that further substantiated Petitioner-Appellant's claim of ineffective assistance of counsel and further supported Petitioner-Appellants claim of actual innocence;

18) Petitioner-Appellant filed a 2nd Amended/Supplemental PC petition Requesting Reconsideration of ineffective assistance of counsel claims, and to add newly discovered witness Antione Ford to Petitioner-Appellant's actual innocence claim;

19) The Circuit Court denied an evidentiary hearing on the ineffective assistance of counsel claims, but granted to broaden the evidentiary to hear testimony from newly discovered witness Antione Ford in Respects to Petitioner-Appellant's actual innocence claim, along witness Ellen Anderson;

20) The Circuit Court dismissed Petitioner-Appellant's actual innocence claim, ultimately dismissed Petitioner-Appellants Post Conviction petition in its entirety at this point, on September 11, 2015;

21) Petitioner-Appellant presented a total of 13 issues via the above named Post Conviction petitions, i.e., initial, 2 amended, 1 supplemental;

17

SA 123

GROUP Exhibit #1

22) Petitioner-Appellant filed a timely notice of appeal, the Circuit Court appointed the First District Appellate Defenders Office to Represent Petitioner-Appellant;

23) On June 9, 2016 Petitioner-Appellant received a legal call from Mr. Bryon M. Reina, Appellate Defender appointed to Petitioner-Appellant's case;

24) The Appellate Defender indicated that he wanted to only proceed with 2 of the 13 issues, those issues being: the forensic issue pertaining to the destruction of evidence of the cartridge cases recovered from the crime scene, and Petitioner-Appellant's actual innocence claim, but before counsel and Petitioner-Appellant could get to the point of deciding how to proceed the legal call was cut short by correctional staff and counsel assured that he would arrange another legal call so that we could finish our discussion for the following Tuesday, June 14, 2016;

25) Petitioner-Appellant wrote Attorney Reina a letter explaining his position and expressed his desire to have all of his issues raised and preserved for latter review, if need be (See Group Exhibit A, 7 page correspondence);

26) On June 14, 2016 counsel, via legal call, re-iterated his position to only advance 2 of the 13 issues; counsel stated that he would read Petitioner-Appellant's correspondence and respond to that correspondence;

SA 124

Group Exhibit #1

27) Appellate counsel did in fact respond to Petitioner-Appellant's correspondence prior to Appellant proceeding with the instant Supplemental Brief (See Group Exhibit B, 2 page correspondence);

28) Appellate counsel's position did not change in Regards to the Remainder of Petitioner-Appellant's issues, and so the instant motion and supplemental brief follows.

Petitioner-Appellant, Joseph Booker, PRo se is putting forth diligent effort to fulfill his obligation and duty to present ("fairly present") the claims that Post Conviction Appellate Counsel chose to bypass; and to prevent his claims from procedural defaults on latter Review.

WHEREFORE, Petitioner-Appellant respectfully request that this Honorable Court grant his motion to Supplement counsel's Post Conviction appeal brief for the Reasons highlighted above.

Respectfully Submitted,

Joseph Booker

Joseph Booker, Pro se
B75793
P.O. Box 112
Joliet, IL 60434

Pages: 469   Filed: 08/19/2022   Document: 28   Case: 21-2166

19

Group Exhibit #4

Nos. : 1-13-0177, 1-13-2279, 1-15-2995
Consolidated.

IN THE
Appellate Court of Illinois
First District

People of the State of Illinois,
        Respondent-Appellee,

Appeal from the Circuit
Court of Cook County, Illinois

—vs—

No. 02 CR 25224

Joseph Booker,
        Petitioner-Appellant.

Honorable
Arthur F. Hill Jr.,
Judge Presiding.

## ORDER

—— Allowed    OR    Denied ——

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

Exhibit A       Exhibit A    6-9-16

Pages: 469   Filed: 08/19/2022   Document: 28   Case: 21-2166

Joseph Booker
B75795
P. O. Box 112
Joliet, IL 60434

To: Mr. Bryon M. Reina
    Assistant Appellate Defender

RE: People v. Joseph Booker
    Cook County No.: 02 CR 25224
    App. Ct. Nos.: 1-13-0177, 1-13-2279, 1-15-2995
      (Consolidated)

Notice: Please take notice that this correspondence has been
    Carbon Copied / Photocopied.

Dear Mr. Reina,

    If you don't mind, I'd like to get straight
to the point about my post conviction issues.

    In regards to my post conviction issues, those
being from the (2) 116-3 motions; from my initial
filed PC petition; my (2) Amended PC petitions; and
my Supplemental PC petition, I'm going need
you to raise all of my issues for the purpose of
preserving my issues for Federal Review, 'if'
things were to go that far.

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 469

Exhibit A                                    Exhibit A

of my actual Innocence claim, but "if" that was to happened just envision where that would leave me, in the penitentiary for the next 42 years for a crime I didn't even commit. I'm not at liberty to just dispose of the remainder of my issues to pursue a favorable ruling on one issue that is not cognizable for latter review, there's no guarantee of a favorable ruling.

I'm sorry Mr. Reina I cannot and will not allow these meritorious issues to be barred from review by the Federal Courts due to procedural defaults. I satisfy the 2 prong test of Strickland v. Washington with a show of evidence, and my trial attorney who acted as my appellate attorney, his ineffectiveness contributed to me being convicted. That's just to name one of the many issues that have merit.

I know I have alot of Issues, and I'm familiar with the Court's Rule in regards to the page limitation, but if you file a motion requesting an extention on the page limitation for the purpose of raising all of my Post Conviction issues and preserving those issues for latter review and I believe the court will

3 of 7     ㉒     SA 128

Exhibit A

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

grant said motion. By Rule this motion is acceptable, and this is one of those instances where this particular motion should be filed on the client's behalf.

Now, Mr. Reina I have a total of 13 issues and I'm telling you, as my Appellate Attorney, I want all 13 of my issues presented to the appellate court for Review, and for the purpose of preserving my issues.

I have (7) issues that were dismissed without reason and or explanation, those issues are:

1) Appellate Counsel was ineffective for failing to raise Petitioner's sufficiency of evidence issue in Petition for Leave to appeal to the Illinois Supreme Court (See supplemental Petition for this claim);

2) Reasonable Doubt / Sufficiency of Evidence (See Supplemental Petition for this claim);

3) Trial counsel failed to file meritorious pretrial motion challenging the unnecessary and unduly suggestive identifications (See 1st Amended Petition, January 2010);

4 of 7    ㉓

SA 129

Exhibit A

4) Trial Counsel was ineffective for failing to object to known perjured testimony
(See 1st Amended Petition, January 2010)

5) Perjured Testimony (See 1st Amended Petition, January 2010)

6) Police Fabrication of Evidence
(See 1st Amended Petition, January 2010)

7) Cumulative Prejudice of all Counsel's errors
(See 1st Amended Petition, January 2010)

According to the recent authority of People v. Sean Tyler, 2015 IL APP (1st) 123470, 39 N.E. 3d 1042, 396 Ill. Dec. 216, these issues are subject to De Novo Review, irrespective of the fact these issue were dismissed without reason/explanation, and the Post Conviction Court is not entitled to any deference upon review of these issues.

Next are the issues that were dismissed without being advanced to an evidentiary (2nd Stage Dismissals):

1) Counsel's failure to file pretrial motions to quash arrest and suppress line-up identifications
(See Initial filed PC petition, 1st Amended Petition, Petitioner's Response to State's Motion to Dismiss, and 2nd Amended Petition);

5 of 7   24

SA 130

Exhibit A

2) Counsel's failure to investigate and call Melissa Westmoreland and Monica Ramsey
(See Initial filed PC petition, 1st Amended Petition, Petitioner's Response to the State's Motion to Dismiss, and 2nd Amended Petition);

3) Counsel's failure to investigate ~~call~~ the lead on other witness - Bettinda "Teda" Brown and Antione Ford
(See 2nd Amended Petition)

As you know Sir these issues are subject to a de novo standard of review as well.

Okay now the next issues, 3 to be exact, were dismissed after evidentiary hearings. First was the (2) 116-3 motion issues dealing with the forensic testings of the baseball hat and shell casings found on the scene; and Second was my actual innocence claim - the testimonial evidence of Ellen Anderson and Antione Ford. Of course you know these issues are subject to the manifestly erroneous standard of review.

6 of 7          (25)          SA 131

Exhibit A                                    Exhibit A

Well, Mr. Reina these are my issues Sir, I would like to have all of my issues raised and preserved. I believe that to consolidated these appeals was the best way to proceed. I believe the appellate will grant our motion for extention on the page limitation due to the fact this is a consolidated appeal, and due to the number of Post Conviction issues.

If you oppose my request to present all of my issues to the appellate Court for Review, for the reasons highlighted above, Please let this be known: your position and the reason for your position, so that I can do what I need to do to preserve my issues. I do not wish to waive any of my issues, I do not wish to have any of my issues procedurally defaulted and barred from Federal review.

I Respectfully request Mr. Reina, that you inform me of your decision in a reasonable amount of time so that I can be timely and effective in getting my issues preserved.

I extend my most sincere gratitude to you for your assistance with my case, and with the matter addressed in this letter. Thank you very much.

Respectfully,

*Exhibit B, 1 of 2*

# OFFICE OF THE STATE APPELLATE DEFENDER
## FIRST JUDICIAL DISTRICT

203 North LaSalle Street • 24th Floor
Chicago, Illinois 60601
Telephone: 312/814-5472 • Fax: 312/814-1447
www.state.il.us/defender • E-mail: 1stDistrict@osad.state.il.us

June 27, 2016

MICHAEL J. PELLETIER
STATE APPELLATE DEFENDER

PATRICIA MYSZA
DEPUTY DEFENDER

BARBARA C. KAMM
ASSISTANT DEPUTY DEFENDER

_____

BRYON M. REINA
ASSISTANT APPELLATE ATTORNEY

Mr. Joseph Booker
Register No. B75795
Stateville Correctional Center
P.O. Box 112
Joliet, IL 60434

RE:   *People v. Joseph Booker*
      Cook County  No. 02 CR 25224
      Appellate Court No. 1-15-2995

Dear Mr. Booker:

     I've read the two letters you sent me after our first phone conversation on June 9, 2016, and understand you would like to preserve your ineffective assistance and perjury claims for a federal *habeas* petition. Even if I do not raise those claims on appeal, you may still be able to preserve them for federal review.

     In *U.S. ex rel. Smith v. Pfister*, 2013 WL 1568063, the defendant filed a *pro se* post-conviction petition in Illinois raising claims of actual innocence and ineffective assistance of counsel. *Pfister*, 2013 WL 1568063 at 4, 8. On appeal, appellate counsel raised only the actual innocence claim. *Id.* at 8. The defendant then filed a motion to discharge counsel and proceed *pro se*, which was denied. *Id.* Thereafter, defendant moved to file a supplemental *pro se* brief raising the ineffective assistance claims, which was also denied. *Id.*

     On appeal, the federal district found the defendant's attempts to file a *pro se* supplemental brief was sufficient to preserve his ineffective assistance claims for federal review. *Pfister*, 2013 WL 1568063 at 9. Specifically, the court held:

> [The defendant's *pro se*] motions were timely filed in the appropriate court, and [his] motions and the accompanying briefs present the operative facts and controlling federal legal principles governing his ineffective assistance claims. [The defendant's] motions do not appear to have been filed "to frustrate the efficient administration of the judicial process," but rather to raise and preserve issues that would otherwise be waived by appointed counsel's refusal to address these

Filed: 08/19/2022 Pages 99

Case: 21-2166    Document: 28

*Exhibit B, 2 of 2*

issues in the opening brief. It is not at all uncommon for a party to discharge counsel and proceed with new counsel or *pro se*. Nor is this court able to locate authority firmly establishing a bar to filing a supplemental brief on appeal. Like [the defendant in] *Kizer*, [the defendant here] raised his claims "using a method that would allow the court, in its discretion, to consider federal claims of unconstitutionality.

*Id.*; *see also United States ex rel. Murithi v. Butler*, 2015 WL 1399511, 8 (finding defendant properly exhausted ineffective assistance claims in the state court by filing a *pro se* supplemental brief in the Illinois Supreme Court raising them, even though leave to file the *pro se* brief was denied); *Kizer v. Uchtman*, 165 Fed. Appx. 465, 467 (7th Cir.2006) (holding that because the state court had discretion to allow hybrid representation, petitioner's attempt to file a supplemental *pro se* brief had "raised issues using a method that would allow the court, in its discretion, to consider federal claims of unconstitutionality").

Further, if the federal court declines to follow the above-cited cases and finds that your ineffective assistance claims are procedurally defaulted, you can attempt to overcome that procedural bar by showing that a failure to grant you relief would result in "a fundamental miscarriage of justice." *Pfister*, 2013 WL 1568063 at 12; *Gonzales v. Mize*, 565 F. 3d 373, 381 (7th Cir. 2009). An allegation of a fundamental miscarriage of justice is "a claim that the constitutional deprivation probably has resulted in a conviction of one who is actually innocent." *Pfister*, 2013 WL 1568063 at 12. Thus, you could try to use your actual innocence as a "gateway" to overcoming forfeiture and raising ineffective assistance claims. The Supreme Court of the United States has held that "a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims (here, ineffective assistance of counsel) on the merits notwithstanding the existence of a procedural bar to relief." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013).

Of course, none of that will be necessary if we can win a new trial on appeal. I firmly believe that your best chance of doing that is to present your actual innocence claim as clearly and convincingly as possible. By raising 13 or so additional issues that lack merit (I understand we disagree about the merits of your ineffective assistance and perjury claims, but for whatever it's worth three attorneys have now reviewed them and each have come to the same conclusion), you are detracting from your meritorious and strong innocence claim.

I hope you are doing well. Please feel to write me if you should have any further questions.

Sincerely,

BRYON M. REINA
Assistant Appellate Attorney

SA 134

Exhibit C

1-13-0177

## IN THE APPELLATE COURT OF ILLINOIS
### FIRST JUDICIAL DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,　)
　　　　Plaintiff-Appellee,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　v.　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
JOSEPH BOOKER,　　　　　　　　　　)
　　　　Defendant-Appellant.　　　　　　)

**ORDER ENTERED**

OCT 1 2 2016

APPELLATE COURT FIRST DISTRICT

## ORDER

　　This cause coming to be heard on defendant-appellant's pro se Motion for Leave to File a Pro Se Supplemental Brief Instanter. The Office of the State Appellate Defender filed an opening brief on September 21, 2016, and the Appellee's Response Brief is due on or before October 26, 2016. The Court being fully advised in the premises;

　　**IT IS HEREBY ORDERED** that defendant-appellant's pro se Motion for Leave to File a Pro Se Supplemental Brief Instanter is ~~ALLOWED~~/DENIED *because of representation by Counsel.*

Enter:

_____
Justice

_____
Justice

_____
Justice



SA 135

Filed: 08/19/2022　Pages: 469

Case: 21-2166　Document: 28



*Graip Exhibits* (1-12)

**NOTICE**
This text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

2017 IL App (1st) 130177-U

Nos. 1-13-0177, 1-13-2279 & 1-15-2995 (cons.)

Order filed August 8, 2017

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
|     Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 02 CR 25224 |
| JOSEPH BOOKER, | ) ) | The Honorable Arthur F. Hill, |
|     Defendant-Appellant. | ) ) | Judge, presiding. |

PRESIDING JUSTICE HYMAN delivered the judgment of the court.
Justices Neville and Pierce concurred in the judgment.

ORDER

*Held*: The trial court's denial of defendant's postconviction petition after a third-stage evidentiary hearing was not against the manifest weight of the evidence where one witness recanted her affidavit supporting the petition and the trial court found a second witness was not credible; trial court's denial of defendant's request to test the five bullet casings for DNA was not manifestly erroneous.

¶ 2       On direct appeal, this court affirmed defendant Joseph Booker's conviction for murder.

Booker filed a postconviction petition asserting actual innocence based on an affidavit from a

witness stating she saw who shot the victim, and it was not Booker. This court reversed and

SA 136

1-13-0177

remanded for further proceedings the trial court's summary dismissal of the petition. In this appeal, Booker argues actual innocence because the evidence implicating the shooter exonerates him and would change the result on retrial. Booker also contests the trial court's denial of his request for DNA testing, which he maintains, "has the potential to produce noncumulative evidence materially relevant to [his] actual innocence claim."

The trial court conducted a full postconviction evidentiary hearing. Based on this record, the trial court's decision was not against the manifest weight of the evidence. Additionally, the trial court's denial of the request to test the five bullet casings for DNA was not error.

<center>Background</center>

In September 2002, Charles Rials was fatally shot while walking in the Wentworth Gardens Housing Development, Chicago. Police arrested Booker the next day after three eyewitnesses identified him as the shooter. The eyewitnesses, all of whom testified at Booker's trial, were Kenneth Williams and Darnell Brown, both Black Gangster Disciples, and Louis Dean, 13-years-old on the night of the shooting.

Kenneth Williams knew Booker from having seen him multiple times at Wentworth Gardens over the previous three months. Booker drove a blue, four-door Pontiac Grand Prix and often visited Melissa Westmoreland, who lived there. On the evening of September 8, Williams was standing with some friends across the street from Westmoreland's house when Booker arrived with several friends. Booker's group argued with Williams and his friends before going into Westmoreland's house. A short time later, Booker and his friends came outside, resumed arguing, and then drove away. Booker returned minutes later with a gun and walked up to Rials who was walking down the street. Williams saw Booker point the gun at Rials and shoot him in

<center>-2-</center>



Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

1-13-0177

the head. Booker then stood over Rials and shot him several more times, before running away. The next day, Williams spoke to the police and identified Booker in a lineup.

¶ 7        Darnell Brown testified that around 11:00 p.m. on September 8, he was walking with Rials down 38th toward Williams who was sitting on some steps. Brown stopped to talk to someone and Rials kept walking. Brown heard a gunshot and started walking toward the sound. Brown heard four more gunshots and then saw Booker with a gun standing next to Rials, putting the gun away on his hip. Booker got into a Grand Prix and drove away. Five days later, Brown went to the police station and identified Booker in a lineup.

        Louis Dean lived at Wentworth Gardens with his parents and grandmother. On the night of the shooting Dean was in his second-floor bedroom watching television. He looked out of his window and saw Rials, whom he knew from the neighborhood. Dean saw Booker walk up behind Rials and shoot him. After Rials fell, Booker stood over him and fired additional shots. Two days later, Dean identified Booker from a lineup as the shooter. On cross-examination, Dean admitted he gave a signed statement to an Assistant State's Attorney and a Chicago detective that he heard the first shot, but did not see it. Dean also stated he did not remember telling the Grand Jury that he did not know where the shots came from. Dean testified that his previous statement was incorrect and that he was telling the truth when he testified that he actually saw Booker shoot Rials.

¶ 9        Physical evidence recovered at the scene included a baseball cap, CTA transit card, five cartridge cases, four metal fragments, and a blood specimen from the sidewalk. A Chicago Police Department forensic investigator identified five bullet casings found at the scene as Winchester .40-caliber Smith and Wesson pistol ammunition fired from the same gun. No gun was recovered.

SA 138

1-13-0177

¶ 10       During deliberations, the jury sent two notes to the trial court indicating a deadlock. A jury convicted Booker after being given the *Prim* instruction.

¶ 11                          Appeal No. 1-03-3533

¶ 12       On direct appeal, this court affirmed Booker's conviction, rejecting his arguments that the eyewitness testimony was unreliable and that the trial court erred by giving the *Prim* instruction. This court held that the identifications were not so "vague or doubtful that no rational jury could have concluded that defendant committed the offense of first degree murder." *People v. Booker*, 1-03-3533 (2005) (unpublished order under Illinois Supreme Court Rule 23).

¶ 13                          Appeal No. 1-06-2581

¶ 14       On May 31, 2006, Booker filed a postconviction petition asserting both trial counsel and appellate counsel were ineffective; the State engaged in prosecutorial misconduct by withholding a material witness and information from the defense; and newly discovered evidence proved his actual innocence, attaching the affidavit of Ellen Anderson.

¶ 15       Anderson stated in her affidavit that around 11:05 p.m. on September 8, 2002, she was visiting Wentworth Gardens when she saw Williams, Brown, and a third man whom she did not know. Anderson had a conversation with Brown while Williams and the other man began to walk away. Anderson heard a gunshot and saw the other man lying on the ground. Anderson then saw Williams approach the man on the ground and shoot him several more times. Afterward, as Anderson ran to catch a cab, Brown followed, threatening her, and telling her to "keep [her] mouth shut."

¶ 16       The trial court summarily dismissed the petition. Booker appealed and this court reversed. *People v. Booker*, No. 1-06-2581 (2008) (unpublished order under Supreme Court Rule 23). We

-4-     ㉜

1-13-0177

found Anderson's proffered testimony "material to the issue of whether defendant shot Rials," not cumulative of the evidence presented at trial, and of such a conclusive nature that it would "probably change the result on retrial." *Id.* at 4. Moreover, although three eyewitnesses identified defendant as Rials' murderer, Anderson's affidavit suggested that Williams and Brown were motivated to fabricate their accounts. *Id.* Further, the third witness, Dean, did not actually see the shooting. This court concluded that "this testimony, considered in conjunction with Anderson's proffered account of the incident provide[d] weak evidence of [Booker's] guilt." *Id.* at 6. Thus, we remanded for further proceedings.

¶17       The trial court granted the State's motion to dismiss finding Booker's ineffective assistance of trial counsel claims could have been raised in his direct appeal. The trial court ordered a hearing on the actual innocence claim in Booker's petition. In September 2014, the State informed the trial court that Anderson had recanted her affidavit and given a videotaped statement to that effect.

¶18       In December 2014, the State tendered recently discovered reports from the Chicago Police Department relating to its investigation of the murder. Among the reports was a handwritten statement from Westmoreland that Booker was at her house, left about 1/2 hour before she heard gunshots, and that another neighbor told her that Williams and "W.K" were arguing before the shooting. After viewing these documents, Booker filed a motion to reconsider the trial court's order granting the State's motion to dismiss. Attached to his motion was a signed statement from Ford, dated December 12, 2014, that on September 8, 2002, Ford was with his fiancé on her porch next door to Westmoreland's house and that around 6:30 or 7:00 p.m. he saw Booker arrive

SA 140

1-13-0177

there and go inside. Ford also saw Williams and 15 to 20 other Gangster Disciples "drinking and smoking weed" across the street.

¶ 19     Around 10:00 or 10:15 p.m., Ford saw Booker leave Westmoreland's and drive away. About 15 or 20 minutes later, Ford saw Rials arrive. Ford saw Rials and Williams arguing, and a short time later saw Williams shoot Rials in the head and again while he was on the ground. Ford also stated that he spoke to the police on the night of the shooting and told them he had only heard shots but had not seen anything because he knew Williams saw him outside and he was afraid for himself and his family.

¶ 20     The trial court denied Booker's motion to reconsider and advanced Booker's actual innocence claim to a third-stage evidentiary hearing. At the hearing, Anderson, Ford, and Booker testified. Booker testified that he did not shoot Rials, and that the only people he knew at Wentworth Gardens were Westmoreland and her family.

¶ 21     Anderson testified that her sworn affidavit stating she saw Williams shoot Rials was false, but she signed it because she loved Booker and did not want to see him in prison. Sporadically over 10 years, she and Booker had been in a romantic relationship but they were not dating in 2002. In 2003, she learned that Booker was in prison, and in 2005, Booker's mother called her. Anderson went to visit Booker in prison about 10 times but never talked to him about the case. Anderson thought he was innocent

¶ 22     Ford testified that he belonged to the Black Disciples gang until 2001, and at the time of the hearing was serving a 60-year sentence for an unrelated murder and armed robbery. His testimony and his affidavit were essentially the same. Ford added that he had talked to the police on the night of the shooting but denied seeing anything because he was afraid for himself, his

-6-

(34)

SA 141

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

1-13-0177

fiancé, and her three children. According to Ford, he saw Williams shoot Rials with a pistol as Rials was attempting to walk away from Williams. On cross-examination, Ford stated the shooting occurred in the middle of the street.

¶ 23       The trial court denied Booker's petition, noting that Anderson testified that her affidavit was "a lie, that she was not out there, that she did not see any shooting, that she had had a relationship with [petitioner] and she felt badly for him, she wanted to help him." The trial court also noted that Ford's credibility was doubtful and that Booker "of course" denied committing the murder.

¶ 24       Booker requests reversal of the third-stage denial of his petition asserting his innocence and remand for a new trial.

¶ 25                                        Forensic Testing

¶ 26       Booker filed a *pro se* motion for forensic testing, requesting DNA and fingerprint testing on the recovered cartridge casings. 725 ILCS 5/116.1, *et seq.* (West 2012). The State objected based on Booker's inability to meet his burden of establishing that the evidence had been properly preserved. 725 ILCS 5/116-3 (West 2012). At the hearing on the motion, Illinois State Police latent fingerprint examiner Christy Fischer testified she tested the five cartridge casings in 2002. Fischer wore latex gloves, a coat, and eyewear but did not cover her mouth because it was not "common practice" to do so. Had DNA testing been initially requested, it would have been done before other testing.

¶ 27       The technician who conducted "firearms analysis" of the casings did not wear gloves or protective face-wear when handling the casings. Two other technicians handled the casings while

35

1-13-0177

processing them. And the casings were sent to a state police lab in Carbondale where technicians would also have handled them without protective gear.

¶ 28    DNA expert Greg Didomenic testified he reviewed the lab reports pertaining to the shell casings. Didomenic opined that the small size of the cartridge casings and the fact that several persons handled the casings without protective gear meant that the casings were "potentially contaminated." Didomenic would not expect to find "meaningful DNA" on the casings. Had "clean technique" precautions been taken, getting DNA evidence would have been more likely.

¶ 29    The trial court found that (i) DNA testing was not requested in 2002, (ii) Illinois State Police followed procedures in place for the requested tests, and (iii) any destruction of the DNA evidence was not malicious. Accordingly, the court held that "DNA testing would not yield probative results in this case," and denied Booker's motion.

¶ 30    Analysis

¶ 31    The Due Process Clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. 1, § 2) affords postconviction petitioners the right to assert a claim of actual innocence based on newly discovered evidence. *People v. Parker*, 2012 IL App (1st) 101809, ¶ 80. To succeed on a claim of actual innocence, a petitioner must present: (i) evidence that has been discovered since the trial and could not have been discovered earlier through due diligence. *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009); (ii) which is relevant and probative of the petitioner's innocence ("material") and adds to the evidence which the jury heard (noncumulative); and (iii) of such a conclusive character that it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96. "Probability" is the key, not certainty, because the trial court predicts what another jury would likely do, considering the new and the old evidence together. *Id.* ¶ 97.

SA 143

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

1-13-0177

¶ 32     At the second stage of postconviction proceedings, the trial court takes all well-pleaded facts that are not positively rebutted by the trial record as true. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Here the trial court not only had Anderson's affidavit before it, but also Ford's signed statement attached to Booker's motion. In ordering the evidentiary hearing, the trial court explicitly stated that Ford's testimony was needed.

¶ 33     At a third-stage evidentiary hearing, the trial court must determine whether the evidence introduced demonstrates that the petitioner is entitled to relief under the Act. *People v. Domagala*, 2013 IL 113688, ¶ 34. The trial court serves as a fact finder and determines the credibility of witnesses, weighs testimony and evidence, and resolves any evidentiary conflicts. *Id.* New evidence produced at the postconviction stage need not exonerate the defendant. This is a comprehensive approach and involves credibility determinations that are uniquely appropriate for the trial judge. *Coleman*, 2013 IL 113307, ¶ 97.

¶ 34     We must decide whether the trial court committed manifest error by determining that the evidence was not conclusive enough to "probably" change the result on retrial. See *id.*, ¶¶ 1, 104. Where fact-finding and credibility determinations are involved, we will not reverse the trial court's decision unless it is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23; *People v. Beaman*, 229 Ill. 2d 56, 72 (2008) (quoting *People v. Morgan*, 212 Ill. 2d 148, 155 (2004) ("Manifestly erroneous" means the trial court's error is "clearly evident, plain, and indisputable.").

¶ 35     Ford did not come forward until December 2014, more than 12 years after the shooting, while incarcerated for an unrelated murder. Booker attempts to justify the lengthy delay by arguing Ford feared retaliation from Williams' gang, and that Ford was unaware of Booker's real

Pages: 469  Filed: 08/19/2022  Document: 28  Case: 21-2166

SA 144

1-13-0177

name. But Ford was imprisoned in 2004 and waited until 2014 to make his statement. This delay alone raises questions as to Ford's credibility. "The omission of a witness to state a particular fact under circumstances rendering it likely that he would state that fact, if true, may be shown to discredit his testimony as to such fact." *People v. Brown*, 47 Ill. App. 3d 920, 928-29 (1977). Although couched in terms of impeachment of a witness at trial, this principle impairs Ford's credibility as a witness. See *People v. Fabran*, 42 Ill. App. 3d 934, 938 (1976).

¶ 36    Additionally, Ford's status as a convicted felon adversely affected his credibility. See *People v. Montgomery*, 47 Ill. 2d 510, 516 (1971) (test used to determine admissibility of witness's prior conviction). The trial court read Ford's statement, heard him testify about what he observed in 2002, and was the ultimate arbiter of Ford's credibility.

¶ 37    Similarly, Anderson did not come forward until 2006, four years after the crime. Anderson stated she saw Booker's mother at church and told her that she knew Booker was not guilty. After visiting Booker in prison multiple times over the next few years, Anderson swore out an affidavit that she later recanted. The affidavit was the basis for advancing the matter to a third-stage hearing.

¶ 38    Regarding Anderson's affidavit, Booker asserts that Anderson's recantation was suspect because she feared Brown, who belonged to the Gangster Disciples, and she was pressured by the prosecutors to talk to them and recant. Booker urges this court to view with skepticism Anderson's recantation testimony. Anderson disavowed her affidavit via a videotaped statement and testified at the evidentiary hearing. While recantation of testimony is viewed with suspicion (*People v. Morgan*, 212 Ill. 2d 148, 155 (2004)), the trial judge heard this witness, both in person and on video, discuss her reasons for recanting the statements in the affidavit.



SA 145

1-13-0177

¶ 39      We find no reason to disturb the postconviction trial judge's credibility determinations. *People v. Coleman*, 183 Ill. 2d 366, 381, (1998).

¶ 40                                      DNA Testing

¶ 41      Booker contends that our standard of review is *de novo* because this issue presents a legal question. A *de novo* standard is appropriate where the trial court's decision is not based on the assessment of the credibility of the witnesses. See *People v. Brooks*, 221 Ill. 2d 381, 393 (2006) (denial of request made pursuant to section 116-3 reviewed *de novo*).

¶ 42      Booker argues that the trial court erred by denying his request for DNA on the five bullet casings recovered from the scene. Booker contends that section 116-3 of the Code entitles him to the DNA testing because the statute provides that where identity was an issue at trial, the evidence was subject to a sufficient chain of custody, and the evidence is new, non-cumulative, and materially relevant to an actual innocence claim, the trial court "shall allow" the evidence to be tested. See 725 ILCS 5/116-3(b), (c) (West 2012).

¶ 43      Identity was the central issue at trial, satisfying the first requirement. The chain of custody evidence, however, refutes Booker's argument as to the second requirement. The bullet casings were recovered at the scene and sent to the state police lab for fingerprint testing. The technicians doing that testing followed all protocols, including using protective gear while handling the casings. After fingerprint testing was completed, the casings were sent to ballistics, where protective gear is not necessary. Ballistics tests determined all five bullet casings were Winchester .40 caliber Smith and Wesson pistol ammunition fired from the same gun. No further testing was done.

Case: 21-2166   Document: 28   Filed: 08/19/2022   Pages: 469

1-13-0177

¶ 44      In this case, as in *Brooks*, the technology was available but no request was made at the time of trial, and our supreme court has stated that a request should be granted only where "the technology for the testing was unavailable at the time of defendant's trial." *Brooks*, 221 Ill. 2d at 393. According to *Brooks*, courts nationwide have recognized the technology having been available since the mid-1990s. *Id.*

¶ 45      Further, the evidence established that had DNA testing been requested before trial, this would have been done in advance of any other testing. But DNA testing was not requested by the defense, and Booker has not met his burden under the statute to present a *prima facie* case that "the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect." 725 ILCS 5/116-3(b), (c) (West 2012).

¶ 46      Finally, as to the third requirement, DNA evidence obtained from the bullet casings would be new, and possibly non-cumulative, but whether it would be materially relevant is highly doubtful. Even if a meaningful sample were obtained and test results matched DNA to Williams, for example, or even to Booker, that evidence would not necessarily prove who actually fired the gun. Anyone loading the pistol would have touched the bullet casing. Any person's DNA on a bullet casing shows only that much, and nothing more. The trial court's denial of Booker's request after a full hearing at which experts on fingerprints, ballistics, and DNA testified was not manifestly erroneous.

¶ 47      Affirmed.

(46)

**GENERAL PROGRESS REPORT**
DETECTIVE DIVISION: CHICAGO POLICE

| OFFENSE CLASSIFICATION LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT |
|---|---|
| HOM. | RIALS |

DATE OF O[ ] CASE REPORT: DAY 08 MONTH Sep YEAR 02
DATE OF THIS REPORT: DAY 09 MONTH Sep YEAR 02 WATCH 1st

BEAT/UNIT ASSIGNED 5734

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvass notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

- 255 W. 38th pl
Victor (M/F) M/1/25
Inside heard 2 or 3 shots - saw nothing

- 253 W. 38th pl
Davis, Prudence F/1/68
Asleep - Heard/Saw nothing

- 251 W. 38th pl - NO ANSWER
- 249 W. 38th pl - NO ANSWER
- 247 W. 38th pl
Fleming, Carla, (M/F)
Asleep - heard/saw nothing

- 245 W. 38th pl - NO ANSWER
- 243 W. 38th pl - NO ANSWER
- 241 W. 38th pl - NO ANSWER
- 239 W. 38th pl - (Ten. in Hosp)   F/B/30
- 237 W. 38TH pl. - Ramsey Monica L. (773) 538-2963
saw M/1 all black clothing w/Vict - saw him shoot & flee on foot

RD NO.  HH-635313

| REPORTING OFFICER'S SIGNATURE-STAR NO. | RECEIVED BY: SUPERVISOR'S SIGNATURE-STAR NO. | DAY-MO.-YR. | TIME |
|---|---|---|---|
| J Castellanos | Det. R.J.C. #1354 | 11 SEP 02 | 0520 |

CPD-23.122 (Rev.2/83)

SA 1484

Exhibit E 

RECEIVED
SEP 1 2 2017
DOCKETING DEPARTMENT
Office of the State Appellate Defender
1st DISTRICT

**IN THE**
**APPELLATE COURT OF ILLINOIS**
**FIRST JUDICIAL DISTRICT**

**ORDER ENTERED**
SEP 1 2 2017

APPELLATE COURT FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| Plaintiff-Appellee, | ) ) | Nos. 1-13-0177 |
| v. | ) ) | 1-13-2279 1-15-2995 |
| JOSEPH BOOKER, | ) ) | (cons.) |
| Defendant-Appellant. | ) ) ) | |

### ORDER

This matter is before the court on defendant' petition for rehearing. This court has reviewed the petition for rehearing. The petition is DENIED.

DATED: _____

_____ Justice

_____ Justice

_____ Justice



Exhibit F



# OFFICE OF THE STATE APPELLATE DEFENDER
## FIRST JUDICIAL DISTRICT

**203 North LaSalle Street • 24th Floor**
**Chicago, Illinois 60601**
**Telephone: 312/814-5472 • Fax: 312/814-1447**
**www.state.il.us/defender • E-mail: 1stDistrict@osad.state.il.us**

October 16, 2017

MICHAEL J. PELLETIER
STATE APPELLATE DEFENDER

PATRICIA MYSZA
DEPUTY DEFENDER

SHAWN O'TOOLE
ASSISTANT DEPUTY DEFENDER

BRYON M. REINA
ASSISTANT APPELLATE ATTORNEY

Mr. Joseph Booker
Register No. B75795
Pontiac Correctional Center
P.O. Box 99
Pontiac, IL 61764

RE:    ***People v. Joseph Booker***
Cook County No. 02 CR 25224
Appellate Court No. 1-13-0177, 1-13-2279, and 1-15-2995
(Consolidated)

Dear Mr. Booker:

I received your letter dated September 11, 2017, in which you state that you did not receive a copy of the petition for rehearing I filed on your behalf. I sent you a copy of the rehearing petition on August 29, 2017, so it might have been in the mail when you sent me your letter. However, in case you still have not received the rehearing petition, I have attached a copy to this letter.

Additionally, as we discussed, I filed a petition for leave to appeal on your behalf this morning, October 16, 2017. I have included a copy of that document with this letter.

You also sent a *pro se* supplemental PLA with your letter and asked me to file it. However, while the First District Appellate Court has a local rule requiring *pro se* documents by persons represented by counsel to be sent to the court through counsel (Local Rule 31(c)), the Illinois Supreme Court does not have a similar policy. Thus, if you would like to seek leave to file your *pro se* supplemental petition, you will have to do it on your own. It is my understanding that, in the past, the Supreme Court has extended the deadline for PLAs filed by *pro se* petitioners to 70 days. Maybe you could benefit from this unwritten rule.

However, be advised that, in *Clemons v. Pfister*, 845 F.3d 816, 819-20 (7th Cir. 2017), the Seventh Circuit Court of Appeals recently found that the defendant's attempt to raise an ineffective assistance claim in a *pro se* reply brief, while he was represented by counsel, failed to preserve the ineffective assistance claim for *habeas* review. The Court reasoned that, since the

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 9

appellate court declined to reach the merits of the *pro se* issue based on the fact the defendant was represented by counsel, there "was an independent and adequate state ground of decision" that "preclude[d] federal *habeas* review[.]" *Pfister*, 845 F.3d at 820. Thus, while at the time I filed your opening brief there were decisions from the federal district court indicating that the denial of leave to file a *pro se* supplemental brief *might* be sufficient to preserve your ineffective assistance claims for federal *habeas* review (*see* letter of October 21, 2016), it now seems unlikely that the denial of leave to file a *pro se* supplemental PLA will serve that purpose.

I am returning the original version of the *pro se* supplemental petition with this letter, but I will keep a photocopy of the petition in my file in case you should need a copy in the future.

Please do not hesitate to write me if you should have any further questions.

Sincerely,

BRYON M. REINA
Assistant Appellate Attorney

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

SA 151

HH635313
DETECTIVE SUP. APPROVAL COMPL

**INVESTIGATION:**



THIS IS THE ASSIGNED UNIT LINEUP REPORT

*Exh. F5*

1. DATE & TIME ASSIGNED:
10 September 2002, 1700 hrs

2. DATE, TIME, & LOCATION OF LINEUP:
10 September 2002, 1700, 1715 & 1730 hrs
Area 1 Detective Headquarters

3. LINEUP PHOTOS TAKEN BY:
E.T. Dones # 5457, beat 9611

4. PHOTOS TAKEN UNDER R.D. :
HH 635-313

5. PERSONS CONDUCTING LINEUP:
Det David Evans # 20927

6. PERSONS PRESENT AT LINEUP:
Det David Evans  #20927
Det John Foster  #20288
Det Brian Foreberg #21249

7. PERSONS VIEWING LINEUP:
#1 Kenneth Williams positive identification
#2 Monica Ramsey negative identification
#3 Louis Dean positive identification

8. PERSONS PARTICIPATING IN LINEUP:
#1 Shawn Perkins  M/1/ CB# 15233791
#2 Brian Jordan  M/1/ DOB 22 Dec 1978
#3 Joseph Booker  M/1/ DOB 15 Jul 1978
#4 Darnell Robinson M/1/ DOB 19 Apr 1982
#5 Margule Robinson M/1/ DOB 6  Apr 1979
#6 Michael Shepard M/1/ DOB 11 FEB 1968

9. PERSON(S) IDENTIFIED IN LINEUP:
#3 Joseph Booker by witness #1 & #3

INVESTIGATION
Reporting detective conducted a line-ups for the homicide of Charles Rials. Subject Booker w
allowed to choose his position in the line up as viewed by the witnesses going left to right. Book
picked position number 3. After each of the line-ups where conducted, Booker was asked if he wante
to change his position in the line-up. Booker replied that he did not want to change his position.



SA 152

Pages: 469     Filed: 08/19/2022     Document: 28     Case: 21-2166

*Exh. F*

HH635313
DETECTIVE SUP. APPROVAL COMPLET

Pages: 469  Filed: 08/19/2022  Document: 28  Case: 21-2166

Each of the witnesses viewing the line-ups did so via a one-way mirror at Area 1 headquarters.

Witness Williams viewed the line-up and made a positive identification of subject # 3 as the person observed on 8 September 2002 having a handgun in his hand and fired one or more shots at th victim Charles Rials. Witnesses Williams also stated that he was the same guy who he observe standing over the victim and firing several more shots at the victim while he was on the ground.

Witness Ramsey viewed the line-up and she was unable to make any identification of anyone one the line-up.

Witness Dean viewed the line-up and he made a positive identification of subject # 3 as the person observed standing over the victim with a handgun.

Reporting detective requested an Evidence Technician to photograph the line-ups as they were vie by the witnesses.

REPORT OF: Detective David Evans # 20927

Group Exhibits
(1-11)

No.

IN THE
SUPREME COURT OF THE
STATE OF ILLINIOS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | Petition for Leave to Appeal from the Appellate Court of Illinois, First Judicial District. |
| Plaintiff-Appellee, | |
| - vs - | |
| | No. 02 CR 25224 |
| JOSEPH BOOKER, | |
| Defendant-Appellant, Petitioner. | App. Ct. Nos.: 1-13-0187, 1-13-2279, 1-15-2995 |
| | ( Consolidated ) |

Pro Se Supplemental Petition For
Leave to Appeal

TO THE HONORABLE JUSTICES OF THE
SUPREME COURT OF THE STATE OF ILLINOIS:

May It Please The Court:

I.

PRAYER FOR LEAVE TO APPEAL

Your Petitioner, Joseph Booker, pro se,
Respectfully petitions this Honorable Court for
leave to appeal pursuant to Supreme Court Rule

①

SA 154

315, from the judgement of the Appellate Court of Illinois, First Judicial District, which affirmed the judgement of dismissing Petitioner's Petition for Post Conviction Relief after an evidentiary hearing, entered by the Circuit Court of Cook County, Illinois, where ultimately Petitioner was denied a new trial after presenting evidence that supported his claim of actual innocence, inter alia. Also which denied Petitioner Pro Se Motion for Leave to File a Pro Se Supplemental Brief.

## II.

## OPINION AND PROCEEDINGS BELOW

On October 3, 2003 Petitioner was found guilty of first degree murder. Petitioner was subsequently sentenced to a total of 55 years. He appealed this conviction to the Illinois Appellate Court, First District. On September 22, 2005 the court delivered its opinion in said appeal, affirming the judgement of conviction and sentence. No Petition for Rehearing. Petition for Leave to Appeal was denied January 25, 2006.

On May 31, 2006 Petitioner filed a petition for post conviction Relief alleging that he was actually innocent, that he was denied effective

②

SA 155

assistance of counsel, that he was denied effective assistance of appellate counsel, that Police Fabricated evidence, that the State knowingly used Perjured Testimony to convict him, and a Cumulative Prejudice claim of all counsel's errors. On June 16, 2006 his petition was dismissed (summarily dismissed) as frivolous and patently without merit. Petitioner appealed the Circuit Court's dismissal of his post conviction petition to the First District Appellate Court of Illinois, and on March 31, 2008 the First District Appellate Court reversed the Circuit Court of Cook County's dismissal and remanded Petitioner's post conviction petition back to the Circuit Court for further proceedings under the Post Conviction Hearing Act.

In the midst of second stage proceedings the Circuit Court dismissed all of Petitioner's post conviction issues except for Petitioner's post conviction free-standing claim of actual innocence, which ultimately was advanced to the third stage proceedings (evidentiary hearing).

After hearing testimony from newly discovered witnesses at evidentiary hearing, the Circuit Court dismissed Petitioner's post conviction petition in its entirety on September 11, 2015. On the same day, September 11, 2015, Petitioner filed his notice of

③

SA 156

appeal, Petitioner appealed all of his issues to the First District Appellate Court of Illinois, via, opening brief and reply brief by appointed counsel, and supplemental brief by Petitioner Pro Se. On August 8, 2017 the First District Appellate Court of Illinois erroneously decided to affirm the Circuit Court's Ruling denying Petitioner a new trial after conducting an evidentiary hearing. Petition for Rehearing was filed by appointed counsel on August 29, 2017. Petition for Leave to Appeal to this Honorable Court was filed by appointed counsel on October 16, 2017. The instant Pro Se Supplemental Petition for Leave to Appeal, filed by Petitioner, follows.

## III.

## POINTS RELIED UPON FOR REVERSAL

The First District Appellate Court erroneously decided not to entertain and adjudicate Petitioner's Pro Se Supplemental Brief Raising the following issues due to hybrid Representation:

1) Ineffective Assistance of Appellate Counsel for failing to Raise/advance Petitioner's Sufficiency of evidence issue

(4)

SA 157

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

in Petition for Leave to Appeal
to the Illinois Supreme Court;

2) Reasonable Doubt/Sufficiency
of Evidence;

3) Ineffective Assistance of trial
counsel for failing to file meritorious
pretrial motion challenging the unnecessary
and unduly suggestive identifications;

4) Ineffective Assistance of trial
counsel for failing to object to Known
perjured testimony;

5) Perjured Testimony;

6) Police Fabrication of Evidence;

7) Cumulative Prejudice;

8) Ineffective Assistance of trial
counsel for failing to file meritorious
pretrial motion to quash arrest and
suppress line-up identifications;

⑤

9) Ineffective Assistance of trial
counsel for failure to investigate
and call Melissa Westmoreland and
Monica Ramsey;

10) Ineffective Assistance of trial
counsel for failure to investigate
lead on pontential exculpatory witnesses:
Belinda "Teda" Brown and Antione Ford;

11) Circuit Court of Cook County
erroneously denied Petitioner DNA
testing on a baseball hat/cap found
by the gunshot victim's body.

In regards to the above listed issues presented to
the First District Appellate Court of Illinois by way
of Pro Se Supplemental Brief. The Petitioner relies
exclusively on U.S. ex rel. Smith v. Pfister, 2013
WL 1568063 (Where the Court found that Petitioner's
attempts to file a pro se supplemental brief was
sufficient to preserve his claims for federal review);
and Kizer v. Uchtman, 165 Fed. Appx. 465, 467
(7th Cir. 2006) (holding that because the state court
had discretion to allow hybrid representation, Petitioner's
attempt to file a supplemental brief, pro se, had

⑥

SA 159

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

"Raised issues Using a method that would allow the court, in its discretion to consider federal claims of unconstitutionality").

Smith v. Pfister and Kizer v. Uchtman was the established caselaw at the time of filing in the instant matter, see citations above. The instant Petitioner seeks to preserve and Raise his constitutional violation, that the Circuit Court and Appellate Court made erroneous Rulings when applying the well established caselaw authority of Strickland v. Washington Petitioner being denied his Sixth and Fourteenth Amendments of the United States Constitution and Article 1, Sections 2 and 8 of the Illinois Constitution of 1970, to the issues Petitioner Raises and highlighted above.

⑦

SA 160

## Argument

Petitioner, Joseph Booker, during Post Conviction proceedings (725 ILCS 5/122-1 et seq.) presented a total of 13 issues. Issues were properly presented to the Circuit Court of Cook County by way of Post Conviction Relief Petition (725 ILCS 5/122-1 et seq.) and Motion for Forensic Testings (725 ILCS 5/116-1 et seq. (West 2012)).

The Circuit Court dismissed all 13 of Petitioner's issues, denying Petitioner Post Conviction Relief, and Forensic Testings. Petitioner filed a timely notice of appeal. The First District Appellate Defender's Office was appointed.

The Petitioner contends that he believes that if the appointed Appellate Defender could Raise the issues that he and Petitioner agreed has merit, counsel would have, but counsel was unable to raise that many issues in one Brief and stay in compliance with the Supreme Court Rules, e.g. page limitations, et cetera, even with an extention on page limits. However, Counsel Raised and presented 2 of the Petitioner's strongest issues. Although Counsel did not agree with the Remainder of issues, which is 11, merit wise, 9 of 11 issues are undisputedly meritorious, 7 of which are claims of ineffective

SA 161

Pages 469
Filed 08/19/2022
Document: 28
Case: 21-2166

assistance of counsel) (appellate and trial). For example, the Circuit Court dismissed all of Petitioner's ineffective assistance of counsel claims "because these claims could have been raised in his direct appeal." (See page 5, paragraph 17 of App. Ct. Order, attached hereto). In litigation, Petitioner explained to the Circuit Court that his trial attorney and appellate attorney is the same lawyer. Petitioner also explained that in People v. Lawton, 212 Ill. 2d 285, 818 N.E. 2d 326, 288 Ill. Dec. 638 the Court found that "a Defendant seeking to challenge the effectiveness of the representation they received during their criminal trials have a mechanism for avoiding this problem. If their trial counsel continues to represent them on direct review and does not raise the issue of the effectiveness of the representation he provided, notions of waiver will yield to considerations of fundamental fairness and defendants will still be permitted to challenge trial counsel's effectiveness through proceedings under the Post Conviction Hearing Act." Citing People v. Mahaffey, 165 Ill. 2d 445, 458-59, 209 Ill. Dec. 246, 651 N.E. 2d 174 (1995). This illustrates how erroneous the Circuit Court's ruling is to dismiss Petitioner's claims "because they could have been raised on direct appeal".

⑨

SA 162

In effort to prevent a procedural default of these claims from latter review the Petitioner filed a Pro se Supplemental Brief behind the Appellate Defender's Opening Brief on Post Conviction Appeal.

Petitioner, Joseph Booker, also contends that the First District Appellate Court was in err when it refuse to exercise its discretion to entertain and adjudicate the issues Petitioner presented in his Pro se Supplemental Brief, irrespective of Representation by counsel.

For the purpose of preventing a miscarriage of justice, and a procedural default of meritorious issues, Petitioner put forth diligent effort to preserve the above listed issues through the filing of the Supplemental Brief as Petitioner is aware that he bears the obligation and duty to "fairly present" his claims through State Court proceedings to prevent a procedural default of those claims, See Wainwright v. Sykes, 433 U.S. 72

## Conclusion

Wherefore, your Petitioner, Joseph Booker, Pro Se, Respectfully request this Honorable Court to grant his petition for leave to appeal and Reverse the

⑩

First District Appellate Court's ruling denying Petitioner's Motion to file a Supplemental Brief due to hybrid representation, and refusing to entertain and adjudicate the above list of claims, and reverse the Circuit Court of Cook County's dismissal of said issues, and grant Petitioner an evidentiary hearing on said issues.

Respectfully Submitted,

Joseph Booker

Joseph Booker

B75795

P. O. Box 99

Pontiac, IL 61764

(11)

Exh. G8

investigation of a homicide of Charles Rials. Reporting detectives were asked to re-interview a witness by the name of Monica Ramsey and attempt to locate and interview Melissa Westmoreland.

Reporting detectives located Monica Ramsey at her home and she related the following information in summary and not verbatim. On the night of the shooting she was in her room when she heard her son call out to her. At the same time she heard several shots being fired in front of her building. She ran to her son's room and observed through her son window a male black running from the scene of the shooting caring a handgun. Ramsey was unable to see the male blacks face when he ran. Reporting detectives then asked to talk to her son Louis Dean. Ramsey then related that her son was not home and was attending school. Reporting detectives then requested Monica Ramsey that when her son come home to contact us so that he could be interview regarding the shooting.

Reporting detectives were then contacted and informed that Melissa Westmoreland was currently at the 2nd district desk waiting for reporting detectives. Reporting detectives then relocated to the 2nd district and met with Melissa Westmoreland. Westmoreland then related the following in summary and not verbatim. On 7 September 02 she was at her home on west 38th place when her boyfriend Joseph Booker aka J Cool and four other male blacks (names unknown) came to her home. They arrived around 1900 hrs and stayed until 2200/2230 hrs. The five subjects left her home via the front door. When her boyfriend and his friends left her apartment, she observed approx. 20 persons standing across of her home drinking and talking between each other. She never saw or heard anything between her boyfriend and the group across from her home. Westmoreland then walked to the rear of her home. While sitting there, she heard several what sounded like gunshots, being fired in front of her building. Westmoreland fearing for her children's safety she ran into her apartment and checked on her kids. Once the shooting stopped she looked out her front window of her apartment and observed a large group of people standing around a male black laying on the side walk bleeding. She then went outside and overheard people saying that the guy who did the shooting was one of the guys from group that had just left her apartment. Fearing for her safety she went back into her apartment.

While in her apartment she re-calls that Booker called her and she told him about the shooting. She also related to him that she was in fear for her safety.
In her first statement Westmoreland stated that she did not see or talk to Booker until Tuesday 10 September 2002. She then stated that she was picked up by Booker on the 9 September. She could not re-call what time she was pickup by Booker. They then went to the Amber Motel on East 39th St and stayed their until 10 Sept 02.

Westmoreland was asked by reporting detectives for the home address of Booker or the home phone number of Booker. Westmoreland stated that she did not know his address or his phone number. Reporting detectives were able to locate a photo of Booker via the ICAM system. Westmoreland was shown the photo and she stated that it was a photo of her boyfriend, Booker.

Reporting detectives went to Booker's home address of 2931 South Federal and found a dark blue Pontiac Grand Prix with the temporary Illinois license plate # of 2346417 parked behind the building. This vehicle was the same type of vehicle that was described by the witnesses as the vehicle used by the offender in the shooting. Reporting detectives then ran the plate of the vehicle and found that it registered to Joseph Booker at 2931 South Federal.

Reporting detectives then requested assistance from the 21st district tactical team to assist reporting

Exhibit G9

detectives. Beat 2161D responded to our location. Reporting detectives went to the front door of apartment 201 and knocked on the door. The front door to the apartment was open by a female black. Reporting detectives asked if Joseph Booker was home and the female black stated, "Yes." Reporting detectives asked for permission for entry to the apartment. The female black stated OK. Upon entering the apartment, reporting detectives observed Joseph Booker sitting on a front room couch. Reporting detectives asked Joseph Booker if he would accompany reporting detectives into Area 1 for a investigation of a shooting. Booker stated he would. Reporting detectives asked Booker for permission to search his bedroom and again Booker stated, yes. A search of the bedroom failed to reveal any evidence pertaining to the homicide.

Booker, was transported into Area 1 by reporting detectives. Once in Area 1 Booker was advised of his rights and informed of the basic facts of the case. Booker denied any part in the shooting. He does admit that on the 8 Sept 2002 he was at his girlfriend apartment (Melissa Westmoreland) from 1900 hrs to 2100/2200 hrs he then left the apartment. Reporting detectives asked Booker if he was with anyone when he left the apartment or if anyone other then his girlfriend was with them. Booker stated that he was alone and that the only person in Westmoreland apartment was unknown female, a girlfriend of Westmoreland.

Booker recalled that on 8 September around 2230 hrs he called Westmoreland and she informed him about the shooting. The next time he saw Westmoreland or heard from her was on Monday 9 September while she was at work on West 79th St driving a CTA bus. They hung around together until 2130 hrs. That was the last time he saw her and the next time he talked to Westmoreland was on 10 September when he talked to her by telephone. This interview was terminated at this time.

Reporting detectives were contacted by the victim's brother, Michael Rials. Rials, related that he had found several citizens who were witnesses to the shooting. These citizens were willing to met with reporting detectives in regards to the case. Rials, then gave reporting detectives the following names, Kenneth Williams and Darnell Brown. Both of these citizen's, were contacted and Williams came into Area 1 for this investigation. Brown was unable to come into Area 1 until 11 September. Reporting detectives were contacted by Monica Ramsey at Area 1. She stated that her son was home from school. Reporting detectives then asked Ramsey if she and her son could come into Area 1 for this investigation. Ramsey replied that she would bring her son into the station.

While waiting for the witnesses to arrive at Area 1 reporting detectives prepared a line-up for the witnesses to view. The facts of the line-up will be the subject of a separate supplementary report. Witnesses Williams 1st viewed the line-up and made a positive identification of Booker as the subject he saw shoot and kill Charles Rials on 8 September at 256 West 38th Place. Witness Ramsey then viewed the line-up but was unable to make a positive identification. Witness Dean Louis then viewed the line-up and made a positive identification of Booker as the subject he saw with a handgun standing over the victim and then running from the scene. Reporting detective then requested an Evidence Technician to photograph the line-ups as viewed by the witnesses. It should be noted that each of the victim viewed the line-up separately and each witnesses after viewing the line-up was kept apart from each other so that they could not communicate with each other.

Williams also stated that a Eddie Norwood had told him that on the night of the shooting he received a phone call on his cell phone and recognized the female voice as Melissa Westmoreland. Westmoreland left a message on Norwood voice message talking about the shooting. Reporting

Pages: 469  Filed: 08/19/2022  Document: 28  Case: 21-2166

Exhibit H



# SUPREME COURT OF ILLINOIS

SUPREME COURT BUILDING
200 East Capitol Avenue
SPRINGFIELD, ILLINOIS 62701-1721

**CAROLYN TAFT GROSBOLL**
Clerk of the Court

(217) 782-2035
TDD: (217) 524-8132

November 14, 2017

**FIRST DISTRICT OFFICE**
160 North LaSalle Street, 20th Floor
Chicago, Illinois 60601-3103
(312) 793-1332
TDD: (312) 793-6185

Mr. Joseph Booker
Reg. No. B-75795
Pontiac Correctional Center
P. O. Box 99
Pontiac, Illinois 61764

Re:  **No. 122804:** People State of Illinois, respondent, v. Joseph Booker, petitioner.

Dear Mr. Booker:

This will acknowledge receipt of your "pro se supplemental petition for leave to appeal" on November 13, 2017. Your document is being returned to you with this letter, unfiled.

You are advised that a petition for leave to appeal has already been filed in this case by your attorney, Assistant State Appellate Defender, Bryon Michael Reina. The petition was filed on October 13, 2017, docketed as Supreme Court case No. 122804, and is currently pending decision in this Court.

Please note that since you have legal representation in this Court, you cannot personally file any documents in this case. The appearance of Mr. Reina on your behalf constitutes your legal presence in this proceeding, and the legal representative is the one who files the documents. Please be advised that this practice is premised on well-established principles of legal representation, and the Supreme Court has held that a defendant has no right to both self-representation and the assistance of counsel. See People v. McDonald, 168 Ill. 2d 420, 434 (1995), and People v. Barrow, 195 Ill. 2d 506, 540 (2001).

Very truly yours,

*Carolyn Taft Grosboll*

Clerk of the Supreme Court

CTG/ak
Enclosures

Pages: 469   Filed: 08/19/2022   Document: 28   Case: 21-2166



Exhibit
I



## OFFICE OF THE STATE APPELLATE DEFENDER
### FIRST JUDICIAL DISTRICT

203 North LaSalle Street • 24th Floor
Chicago, Illinois 60601
Telephone: 312/814-5472 • Fax: 312/814-1447
www.state.il.us/defender • E-mail: 1stDistrict@osad.state.il.us

December 12, 2017

**MICHAEL J. PELLETIER**
STATE APPELLATE DEFENDER

**PATRICIA MYSZA**
DEPUTY DEFENDER

**SHAWN O'TOOLE**
ASSISTANT DEPUTY DEFENDER

**BRYON M. REINA**
ASSISTANT APPELLATE ATTORNEY

Mr. Joseph Booker
Register No. B75795
Menard Correctional Center
P.O. Box 1000
Menard, IL 62259

RE: *People v. Joseph Booker*
Cook County No. 02 CR 25224
Appellate Court Nos. 1-13-0177, 1-13-2279, and 1-15-2995
(Consolidated)

Dear Mr. Booker:

I received your letter of November 21, 2017, which contained a *Pro Se* Supplemental Petition for Leave to Appeal, and a request that I file the petition for you in the Illinois Supreme Court. As I explained in my letter of October 16, 2017, I cannot file this petition for you.

You do not have a right to both self-representation and the assistance of counsel. *People v. Barrow*, 195 Ill. 2d 506, 540 (2001). While the Illinois Supreme Court could have granted you leave to file your *pro se* supplemental petition when you initially sent it to them (*Barrow*, 195 Ill. 2d at 540), it apparently denied your request. Because I did not raise the issues you discuss in your *pro se* pleading on direct appeal, it would be inappropriate for me to raise them for the first time in a petition for leave to appeal.

Attached you should find the *pro se* petition you sent me.

I hope you are doing well.

Sincerely,

BRYON M. REINA
Assistant Appellate Attorney



Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

1      A     38th Place.

2      Q     Where were you when you first saw Charles?

3      A     It's really like the same side -- Well I

4  guess I can explain it. He walking down the sidewalk towards

5  me from 38th Place towards Princeton.

6      Q     Were you closer to Princeton than he was, is

7  that right?

8      A     Right.

9      Q     Where exactly were you?

10     A     Sitting on the stairs.

11     Q     Would that be your hang out?  You like to

12  hang out there?

13     A     Yes.

14     Q     What were you doing that day?

15     A     Drinking, kicking it, talking.

16     Q     Did you have an opportunity to talk to

17  Charles?

18     A     No.

19     Q     Why not?

20     A     Because somebody came after him.  A guy that

21  we was arguing with came out and shot him.

22     Q     How far away were you from Charles and this

23  guy that shot him when this happened?

24     A     Maybe 4 cars .

I19

SA 169

EA. "L 4"

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

1  police officers the next day, is that right ?

2      A    Yes.

3      Q    And when you went down to talk to the police

4  officers, they had you look at something, is that right?

5      A    Yes.

6      Q    What was that?

7      A    A picture.

8      Q    Did you look at anything else?

9      A    No.

10     Q    Did you look at something?  Did you see the

11  defendant at all at the police station that day?

12     A    Yes.

13     Q    Where?

14     A    In a lineup.

15     Q    What is a lineup ?

16     A    I guess show who-- to pick the one out who

17  did the murder or did the shootings.

18     Q    Pardon?

19     A    They wanted me to pick the one one out between

20  the five or six guys they had standing up there who did the

21  shooting.

22     Q    The defendant was with five or six other guys?

23     A    Yes.

24     Q    When you looked at that lineup, were you able

I33

SA 170



1    A    I don't know if it was 2 days or one day.

2  Can't remember that.

3         Q    And you didn't go down to the police station

4  by yourself that day, did you?

5         A    Yes.

6         Q    You did?  It wasn't CC's brother who took you

7  down there?

8         A    No.

9         Q    So CC's brother didn't go and get you and Mr.

10  Brown and take you down to the police station ?

11        A    No.

12        Q    Do you know whether or not CC has a brother?

13        A    Yes, I know he got family members.

14        Q    You don't know CC's brother?

15        A    By face.

16        Q    Just by face?

17        A    Just seeing him around, I don't know his name

18  or nothing like that.

19        Q    Now you say as you are sitting on those stairs

20  you see CC walking by.  You have known him for ten years,

21  right?  You grew up with him?

22        A    No, he came up under me .

23        Q    You lived in the same neighborhood as kids?

24        A    Yes.

I65

SA 171

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166



Place.

Q.    You walked down the lane to 38th Place?

A.    Yes.

Q.    When you got to 38th Place, where did you
go?

A.    We went to the end of the parking lot at
38th Place.

Q.    What did you do when you got to the end
of the parking lot at 38th Place?

A.    I was talking to a young lady by the name
of Ella.

Q.    What did Charles Rials do?

A.    He kept going and started talking to a
guy named Kenny Williams.

Q.    Did you see -- did you see Kenny Williams
out there?

A.    Yes.

Q.    Where was Kenny Williams?

A.    Sitting over there on 38th Place and like
a little -- like by some steps.

Q.    Were there some steps?

A.    Yes.

Q.    Okay.

What did you do as Charles Rials

Exh. "M 7"

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

1     A.    I went back to the crime scene.

2     Q.    Did you talk to police that day?

3     A.    No.

4     Q.    What happened?

5     A.    I went home.

6     Q.    How was it that you came in contact with

7  the police?

8     A.    I came in contact with the police through

9  Kenny Williams and told him I would testify to what I

10  seen and what I know.

11     Q.    And you came in contact with the police

12  how soon after -- this occurred the night of September

13  8th.

14     A.    I would say about the 13th.

15     Q.    When you came -- did you in fact come

16  into the police station, Darnell?

17     A.    Yes.

18     Q.    And did you speak to the police about

19  what you had seen?

20     A.    Yes.

21     Q.    And did the police show you a group of

22  people?

23     A.    Yes.

24     Q.    Did they ask you to point out the person

SA 173

Exh. "M 21"

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

```
1              A.     Like a brother.

2              A.     Like a brother.

3                     And you didn't tell the police what

4      you saw that night?

5              A.     Nope.

6              Q.     Now -- but you did tell the police a

7      couple of days later, is that right?

8              A.     Yes.

9              Q.     But that was after you talked to Michael

10     Rials, is that right?

11             A.     No.

12             Q.     You never talked to CC's brother?

13             A.     No.

14             Q.     You never told -- CC's brother never

15     asked you to come down to the police station and talk

16     to the police --

17             A.     No.

18             Q.     -- about what happened on that night?

19             A.     Nope.

20             Q.     You said earlier that it was Kenneth

21     Williams who asked you, is that right?

22             A.     Yes.

23             Q.     Did you talk to CC's brother?

24             A.     Nope.
```

SA 174

Exh. "Q 4"

1        Q.      Where?

2        A.      Area 1 Homicide Division, which was then

3    located at 1819 West Pershing Road, Chicago, Illinois.

4        Q.      While the defendant was back at the

5    temporary Area 1 Headquarters, did you have an

6    opportunity to speak to a person by the name of Kenny

7    Williams?

8        A.      Yes, I did.

9        Q.      And tell us how did Kenny Williams come

10   to the police station that day, if you remember?

11       A.      Mr. Williams was brought to our attention

12   by one of the family members of the deceased.  We asked

13   Mr. Williams to come into Area 1 to be interviewed.

14       Q.      And when you got there, did you do

15   anything with Mr. Williams?

16       A.      Yes.

17       Q.      What did you do?

18       A.      We conducted a lineup with the defendant,

19   Mr. Booker, as being a participant in that lineup.

20       Q.      Describe what you mean by lineup.  What

21   is a lineup?

22       A.      A lineup is individuals that are of

23   similar race, color, size, and age and physical, the

24   overall physical appearance of an individual.

SA 175



STATE OF ILLINOIS )
                   ) ss:
COUNTY OF COOK )

Pages: 469
Filed: 08/19/2022
Document: 28
Case: 21-2166

## AFFIDAVIT

I, Ellen Anderson, state that I have personal knowledge of the statements contained in this Affidavit, that I am competent to testify and that if called to testify I would testify to the same.

I further state:

That if called upon to testify, I can be contacted at 2315 North Mobile, Chicago, Illinois  Telephone number (773) 870-7644;

That on September 8, 2002, I was visiting a friend who lived in the Wentworth Gardens, which is a CHA housing project three blocks South of White Sox Park, Chicago, Illinois;

That I arrived at my friend's residence at approximately 8:00 p.m. the night of September 8, 2002;

That I stayed at my friend's apartment for a few hours before I decided to go home;

That before I left my friend's apartment, I called myself a cab which I was to meet on the corner of 39th and Princeton, Chicago, Illinois;

That I left my friend's apartment at approximately 11:05 p.m. and proceeded to walk Westbound on 38th Place to meet my cab;

That while I was walking, I saw three guys standing around drinking and talking;

That I recognized and knew two of the guys who were standing there. they were Kenny Williams and Darnell Brown;

That I observed Kenny Williams and Darnell Brown were both wearing dark clothing and the guy that I didn't know was wearing a white t shirt and blue jeans shorts;

SA 176



That I held a short conversation with Darnell, and while we were talking, Kenny and the guy that I didn't know, began to walk away from me and Darnell;

That while Kenny and the other guy were distancing themselves from me and Darnell, I observed Kenny Williams wearing black leather gloves. I put no significance on the fact that Kenny had on gloves because I thought that they were all friends, so I continued to conversate with Darnell;

That after I told Darnell that I was doing fine, that I had been visiting a friend and was about to go home, that I would talk to him later, that I had to meet my cab, I heard a single gun shot;

That when I heard the single gun shot I ducked and ran behind Darnell;

That I then stood up straight and looked in the same direction that Darnell had focused his attention;

That I then saw the guy that I didn't know lying on the ground, and Kenny Williams was walking closer to the man on the ground and he began firing more bullets into the mans body;

That I then ran down Wells Street to 39th (Pershing Road);

That while I was running to 39th Street, I noticed that Darnell had followed me there;

That when we reached 39th Street, Darnell told me to keep my mouth shut if I didn't want to get myself hurt, that I didn't see nothing and that I don't know nothing;

That Darnell then went back the same way which we had got to 39th Street taking him back toward the murder scene;

That I went Eastbound on 39th Street to State Street to catch a bus;

That at that point I was traumatized by what I'd just saw and I feared for my life so I did what Darnell advised and never returned to Wentworth Gardens again;

That I then re-located myself to my current address because I feared for my life;

That I later learned of Joseph Booker's conviction at a church that I attend on the Southeast side, 75th and Phillips, Chicago, Illi-



Exh. "R 3"

nois;

That I introduced myself to Denise Booker, Joseph Booker's mother at the church that we both attend and voluntarily informed her of what knowledge I had about the murder her son is wrongfully convicted and imprisoned for.

Further Affiant sayeth not.

_Ellen Anderson_
Ellen Anderson

Pages: 469
Filed: 08/19/2022
Document: 28
Case: 21-2166

SUBSCRIBED and SWORN to before me this 10th day of January, 20 06

_Notary Public_
Notary Public

OFFICIAL SEAL
DEENA LUSINSKI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 1-23-2009

406

Exhibit #2



# SUPREME COURT OF ILLINOIS

**SUPREME COURT BUILDING**
200 East Capitol Avenue
SPRINGFIELD, ILLINOIS 62701-1721
(217) 782-2035

**FIRST DISTRICT OFFICE**
160 North LaSalle Street, 20th Floor
Chicago, IL 60601-3103
(312) 793-1332
TDD: (312) 793-6185

**January 18, 2018**

In re:   People State of Illinois, respondent, v. Joseph Booker, petitioner.
Leave to appeal, Appellate Court, First District.
122804

The Supreme Court today DENIED the Petition for Leave to Appeal in the above entitled cause.

The mandate of this Court will issue to the Appellate Court on 02/22/2018.

Very truly yours,

*Carolyn Taft Grosboll*

Clerk of the Supreme Court

Pages: 469   Filed: 08/19/2022   Document: 28   Case: 21-2166

SA 179

Exhibit #3

# Supreme Court of the United States
# Office of the Clerk
# Washington, DC 20543-0001

Scott S. Harris
Clerk of the Court
(202) 479-3011

April 18, 2018

Mr. Joseph Booker
Prisoner ID #B75795
P.O. Box 1000
Menard, IL 62259

   Re: Joseph Booker
     v. Illinois
     No. 17-8552

Dear Mr. Booker:

  The petition for a writ of certiorari in the above entitled case was filed on February 9, 2018 and placed on the docket April 18, 2018 as No. 17-8552.

  A form is enclosed for notifying opposing counsel that the case was docketed.

       Sincerely,

       Scott S. Harris, Clerk

       by

       Jacob C. Travers
       Case Analyst

Enclosures

SA 180

Exhibit #4

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC 20543-0001

Scott S. Harris
Clerk of the Court
(202) 479-3011

May 29, 2018

Mr. Joseph Booker
Prisoner ID #B75795
P.O. Box 1000
Menard, IL 62259

Re:   Joseph Booker
      v. Illinois
      No. 17-8552

Dear Mr. Booker:

The Court today entered the following order in the above-entitled case:

The petition for a writ of certiorari is denied.

Sincerely,

Scott S. Harris, Clerk

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

Group Exhibits # 3
(1 of 10)

# LAW OFFICE OF H. CANDACE GORMAN

H. Candace Gorman
hcgorman@igc.org

312.427-2313
(FAX) 312.427-9552

August 30, 2015

Joseph Booker - B75795
Stateville Correctional Center
P.O. Box 112
Joliet, IL 60434
Legal Mail: Open only in presence of inmate

Good day Mr. Booker,

I am writing because I am reviewing files for a client of mine and in the course of that review I found a Chicago police file related to your case. I would like to talk with your attorney if you have one so that I can share the information. Could you please send me the contact information for your attorney? I cannot share the information with you directly because of a court order. If you do not have a current attorney please send me contact information for your last known attorney. I am attaching an authorization for you to sign allowing me to talk with any attorney that has represented you and to obtain your file so that I can compare it with what I have obtained. Also, you can feel free to send me any documents that you believe might be helpful regarding your conviction.

I am sorry I cannot share the contents of the file with you at this time. The judge entered an order stating that I cannot share the documents with the defendant but I can share the documents with the attorney.

Best regards,

H. Candace Gorman

SA 182

Group Exhibit #3
(2 of 10)

# Old police 'street files' raise question: Did Chicago cops hide evidence?



Lawyer Candace Gorman looks through some of the more than 70,000 pages of files, including police "street files" related to Nathson Fields' 1986 conviction. (Michael Tercha / Chicago Tribune)

**Jason MeisnerContact Reporter**Chicago Tribune

The homicide files sat untouched for years in the dingy basement at a South Side police station, thousands of aging manila folders locked away in cabinets cataloging seven decades of long-forgotten killings.

Stuffed with manually typed police reports, scribbled detectives' notes, faded lineup cards and other evidence, the so-called "street files" might never have seen the light of day.

But now about 500 of the files — located in 23 cabinets — have landed at the center of a court fight over whether the Chicago Police Department for years violated its own directives by hiding evidence from criminal defense lawyers.

SA 183

Group Exhibits #5
(3 of 10)

The controversy could become another black mark for a Police Department rocked in recent months by the fallout over a disturbing video of an officer shooting teenagerLaquan McDonald 16 times.

With the approval of a federal judge, Chicago attorney Candace Gorman has spent much of the last year combing through street files found in the basement of the old Wentworth Area headquarters, trying to match their contents with evidence that was disclosed by police and prosecutors at the time of trials long ago.

It has been a monumental task. Gorman and her small team of attorneys have spent hundreds of hours and tens of thousands of dollars tracking down prisoners whose murder cases were among the stack she was allowed to review. As they've navigated the archaic bureaucracy of the Cook County courts, Gorman and her team have run into numerous delays and dead ends, from cases missing from boxes buried deep in county warehouses to others that were destroyed long ago by private attorneys who purged their files when cases concluded.

But what Gorman has found so far has been eye-opening.

In the 60 cases she's been able to compare, Gorman said she has found that more than 90 percent have information in the street file that was not in the defense file. The discrepancies run the gamut, she said, including names and accounts of eyewitnesses that apparently were never disclosed, statements in detectives' notes that contradict later versions of typed reports and lineup cards that were missing or different from what the defense eventually saw.

"I knew we'd find stuff that was missing, but I didn't think it would be this much," said Gorman, who will only recoup her expenses if she wins. "These little pieces of information can be so crucial to a defense attorney because you never know which witness could be the key unless you're able to track them down."

The city, meanwhile, has vehemently denied that any evidence was improperly withheld.

Judge orders new trial in gang general's lawsuit after key witness's release

**Nearly 500 files to examine**

The Tribune first wrote about the filing cabinets in the Wentworth Area basement in a front-page report in April 2014. A street file on Gorman's client, former El Rukn lieutenant Nathson Fields, had been found there three decades after his conviction in an infamous 1981 double murder. Fields was sent to death row, but his conviction was later overturned after it was discovered the trial judge had taken a bribe to fix the case.

SA 184

Group Exhibits #5
(4 of 10)

After he was freed, Fields filed a wrongful conviction suit against Chicago police and prosecutors alleging his street file was buried in an effort to frame him for the murders. The file contained evidence of other potential suspects that was not turned over to his trial lawyers.

At trial in 2014, Gorman had the grimy, yellow-green filing cabinet hauled into a federal courtroom to show the jury where Fields' file had been found. The jury, however, ruled against Fields on all but one count and awarded him just $80,000 in damages.

But last April, U.S. District Judge Matthew Kennelly ordered a new trial. In doing so, Kennelly made the bombshell decision to allow Gorman to expand her investigation well beyond Fields' file, giving her wide range to dig into the rest of the cabinets in her effort to show the burying of street files was a de facto policy of the Police Department.

Fields, whose retrial is scheduled for May, told the Tribune he hoped his case "can be the lightening rod to help other men who were innocent and fall in the same boat as me."



Filing cabinets in the basement of the Chicago Police Department station at 51st Street and Wentworth Avenue holding "street files."

(Courtesy of Candace Gorman)

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 469

Group Exhibits #5
(5 of 10)

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

"You've got people in prison trying to fight a fight where they don't even know what happened because they've never seen their street files," said Fields, who now works with a national organization of former death row inmates.

The filing cabinets contained about 2,700 cases dating to the 1940s, but to keep the search relevant to Fields' claims, Gorman was allowed to dig into homicide files ranging from 1979 to 2006.

That left her with a total of 466 files to examine — and an equal number of defense files to track down for comparison. Unless she wanted to issue subpoenas for each case, Gorman was advised early on by the Cook County Public Defender's Office to try to obtain authorization to review files from the defendants themselves.

"That started my letter-writing campaign," Gorman said.

**'Bureaucratic shuffle'**

Using online databases, Gorman located and contacted more than 275 defendants — most still in prison — to ask permission to view their defense files. But in doing so, Gorman was worried about giving false hope to many who had heard about her efforts through the legal grapevine.

"I explained in each letter that I needed the attached authorization signed so that I could try to track down the defense counsel's file and compare the two," Gorman said. "Only then would I know if material was withheld in their cases."

To help with the seemingly overwhelming task, Gorman last fall enlisted lawyers with the Loevy & Loevy law firm, which specializes in police misconduct cases. Also involved was the Committee on Transparent Files, a watchdog panel of about a dozen lawyers from some of the city's top wrongful conviction groups as well as the public defender's office that formed after the Tribune wrote about the basement filing cabinets two years ago.

Even after finding a defendant and obtaining authorization, locating the original defense file for cases up to three decades old has proven difficult. Armed with a list of defendants, Gorman contacted several dozen private attorneys who had handled some of the murder cases and asked for their files, but it often led to a dead end because the files had either been destroyed or sent to other offices for postconviction litigation.

Meanwhile, the bulk of the files were determined to belong to the public defender's office, which had only one staffer with the knowledge and authority to look up files and find them in one of the county's two sprawling warehouses.

SA 186

Group Exhibits #5
(6 of 10)

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

Adding to the difficulty was the county's Byzantine system for storing files. Records that were supposed to be in boxes in a specific area of a warehouse had been removed for postconviction litigation or other reasons. In other cases, their current location was not noted. During one visit to the warehouses in December, attorneys were able to locate only eight of the 20 files they had hoped to find, court records show.

In a court hearing last month, Gorman and other attorneys involved in the search described the frustrating process for the judge, who likened it to a "bureaucratic shuffle."

"Look here, no,' " Kennelly said. "And then that person says, look there. That person says look over there, and that person says look over here. And eventually, you get to the point where you say, this is a stupid system."

## Heartbreaking stories

The controversy over street files first erupted in 1983 when Chicago police Detective Frank Laverty blew the whistle during the trial of George Jones in the murder of a 12-year-old girl. Incensed that the prosecution was going forward despite evidence that Jones was innocent, Laverty turned his street file over to defense attorneys in the middle of the trial. The charges against Jones were dropped.

Laverty, a veteran homicide detective, was demoted to overseeing urine tests for recruits at the police academy, but his whistleblowing wasn't for naught. After Jones successfully sued the police for railroading him, police issued a new general order in 1986 that eliminated street files. In its place the department created what are called general progress reports in which detectives' notes and other updates on the investigation are typed into a form that is inventoried and subject to subpoena.

Group Exhibits #5
( 7 of 10)



Lawyer Candace Gorman displays files on Feb. 9, 2016, for inmates' letters, which ask her to look into their case or give her permission to acquire their files. (Michael Tercha / Chicago Tribune)

Gorman said that one of the hallmarks of the department's 1986 general order was the inventory log sheet. Essentially a "road map" for each homicide investigation, the inventories were supposed to give defense attorneys a clear idea of what documents and evidence they should expect to receive in discovery.

But there was one problem. In all the defense files Gorman has reviewed as part of the Fields litigation, not one contained the inventory log, even though most of the street files found in the basement had them. When Gorman talked to defense attorneys for those charged, not one knew that the inventory forms even existed or that they were supposed to have been tendered to them, she said.

"They were in a situation where the police were telling them that's all there is," Gorman said. "Without the inventories, defense attorneys did not know what they were even missing."

Most of the details uncovered in the street files search so far is subject to protective order and cannot be revealed publicly. In a recent court filing, however, one case in which evidence appeared to have been withheld was identified as the 2004 homicide of Alonzo Jones, who

SA 188

Group Exhibits 3
(8 of 10)

Pages: 469   Filed: 08/19/2022   Document: 28   Case: 21-2166

allegedly was beaten, stabbed and run over by a car by a group of people after he was accused of molesting a child.

In all, five people were charged in the murder, including a woman who told police in a videotaped statement that while she had been present at the beginning of the incident, she was not in the car when Jones was killed, court records show. The filing does not identify the woman.

The investigative file found in the Wentworth Area basement contained an Illinois State Police lab report that might have bolstered the woman's account, according to a recent court filing by Loevy & Loevy attorney Anand Swaminithan. Among the details in the report: the woman's DNA was not one of the profiles found on cigarette butts in the car's ashtray, and her fingerprints were not on a knife or other evidence gathered at the scene. That report was not included in the defense file, according to Swaminithan.

The street file also contained information that could have been helpful to a defense attorney seeking to track down witnesses to the murder. In a general progress report, a detective stated first-floor neighbors reported seeing the victim being beaten and described what they saw.

But that report apparently was never turned over to the defense. Instead, a supplemental report included in the public defender's file stated only that the neighbors were "highly intoxicated and uncooperative with the investigation" and "denied all knowledge of any crimes," according to the filing.

The woman wound up pleading guilty and was sentenced to 20 years in prison. She isn't eligible for parole until 2025.



Feds to conduct civil rights probe of Chicago police

SA 189

Group Exhibit#3
(9 of 10)

While she's found a clear pattern of police withholding evidence, Gorman said, it's difficult to know whether any of the information contains a smoking gun — a piece of evidence that wasn't turned over that could have changed the outcome of a trial.

As she's pored through the files, Gorman has been struck by the heartbreaking stories they tell, of Chicago's violent history, of victims long buried and of defendants who were mostly young when they were arrested and are now growing old in prison.

The search also has had its notes of irony. The defense file for Cecil Robinson, who was charged in the 1983 murder of a junk shop owner, contained a response to a subpoena asking for the street file in the case. The response, dated March 8, 1989, was typed up by Jon Burge, then-commander of the Area 3 detective division who has since been disgraced over allegations of torture of dozens of black suspects.

"A diligent check of our records disclosed that no investigative file exists on this case," Burge wrote.

Robinson was sentenced to 23 years in prison. Two decades later, his street file was found in the basement cabinets at 51st Street and Wentworth Avenue.

And Gorman has a copy.

Group Exhibits #5
(10 of 10
)

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166



Candace Gorman creates files for inmates' letters asking her to look into their case or giving her permission to acquire their files.

(Michael Tercha / Chicago Tribune)

Group Exhibits #6
(1 of 7)

Pages: 469   Filed: 08/19/2022   Document: 28   Case: 21-2166

STATEMENT OF

Melissa Westmoreland

Taken __Sept. 11, 2002__ At __2:30 pm__

At __Area 1 Detective Division__

Present __ASA Dan Klepman__

__Det. C Bach__

This statement taken regarding the __murder__

of __Charles Rials__ which occurred on __September 8, 2002__

at __256 W. 38TH Pl.__ at approx __11:35 pm__.

~~I understand I have the right to remain silent and that anything I say can be used against me in a court of law. I understand that I have the right to talk to a lawyer and have him present with me during questioning, and if I cannot afford to hire a lawyer one will be appointed by the court to represent me before any questioning. Understanding these rights, I wish to give a statement.~~

After being advised that Dan Klepman is an assistant state's Attorney, a lawyer, and a prosecutor, and not her lawyer, Joseph Barker's lawyer, or the lawyer for anyone else involved in this case, Melissa Westmoreland agreed to give the following statement which is a summary and not word for word.

Melissa Westmoreland states she is 33 years old and was born on ▓▓▓▓. She lives at ▓▓▓▓▓▓▓▓ and has been living there her whole life. She lives there with her two kids, Jelissa Westmoreland, who is 14, and Shakyrah Ashby, who is 7. Meliss

~~Tf. read with me~~   ASA D~ H

Det. C. Bosh #20438

Group Exhibits #6

PAGE 2 OF 7

states she works for the CTA as a bus driver, and has been doing that for about 3 years.

Melissa states that for the last six months, she's bein dating a man named Joseph Booker. Melissa states she recognizes Exhibit #1 as a picture of Joseph. Melissa states she doesn't have a car, and Joseph does - a dark green Pontiac Grand Prix, a recent model. Joseph drives Melissa to work everyday, and has been staying the night almost every night. Melissa states that if leaves or goes out, he always calls to say his coming back to the house.

Melissa states that on Sunday, Sept. 8, 2002; Joseph and some of his friends were at her house. Melissa doesn't know their names, but states three of Joseph's friends, at her house that night. They came together at around 7:00-7:30 p.m.

Det. C. Book # 20430

Group Exhibits #6

PAGE 3 OF 7

They all hung out for most of the night. Melissa states one of Joseph's friend that was there was a guy they call W.K. but Melissa doesn't know anything else about him, or Joseph's other friends, not even their nicknames. Melissa states that for a while, W.K and another of Joseph's friends were out on the front porch. Also, Melissa states when she got home, and when Joseph + his friends came over, a man named Kenny Williams was outside. Melissa states she recognizes Exhib. #2 as a picture of Kenny Williams. Melissa states she heard from a friend named Teds that Kenny had some words, meaning a verbal altercation with W.K while W.K was outside. She heard that from Teds yesterday Sept. 10, 2002.

ASA D-Hf.

Det. C. Bauh #2042

SA 194

Group Exhibits #6

PAGE __4__ OF __7__

Melissa states that Joseph
and his friends all left her house
together sometime between 10:00 - 11:00pm,
Melissa thinks closer to 10:30pm.
She stayed home. About 30 minutes
after they left, Melissa was
sitting on her back porch which
faces south, away from 38th place.
While on the porch, Melissa heard
gun shots, and immediately ran
into her house screaming, because
she could tell the shots were
close by, and she wanted to
make sure her kids were down
and away from windows.

After the shots, maybe 5-10 minutes
later, she got a phone call from
Joseph. Joseph was alone, and
said he was coming over, like
he always does. Melissa told Joseph
that he could only come by to pick
her up, told him about how someone
got shot and that people were pointing

Det C Book #20938          TSA Det

Group Exhibits#6

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

PAGE 5 OF 7

at her house, saying the shooter came from her house. She wanted to get picked up so she could get out of the neighborhood, because she was scared. Melissa states she confronted Joseph asking him if he or any of his friends had anything to do with the shooting. Joseph told her no, and she believed him. Melissa doesn't know where he was or what he was doing when he left her house which is why she asked him if he was involved in the shooting.

Melissa states he came to pick her up. She sent her kids to her moms, and stayed with Joseph for the next two days in a hotel at Indiana and Pershing. She never discussed the shooting with Joseph again.

Melissa states she has been treated well by the police and by Assistant State's Attorney Klipman. She's ~~been interviewed~~ BAD DJ

Det. G Bash #20738

SA 196

Group Exhibits #6

PAGE __6__ OF __7__

been given pepsi to drink, and been allowed to use the bathroom when she needed. ~~DSK CK~~ Melissa states she came to the police station on her own, initially, to tell them what she knew and told them the same thing she told ASA Klepman today. She states she's giving this statement freely and voluntarily, and that no threats or promises were made to her in order to get her to give this statement. Melissa also states she is not under the influence of any drugs or alcohol at this time.

Melissa Wolfe and ASA Duff Det C. Bad + 20138 Melissa states she graduated from Wendell Phillips High school and finished one year of college, and can read and write English. She demonstrated this ability by reading the first paragraph of this statement out loud. ASA D. Klepman then read the rest of this statement out loud while Melissa followed along reading.

Melissa Wolfe ASA Duff

Det C. Bad #20138

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

Group Exhibits #6

PAGE ___7___ OF ___7___

to herself. She was then allowed to
make any changes or corrections
she wished to this statement
Muslim Watore ASAD-JF Det C. Anderson

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

SA 198

Group Exhibits #1
(1 of 4)

destruction of the DNA evidence was not malicious. The court concluded that, because of the "way" the "cartridges" were "handled" in 2002, "DNA testing would not yield probative results[.]" (PC3. R. I28-29). Booker filed timely notices of appeal relating to the denial of both of his DNA motions. (PC2. C2. 484; PC3. C. 36-37).

### Third-Stage Evidentiary Hearing

On October 8, 2014, the State revealed it had received 185 pages of reports relating to Booker's case from the Chicago Police Department. (PC4. R1. N2-3). Among the new discovery was a handwritten statement from Melissa Westmoreland given to Assistant State's Attorney ("ASA") Dan Klapman and Detective Bach. (PC4. C. 128-33; PC4. R1. O3-5). Westmoreland told ASA Klapman that Booker was at her home the night of the shooting, and that he left about 30 minutes before she heard gunshots. Moreover, Westmoreland's neighbor, a woman named "Teda," said she saw Kenneth Williams argue with a man named W.K. before the shooting. (PC4. C. 128-33). Booker then supplemented his petition with an affidavit from Teda's fiancé at the time, Antione Ford, with help from an exoneration project. (PC4. R1. O3).

### Antione Ford's affidavit

Antione Ford's affidavit stated that he and Teda were on their front porch around 6:30 or 7:00 p.m., on September 8, 2002, when Booker arrived in a blue Grand Prix. (PC4. C. 140). Booker briefly spoke to Ford and Teda before entering Melissa Westmoreland's house, which was next door to Teda's house. Twenty or 30 minutes later, two men arrived in a white Chevy Tahoe. They walked past Kenneth Williams, whom Ford knew as the Senior Regent for the Gangster Disciples in Wentworth Gardens. People called Williams "Kenny Wayne," and "Godzilla" because he had survived multiple shootings. (PC4. C. 139-40).[4] One of the men

---

[4]The record shows Ford testified that Williams's nickname was "Kenny Wang," but this is likely a typographical error. Ford's affidavit states that Williams's nickname was "Kenny Wayne." (PC4. C. 139-44; PC4. R2. V10).

SA 199

Group Exhibits #7
( 2 of 4)

asked Williams "what the fuck he was looking at," and Williams told him to straighten his hat. The men from the Tahoe then entered Westmoreland's house. (PC4. C. 139-40).

Ford saw Williams and 15 or 20 of his Gangster Disciple friends "drinking and smoking weed" across the street. (PC4. C. 140). At some point, Williams yelled, "Who the fuck putting on for the 'omegas' and 'blue dolphins[?],'" which Ford explained were ecstacy pills. Williams then sent some of his guys to buy the ecstacy and liquor, and when they returned 20 or 25 minutes later, "Everybody that drink was drinking, [e]verybody that pop pills was popping pills and [e]verybody that smoked weed was smoking weed."(PC4. C. 141).

Around 10:00 or 10:15 p.m., Ford saw Booker and the men from the Tahoe leave Westmoreland's house. Booker got in his car and drove off without talking to Williams or the other Gangster Disciples, and the other men entered their car and did the same. About 15 or 20 minutes later, Ford saw Charles Rials arrive. (PC4. C. 141). Williams and the other gang members were happy to see Rials because he had just gotten out of prison, but Rials started arguing with Williams. Ford stated that Rials was upset with Williams and the other Gangster Disciples because they had failed to post bond for him, provide him with a lawyer, or send him money while he was incarcerated. (PC4. C. 141-42). Rials said he "was gone [sic] cooperate with the police and send them all to jail, from the top to the bottom," meaning "from the shot caller's [sic] to the foot soldiers." Williams swung at Rials but missed. A woman then removed Rials and walked off with him. (PC4. C. 142).

Sensing tension, Ford and Teda went inside and Ford looked out the window. He saw Williams walk toward W. 37th Place and out of sight while the other gang members continued partying. Shortly thereafter, Ford saw Williams walk back toward the crowd with Darnell Brown. (PC4. C. 142). After Williams grabbed a beer, Williams, Brown, and Rials met in the middle of the block. A woman then

SA 200

Case: 21-2166      Document: 28      Filed: 08/19/2022      Pages: 469

Group Exhibits #7
( 3 of 4)

yelled to Brown and he crossed to the side of the street on which Ford lived. Williams and Rials "stepped off a few paces" before Williams shot Rials in the head and again while he was on the ground. (PC4. C. 143).

<div align="center">Antione Ford's testimony</div>

At the evidentiary hearing, Antione Ford acknowledged that he was serving a 60-year sentence for an unrelated murder and armed robbery at the time of the hearing (PC4. R2. V48), and that he was a Black Disciple until 2001. (PC4. R2. V11). Ford testified he never had any problems with anyone in Wentworth Gardens. (PC4. R2. V11). Ford recounted the facts of his affidavit and testified: he saw Booker enter Westmoreland's house around 7:00 p.m., without interacting with Williams; that Williams was partying with about 20 other gang members; that Williams sent some people to buy liquor and ecstacy; that about 30 minutes after Booker entered Westmoreland's two men arrived in a Tahoe; that one of those men exchanged words with Williams; that Booker left Westmoreland's house around 10:00 p.m., and drove off without talking to anyone; that the two men from the Tahoe left at the same time without incident; that Charles Rials arrived about 20 minutes later and threatened to "take everybody down" in Williams's gang because they failed to support him in prison; and that a woman removed Rials when he and Williams started arguing. (PC4. R2. V7-27).

In describing the shooting, Ford testified he saw Williams walk toward 37th Place before losing sight of him. Williams returned shortly thereafter with Darnell Brown. (PC4. R2. V22-23). While Brown and Williams were talking, Rials returned and met up with them in the middle of W. 38th Place. Brown then went to the south side of W. 38th Place to talk to a woman Ford did not know, and Williams and Rials went to the north side of the street. (PC4. R2. V23-24, 26-27). Rials tried to walk away, but Williams shot him. (PC4. R2. V27). Ford talked to police that night, but denied seeing the shooting because he was scared for himself,

<div align="center">-11-</div>

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

Group Exhibits #1
(4 of 4

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

Teda, and her three children. (PC4. R2. V28). When Ford saw Williams two days later, he no longer had braided hair. (PC4. R2. V34).

Ford further testified that, on September 10, 2002, Westmoreland visited him and Teda at their home. Westmoreland told Ford she had heard Williams told police that he argued with Booker before the shooting. Ford responded that he had seen Williams arguing with two people that night, and that Booker was not one of them. Ford told Westmoreland that Williams first argued with one of the men from the Tahoe. He told her the second argument was "amongst themselves." (PC4. R2. V29-31). Ford did not say that the second argument was between Williams and Rials, or what it was about, because he was scared Williams would retaliate if he implicated him as the shooter. (PC4. R2. V31-32).

On cross-examination, Ford testified he was imprisoned at Menard Correctional Center from 2006 until May of 2011, when he was transferred to Stateville Correctional Center. (PC4. R2. V49). He had no contact with Booker, or anyone on his behalf, at Stateville. (PC4. R2. V60). On the morning of the evidentiary hearing, Ford was transported on the same bus as Booker and was in the bullpen with him. (PC4. R2. V64). Ford acknowledged he had received disciplinary citations while in prison. (PC4. R2. V65-70). Ford further testified that ASA Terrance Reilly visited him at Stateville on March 4, 2015. (PC4. R2. V5-6, 38-40). Ford told ASA Reilly that the allegations in his affidavit are true; he refused to answer any questions without consulting Booker or his legal representative. (PC4. R2. V38-40).

In response to questioning by ASA Reilly, Ford testified that the shooting "happened in the street." (PC4. R2. V90). Ford further testified that State's Exhibit 4 was a picture of W. 38th Place from the night of the shooting, and that it showed blood and other items on the sidewalk on the north side of the street. (PC4. R2. V102). He stated that the photograph did not contradict his testimony that the

Group Exhibits #8
( 1 of 3)

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

(1) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence even though the results may not completely exonerate the defendant;

(2) the testing requested employs a scientific method generally accepted within the relevant scientific community. **\***

## STATEMENT OF FACTS

Joseph Booker is an admitted drug dealer who, at the time he was charged in this case, had no prior convictions for violence or weapons. (PC4. R3. X14). He was found guilty of first-degree murder based primarily on the testimony of Kenneth Williams, a high-ranking Gangster Disciple whom other witnesses have since identified as the actual shooter. *People v. Booker*, No. 1-06-2581, 5-6 (unpublished order of March 31, 2008). The State presented no forensic evidence linking Booker to the gun or crime scene, and Booker made no inculpatory statement. The jury engaged in prolonged deliberations and was issued a *Prim* instruction before returning its verdict. *Booker*, No. 1-06-2581 at 6. In the post-conviction proceedings below, Booker maintained his innocence and presented evidence from two new eyewitnesses who were too scared to accuse Williams earlier. (PC4. R3. X14; PC1. C1. 238-40; PC4. C. 139-44; PC4. R2. V7-118). The circuit court denied Booker's innocence claim after an evidentiary hearing. (PC4. R3. Y8). Booker now appeals.

### Trial

Kenneth Williams testified that he grew up in the same neighborhood as the decedent, Charles "CC" Rials, and that he had known him for about 10 years. (Tr. 179). On September 8, 2002, Williams was drinking beer in the Wentworth Gardens Housing project with about 20 of his friends. (Tr. 212, 186). At about 9:00 p.m., he was standing on the corner of W. 38th and S. Princeton, near his friend, Melissa Westmoreland's, home when he saw Booker and about eight of his friends arrive in four cars. (Tr. 179-80, 209, 183-86, 213). Williams had seen Booker before and recognized his blue, four-door Pontiac Grand Prix. (Tr. 184).

SA 203

Group Exhibits #8
(2 of 3)

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

According to Williams, Booker's group argued with Williams's group about "gang banging stuff." (Tr. 186). Westmoreland told Booker to come inside. (Tr. 187). At about 10:30 p.m., Booker and his friends left Westmoreland's and words were again exchanged between the two groups. (Tr. 188-89). Williams saw Booker drive away afterward. (Tr. 189).

Some of Williams's group then left to get beer while Williams remained on the stairs. (Tr. 189-90, 215). Around 11:00 p.m., Williams saw Charles Rials approach. (Tr. 180, 190). Three minutes later, Williams saw Booker running down "the middle of the street" toward Rials with a gun. (Tr. 190-91, 216, 228). Williams did not alert Rials of Booker's approach. (Tr. 229, 191).

Williams got up to run and saw Booker point the gun at Rials and shoot. (Tr. 192). When Williams looked back, he saw Booker standing over Rials. He heard more gunshots as he ran. (Tr. 193). Williams testified Booker was wearing a white t-shirt and black jogging pants, and that his hair was in French braids. (Tr. 196). "[M]any police" arrived at Wentworth Gardens that night, but he did not talk to any of them. (Tr. 226). Two days later, on September 10, 2002, Williams went to the station and identified Booker from a lineup. (Tr. 195, 202, 227-28).

Darnell Brown testified that his friend of 18 years, Charles Rials, was "like a brother" and that he saw him everyday. (Tr. 286-87). On September 8, 2002, Brown bumped into Rials in Wentworth Gardens and walked down W. 38th Place with him. (Tr. 249-50). Williams was sitting on some stairs nearby. Brown stopped to talk to a woman named Ella while Rials continued toward Williams. (Tr. 250, 268). Brown talked to Ella for about five minutes while Rials talked to Williams. (Tr. 250, 269). When Brown turned to go back home he heard a shot behind him, and then four more shots. (Tr. 251-52). When Brown looked up, he saw a "dark tall fellow," wearing an "all black jogging suit" putting a gun in his waistband. He did not see the shooter's face. (Tr. 252, 252-53, 272, 278-79). Brown saw the

-4-

Group Exhibits 8
(8 of 3)

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

shooter get in the back seat of a blue Grand Prix. (Tr. 256).

Brown did not tell police that night that he saw his friend's murder. (Tr. 287). Two days later, he went to a police station at the request of Kenneth Williams and identified Booker as the shooter from a lineup. Brown testified he fingered Booker because his clothes and build matched the shooter's. (Tr. 287, 278).

Fourteen-year-old Louis Dean testified he was Westmoreland's neighbor, and that he knew Rials from the neighborhood. (Tr. 300-02, 304A). On the night of the shooting, Dean was in his bedroom watching television. (Tr. 302-03). Around 11:30 p.m., he looked out the window and saw someone dressed in all black walk up behind Rials and shoot him several times. (Tr. 302-304B).

Dean did not positively identify Booker in a lineup, but described him as someone who looked like the shooter. (Tr. 314-15). On direct examination, Dean testified he saw Booker approach from behind and shoot Rials; on cross-examination, he testified he saw Booker approach with a gun, but he did not see a shooting. (Tr. 304B, 309-10). Dean was impeached with his grand jury testimony indicating he did not know from where the gunshots came. (Tr. 323-24). The lawyers questioned whether someone coached Dean from the gallery by nodding yes and no. (Tr. 312).

The jury began deliberating at 3:30 p.m. At 6:30 p.m., they sent a note stating they were deadlocked, with nine jurors voting guilty and three jurors voting not guilty. (Tr. 584). The court advised the jurors to continue deliberating. (Tr. 585). At 9:00 p.m., the jury sent another note stating that it was at an impasse. (Tr. 586-87). Over defense counsel's objection, the court issued a *Prim* instruction. (Tr. 588-89). At 11:45 p.m., the jury found Booker guilty of first-degree murder. (Tr. 593). The trial court sentenced Booker to 55 years in prison. (Tr. 615-16).

## Proceedings Leading to Current Appeals

On direct appeal, Booker argued that the eyewitness identification testimony was too unreliable to prove him guilty beyond a reasonable doubt, and that issuance

Group Exhibits #9
(1 of 4)

(PC4. R2. W48-49). Anderson then repeated that she did not remember discussing the case during prison visits. (PC4. R2. W51).

In January of 2015, shortly after Anderson gave her videotaped statement recanting her affidavit, she was arrested and charged with several misdemeanor offenses, including driving with a broken tail light, driving on a suspended license, and possession of a small amount of marijuana. (PC4. R2. W42-43). After Anderson appeared in court, the charges were dismissed. (PC4. R2. W43).[5]

<u>Joseph Booker's testimony</u>

Booker testified in his own defense. He proclaimed his innocence, stating, "I did not shoot Charles Rials." (PC4. R3. X14). Booker continued:

> My reputation in the street was known for selling drugs and I'm not slinging that around in a proud manner. Or like it is any less of an evil than the charges I stand convicted of, but it is the truth. That's what I did.
>
> I've never had a reputation for shooting and killing. This is facts [sic] supported by my rap sheet. If you was [sic] to review my rap sheet, all you see is several arrests for narcotics and one conviction for simple possession, possession with intent to deliver, concurrent. And, if you will, selling drugs is my *modus operandi*.

(PC4. R3. X14).

Booker testified that before being charged in this case, he had never seen Charles Rials, Kenneth Williams, Darnell Brown, Louis Dean, or Monica Ramsey. He denied arguing with Williams or anyone from Wentworth Gardens. The only people he knew there were Westmoreland and her family. (PC4. R3. X14).

On September 8, 2002, Booker visited Westmoreland's house because he had arranged to sell drugs there. He arrived alone in a blue Pontiac Grand Prix. On his way inside, he greeted her neighbors, Belinda "Teda" Brown and Antione Ford.

---

[5]The circuit court clerk's computer shows that Anderson was additionally charged with operating a motor vehicle without insurance in the same case (case# 15119426901). That charge was also dismissed. *See People v. Steward*, 406 Ill. App. 3d at 93 (Illinois courts may take judicial notice of public records).

SA 206

Group Exhibits #9
(2 of 4)

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

Booker did not know Ford's last name at the time. He testified that a man named W.K. and his associate arrived at Westmoreland's house in a white Chevy Tahoe for the drug deal. While W.K. and his associate were using Westmoreland's kitchen, she braided Booker's hair. Booker did not know W.K. had exchanged words with Williams before entering Westmoreland's house until he received additional discovery from the State in December of 2014, and read the handwritten statement Westmoreland gave to an ASA on September 11, 2002. (PC4. R2. WX15-16).

After the deal, W.K. and his associate drove off in their Tahoe and Booker drove off in his car. Booker returned to his fiancée and three daughters at 2931 S. Federal around 10:45 p.m. (PC4. R2. W16-17). Booker's mother-in-law arrived shortly thereafter with tea for his youngest daughter, who was feeling ill. Booker stayed home until about 1:00 a.m. (PC4. R2. W17-18).

Around then, Booker called Westmoreland and told her he was coming to get her. Westmoreland told Booker not to come to Wentworth Gardens because someone had been shot and police were everywhere. Booker picked up Westmoreland and took her to the Amber Motel. (PC4. R3. X18).

Booker further testified he had an intimate relationship with Ellen Anderson in 1995 that only lasted a couple of months. (PC4. R3. X19). In late 2005, Booker asked his mother to call Anderson because she had previously told Booker's mom that he was innocent. Booker's mom called the cell phone number listed in Anderson's affidavit, which Anderson had given to Booker's partner, Chuck Wick, to give to Booker's mother. During that call, Booker asked Anderson to submit an affidavit based on her independent statement to his mom that he was innocent. (PC4. R3. X20). Had Anderson not come forward, Booker would never have known she visited Wentworth Gardens, or that she knew Brown and Williams. (PC4. R3. X21-22).

SA 207

GROUP Exhibits #9
(3 of 4)

Case: 21-2166   Document: 28   Filed: 08/19/2022   Pages: 469

Booker testified he had never discussed the details of his case with Anderson in person, by phone or mail, or otherwise. At some point, he sent her police reports related to Monica Ramsey and Melissa Westmoreland so she could give them to investigator Patti Krashesky, who Booker hoped would get affidavits from them. (PC4. R3. X21-22). Booker argued that the reports did not indicate that Kenneth Williams was the shooter. (PC4. R2. W51-53; PC4. R3. X75).

Booker watched Anderson's video interview with ASA Reilly in which she denied that he had told her what to write in her affidavit, and stated she had come up with those allegations on her own. (PC4. R3. X22). Booker asked the court to watch the video, but the court declined, stating that Booker's testimony about the video was "sufficient for the court at this stage of the proceeding." (PC4. R3. X57). The court also declined Booker's request to admit Westmoreland's handwritten statement into evidence, finding it was hearsay. (PC4. R3. X7-8, 62).

On cross-examination, Booker testified he saw guys he knew to be Gangster Disciples near W. 38th Place whenever he went to Wentworth Gardens. He was not acquainted with any of them and did not want to be involved with them. (PC4. R3. X30-31). Booker denied being a Mickey Cobra in 2002 and claimed the "MC" tattoo on his right arm represents his name. (PC4. R3. X31). Booker told police he arrived at Wentworth Gardens around 7:00 p.m. on the night of the shooting, and that he left between 9:00 and 10:00 p.m. (PC4. R3. X37).

Booker testified he knew Teda and Ford in 2002. He did not know how many kids Teda had. (PC4. R3. X52). After September 8, 2002, Booker did not see Ford until July 15, 2015, when they arrived at court together. Booker had no contact with Ford at Stateville. (PC4. R3. X55-56).

In closing, Booker argued that the new evidence of innocence warranted a new trial. At trial, the State theorized Booker had shot Rials over an altercation he had with Williams. Ford's new affidavit and testimony contradicted that theory

SA 208

Group Exhibits #9
C 4 of 4

by establishing that Williams argued with W.K. and Rials that night, not Booker. (PC4. R3. X63-65). Ford's testimony that Booker never argued with Williams was corroborated by Westmoreland's statement. (PC4. R3. X64-65). Moreover, Ellen Anderson's recanted allegations were corroborated by other evidence and thus more likely to be true than her testimony at the evidentiary hearing. (PC4. R3. X74). Anderson's affidavit gave the exact time, place, and sequence of shots, which was corroborated by Williams and Brown's trial testimony, and Ford's new testimony. (PC4. R3. X73-74). Additionally, Brown's trial testimony that he talked to "Ella" right before the shooting corroborated Anderson's recanted allegation that she talked to Brown before the shooting, and Ford's testimony at the evidentiary hearing indicated he saw Anderson talking to Brown at that time. Finally, Ford's new testimony, Brown's trial testimony, and Anderson's affidavit, indicated Rials and Williams were together right before the shooting. (PC4. R3. X75-77).

In dismissing Booker's petition, the circuit court found that Ford's testimony was unreliable because he was in prison for murder, and because he misidentified the location of the shooting. The court then stated it was "unfortunate" this Court had remanded this case where Anderson recanted her affidavit. The court concluded there would be no possibility of a different verdict on retrial. (PC4. R3. Y8).

## ARGUMENT

**I.     This Court Should Remand Joseph Booker's Case For A New Trial Where The New Evidence of Innocence Implicating Kenneth Williams As The Shooter Would Probably Change The Result On Retrial.**

At an evidentiary hearing on Joseph Booker's actual innocence claim, Booker presented affidavits from two new, unacquainted witnesses, Ellen Anderson and Antione Ford, establishing they saw the shooting, that Booker was not the shooter, and that they were too scared to come forward before trial. (PC2. C1. 193-95; PC4. C. 139-44; PC4. R2. V5-118). According to Anderson and Ford's affidavits, the actual shooter was the State's primary eyewitness at trial, Kenneth Williams,

Pages: 469     Filed: 08/19/2022     Document: 28     Case: 21-2166

Pages: 469　Filed: 08/19/2022　Document: 28　Case: 21-2166

Group Exhibit #10

1 of 3

## STATEMENT OF

Louis Dean

TAKEN September 10, 2002 AT 8:00 pm

AT Area 1

PRESENT ASA Michelle Wilson

Det. Evans #50907

Monica Ramsey

This statement taken regarding the _____ Murder

of Charles Rials _____ which occurred on September 8, 2002

at 256 W. 38th Pl. _____ at approximately 11:35pm

I understand I have the right to remain silent and that anything I say can be used against me in a court of law. I understand that I have the right to talk to a lawyer and have him present with me during questioning, and if I cannot afford to hire a lawyer one will be appointed by the court to represent me before any questioning. Understanding these rights, I wish to give a statement.

After being told that Assistant State's Attorney Michelle M. 1967 is a lawyer, a prosecutor, and not his lawyer, or the lawyer for anyone else in this case, Louis Dean agreed to give the following statement which is a summary and not word for word.

Louis States he is 13 years old and his birthday is ▓▓▓▓▓▓▓. He lives at ▓▓▓▓▓▓▓ with his mom, dad, 2 sisters, and 1 brother. He is in 8th grade at Arbot Elementary and he reads and understands English.

Louis Dean　Asa Michelle Wilson　Monica Ramsey

SA 210

Group Exhibits 10

Louis states that at about 11:35pm on September 8, 2002, he was at home. He was looking out his bedroom window. He heard a gunshot and ducked down. After a pause he heard more gunshots although he is not sure exactly how many. He did not get up until the shooting stopped.

Louis states when the shooting was over, he looked out the window again. He saw a black man with dark skin running with a gun in his hand. The gun was a dark-colored handgun. Exhibit A is a photo of the man that was running with the gun. He could see that somebody was hurt across the street. They were just laying there. Louis found out later it was Charles Rials who he knew as Chuck. The man with the gun was running away from where Chuck was laying. Louis never saw the man with the gun again. The man in Exhibit A was the only person Louis saw with a gun

*that Louis identified today in a line-up as looking like the* DeMr

NW LD

*that Louis identified in the line-up looking like the man with the gun* DC NW

LD m

Louis Dean   ASH Ymichell   Ymruca Ram SA311

Group Exhibits

3 of 3

when he looked out the window. When Louis looked out the window after the shots, there was no one but the man in Exhibit A anywhere close to Chuck.

Louis states he is giving this statement because it is the truth, and no one has threatened him, forced him, or promised him anything for him to give this statement. He has been with his mom, Monica Ramsey, the whole time he has been in Area One. They have been sitting in an office. He has been treated fine by the police and by ASA Wilson. He is not under the influence of any drugs or alcohol.

Louis Dean

Louis showed he can read English by reading the first paragraph of this statement out loud, ASA Wilson then read the rest of this statement out loud while Louis followed along. Louis was allowed to make any changes, additions, or corrections he wanted to make to this statement.

Louis Dean

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

Group Exhibits #11
(1 of 2)

STATE OF ILLINOIS    )
                         ) SS:
COUNTY OF COOK      )

## AFFIDAVIT

    I, Denise Miles, being first duly sworn under oath, deposes and state that the contents of this affidavit is given from my own personal knowledge, and is true and accurate in substance and in fact; I am competent to, and willing to testify to the contents of this sworn affidavit.

    I further state that:

    My maiden name is Denise Booker, and I am the mother of Joseph Booker;

    That sometime in January of 2001 I received a telephone call from my son's fiance', Carolyn Wilson, who informed me that my son Joseph Booker, had been arrested by two detectives;

    That Carolyn came to my residence to pick me up in her vehicle, then we both went to the Area 1 police station, located at 51st and Wentworth Street in Chicago, Illinois, to learn of the reason that my son, Joseph Booker, was being arrested;

    That while I was at the Area 1 police station I learn that Joseph could have potentially been charged with 3 attempt murders, 3 aggrevated discharge of a firearm, and possibly some other charges;

    I learned that the detective that arrested Joseph was a detective named David Evans;

    Detective David Evans told me that he arrested Joseph because Joseph's vehicle was identified as the vehicle observed leaving the scene of a shooting;

    The victims of the shooting told Detective Evans that my son

SA 213

Group Exhibits #11
( 2 of 2 )

is not the person that shot them, and that Joseph's car was not the car they seen leaving after the shooting;

That while I was at the Area 1 police station, Detective Evans approached me and my son's fiance', Carolyn Wilson, in an angry manner, and said that he was going to get Joseph sooner or later;

That a short period of time later, the detective released Joseph, and as we were leaving the police station Detective Evans again threatened to get Joseph next time; specifically telling Joseph, " I know it was your car involved with the shooting, but I'll get you next time";

That while we were walking to the car, Carolyn told Joseph that Detective Evans made that same threat " to get him later", just before the detective released him;

I told my son, Joseph Booker, that what Carolyn told him about the threat the detective made was true, and that he need to be careful and to watch himself.

Further Affiant Sayeth Not.

Denise Miles/Affiant

Subscribed and Sworn to before me
this 3 day of October ,2011.

NOTARY PUBLIC

"OFFICIAL SEAL"
JUWANDA WATSON
Notary Public, State of Illinois
My Commission Expires Nov. 27, 2014
Commission No. 664272

SA 214

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

Group Exh. #12
(1 of 2)

STATE OF ILLINOIS )
                  ) SS:
COUNTY OF WILL    )

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

## AFFIDAVIT

I, Joseph Booker, being duly sworn under oath, deposes and state that the contents of this affidavit is given from personal knowledge, and is true and accurate in substance and in fact; I am competent to, and willing to testify to the contents of this sworn affidavit.

I further state that:

Sometime in January of 2001 I was arrested by a detective named David Evans;

That my arrest was allegedly based on the victims of a shooting identifying my car as the car the shooter used to get away in;

That Detective Evans arrested me with the intentions of charging me with 3 attempted murders, 3 aggrevated discharges of a firearm, and a rundown of other charges;

That while I was being held in custody at the Area 1 police station in an interrogation room under the pretenses that my car was identified as a getaway car in a shooting, I was placed in a lineup;

That after I was displayed in a lineup, I was escorted back to the same interrogation room that I was being held in upon my arrival at the Area 1 police station;

That a little while after being escorted back to the interrogation room, Detective Evans came to the interrogation room and released me;

SA 215

Group Exh. #12
(2 of 2)

That the victims of the shooting told the detective that I was not the man who shot them, and that my car was not the car they seen leaving after the shooting;

That when I reached the waiting area of the police station, I noticed that my fiance', Carolyn Wilson was waiting for me;

That as me and my fiance', Carolyn Wilson was leaving the police station, Detective Evans approached me and said " he knows it was my car involved with the shooting,but he'll get me next time";

That while we ( my fiance' and me ) were walking to our car, my fiance', Carolyn Wilson told me that Detective Evans had made that same threat of getting me later to her. Further Affiant Sayeth Not.

_Joseph Booker_
Joseph Booker/ Affiant


Subscribed and Sworn to before me
this _18th_ day of _September_ ,2009.
_Phyllis Baker_
NOTARY PUBLIC

OFFICIAL SEAL
PHYLLIS BAKER
Notary Public - State of Illinois
My Commission Expires Feb 07, 2011

Case: 1:10-cv-03995 Document: 28 Pages: 189 Filed: 08/31/2022 16

**CRIME SCENE PROCESSING REPORT**
**CHICAGO POLICE DEPARTMENT**

Group Exhibit #13 (1 of 3)

| CLASSIFICATION OF OFFENSE/INCIDENT | I-UCR CODE | OTHER NO | RD NO |
|---|---|---|---|
| Homicide | 0110 | | HH635-315 |

E#02253/1021

| ADDRESS OF SERVICE | VICTIM'S NAME | SEX-RACE-AGE | AREA-DIST-BEAT OCCUR |
|---|---|---|---|
| 1819 W. Pershing | RIALS, Charles | m/1/20 | 01/09/ |

| ASSIGNMENT TYPE | REQUESTED BY | DATE RECEIVED - TIME | UNIT ASSIGNED |
|---|---|---|---|
| PR | 5138 | 10 Sep 02  1550 | 7611 |

**PHOTOGRAPHY**

| A Group 9A left, front, right | D | G |
|---|---|---|
| B identified by left, front, right | E | H |
| C | F | I |

| FINGERPRINTS | ELIM. PRINTS ☐ YES ☐ NO | IN CUSTODY ☐ YES ☐ NO | NAME (LAST - FIRST) | SEX-RACE | D.O.B | C.B.NO. | I.R. NO. |
|---|---|---|---|---|---|---|---|

| MED NEG LIFT | LOCATION FOUND | F.N. | MED NEG LIFT | LOCATION FOUND | F.N. |
|---|---|---|---|---|---|
| | | | | | |

| POSSIBLE SUSPECT INFORMATION ☐ MALE ☐ FEMALE | ☐ ADULT ☐ JUVENILE | RACE | TOTAL NO. OF LIFTS | DATE OF TRANSMITTAL |
|---|---|---|---|---|

| ☐ PALMS ☐ IMPRESSIONS ☐ FINGERPRINTS | SUITABLE FOR COMPUTER ☐ YES ☐ NO | PRINTS SUITABLE FOR COMPARISON ☐ YES ☐ NO | INITIALS OF EXAMINER | DATE |
|---|---|---|---|---|

| VEH. YEAR | MAKE & MODEL | COLOR | STATE LICENSE NO. | V.I.N. |
|---|---|---|---|---|

**PHYSICAL EVIDENCE**

| GROUP | INVENT NO - UNIT | DESCRIPTION & LOCATION | INITIAL DEST |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**DETAILS OF CASE**

B/3 shot photos of investigative line up as indicated above * #3 identified

1) Perkins, Shawnell  m/1/19  CB 15733791
2) Jordan, Brian  m/1/23  22 Dec 78
3) Booker, Joseph  m/1/204  15 July 76  14 Apr 82
4) Robinson, Darnell  m/1/20  19 Apr 82  5 Aug 79
5) Robinson, Marcus  m/1/23  6 Aug 77
6) Shepard, Michael  m/1/34  1 Feb 64

| INVESTIGATING OFFICER'S NAME | STAR NO | UNIT | BEAT OFFICER'S NAME | STAR NO | UNIT |
|---|---|---|---|---|---|
| D EVANS | 20927 | 610 | R Anderson | 14309 | 09 |

| REPORTING TECHNICIAN - PRINT LAST NAME - FIRST - STAR NO - UNIT | DATE ARRIVED | TIME | TIME COMPLETED |
|---|---|---|---|
| (W) Dolan  5457  477 | 10 Sep 02 | 1550 | 1620 |

| TECHNICIAN'S SIGNATURE | DATE | APPROVING SUPERVISOR (PRINT NAME) - STAR NO |
|---|---|---|
| (W) Dolan | 10 Sep 02 | Sgt Gibson  2299 |
| | | SUPERVISOR'S SIGNATURE |

CPD-21 949 (REV 10/92)

**CRIME SCENE PROCESSING REPORT**    CLASSIFICATION OF OFFENSE/INCIDENT    I-UCR CODE    OTHER NO.    RD NO    V #13

**CHICAGO POLICE DEPARTMENT**

F # 0205309 852    Homicide    0110    (2 of 3) HH625-315

**ADDRESS OF SERVICE**
1619 W. Pershing (5)    **VICTIM'S NAME** RIALS, Charles

**ASSIGNMENT TYPE** PR    **REQUESTED BY** 5138

SEX-RACE-AGE m/l/2c    AREA-DIST-BEAT OCCUR 01 0919

DATE RECEIVED - TIME 10 Sep 02 1445    UNIT ASSIGNED 9/p 11

**PHOTOGRAPHY**

| | | |
|---|---|---|
| A 4u VIN | D | G |
| B O/A four sides of vehicle | E | H |
| C | F | I |

**FINGERPRINTS**   ELIM. PRINTS ☐YES ☐NO   IN CUSTODY ☐YES ☐NO   NAME (LAST - FIRST)   SEX-RACE   D.O.B.   C.B. NO.   I.R. NO.

| MED NEG LIFT | LOCATION FOUND | F.N. | MED NEG LIFT | LOCATION FOUND | F.N. |
|---|---|---|---|---|---|
| | NONE | | | | |

**POSSIBLE SUSPECT INFORMATION** ☐MALE ☐FEMALE    ☐ADULT ☐JUVENILE   RACE    TOTAL NO. OF LIFTS    DATE OF TRANSMITTAL

☐PALMS ☐IMPRESSIONS   ☐FINGERPRINTS   SUITABLE FOR COMPUTER ☐YES ☐NO   PRINTS SUITABLE FOR COMPARISON ☐YES ☐NO   INITIALS OF EXAMINER   DATE

**VEH YEAR** 2002   **MAKE & MODEL** Pontiac Grand Prix   **COLOR** Dark Blue   **STATE LICENSE NO.** 2346417 Il/Temp   **V.I.N.** 1G2WP52K22F187652

**PHYSICAL EVIDENCE**

| POP INVENT NO - UNIT | DESCRIPTION & LOCATION | INITIAL DEST |
|---|---|---|
| | NONE | |

**DETAILS OF CASE**
RT shot photos of vehicle used by offender to leave scene of incident.

**INVESTIGATING OFFICER'S NAME** D Evans   **STAR NO** 20957   **UNIT** 610   **BEAT OFFICER'S NAME** R Anderson   **STAR NO** 14309   **UNIT** 09

**REPORTING TECHNICIAN - PRINT LAST NAME - FIRST - STAR NO - UNIT** W Jones 5457   477   **DATE ARRIVED** 10 Sep 02   **TIME** 1500   **TIME COMPLETED**

**TECHNICIAN'S SIGNATURE** W Jones   **DATE** 10 Sep 02   **APPROVING SUPERVISOR (PRINT NAME) - STAR NO** Colvin 2207   **SUPERVISOR'S SIGNATURE**

CPD-21 949 (REV 10/92)

Group Exhibit HS #13

**CRIME SCENE PROCESSING REPORT**
**CHICAGO POLICE DEPARTMENT**

| CLASSIFICATION OF OFFENSE/INCIDENT | I-UCR CODE | OTHER NO. | RD NO |
|---|---|---|---|

E#0325 411858

Homicide Billecard Bug

(3 of 3)

HH 635-342

| ADDRESS OF SERVICE | VICTIM'S NAME | SEX-RACE-AGE | AREA-DIST -BEAT OCCUR |
|---|---|---|---|
| 1815 W Pershing 5 | KEALY, Charles | M/1/30 | 6 - 109/934 |

| ASSIGNMENT TYPE | REQUESTED BY | DATE RECEIVED - TIME | UNIT ASSIGNED |
|---|---|---|---|
| PR | 5138 | 11 Sep 02   1606 | 9611 |

**PHOTOGRAPHY**

| A Group: left, front, right | D | G |
|---|---|---|
| B  #3 identified Left front, right | E | H |
| C | F | I |

| FINGERPRINTS | ELIM. PRINTS ☐ YES ☐ NO | IN CUSTODY ☐ YES ☐ NO | NAME (LAST - FIRST) | SEX-RACE | D.O.B. | C.B.NO. | I.R. NO. |
|---|---|---|---|---|---|---|---|

| MED NEG LIFT | LOCATION FOUND | F.N. | MED NEG LIFT | LOCATION FOUND | F N |
|---|---|---|---|---|---|
| | None | | | | |

Page 406

| POSSIBLE SUSPECT INFORMATION ☐ MALE ☐ FEMALE | ☐ ADULT ☐ JUVENILE | RACE | TOTAL NO. OF LIFTS | DATE OF TRANSMITTAL |
|---|---|---|---|---|

| ☐ PALMS ☐ IMPRESSIONS ☐ FINGERPRINTS | SUITABLE FOR COMPUTER ☐ YES ☐ NO | PRINTS SUITABLE FOR COMPARISON ☐ YES ☐ NO | INITIALS OF EXAMINER | DATE |
|---|---|---|---|---|

| VEH YEAR | MAKE & MODEL | COLOR | STATE LICENSE NO. | V.I.N. |
|---|---|---|---|---|

**PHYSICAL EVIDENCE**

| TOP INVENT NO - UNIT | DESCRIPTION & LOCATION | INITIAL DEST |
|---|---|---|
| | None | |
| | | |
| | | |
| | | |

**DETAILS OF CASE**

4 shot photos of investigative lineup. Number #3 identified.

1) Jordon, Brian   m/1/23   CB 15235111

2) Robinson, Marquis   m/1/23   15235114

* 3) Booker, Joseph   m/1/24   IL 1110950

4) Harris, Mark   m/1/21   15235195

| INVESTIGATING OFFICER'S NAME | STAR NO | UNIT | BEAT OFFICER'S NAME | STAR NO | UNIT |
|---|---|---|---|---|---|
| Bach | 20438 | 610 | | | |

| REPORTING TECHNICIAN - PRINT LAST NAME - FIRST - STAR NO - UNIT | DATE ARRIVED | TIME | TIME COMPLETED |
|---|---|---|---|
| Solivo   5457   477 | 11 Sep 02 | 1616 | 1700 |

| TECHNICIAN'S SIGNATURE | DATE | APPROVING SUPERVISOR (PRINT NAME) - STAR NO |
|---|---|---|
| | 11 Sep 02 | Gibson   2299 |
| | | SUPERVISOR'S SIGNATURE |

CPD-21 949 (REV 10/92)

SA 219

Case: 1:10-cv-2166   Document: 28   Filed: 03/17/2022   Page: 400

# INDEX TO APPENDICES

Appendix A - Appellate Court of Illinois, First Judicial District Unpublished Order of August 8, 2017 - 2017 IL App (1st) 130177-U

Appendix B - Appellate Court of Illinois, First Judicial District Unpublished Order of March 31, 2008 - No.: 1-06-2581

Appendix C - Appellate Court of Illinois, First Judicial District Unpublished Order of September 22, 2005 - No.: 1-03-3533

Appendix D - McIntosh petition & exhibits on Corrupt Cops: David Evans 20927■ and Chester Bach 20438

Appendix E - Article on Corrupt former Chicago Police Sergeant Ronald Watts & Crew (David Evans and Chester Bach included)

*Appendix A*
*Pg. 1 - 12*

NOTICE
This text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

2017 IL App (1st) 130177-U

Nos. 1-13-0177, 1-13-2279 & 1-15-2995 (cons.)

Order filed August 8, 2017

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 02 CR 25224 |
| JOSEPH BOOKER, | ) | The Honorable Arthur F. Hill, Judge, presiding. |
| Defendant-Appellant. | ) | |

PRESIDING JUSTICE HYMAN delivered the judgment of the court.
Justices Neville and Pierce concurred in the judgment.

ORDER

*Held*: The trial court's denial of defendant's postconviction petition after a third-stage evidentiary hearing was not against the manifest weight of the evidence where one witness recanted her affidavit supporting the petition and the trial court found a second witness was not credible; trial court's denial of defendant's request to test the five bullet casings for DNA was not manifestly erroneous.

¶ 2    On direct appeal, this court affirmed defendant Joseph Booker's conviction for murder.

Booker filed a postconviction petition asserting actual innocence based on an affidavit from a

witness stating she saw who shot the victim, and it was not Booker. This court reversed and

1-13-0177

remanded for further proceedings the trial court's summary dismissal of the petition. In this appeal, Booker argues actual innocence because the evidence implicating the shooter exonerates him and would change the result on retrial. Booker also contests the trial court's denial of his request for DNA testing, which he maintains, "has the potential to produce noncumulative evidence materially relevant to [his] actual innocence claim."

¶ 3    The trial court conducted a full postconviction evidentiary hearing. Based on this record, the trial court's decision was not against the manifest weight of the evidence. Additionally, the trial court's denial of the request to test the five bullet casings for DNA was not error.

¶ 4                                              Background

¶ 5    In September 2002, Charles Rials was fatally shot while walking in the Wentworth Gardens Housing Development, Chicago. Police arrested Booker the next day after three eyewitnesses identified him as the shooter. The eyewitnesses, all of whom testified at Booker's trial, were Kenneth Williams and Darnell Brown, both Black Gangster Disciples, and Louis Dean, 13-years-old on the night of the shooting.

¶ 6    Kenneth Williams knew Booker from having seen him multiple times at Wentworth Gardens over the previous three months. Booker drove a blue, four-door Pontiac Grand Prix and often visited Melissa Westmoreland, who lived there. On the evening of September 8, Williams was standing with some friends across the street from Westmoreland's house when Booker arrived with several friends. Booker's group argued with Williams and his friends before going into Westmoreland's house. A short time later, Booker and his friends came outside, resumed arguing, and then drove away. Booker returned minutes later with a gun and walked up to Rials who was walking down the street. Williams saw Booker point the gun at Rials and shoot him in

SA 222

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

1-13-0177

the head. Booker then stood over Rials and shot him several more times, before running away. The next day, Williams spoke to the police and identified Booker in a lineup.

¶ 7 Darnell Brown testified that around 11:00 p.m. on September 8, he was walking with Rials down 38th toward Williams who was sitting on some steps. Brown stopped to talk to someone and Rials kept walking. Brown heard a gunshot and started walking toward the sound. Brown heard four more gunshots and then saw Booker with a gun standing next to Rials, putting the gun away on his hip. Booker got into a Grand Prix and drove away. Five days later, Brown went to the police station and identified Booker in a lineup.

¶ 8 Louis Dean lived at Wentworth Gardens with his parents and grandmother. On the night of the shooting Dean was in his second-floor bedroom watching television. He looked out of his window and saw Rials, whom he knew from the neighborhood. Dean saw Booker walk up behind Rials and shoot him. After Rials fell, Booker stood over him and fired additional shots. Two days later, Dean identified Booker from a lineup as the shooter. On cross-examination, Dean admitted he gave a signed statement to an Assistant State's Attorney and a Chicago detective that he heard the first shot, but did not see it. Dean also stated he did not remember telling the Grand Jury that he did not know where the shots came from. Dean testified that his previous statement was incorrect and that he was telling the truth when he testified that he actually saw Booker shoot Rials.

¶ 9 Physical evidence recovered at the scene included a baseball cap, CTA transit card, five cartridge cases, four metal fragments, and a blood specimen from the sidewalk. A Chicago Police Department forensic investigator identified five bullet casings found at the scene as Winchester .40-caliber Smith and Wesson pistol ammunition fired from the same gun. No gun was recovered.

-3-

1-13-0177

¶ 10      During deliberations, the jury sent two notes to the trial court indicating a deadlock. A jury convicted Booker after being given the *Prim* instruction.

¶ 11                    Appeal No. 1-03-3533

¶ 12      On direct appeal, this court affirmed Booker's conviction, rejecting his arguments that the eyewitness testimony was unreliable and that the trial court erred by giving the *Prim* instruction. This court held that the identifications were not so "vague or doubtful that no rational jury could have concluded that defendant committed the offense of first degree murder." *People v. Booker*, 1-03-3533 (2005) (unpublished order under Illinois Supreme Court Rule 23).

¶ 13                    Appeal No. 1-06-2581

¶ 14      On May 31, 2006, Booker filed a postconviction petition asserting both trial counsel and appellate counsel were ineffective; the State engaged in prosecutorial misconduct by withholding a material witness and information from the defense; and newly discovered evidence proved his actual innocence, attaching the affidavit of Ellen Anderson.

¶ 15      Anderson stated in her affidavit that around 11:05 p.m. on September 8, 2002, she was visiting Wentworth Gardens when she saw Williams, Brown, and a third man whom she did not know. Anderson had a conversation with Brown while Williams and the other man began to walk away. Anderson heard a gunshot and saw the other man lying on the ground. Anderson then saw Williams approach the man on the ground and shoot him several more times. Afterward, as Anderson ran to catch a cab, Brown followed, threatening her, and telling her to "keep [her] mouth shut."

¶ 16      The trial court summarily dismissed the petition. Booker appealed and this court reversed. *People v. Booker*, No. 1-06-2581 (2008) (unpublished order under Supreme Court Rule 23). We

-4-

1-13-0177

found Anderson's proffered testimony "material to the issue of whether defendant shot Rials," not cumulative of the evidence presented at trial, and of such a conclusive nature that it would "probably change the result on retrial." *Id.* at 4. Moreover, although three eyewitnesses identified defendant as Rials' murderer, Anderson's affidavit suggested that Williams and Brown were motivated to fabricate their accounts. *Id.* Further, the third witness, Dean, did not actually see the shooting. This court concluded that "this testimony, considered in conjunction with Anderson's proffered account of the incident provide[d] weak evidence of [Booker's] guilt." *Id.* at 6. Thus, we remanded for further proceedings.

¶ 17    The trial court granted the State's motion to dismiss finding Booker's ineffective assistance of trial counsel claims could have been raised in his direct appeal. The trial court ordered a hearing on the actual innocence claim in Booker's petition. In September 2014, the State informed the trial court that Anderson had recanted her affidavit and given a videotaped statement to that effect.

¶ 18    In December 2014, the State tendered recently discovered reports from the Chicago Police Department relating to its investigation of the murder. Among the reports was a handwritten statement from Westmoreland that Booker was at her house, left about 1/2 hour before she heard gunshots, and that another neighbor told her that Williams and "W.K" were arguing before the shooting. After viewing these documents, Booker filed a motion to reconsider the trial court's order granting the State's motion to dismiss. Attached to his motion was a signed statement from Ford, dated December 12, 2014, that on September 8, 2002, Ford was with his fiancé on her porch next door to Westmoreland's house and that around 6:30 or 7:00 p.m. he saw Booker arrive

-5-

1-13-0177

there and go inside. Ford also saw Williams and 15 to 20 other Gangster Disciples "drinking and smoking weed" across the street.

¶ 19    Around 10:00 or 10:15 p.m., Ford saw Booker leave Westmoreland's and drive away. About 15 or 20 minutes later, Ford saw Rials arrive. Ford saw Rials and Williams arguing, and a short time later saw Williams shoot Rials in the head and again while he was on the ground. Ford also stated that he spoke to the police on the night of the shooting and told them he had only heard shots but had not seen anything because he knew Williams saw him outside and he was afraid for himself and his family.

¶ 20    The trial court denied Booker's motion to reconsider and advanced Booker's actual innocence claim to a third-stage evidentiary hearing. At the hearing, Anderson, Ford, and Booker testified. Booker testified that he did not shoot Rials, and that the only people he knew at Wentworth Gardens were Westmoreland and her family.

¶ 21    Anderson testified that her sworn affidavit stating she saw Williams shoot Rials was false, but she signed it because she loved Booker and did not want to see him in prison. Sporadically over 10 years, she and Booker had been in a romantic relationship but they were not dating in 2002. In 2003, she learned that Booker was in prison, and in 2005, Booker's mother called her. Anderson went to visit Booker in prison about 10 times but never talked to him about the case. Anderson thought he was innocent

¶ 22    Ford testified that he belonged to the Black Disciples gang until 2001, and at the time of the hearing was serving a 60-year sentence for an unrelated murder and armed robbery. His testimony and his affidavit were essentially the same. Ford added that he had talked to the police on the night of the shooting but denied seeing anything because he was afraid for himself, his

-6-

1-13-0177

fiancé, and her three children. According to Ford, he saw Williams shoot Rials with a pistol as Rials was attempting to walk away from Williams. On cross-examination, Ford stated the shooting occurred in the middle of the street.

¶ 23    The trial court denied Booker's petition, noting that Anderson testified that her affidavit was "a lie, that she was not out there, that she did not see any shooting, that she had had a relationship with [petitioner] and she felt badly for him, she wanted to help him." The trial court also noted that Ford's credibility was doubtful and that Booker "of course" denied committing the murder.

¶ 24    Booker requests reversal of the third-stage denial of his petition asserting his innocence and remand for a new trial.

¶ 25                                    Forensic Testing

¶ 26    Booker filed a *pro se* motion for forensic testing, requesting DNA and fingerprint testing on the recovered cartridge casings. 725 ILCS 5/116.1, *et seq*. (West 2012). The State objected based on Booker's inability to meet his burden of establishing that the evidence had been properly preserved. 725 ILCS 5/116-3 (West 2012). At the hearing on the motion, Illinois State Police latent fingerprint examiner Christy Fischer testified she tested the five cartridge casings in 2002. Fischer wore latex gloves, a coat, and eyewear but did not cover her mouth because it was not "common practice" to do so. Had DNA testing been initially requested, it would have been done before other testing.

¶ 27    The technician who conducted "firearms analysis" of the casings did not wear gloves or protective face-wear when handling the casings. Two other technicians handled the casings while

SA 227

1-13-0177

processing them. And the casings were sent to a state police lab in Carbondale where technicians would also have handled them without protective gear.

¶ 28    DNA expert Greg Didomenic testified he reviewed the lab reports pertaining to the shell casings. Didomenic opined that the small size of the cartridge casings and the fact that several persons handled the casings without protective gear meant that the casings were "potentially contaminated." Didomenic would not expect to find "meaningful DNA" on the casings. Had "clean technique" precautions been taken, getting DNA evidence would have been more likely.

¶ 29    The trial court found that (i) DNA testing was not requested in 2002, (ii) Illinois State Police followed procedures in place for the requested tests, and (iii) any destruction of the DNA evidence was not malicious. Accordingly, the court held that "DNA testing would not yield probative results in this case," and denied Booker's motion.

¶ 30                              Analysis

¶ 31    The Due Process Clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. 1, § 2) affords postconviction petitioners the right to assert a claim of actual innocence based on newly discovered evidence. *People v. Parker*, 2012 IL App (1st) 101809, ¶ 80. To succeed on a claim of actual innocence, a petitioner must present: (i) evidence that has been discovered since the trial and could not have been discovered earlier through due diligence. *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009); (ii) which is relevant and probative of the petitioner's innocence ("material") and adds to the evidence which the jury heard (noncumulative); and (iii) of such a conclusive character that it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96. "Probability" is the key, not certainty, because the trial court predicts what another jury would likely do, considering the new and the old evidence together. *Id.* ¶ 97.

SA 228

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

1-13-0177

¶ 32    At the second stage of postconviction proceedings, the trial court takes all well-pleaded facts that are not positively rebutted by the trial record as true. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Here the trial court not only had Anderson's affidavit before it, but also Ford's signed statement attached to Booker's motion. In ordering the evidentiary hearing, the trial court explicitly stated that Ford's testimony was needed.

¶ 33    At a third-stage evidentiary hearing, the trial court must determine whether the evidence introduced demonstrates that the petitioner is entitled to relief under the Act. *People v. Domagala*, 2013 IL 113688, ¶ 34. The trial court serves as a fact finder and determines the credibility of witnesses, weighs testimony and evidence, and resolves any evidentiary conflicts. *Id.* New evidence produced at the postconviction stage need not exonerate the defendant. This is a comprehensive approach and involves credibility determinations that are uniquely appropriate for the trial judge. *Coleman*, 2013 IL 113307, ¶ 97.

¶ 34    We must decide whether the trial court committed manifest error by determining that the evidence was not conclusive enough to "probably" change the result on retrial. See *id.*, ¶¶ 1, 104. Where fact-finding and credibility determinations are involved, we will not reverse the trial court's decision unless it is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23; *People v. Beaman*, 229 Ill. 2d 56, 72 (2008) (quoting *People v. Morgan*, 212 Ill. 2d 148, 155 (2004) ("Manifestly erroneous" means the trial court's error is "clearly evident, plain, and indisputable.").

¶ 35    Ford did not come forward until December 2014, more than 12 years after the shooting, while incarcerated for an unrelated murder. Booker attempts to justify the lengthy delay by arguing Ford feared retaliation from Williams' gang, and that Ford was unaware of Booker's real

-9-

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

1-13-0177

name. But Ford was imprisoned in 2004 and waited until 2014 to make his statement. This delay alone raises questions as to Ford's credibility. "The omission of a witness to state a particular fact under circumstances rendering it likely that he would state that fact, if true, may be shown to discredit his testimony as to such fact." *People v. Brown*, 47 Ill. App. 3d 920, 928-29 (1977). Although couched in terms of impeachment of a witness at trial, this principle impairs Ford's credibility as a witness. See *People v. Fabran*, 42 Ill. App. 3d 934, 938 (1976).

¶ 36        Additionally, Ford's status as a convicted felon adversely affected his credibility. See *People v. Montgomery*, 47 Ill. 2d 510, 516 (1971) (test used to determine admissibility of witness's prior conviction). The trial court read Ford's statement, heard him testify about what he observed in 2002, and was the ultimate arbiter of Ford's credibility.

¶ 37        Similarly, Anderson did not come forward until 2006, four years after the crime. Anderson stated she saw Booker's mother at church and told her that she knew Booker was not guilty. After visiting Booker in prison multiple times over the next few years, Anderson swore out an affidavit that she later recanted. The affidavit was the basis for advancing the matter to a third-stage hearing.

¶ 38        Regarding Anderson's affidavit, Booker asserts that Anderson's recantation was suspect because she feared Brown, who belonged to the Gangster Disciples, and she was pressured by the prosecutors to talk to them and recant. Booker urges this court to view with skepticism Anderson's recantation testimony. Anderson disavowed her affidavit via a videotaped statement and testified at the evidentiary hearing. While recantation of testimony is viewed with suspicion (*People v. Morgan*, 212 Ill. 2d 148, 155 (2004)), the trial judge heard this witness, both in person and on video, discuss her reasons for recanting the statements in the affidavit.

-10-

1-13-0177

¶ 39    We find no reason to disturb the postconviction trial judge's credibility determinations. *People v. Coleman*, 183 Ill. 2d 366, 381, (1998).

¶ 40                                    DNA Testing

¶ 41    Booker contends that our standard of review is *de novo* because this issue presents a legal question. A *de novo* standard is appropriate where the trial court's decision is not based on the assessment of the credibility of the witnesses. See *People v. Brooks*, 221 Ill. 2d 381, 393 (2006) (denial of request made pursuant to section 116-3 reviewed *de novo*).

¶ 42    Booker argues that the trial court erred by denying his request for DNA on the five bullet casings recovered from the scene. Booker contends that section 116-3 of the Code entitles him to the DNA testing because the statute provides that where identity was an issue at trial, the evidence was subject to a sufficient chain of custody, and the evidence is new, non-cumulative, and materially relevant to an actual innocence claim, the trial court "shall allow" the evidence to be tested. See 725 ILCS 5/116-3(b), (c) (West 2012).

¶ 43    Identity was the central issue at trial, satisfying the first requirement. The chain of custody evidence, however, refutes Booker's argument as to the second requirement. The bullet casings were recovered at the scene and sent to the state police lab for fingerprint testing. The technicians doing that testing followed all protocols, including using protective gear while handling the casings. After fingerprint testing was completed, the casings were sent to ballistics, where protective gear is not necessary. Ballistics tests determined all five bullet casings were Winchester .40 caliber Smith and Wesson pistol ammunition fired from the same gun. No further testing was done.

Pages: 469   Filed: 08/19/2022   Document: 28   Case: 21-2166

1-13-0177

Pages: 469   Filed: 08/19/2022   Document: 28   Case: 21-2166

¶ 44       In this case, as in *Brooks*, the technology was available but no request was made at the time of trial, and our supreme court has stated that a request should be granted only where "the technology for the testing was unavailable at the time of defendant's trial." *Brooks*, 221 Ill. 2d at 393. According to *Brooks*, courts nationwide have recognized the technology having been available since the mid-1990s. *Id.*

¶ 45       Further, the evidence established that had DNA testing been requested before trial, this would have been done in advance of any other testing. But DNA testing was not requested by the defense, and Booker has not met his burden under the statute to present a *prima facie* case that "the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect." 725 ILCS 5/116-3(b), (c) (West 2012).

¶ 46       Finally, as to the third requirement, DNA evidence obtained from the bullet casings would be new, and possibly non-cumulative, but whether it would be materially relevant is highly doubtful. Even if a meaningful sample were obtained and test results matched DNA to Williams, for example, or even to Booker, that evidence would not necessarily prove who actually fired the gun. Anyone loading the pistol would have touched the bullet casing. Any person's DNA on a bullet casing shows only that much, and nothing more. The trial court's denial of Booker's request after a full hearing at which experts on fingerprints, ballistics, and DNA testified was not manifestly erroneous.

¶ 47       Affirmed.

SA 232

*Appendix B*
*pg. 1 - 8 (Duplex)*

No. 1-06-2581

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 02 CR 25224 |
| | ) | |
| JOSEPH BOOKER, | ) | Honorable John J. Moran, Jr., Judge Presiding. |
| Defendant-Appellant. | ) | |

### O R D E R

Defendant Joseph Booker appeals from an order of the circuit court of Cook County summarily dismissing his pro se petition for relief under the Post-Conviction Hearing Act (Act) 725 ILCS 5/122-1 et seq. (West 2004). He contends that the first stage dismissal of his petition was erroneous because he stated the gist of a constitutional claim of actual innocence based on newly discovered evidence.

Defendant is currently serving the 55-year term of imprisonment imposed on his jury conviction of the first degree murder of Charles Rials. This court affirmed that judgment on direct appeal, over defendant's challenge to the sufficiency of the evidence to sustain his conviction, and his further contention that a new trial was warranted based upon the circuit court's issuance of a Prim instruction to the jury. People v.

1-06-2581

Booker, No 1-03-3533 (2005) (unpublished order under Supreme Court Rule 23).

On May 31, 2006, defendant filed a pro se post-conviction petition alleging, in pertinent part, newly discovered evidence that proved his actual innocence. In support of this claim, he attached the affidavit of Ellen Anderson, dated January 12, 2006, who averred therein that on the night in question, she was waiting for a cab after visiting a friend who lived in the Wentworth Gardens housing complex. As she waited, she was talking to an acquaintance, Darnell Brown, when she heard a single gunshot and then observed Kenneth Williams standing over a body lying on the ground, shooting it repeatedly. She further claimed that after the shooting, Darnell Brown told her to "keep [her] mouth shut if [she] didn't want to get [her]self hurt" and to say that she "didn't see nothing" and that she didn't "know nothing." Anderson claimed that she was traumatized by the experience and feared for her life, that she never returned to Wentworth Gardens, and relocated to a new address. She further averred that she learned of defendant's conviction at her church, introduced herself to defendant's mother, who attends the same church, and voluntarily informed her of what she knew about the murder for which her son was wrongly convicted.

The circuit court reviewed defendant's petition and dismissed it as frivolous and patently without merit. In reaching this conclusion, the court rejected, inter alia,

- 2 -

SA 234

1-06-2581

defendant's claim that Anderson's affidavit constituted newly
discovered evidence. The court noted that defendant had failed
to explain why Anderson was not able to testify at trial, and
that it took her "over two years to come forward and proclaim the
petitioner's innocence." The court continued:

> "Even if Petitioner presented this new
> evidence through the exercise of due
> diligence this court does not find that the
> evidence provided in the petition would
> likely change the outcome of the trial. At
> trial, this court had the opportunity to
> assess the credibility of the witnesses. As
> stated in the appellate court decision, there
> were three eyewitnesses to this shooting who
> all identified the petitioner as the shooter
> the night of September 8, 2002. Therefore,
> this claim is dismissed."

Defendant now challenges the propriety of that decision. He
specifically claims that he set forth the gist of a
constitutional claim of actual innocence requiring further
proceedings under the Act.

Section 122-2.1 of the Act directs the circuit court to
dismiss a post-conviction petition determined to be frivolous or
patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2006);
People v. Coleman, 183 Ill. 2d 366, 379 (1998). A petition is

- 3 -

1-06-2581

deemed so only if the allegations in the petition, taken as true and liberally construed, fail to present the "gist of a constitutional claim." People v. Edwards, 197 Ill. 2d 239, 244 (2001). Although this is a low threshold (Edwards, 197 Ill 2d at 244), defendant must support his allegations with affidavits, records, or other evidence or state why the same are not attached. 725 ILCS 5/122-2 (West 2006); People v. Collins, 202 Ill. 2d 59, 66 (2002). Our review of the dismissal of a post-conviction petition is de novo. Coleman, 183 Ill. 2d at 389.

The supreme court has recognized the right of a petitioner to raise a post-conviction claim of actual innocence based upon newly discovered evidence. People v. Washington, 171 Ill. 2d 475, 489 (1996). To secure relief under that theory, defendant must show that the evidence he is relying upon (1) is so conclusive that it will probably change the result on retrial; 2) is material to the issue and not merely cumulative; and 3) was discovered since trial, and is of such character that defendant could not have discovered it earlier through the exercise of due diligence. People v. Anderson, 375 Ill. App. 3d 990, 1006 (2007).

After reviewing the record, we conclude that Anderson's proffered testimony is material to the issue of whether defendant shot Rials, is not cumulative of the evidence presented at trial, and is of such a conclusive nature that it will probably change the result on retrial. Although three witnesses identified

- 4 -

SA 236

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

1-06-2581

defendant as Rials' murderer at trial, Anderson's affidavit suggests that two of those witnesses had motivation to fabricate their accounts. The remaining witness, a 14-year old boy, did not actually see the shooting.

At trial, Kenneth Williams testified that he was in a parking lot in Wentworth Gardens on the night of the murder and saw defendant, wearing black jogging pants and a white T-shirt, approach Charles Rials from behind and shoot him in the back with a black handgun. After Rials fell to the ground, defendant stood over him, shot him four more times and then fled the scene. Williams knew defendant from the neighborhood and subsequently identified him as the shooter in a police lineup.

Darnell Brown was also familiar with defendant and testified that he was walking home after talking to someone in the parking lot, when he heard a gunshot. He walked back towards the sound, heard four more shots, and then saw defendant, wearing a black jogging suit, standing over Rials and putting a black handgun away somewhere near his right hip. Brown also identified defendant in a police lineup within days of the murder. On cross-examination, however, Brown admitted that he did not see the face of the shooter.

A third eyewitness, 14 year-old Louis Dean, testified that he was in his bedroom when he saw defendant, wearing all black clothing, approach Rials from behind, shoot him in the back, and continue shooting him after he fell to the ground. On cross

- 5 -

SA 237

1-06-2581

examination, Dean admitted that he did not see the shooting, but merely saw defendant walk up behind Rials with a gun before jumping back from the window at the sound of the first gunshot. When asked to identify the shooter in a police lineup, Dean did not positively identify defendant, but rather described him as someone who looked like the shooter.

This testimony, when considered in conjunction with Anderson's proffered account of the incident, provides weak evidence of defendant's guilt. Brown and Dean acknowledge that they did not actually witness the shooting itself and Anderson's affidavit implicates Williams as the true murder and thus suggests that he fabricated his story in order to avoid prosecution himself. Anderson's claim that Brown threatened her in order to prevent her from testifying casts doubt on Browns' testimony as well. If Anderson testifies, the weight of the evidence in favor of defendant's innocence would be much stronger and would probably change the result upon retrial.

This probability appears to be bolstered by the fact that the jury had difficulty in reaching its verdict. Although this is, at most, but one factor to consider in our analysis (People v. Smith, 341 Ill. App. 3d 530, 543 (2003)), the fact that the jury deliberated for eight hours, twice indicated that they were deadlocked, requested transcripts of Williams and Brown's testimony, and received a Prim instruction before convicting defendant does suggest that Anderson's proffered testimony could

- 6 -

Filed: 08/19/2022 · Pages: 469

Document: 28

Case: 21-2166

1-06-2581

have caused the jury to reach a different conclusion.

The State argues, however, that defendant's petition was properly dismissed because Anderson's testimony does not constitute newly discovered evidence. Specifically, it claims that even if Anderson feared for her life and moved to another part of Chicago after the crime in order to avoid being found, defendant still failed to show that he could not have discovered her through due diligence.

This court, however, has twice found the testimony of previously unavailable witnesses to constitute newly discovered evidence in circumstances similar to those presented in the case at bar. In People v. Ortiz, No. 1-06-1314, Slip op. at 5-6 (December 17, 2007), defendant filed a post-conviction petition claiming actual innocence based upon the claim of a previously undiscoverable witness, who alleged that he saw the murder in question and that defendant was not present. After the crime, the witness moved from Chicago to Wisconsin because he feared for his safety and did not return until a decade later, when he met defendant's mother at a parade and told her his story. Ortiz, No. 1-06-1314, Slip op. at 6. We concluded that this testimony qualified as newly discovered evidence because there was no indication that defendant knew the witness had seen the shooting and the witness had fled the state a few months after the crime. Ortiz, No. 1-06-1314, Slip op. at 10-11.

- 7 -

1-06-2581

Similarly, in <u>People v. Washington</u>, 256 Ill. App. 3d 445, 446 (1993), defendant sought a new trial based upon a newly discovered witness who claimed that her boyfriend, not defendant, shot the victim. After the crime, the witness was threatened and moved from Chicago to Mississippi to avoid being found. <u>Washington</u>, 256 Ill. App. 3d at 448-49. We concluded that her testimony constituted newly discovered evidence sufficient to support defendant's claim for a new trial based on actual innocence. <u>Washington</u>, 256 Ill. App. 3d at 448-49.

In this case, Anderson was threatened with harm if she came forward and moved residences to avoid being found. The record provides no indication that defendant knew that she witnessed the crime or could have discovered her whereabouts through due diligence. Defendant only discovered Anderson's claim after she approached his mother at church, well after his conviction. Anderson's testimony constitutes newly discovered evidence sufficient to warrant a new trial.

In sum, the circuit court of Cook County erred in dismissing defendant's petition for failure to state the gist of a claim of actual innocence based upon newly discovered evidence. Accordingly, we reverse and remand the matter for further proceedings under the Act.

Reversed and remanded.

GREIMAN, J., with QUINN, P.J., and THEIS, J., CONCURRING.

- 8 -

SA 240

Case: 21-2166 Document: 28 Filed: 08/19/2022 Pages: 469

NOTICE

The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

affirmed
9.22.05

FOURTH DIVISION
September 22, 2005

Appendix C
Pg. 1 - 13

No. 1-03-3533

BRIAN BEGLEY
RON DEWALD
JAMES LYNCH

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

05-892

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 02 CR 25224 |
| | ) | |
| JOSEPH BOOKER, | ) | The Honorable John J. Moran Jr. Judge Presiding. |
| Defendant-Appellant. | ) | |

## O R D E R

Following a jury trial, defendant Joseph Booker was found guilty of first degree murder and sentenced to 55 years in prison. On appeal, defendant contends that (1) the evidence was not sufficient to prove him guilty beyond a reasonable a doubt; and (2) the trial court erred in giving a *Prim* instruction. For the following reasons, we affirm.

During the evening of September 8, 2002, Charles Rials was shot and killed in the Chicago Housing Authority complex known as Wentworth Gardens. Defendant was subsequently arrested and charged with first degree murder.

At trial, Kenneth Williams testified that he knew defendant from the neighborhood because defendant frequently visited a friend who lived in the complex. Williams stated that defendant drove a blue four-door Pontiac Grand Prix. Sometime between 9:30 and 10 p.m. on September 8, 2002, Williams and defendant got into

1-03-3533

an argument. Words were exchanged about "gang banging stuff" and defendant eventually left to visit his friend. At about 10:30 p.m., defendant and Williams exchanged more words before defendant got into his blue Grand Prix and left. A few minutes later, Williams saw the victim Rials, a long-time friend, walking on the sidewalk. A few minutes after that, defendant was running down the street toward Rials with a gun in his hand. As Williams got up to run, he saw defendant point the gun at Rials and shoot. When Williams looked back to make sure defendant was not coming after him, he saw defendant standing over Rials and he heard more gunshots. According to Williams, defendant was wearing a white t-shirt and black jogging pants and his hair was in braids. He also stated that the area was well lit at the time of the shooting. Williams identified defendant in a lineup two days later.

On cross-examination, Williams stated that he drank two beers prior to the shooting, but denied that he was drunk. Williams also repeatedly denied that a tree obstructed his view of defendant.

Darnell Brown, a resident at Wentworth Gardens, testified that he ran into Rials sometime after 11 p.m.. The two walked to the end of a parking lot at 38th Place. Brown stopped to speak with a friend, while Rials continued to walk toward Williams who was sitting on some steps. As Brown was returning home, he heard

- 2 -

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2466

1-03-3533

a single gunshot and four subsequent shots. Brown ducked behind
a car when he heard the second set of shots. When he looked up
from about four or five car lengths away, Brown could see
defendant standing over Rials and he was putting a gun in the
right side of his hip. Defendant was wearing a black jogging
suit. After the shooting, defendant got into the back seat of
the same dark blue Pontiac Grand Prix that Brown had seen
defendant driving on previous occasions. According to Brown, the
area was well lit. Within days of the shooting, Brown identified
defendant in a lineup.

On cross-examination, Brown stated that he could not see the
shooter's face as he stood over Rials because he was turned
sideways. He also stated that he identified defendant in the
lineup based on what he was wearing and his build. However, when
Brown was asked if what he saw was someone who looked like
defendant he responded "no."

On redirect, Brown stated that he picked defendant out of
the lineup because he actually saw defendant shoot the victim.

State's witness Louis Dean also resided at Wentworth
Gardens. Dean was 13 years old at the time of the shooting. Dean
testified that at approximately 11:30 p.m., he was in his bedroom
watching television. At some point he looked out his bedroom
window and saw Rials, a friend from the neighborhood. As Dean
was looking out the window, defendant, who was dressed in black,

- 3 -

1-03-3533

walked up behind Rials and shot him. After Rials fell to the ground, defendant stood over him and fired additional shots.

On cross-examination, Dean admitted that in a signed statement he gave two days after the shooting, he told Assistant State's Attorney Wilson and Detective Evans that he heard the first gunshot, but did not actually see it. Dean also stated that he did not remember telling the grand jury that he did not know where the gunshots came from. Dean, however, stated that his previous statement was incorrect and that he was telling the truth when he testified that he actually saw defendant shoot Rials.

Detective David Evans testified that following defendant's arrest, it was discovered that he was the owner of a dark-colored Pontiac Grand Prix.

James Eldridge, a private detective, testified on behalf of the defense. Eldridge stated that he measured the distance from the stairs where Williams allegedly sat to the crime scene to be approximately 35 feet. He also stated that a large tree with a circumference of 29 feet was located in between the stairs and the scene. The distance from Dean's home to the spot where Rials was shot was 144 feet.

Following the close of evidence, the jury began deliberating at 3:30 p.m. At 6:30 p.m., the jurors sent a note to the court stating "we seem to be deadlocked, 9 guilty 3 not guilty, no one

1-03-3533

wants to change their vote we need direction." The court
instructed the jury to continue to deliberate. At 7:30 p.m., the
jury requested to see Darnell Brown's testimony. The court
tendered the transcript to the jurors over defense counsel's
objection. At 9 p.m., the jury sent a letter to the judge
indicating that the jurors as a group could not come to an agreed
verdict. Over defense counsel's objection, the trial court
issued the following *Prim* instruction:

> "Members of the jury, the verdict
> must represent the considered
> judgment of each juror. In order
> to return a verdict it is necessary
> that each juror agree there to.
> Your verdict must be unanimous. It
> is your duty as jurors to consult
> with one another and to deliberate
> with a view to reaching an
> agreement if you can do so without
> violence to individual judgment.
> Each of you must decide the case
> for yourselves, but do so only
> after an impartial consideration of
> the evidence with your fellow
> jurors. In the course of your

SA 245

1-03-3533

Pages: 469   Filed: 08/19/2022   Document: 28   Case: 21-2166

deliberations do not hesitate to
reexamine your own views and to
change your opinion if you are
convinced that it is erroneous, but
do not surrender your honest
convictions as to the witnesses or
effect of evidence solely because
of the opinion of your fellow
jurors or for the mere purpose of
returning a verdict. You are not
partisans, you are judges, judges
of the facts. Your sole interest
is to ascertain the truth of the
evidence in this case. Your
continued effort is appreciated."

The court then instructed the jury to continue to deliberate. At
10:05 p.m., the jury requested the testimony of Kenneth Williams.
Over defense counsel's objection, the court tendered the
transcript to the jurors. At approximately 12 a.m., the jury
returned a guilty verdict.

On appeal, defendant first contends that the evidence was
insufficient to prove him guilty beyond a reasonable doubt.

In reviewing a sufficiency of the evidence claim, the
question is whether, after viewing the evidence in the light most

1-03-3533

favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Brooks, 187 Ill. 2d 91, 132 (1999). A reviewing court will not set aside a criminal conviction on appeal unless the evidence is so improbable or unsatisfactory that it creates reasonable doubt of the defendant's guilt. People v. Cox, 195 Ill. 2d 378, 387 (2001).

When considering a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. People v. Tenney, 205 Ill. 2d 411, 428 (2002). Rather, the jury, as trier of fact, has the responsibility to assess the credibility of the witnesses, the weight to be given their testimony and to draw inferences from the evidence. People v. Bull, 185 Ill. 2d 179, 204 (1998). It is also the function of the jury to resolve inconsistencies and conflicts in the evidence where they exist. Bull, 185 Ill. 2d at 205. A reviewing court will not substitute its judgment for that of the trier of fact on issues involving witness credibility and the weight of the evidence. Tenney, 205 Ill. 2d at 428-29, citing People v. McDonald, 168 Ill. 2d 420, 448-49 (1995).

While vague and doubtful testimony is insufficient to sustain a conviction, it is well established that the identification testimony of a single witness may be sufficient proof to sustain a conviction where the witness viewed the

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

1-03-3533

defendant committing the crimes under circumstances permitting a positive identification. <u>People v. Lewis</u>, 165 Ill. 2d 305, 356 (1995), citing <u>People v. Slim</u>, 127 Ill. 2d 302, 307 (1989). In assessing the reliability of identification testimony, courts consider the following factors: (1) the opportunity the witness had to view the offender at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. <u>Lewis</u>, 165 Ill. 2d at 356; <u>Slim</u>, 127 Ill. 2d at 307-08.

Based on the record presented here, we find that the evidence was sufficient to prove defendant committed the offense of first degree murder. In the instant case, three separate witnesses testified that they saw defendant shoot the victim Charles Rials. First, Kenneth Williams testified that he saw defendant, who he knew from the neighborhood, run up to Rials and shoot him. Williams stated that he saw defendant standing over Rials's body and he heard four more shots. Williams did not waver in his testimony that he had a clear view of defendant and that the area was well lit. Second, Darnell Brown testified that he heard a single gunshot and four subsequent shots as he was walking home. Brown stated that he ducked behind a car and when he looked up after the second set of shots, Rials was on the

- 8 -

SA 248

1-03-3533

ground and defendant was standing next to him. Defendant was putting a gun away in the area of his right hip. Brown then saw defendant get into a dark blue Pontiac Grand Prix. Brown specifically testified that he identified defendant because he was the individual who shot the victim. Third, Louis Dean testified that from his bedroom window, he saw defendant walk up behind Rials and shoot him. After Rials fell, defendant stood over him and fired additional shots. Within days of the shooting, all three witnesses separately identified defendant in a lineup.

Defendant challenges the sufficiency of the evidence arguing that Brown's testimony "defies logic," Dean's testimony is "fanciful" and that the testimony of Williams is "unworthy of belief." Specifically, defendant asserts that Brown testified that he could not see the offender's face and that he selected defendant out of the lineup based on the way he was "built." Defendant also argues Dean's testimony was not credible because prior to trial, he "never claimed to have seen anyone shoot Charles Rials." Finally, defendant attacks Williams's testimony alleging the consumption of alcohol and a discrepancy in the description of the clothing defendant was allegedly wearing the day of the shooting renders the testimony inconsistent and incredible.

Defendant's arguments address functions of the jury and not

- 9 -

SA 249

1-03-3533

of this court.  See <u>Tenney</u>, 205 Ill. 2d at 428.  The record
reveals that the jury was well aware of these alleged
inconsistencies. However, at trial, all three witnesses provided
unwavering testimony that they actually observed defendant shoot
the victim.  Despite vigorous cross-examination by defense
counsel, the jury was unpersuaded by the alleged inconsistencies
and determined that these witnesses were credible.  It is not the
role of this court to second guess these credibility
determinations.  <u>Tenney</u>, 205 Ill. 2d at 428.  Accordingly, we do
not find that defendant's arguments are sufficient to render the
identifications vague or doubtful such that no rational jury
could have concluded that defendant committed the offense of
first degree murder.

Next, defendant contends that the trial court committed
error in issuing a *Prim* instruction after the jury had informed
the court that they were split nine to three in favor of guilty.
Rather than challenge the language contained in the instruction,
defendant argues that the timing of the instruction resulted in a
coerced verdict.

When a jury communicates to the court that it is having
difficulty reaching a unanimous verdict, the court may, in its
discretion, provide some guidance by giving a supplemental *Prim*
instruction.  <u>People v. Lee</u>, 303 Ill. App. 3d 356, 363 (1999);
<u>People v. Prim</u>, 53 Ill. 2d 62, 75-76 (1972).  The *Prim*

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

1-03-3533

instruction informs the jury of the requirement that (1) a
verdict be unanimous; (2) the jury has a duty to deliberate; (3)
jurors must impartially consider the evidence; and (4) jurors
should not hesitate to reexamine their views and change their
opinions if they believe them to be erroneous, provided the
change is not solely for the mere purpose of obtaining a verdict.
People v. Chapman, 194 Ill. 2d 186, 222 (2000), citing Prim, 53
Ill. 2d at 75-76.  It is within the trial court's discretion
whether to give a *Prim* instruction, and, if so, when to give the
instruction.  People v. Cowan, 105 Ill. 2d 324, 328 (1985).  The
court's determination should be based on the length of time
already spent in deliberation and the complexity of the issues
before the jury.  Cowan, 105 Ill. 2d at 328.

Based on the record presented in the instant case, we find
that the trial court did not abuse its discretion in giving the
jury a *Prim* instruction more than five hours after deliberations
had begun.  Here, the jury began deliberating at 3:30 p.m.  At
6:30 p.m., the jury sent its first note to the court stating that
it was deadlocked, nine jurors voting guilty and three jurors not
guilty.  The trial court instructed the jury to continue to
deliberate.  At 7:30 p.m., the court granted the jury's request
for a transcript of Brown's testimony.  At 9 p.m., more than five
hours after the jury had begun deliberations, the jurors sent a
letter to the court stating that it could not come to an agreed

- 11 -

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

1-03-3533

verdict. The court subsequently issued a *Prim* instruction and instructed the jury to continue to deliberate. Thereafter, the court granted the jury's request for a transcript of Williams's testimony. The jury returned a guilty verdict three hours later at 12 a.m. Contrary to defendant's assertion, the court here did not issue the *Prim* instruction immediately after the jury sent its first note indicating the numeric breakdown of the jurors. Furthermore, in light of the three hours of deliberations following the *Prim* instruction before the jury reached a verdict, we cannot conclude that the instruction had a coercive effect on the jury. See People v. Novak, 242 Ill. App. 3d 836, 856 (1993) (holding *Prim* instruction was not coercive where the trial court gave the instruction more than six hours after the start of deliberations and nearly three hours passed between instruction and verdict).

Moreover, we have considered the cases cited by defendant and find them distinguishable from the instant case. First, in People v. Danielly, 274 Ill. App. 3d 358 (1995), the court engaged in an *ex parte* communication with the jury in response to the jury's notice of a numerical divide. The appellate court held that the *ex parte* communication, coupled with an immediate *Prim* instruction could have led the jury to conclude that the trial judge favored a conviction. Danielly, 274 Ill. App. 3d at 366. In People v. Santiago, 108 Ill. App. 3d 787, 806-07 (1992),

SA 252

1-03-3533

the trial court repeatedly questioned the jury regarding the state of the deliberations and then gave a *Prim* instruction immediately after it learned the numerical division of the jury. Unlike in the above mentioned cases, the numerical division contained in the note here was unsolicited and the court did not immediately issue a *Prim* instruction upon discovery of that division. Accordingly, we cannot conclude that the trial court abused its discretion in giving the *Prim* instruction.

For all of the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

GREIMAN, J., with QUINN, P.J., and CAMPBELL, J., CONCURRING.

Pages: 469
Filed: 08/19/2022
Document: 28
Case: 21-2166

SA 253

~~Group Exhibit A, attached to Booker's Case~~

(46 page)

## IN THE CIRCUIT COURT OF COOK COUNTY,

### CRIMINAL DIVISION

APPENDIX D (46 pages)

Duplex

| | | |
|---|---|---|
| **PEOPLE OF ILLINOIS** | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | Case No. 02 CR 3003 |
| | ) | |
| **NORMAN MCINTOSH** | ) | |
| Petitioner, | ) | |
| | ) | |

---

### PETITION FOR RELIEF FROM JUDGMENT

Petitioner, Norman McIntosh, respectfully petitions this Court to set aside his convictions for first-degree murder and attempted first-degree murder pursuant to 735 ILCS 5/2-1401 (West 2016). In support of this request, alleges and states the following:

### INTRODUCTION

1.     Twelve years ago, Norman McIntosh stood before this Court and made a statement in allocution.    While he knew that admitting guilt would lessen his sentence, he told what subsequent investigations have shown to be the truth.  He said, "Now that it is over … I did really want you to know I really didn't kill them. I don't even know them…. The police officer have a reason to hate me. He told me he was going to get me one day. I didn't think it was going to be this bad, but I guess so. I just really want you to know after it was over that I really didn't shoot them people."  (Tr. R MM 23-24). Forensic evidence and fraudulently concealed evidence has not only shown that McIntosh

is innocent and was framed by Area 1 detectives, but it also reveals the identity of the true perpetrator.

2.    Evidence uncovered since this Court found McIntosh guilty of Devon Hobson's murder destroys the State's evidence, explains why witnesses falsely identified McIntosh as Hobson's shooter, and reveals the false basis that McIntosh became a suspect in Hobson's murder. In what only can be considered great irony, James Hobson, the victim's brother, initiated the wheels of justice to start rolling in this case and exposed Bach's and Evans' frame-up of McIntosh. Hobson contacted McIntosh's family and confirmed what McIntosh told this Court. He explained that detectives at Area 1 coerced him into falsely identifying McIntosh and allowed him to tell the two younger witnesses to identify McIntosh as his brother's shooter. Hobson explained that he thought McIntosh might have been the shooter because detectives told Hobson that he was the perpetrator, he had beaten cases like his brother's before, and he was caught driving a car like the shooter drove. (PC Exhibits A, B) Hobson's fears that he had identified the wrong man were confirmed when he met a Vice Lord in Cook County. That man told him that a Vice Lord named "Eggy," not McIntosh, was his brother's killer. (PC Exhibit A, B) Post conviction investigation later established that Eggy's identity was Charles Smith, a man that McIntosh knew from his neighborhood. (Exhibit 5, 17).

3.    Post conviction investigation and the subsequent discovery of Devon Hobson's case file in the hidden "basement" files located at Area Central Headquarters[1], proved what both Hobson and McIntosh claimed — McIntosh was innocent, and he was

---

[1] Area Central was formerly called Area 1 (Wentworth), which is the Area that investigated Devon Hobson's murder.

SA 255

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 469

framed by Area 1 detectives. The two remaining eyewitnesses recanted and confirmed allegations of police misconduct.

4.     Forensic testing, viewed in concert with post conviction investigation, did more: It substantiated the eyewitnesses' recantations and proved that Charles "Eggy" Smith committed Devon Hobson's murder.

5.     In light of these facts, justice demands that McIntosh's conviction be reversed.

## JURISDICTION AND TIMELINESS

6.     This petition for relief from judgment is brought under 735 ILCS 5/2-1401. The petition is not subject to the ordinary two-year limitation period because it is based on fingerprint evidence obtained pursuant to 725 ILCS 5/116-3 (West 2016). 735 ILCS 5/2-1401(c), and because the other grounds for relief were fraudulently concealed from McIntosh. 735 ILCS 5/2-1401(c).

## PROCEDURAL HISTORY

7.     After a bench trial, this Honorable Court found Norman McIntosh guilty of first-degree murder, aggravated discharge of a firearm and aggravated battery. In finding petitioner guilty, this Court specifically relied on Detective Evans' testimony that McIntosh admitted to owning a greyish Oldsmobile. This Court stated, "[McIntosh] admits that he was the owner of a grayish Oldsmobile and that he abandoned it...in an alley in the area around 57th and Hamilton or Hoyne Avenue. And that's when he told Detective Evans in January of '02 when he was taken into custody." (R. FF. 9)

8.     This Court sentenced McIntosh to 45 years in prison – 20 years for first-degree murder with the 25-year enhancement for personally discharging a firearm added

3

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

to his 20-year-sentence. (Tr. R. MM24-MM25) This Court also sentenced him to concurrent sentences of six years for attempted murder, six years for aggravated discharge of a firearm, and three years for aggravated battery.

9. McIntosh filed a direct appeal arguing, in part, that the trial court erroneously precluded him from conducting cross-examination of Darius Thompson's pending charges. *People v. McIntosh*, No. 1-04-2574, 1. The appellate court agreed but held that the error was harmless. *Id.* at 7. The appellate court also vacated McIntosh's conviction and sentence for aggravated battery as a lesser included offense of attempted murder. *Id.* at 9. The court affirmed McIntosh's convictions and sentences with respect to the remaining counts. *Id.* at 11. The Illinois Supreme Court denied McIntosh's petition for leave to appeal. *People v. McIntosh*, 219 Ill. 2d 584 (2006).

10. On November 29, 2006, McIntosh filed a *pro se* post-conviction petition. (C. 36- 80) In the petition, he alleged, *inter alia*, that trial counsel was ineffective for failing to challenge the reliability of the identification procedures with respect to witnesses who identified him at trial. (C. 65) On January 19, 2007, this Court summarily dismissed the petition as frivolous and patently without merit. (C. 81-93). The First District Appellate Court affirmed the trial court's dismissal.

11. On March 30, 2011, McIntosh filed the petition that is currently pending before this Court. In it, he argued that he was actually innocent of Devon Hobson's murder based on the affidavit of James Hobson, the victim's brother. In the affidavit, Hobson recanted his identification of McIntosh as the suspect and explained that police coerced him into identifying McIntosh. He also gave the name of the man he believed to be the true perpetrator, a man named "Eggy."

SA 257

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

12.    On May 7, 2013, post-conviction counsel filed a § 116-3 motion. In it, she asked that fingerprints previously lifted from the offender's CD's that were compared to McIntosh's be compared to Charles "Eggy" Smith's fingerprints. The State agreed and on July 9, 2013, this Court ordered the testing.

13.    On January 29, 2015, post-conviction counsel filed an amended petition. In that petition, McIntosh supported his actual innocence with affidavits from the two remaining eyewitnesses, Aaron Smith and Darius Thompson. Thompson corroborated Hobson's claims that police told him that McIntosh drove a car like the shooter's. (PC Exhibit C, D). Both Thompson and Smith explained that they picked McIntosh from the lineup only because police allowed James Hobson to tell them, immediately before they viewed their lineups, to pick the guy in the red shirt. (PC Exhibit C, D, G). All three affiants also stated that the shooter drove a four-door vehicle, not a two-door car like McIntosh owned. McIntosh also presented this Court with proof that he truthfully told Detective Evans that his two-door Oldsmobile Cutlass was towed by Streets and Sanitation long before the Hobson murder, a fact that police easily could have substantiated. He also raised additional claims of ineffective assistance of counsel and that the State violated *Brady* in failing to disclose that police coerced Hobson, Thompson, and Smith into identifying McIntosh.

14.    McIntosh's amended petition is still pending before this Court.

## STATEMENT OF FACTS[2]

*Robbery of perpetrator/murder of Devon Hobson*

---

[2] McIntosh's Amended Post-Conviction included a complete Statement of Facts. Under Illinois Supreme Court Rule 134 McIntosh incorporates those fact by reference. Ill. S. Ct. R. 134

SA 258

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 469

15.     Early in the morning of November 24, 2001, brothers James Hobson, 27, and Devon Hobson, 21, their 12-year-old cousin Darius Thompson, and Thompson's 12-year-old friend, Aaron Smith, were all at Hobson's mother's house at 6511 South Justine Avenue in Chicago. (Tr. R. W25, W27) The four left the house armed with a .22 caliber revolver with plans to pretend to sell marijuana to the people that they would then rob. (Tr. R. W30, W33)

16.     The four arrived at 70th Street and Throop Street, a well-known drug spot. (Tr. R. W82) At trial, they testified that they flagged down a silverish-looking car with what Hobson described as a brownish-colored primed-up driver's side door. (Tr. R. W34, W37, W95) Thompson said that the car was gray, had four doors and had approximately 12-inches of "a little red paint" mark on the front part of the car. (Tr. R. W212, 215) Thompson later told police that he thought that he remembered the car having a blue door, but he was not sure due to the passage of time. (Tr. R. W213, 216) The driver of the car stopped and asked for marijuana. (Tr. R. W36) According to Hobson, Devon went into a nearby gangway and acted as if he were going to get the marijuana but instead got the gun ready. (Tr. R. W37) When Devon came back to the car, he pulled out the pistol and pointed it at the driver's face. (Tr. R. W38-W39) Thompson and Smith opened the car door and started searching the car and the driver's pants pockets. (Tr. R. W39-40) The boys took $20 and a few bags of crack cocaine from the man's person and took his CD's. (Tr. R. W40) The driver said that they could have the car and jumped out. Hobson told the driver he did not want the car and threw his keys back and started walking away. (Tr. R. W41) The driver jumped back into his car, pulled up beside the group, and yelled that he was a Vice Lord and would be back to kill them. (Tr. R. W41)

SA 259

While, at trial, Hobson said that he never had any problems with Vice Lords (Tr. R. W82), he made an earlier statement to the police that the Vice Lords had shot his brother and that Vice Lords were always shooting Black Disciples. (R. CC37)

17.    After robbing the man, the group walked back to Hobson's mother's house and put the man's CD's in Devon's room in the basement. (Tr. R. W42) The group then left the house again, went to a store on 63rd Street and Ashland Avenue, and from there made their way to 60th Street and Honore Avenue on their way to a friend's house. (Tr. R. W43)

18.    As the group walked down 60th Street, the same gray car pulled up next to them. (Tr. R. W186) Thompson said, "Here comes the guy we robbed earlier." (Tr. R. W162) The man drove up to the group, said, "What's up now?" He then held a gun out of the window and started shooting. (Tr. R. W47) The group started running, but Devon was shot and fell to the ground. (Tr. R. W47) Hobson turned around and begged the driver not to shoot Devon, but he shot Hobson in the chest. (Tr. R. W48) Devon was crawling in the street and the driver backed up his car to Devon, put the gun to the back of his head, and shot him. (Tr. R. W50-W51)

19.    When Smith, Thompson, and Hobson were interviewed after the shooting occurred, they all gave descriptions of the shooter. Smith described the shooter as a 26-year-old black male with braids and a light complexion. (Exhibit 1, p.132) Thompson described the shooter as a 22 to 23-year-old black male with braids and a dark complexion.  (Exhibit 1, p.136) Hobson described the shooter as 20 to 25-year-old medium complected black male with braids. (Exhibit 1, p. 146).

20. A 911 caller reported that the shooter drove a four-door car. (PC Exhibit H)[3] Thompson originally told police that the shooter's car was a gray, four-door vehicle that looked like a police car. (Exhibit 1 p.169) Smith also said the car was a gray, four-door car with a rack on the back. (Exhibit 1 p.132)

21. Chicago Police Detectives Chester Bach, David Evans, Joseph Frugoli and Will Svilar were assigned to investigate Hobson's murder with Bach and Evans acting as lead detectives. Crime scene processing reports showed that the shooter used a .9 mm weapon to shoot the Hobson brothers. (Exhibit 1 pp.88, 200)

22. Detectives' investigation stalled after James Hobson, Aaron Smith, and Darius Thompson gave statements. Detectives did not have a potential suspect.

*Norman McIntosh's ER visit*

23. The same morning that the Hobson brothers were engaging in fake drug sales and robbing the Vice Lord, McIntosh was being treated at Mercy Hospital. At trial, Iashiskala Sims testified that on the morning of November 24, 2001, McIntosh needed medical attention for a treatment for symptoms stemming for an STD. (Tr. R. CC6-CC7, CC116) Sims drove McIntosh to Mercy Hospital, located at 2525 South Michigan Avenue, at 5 or 6 a.m. in her own car, a 2000 KIA. (Tr. R. CC6, CC15-16, CC33)

24. Edgar Sarmiento, a registered nurse from Mercy Hospital, confirmed Sims's testimony. Sarmiento testified that medical records indicated that McIntosh was triaged at 6:10 a.m. and then treated in the emergency area of Mercy at 6:35 a.m. (Tr. R. CC23-CC26) The hospital ordered tests for McIntosh and took body fluids from him. (Tr.

---

[3] Exhibits cited as "Exhibit" refer to exhibits appended to this Petition for Relief from Judgement and are labeled with numbers. Exhibits cited as "PC Exhibit" refer to exhibits from McIntosh's Amended Post-Conviction Petition and are labeled with letters. McIntosh incorporates those exhibits by reference.

SA 261

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

R. CC29) McIntosh was given medication and was given his discharge papers from the hospital at 7:05 a.m., at which point he was free to leave. (Tr. R. CC27)

      25.    Sims testified that she sat in the waiting room watching television until McIntosh was released from the hospital. (Tr. R. CC17) They both drove back to her home and spent the rest of the day inside, watching TV, and chatting. (Tr. R. CC18) Sims said that McIntosh was never out of her sight on that day. (Tr. R. CC8)

*The Benjamin Rush/Christopher Monroe shooting/investigation by Bach and Evans*

      26.    Approximately two weeks before Hobson's murder, on November 12, 2001, a gunman shot and injured Benjamin Rush and Christopher Monroe. (Exhibit 3). The same detectives (Detectives Bach, Evans, and Frugoli) were assigned to investigate Rush's and Monroe's shooting. In that case, witnesses told police that the shooter used a Tech-9 style weapon. Shell casings recovered from the scene indicated that a .380 caliber weapon was used. (Exhibit 3) One witness described the offender as 19-20 years' old, 5'9", braids, and light skinned. Two witnesses, including Monroe, said that the shooter was a man known as "Norman." Monroe said the shooter was 5'9" to 5'10" with a dark complexion. (Exhibit 3)

      27.    On November 12, 2001, after the shooting, Detective Bach showed Monroe a photo array that included McIntosh, but he could not make an identification. (Exhibit 3).

      28.    On December 20, 2001, police arrested McIntosh as a suspect in the Rush/Monroe offense pursuant to an investigative alert. (Exhibit 3). McIntosh was arrested driving black four-door Oldsmobile. Police did not impound or search the vehicle. (Exhibit 3) While McIntosh was in custody, he was not questioned about the

Case: 21-2166　　Document: 28　　Filed: 08/19/2022　　Pages: 469

shooting of Devon Hobson. Police contacted Monroe to view a lineup containing McIntosh, but Monroe refused, saying he could not make an identification. Rush came to the station and viewed a lineup containing McIntosh, but could not make an identification. Rush said he would be available if there were any new leads in the case. (Exhibit 3). Bach and Evans were forced to release McIntosh from police custody two days later. (Exhibit 2).

*After Bach and Evans release McIntosh they make him a suspect Hobson's murder*

29.　　As soon as police released McIntosh for the Rush/Monroe offense, Bach decided that McIntosh was a key suspect in Hobson's murder. Bach justified his investigative "breakthrough" by stating that the witnesses' description of the shooter in the Rush/Monroe case matched the witnesses' description of the shooter in Hobson's case. Bach also opined that the gun used in the Rush/Monroe battery was similar to the gun used to kill Hobson. (Exhibit 1, p. 79). Bach also noted that the crimes occurred in the same area. The only commonality between the descriptions of the two offenders was that the shooter was a black male with braids. As previously mentioned, crime scene reports established that the guns were a different caliber weapon. (Exhibit 1 p. 88, 200).

30.　　Following the Christmas holidays, Bach's report indicated that he located James Hobson; Hobson avers that he had been avoiding the detectives until they found him at his home on January 9, 2002. (PC Exhibit A) Hobson testified that Detective David Evans came to Hobson's house and told him that he had "the individual, [McIntosh], down at the police station." (Tr. R. W56-57) Police reports indicate that detectives showed him a photo array that included McIntosh, and Hobson identified McIntosh as the shooter. (Tr. R. W56-57; Exhibit 1, p.79)

SA 263

*Police did not investigate evidence that McIntosh's car was impounded.*

31. On January 16, 2002, Evans interviewed McIntosh about the shooting of Devon Hobson. McIntosh denied all involvement. (Tr. R. X157)

32. Evans asked McIntosh about the type of car that he drove. McIntosh told him that he owned a primer-gray, two-door Oldsmobile, but he had abandoned the car in an alley and thought that it had been towed by the city. (Tr. R. X158, X167) McIntosh also said that the car did not have a license plate. (Tr. R. X167) During trial, Detective Evans testified that the police were unable to find the vehicle by doing a manual search for the car McIntosh had described, but they did not attempt to do a computer search. (Tr. R. X159) Defense counsel did not ask Evans the dates of Streets and Sanitations records that he searched. However, police reports indicate that Evans searched tow records for the dates of November 24, 2001, through January 15, 2002. (Exhibit 1 p. 80) November 24, 2001, was the date that Hobson was killed, and January 15, 2002, was the day before McIntosh's arrest.

33. That same day, Evans asked an evidence technician to take Norman's fingerprints. (Exhibit 1 p. 159) The next day, Bach asked ISP to compare McIntosh's prints to the fingerprints lifted from the CD's taken from the perpetrator. (Exhibit 11)

*Police Tailor Evidence to Match McIntosh*

34. After Evan's interview with McIntosh, police reports, for the first time, state that witnesses' description of the shooter's vehicle was that it was an Oldsmobile. Specifically, Detective Evans' authored a supplemental report stating that Thompson told Assistant State's Attorney ("ASA") Meenan, while giving a handwritten statement, that the shooter was driving a "grey, older Oldsmobile." (Exhibit 1 p. 80) ASA Meenan

11

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

included no mention of an Oldsmobile in Thompson's handwritten statement; it provides that Thompson said that the shooter was driving a "grey older car." (Exhibit 1 p. 186)

35.     After police interview McIntosh, police reports made no further mention of the car being described as four-door.

*Hobson, Thompson and Smith view lineups*

36.     Police reports indicate that Thompson and Smith were at the police station on January 17, 2002, to view lineups that included McIntosh. In photographs taken from both, McIntosh is wearing a red shirt. (Figure 2; Exhibit 6) Both identified McIntosh as the man that shot Devon Hobson. (Exhibit 1 pp.208-209) Detectives Bach, Evan, Frugoli, and Svilar conducted the lineups. (Exhibit 1 pp.202-203) Reports make no mention of Hobson being at the station that day.

37.     Police reports indicate that the next day (January 18, 2002), Hobson came to the police station and viewed a lineup at 11:55 a.m. At trial, when Hobson identified the lineup picture, he testified that McIntosh was the guy in "the black hoodie with the red shirt." (Tr. R. W 61) Detective Evans and "GSK O'Brien" conducted the lineup. (Exhibit 1, p. 201) Police reports indicate that ASA Meenan arrived at the station and began to interview Hobson at 12:40 p.m., and she took his handwritten statement at 1:15 p.m. (Exhibit 8)

*Tina Noel murder*

38.     On January 17, 2002, a man shot and killed Tina Noel while attempting to shoot John Coppage. Noel's murder sparked protests about the lack of safety for public housing residents. Noel, who was beloved by residents of the Harold Ickes CHA building when murdered, was a Chicago Housing Authority engineer for the building. Her death

12

SA 265

sparked protests for the lack of safety for residents.[4]  Police reports indicate that witnesses to Noel's murder were at Area 1 on both January 17th and January 18th. (Exhibit 9)

39.  CPD assigned Detectives Frugoli, Svilar, and Winstead to the investigation. (Exhibit 9)  Andrew Vance and Antoine Sanders were suspects in the case. (Exhibit 9)

*Forensic evidence*

40.  Forensic testing revealed numerous fingerprints on the CD's taken from the man that shot and killed Devon Hobson. As soon as McIntosh was arrested as a suspect in Hobson's murder, Detective Bach had technicians take his prints and requested the prints be compared to the prints found on the CD's. Subsequent testing revealed Hobson's prints and multiple unidentified prints on the 20 CD's but none were McIntosh's. (Exhibit 11)

*Grand Jury*

41.  All three eyewitnesses testified before the Grand Jury.  Detective Bach also testified.   Bach took Thompson and Smith to testify on January 18, 2001, and Hobson testified on January 22, 2002. During grand jury testimony, when asked about being at the station on January 18th, Hobson explained that he had been at the police station for two days in a row.  He was there for five hours on January 17th and for nine hours on January 18th. (Exhibit 8)

***McIntosh is charged and convicted of Devon Hobson's murder based on eyewitness identifications and David Evans' testimony that McIntosh owned a car that matched***

---

[4]Liam Ford, *CHA residents stage rally where worker was killed*, Chicago Tribune http://articles.chicagotribune.com/2002-01-25/news/0201250007_1_gang-members-residents-workers (last visited May 30, 2016).

SA 266

*the description of the shooter's car.*

42.  At McIntosh's bench trial, Hobson, Thompson, and Smith testified that McIntosh was the perpetrator. Evidence established that McIntosh's prints were not on the CD's taken from the perpetrator. Evans testified that McIntosh drove a car like the shooters, and even though McIntosh told him that the car had been towed, he could not find any evidence to verify that fact. At trial when Hobson identified the lineup picture, he testified that McIntosh was the guy in "the black hoodie with the red shirt." (Tr. R. W 61) Hobson also testified that while police were questioning him at the hospital they were hinting at charging him with "robbery and UUW" (Tr. R. W 124-125) The defense presented McIntosh's alibi — that he was at the ER that morning and with his girlfriend the rest of the day. (See ¶23-25)

43.  This Court found McIntosh guilty on all counts. (Tr. R. FF11-FF12) In finding McIntosh guilty, this Court found it relevant that McIntosh admitted to owning a grayish Oldsmobile that he abandoned. (Tr. R. FF9) This Court also noted that all three witnesses identified McIntosh in "separate lineups." (Tr. R. FF10) Lastly, this Court also found that McIntosh's alibi defense did not hold up past 7:05 a.m., when he was released from the hospital, and the shooting occurred around 9:30 a.m. (Tr. R. FF4- FF5)

*James Hobson contacts McIntosh's family, recants, and provides the name of an alternate suspect, Charles Smith.*

44.  After petitioner's conviction, James Hobson was arrested on an unrelated charge. While in Cook County jail, Hobson asked someone to contact petitioner's family on his behalf because he had information about petitioner's case. When he met with McIntosh's family, he explained that he realized that he had incorrectly identified McIntosh as the man that shot him and killed his brother. (PC Exhibit A, B) Hobson

14

SA 267

Case: 21-2166          Document: 28          Filed: 08/19/2022          Pages: 469

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

explained that the only reason that he identified McIntosh as the perpetrator was because the police told him that McIntosh committed the crime. In a later affidavit provided to post-conviction counsel, Hobson's explained that detectives showed him a picture of McIntosh before they showed him a photo array. They told him, in the presence of his mother, that McIntosh had been caught riding in the shooter's car, and explained that they had problems with McIntosh before. (PC Exhibit A) Hobson tried to explain that he did not think that McIntosh was the man who shot him and killed his brother, but police insisted that he was. His mother began getting "hysterical" because she thought that he was not identifying McIntosh due to gang street rules, so she kept pressuring him to "tell the truth." Hobson identified McIntosh, in part because of pressure from detectives because he knew they would "put a robbery" on him if he did not comply, and in part because of pressure from his mother. (PC Exhibit A) Even though he knew McIntosh was not the right man, he did not feel that badly about it because he knew McIntosh was in a rival gang, the Vice Lords.

45.     Subsequently, Hobson went to the station. The first day that he went, his mother went with him. (PC Exhibit B) Detectives, again, showed him McIntosh's picture, which had a circle around it, and told him that he was the perpetrator. (PC Exhibit A, B; Exhibit 4). Immediately thereafter, detectives showed him a lineup where McIntosh was wearing a red shirt, and Hobson picked him because he recognized him from the photograph. (PC Exhibit A; Exhibit 4) As Hobson left the lineup room, he told Thompson (and possibly Smith), who were also at the police station waiting for their turn to view the lineup, to pick the man in the red shirt. (PC Exhibit A, B; Exhibit 4) Hobson said that he was never sure that McIntosh was the perpetrator, but he explained that

SA 268

police pressured him into identifying McIntosh by threatening to charge him with his brother's murder and robbery. (PC Exhibit A- B)

46.    He also averred that his younger cousin, Darius Thompson, was not sure if McIntosh was the perpetrator. After McIntosh's trial, he and his cousin looked McIntosh up on the IDOC website. Both agreed that McIntosh was not Hobson's brother's killer. (PC Exhibit A)

47.    In addition to clarifying why he identified McIntosh when he was not certain that he committed the crime, Hobson also supplied McIntosh's family and post-conviction counsel with the name of the man that he learned was the actual killer of his brother. According to Hobson, a Vice Lord in Cook County jail told him that his identification of McIntosh as his brother's killer was erroneous; the real shooter was a Vice Lord from the area named Charles "Eggy" Smith. (PC Exhibits A-B)

*Charles Smith's fingerprints are on the perpetrator's CD's.*

48.    Petitioner filed a Section 116-3 petition, seeking to have Charles Smith's prints compared to the prints lifted from the CDs. Tests revealed that the fingerprints on the CD's matched Charles Smith. *Id.* Fingerprints found matching Vernon Clay and Justin Miller were also found from an AFIS and IAFIS search. (PC Exhibit E) Testing again confirmed that the none of the prints were McIntosh's.

*Charles Smith matches the witnesses' description of the shooter*

49.    Post-conviction counsel filed a Freedom of Information Act request for arrest photographs of Charles Smith. CPD arrested Charles Smith on October 26, 2001, for possession of cannabis. (Exhibit 5) CPD sent that arrest photograph, which was taken approximately a month before Hobson's murder. The photograph of Charles Smith

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 469

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

establishes that he had the one consistent feature all the three witnesses said about the shooter — he had braids  (See ⁋19)  CPD also had previously arrested Charles Smith for the sale of crack cocaine. (Exhibit 15)



**Figure 1: Booking Photograph of Charles Smith from October of 2001 (Exhibit 5)**

*The two remaining eyewitnesses — Thompson and Smith — recant their identification recant.*

 50. During her investigations, post-conviction counsel located Thompson and Aaron Smith. Aaron Smith was housed in Cook County jail pending home invasion charges and Thompson was in the Illinois Department of Corrections on a gun charge. Counsel notified them about her representation of McIntosh and inquired about their memories of the case.

 51. Thompson spoke to counsel via a collect call from IDOC. Thompson confirmed that he was present when Devon Hobson was shot and killed. Thompson said he had identified McIntosh, but he admitted that he was not sure if McIntosh was the man that shot his cousin. (PC Exhibit C) He explained that the police immediately arrested him for possession of the weapon that Hobson used to rob the perpetrator. Thompson, who was only 12-years-old at the time, explained that he was scared. Police showed

17

SA 270

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 469

Thompson pictures of several individuals, but he was unable to identify anyone as the shooter. Officers then pointed to McIntosh's picture and told him that McIntosh was the individual that shot Devon. They told him that McIntosh was known for murder and had just beaten a murder charge. After detectives showed him the picture of McIntosh, they took him to view a lineup. Thompson said that James Hobson was at the station at the same time. When Hobson was on his way out of viewing the lineup, he told Thompson to pick the guy in the red shirt. (PC Exhibit C) McIntosh was wearing a red shirt. (See Figure 2)

52.     Aaron Smith agreed to meet with post-conviction counsel in Cook County jail. Aaron Smith also confirmed that he was present when Devon Hobson was shot and killed. He vividly recalled how Devon Hobson screamed for his brother's help as he lay on the ground suffering from multiple gunshot wounds. Aaron Smith, like Thompson, said that he was not certain that McIntosh was the shooter. He explained that he did not think McIntosh was the shooter, but he picked McIntosh because Hobson and Thompson told him to pick the guy wearing red and because he was scared. (PC Exhibit G) Aaron Smith had not seen or talked to Hobson or Thompson since McIntosh's trial.

*McIntosh is wearing a red shirt in Thompson's and Smith's lineups*

53.     After talking to both witnesses, post-conviction counsel asked for permission to view impounded evidence in order to view lineup photographs, which were impounded after the trial. This Court signed the order and defense counsel, along with Assistant State's Attorney Dewalt, viewed the photographs. For the first time, post-conviction counsel could confirm that McIntosh was wearing a red shirt in Smith's and Thompson's lineups. (Exhibit 6, pp. 1-2)

SA 271

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 469



**Figure 2: Lineup Photograph for Darius Thompson from Exhibit 6, p.1**

54.     Hobson's lineup photos show McIntosh wearing a black hoodie with his red shirt showing at his collar.



**Figure 3: Photograph from January 18th lineup (Exhibit 6, p.3)**

*The State cannot establish that the eyewitnesses have spoken since the trial*

55.     After post-conviction counsel filed McIntosh's Amended Petition, the State asked for leave to subpoena the inmate phone calls for James Hobson, Darius

SA 272

Thompson, and Aaron Smith. This court granted the State's request. The State reported that none offered any evidence that Hobson, Thompson, and Smith were in communication with each other.

*Streets and Sanitation Records Prove That Norman McIntosh's 2-Door Cutlass Was Impounded Months Before the Shooting.*

56.    McIntosh has also established that he was truthful when he told police that his Oldsmobile had been towed before the shooting occurred. Through the Freedom of Information Act and subsequent subpoenas, McIntosh obtained Streets and Sanitation reports that show that City workers towed a gray, two-door 1985 Oldsmobile, with no license plate, from 5402 South Damen on September 9, 2001. (PC Exhibit J, K) McIntosh, at the time, told police that his car had no plates. (Tr. R. X167) A speeding ticket McIntosh received on September 1, 2001, also confirms that the gray Cutlass did not have plates. (PC Exhibit L) City workers towed the Oldsmobile to Pound Number 2, where it was held until it was destroyed on April 1, 2002. (PC Exhibit J)

*Charles Smith, not Norman McIntosh, drove a car that matches the description of the perpetrator's car*

57.    Post-conviction counsel contacted Vernon Clay after learning that prints on the CD's matched him. At the time, Clay was housed at Vienna Correctional Center, serving a six year sentence for narcotics. Clay knew about McIntosh's conviction in this case because he was one of his best friends. Clay also said that he was friends with Charles Smith. Clay explained that he used to ride around with Smith. When asked what type of car Smith drove during the relevant time period, Clay stated that Smith owned a four-door, grey Oldsmobile that had a patch on one of its doors. (PC Exhibit I) This

SA 273

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

description matches the description of the car given by Thompson, Aaron Smith, Hobson and independent witnesses to the crime scene. (PC Exhibit D, H)

58.     After talking to Clay, post-conviction counsel sent Aaron Smith, Hobson, and Thompson pictures of three vehicles. She selected the three types of cars because they were either tied to McIntosh or Charles Smith.  One car, a 2-door 1985 Cutlass Supreme, was the car Streets and Sanitation towed.  The below figure is a photo of a vehicle like the one McIntosh owned and the photo sent to the eyewitnesses.



**Figure 4: Photograph of 1985 Oldsmobile Cutlass Supreme**

Another, a 1984 Delta 88 Royale, was the type of car McIntosh was driving when he was arrested.  Finally, a 4-door 1995 Cutlass Supreme, was included because Charles Smith owned one at the time of the offense.  (PC Exhibit I)  Counsel asked each affiant to tell her which vehicle most closely resembled the shooter's car.  Both Hobson and Thompson responded.  Both men reported that the 1995, 4-door Cutlass Supreme matched the shooter's vehicle except for the color — the car in the photograph was white, not grey like the shooter's. (PC Exhibit B, D)

SA 274

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166



**Figure 5: Photograph Identified by Thompson and Hobson (PC Exhibit B, D)**

59. Hobson, below the above picture of the 4-door Cutlass Supreme, wrote:

> This Looks just Like The car The shooter Drove That Day

**Figure 6: Handwritten Note Hobson (PC Exhibit B, p.4)**

*Documents supporting McIntosh's claims came from an investigation file found hidden in Area Central basement.*

60. After post-conviction counsel filed McIntosh's amended petition, she was notified that McIntosh's file was found in the basement of the Area Central Police Station ("Gorman files"). The files were discovered pursuant to Nathan Field's federal lawsuit against the City of Chicago. The Tribune first wrote about the filing cabinets in the Wentworth Area basement in a front-page report in April 2014. A street file on Candace Gorman's client, former El Rukn lieutenant Nathson Fields, had been found there three decades after his conviction in an infamous 1981 double murder. The filing cabinets contained about 2,700 cases dating to the 1940s, but to keep the search relevant to Fields' claims, Gorman was allowed to review into homicide files ranging from 1979 to 2006.

SA 275

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

61. Pursuant to her investigation, Gorman, contacted inmates once she discovered that their files were contained in the basement file.[5] Gorman then released the files to the men's attorneys after their attorneys agreed to comply with with the federal protective order.

62. Post-conviction counsel, in the presence of Assist State's Attorney Cathleen DeWalt, the ASA assigned to McIntosh's case, compared the Area Central basement file to his trial attorney's file file. His trial attorney, Assistant Public Defender Mary Jane Placek, maintained a trial file. Her file was missing 56 pages of documents, including lineup sheets, and General Progress Reports ("GPR's"). The file was also missing the general inventory report, the daily major information log, and the independent control file. Additionally, although the basement file contained crime scene photographs, it did not contain any photographs of the three witnesses' lineups.

59. The basement file in this case also contained a note at the bottom of a court notification form written from the Assistant State's Attorney assigned to McIntosh's case to the lead detectives. (Exhibit 1, p.125) The note instructed the detectives to "please bring complete-orig-street file with you." (Exhibit 1, p.125) Notably, the investigatory file inventory report, which was not tendered to the Public Defender, indicates that detectives tendered a great majority of their police reports to be entered into the file after it would have been taken to the ASA for McIntosh's first court date. Thus, the file was anything but "complete." (Exhibit 1 p. 2-4)

---

[5] Jason Meisner, *Old police 'street files' raise question: Did Chicago cops hide evidence?*, Chicago Tribune (last visited May 24, 2016)
http://www.chicagotribune.com/news/ct-chicago-police-street-files-met-20160212-story.html

SA 276

*please bring the Complete -orig. -STREET FILE with you.*

*Thanks !*

**Figure 7: Note from Assistant State's Attorney to Detectives (Exhibit 1 p. 125)**

*James Hobson lineup could not have occurred when detectives said that it did.*

60. After receiving McIntosh's basement file, post-conviction counsel closely examined all police reports relating to the lineups conducted in McIntosh's case. As previously discussed, all three eyewitness (Hobson, Aaron Smith, and Thompson) attest to Hobson being at the station on January 17, 2002. (See ¶¶45, 51) As previously discussed, Hobson told the Grand Jury that he was at the station on January 17. (See ¶41) All three attest to the fact that Hobson was allowed to tell Thompson and Aaron Smith to pick McIntosh, or "the guy in the red shirt." (PC Exhibits B, G; Exhibit 4). However, police reports, if true, render that impossible. Police reports indicate that both Thompson and Smith viewed lineups on January 17, 2002: Thompson viewed a lineup at 1:20 p.m., and Smith viewed one at 4:30 p.m. (Exhibit 1 p.202-203) Reports make no mention of Hobson being at the station that day and only mention that detectives called Hobson. Police reports provide that Hobson viewed his lineup the next day, January 18, 2002, at 11:55 a.m. (Exhibit 1 p.201) Immediately thereafter, at 12:40 p.m., Assistant State's Attorney Meenan arrived and interviewed Hobson. She took Hobson's handwritten statement at 1:15 p.m. (Exhibit 1, p.163)

24

SA 277

61.     Post-conviction counsel's review of police reports revealed that Hobson's lineup report could not have occurred when detectives said that it did. Furthermore, comparison of Hobson's lineup reports with Thompson's and Smith's reports warrants a determination that Hobson's lineup reports were falsified.

62.     The first reason to know Hobson's lineup report is falsified is that one of the men in the lineup had not even been arrested by CPD when the lineup occurred. The January 18th "Crime Scene Processing Report's" indicate a man named Kevin Scott participated in the lineup that was conducted at 11:55 a.m. Because counsel had suspicions that detectives falsified the fact that Hobson viewed a lineup on January 18th, counsel subpoenaed Scott's arrest reports (along with the reports of all the other men in the lineup). Scott's arrest report details that CPD arrested him at 5600 South Carpenter Street on January 18th at 12:30 p.m. Police transported him to the station five minutes later, at 12:35 p.m. (Exhibit 7) Hence, as Figure 8 shows, CPD apprehend Scott 35 minutes *after* he was supposedly already at Area 4 standing in a lineup.



**Figure 8: Arrest and Transport Times for Kevin Scott (Exhibit 7)**

63.     Police arrested Scott at 5600 South Carpenter Street and Area 1 Police Station is located at 5101 South Wentworth Avenue. Under optimal driving conditions, the earliest police could have arrived at Area 1 with Scott was 12:41 p.m. Scott and other lineup participants are not wearing shoelaces, so additional minutes would be necessary for police to process Scott before placing him in the lineup. (Exhibit 6, p.3) Thus, it is

SA 278

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

impossible that Scott was at the station in a lineup at 11:55 a.m., showing, at a minimum, police falsified the time that Hobson viewed a lineup.

*Irregularities in lineup sheets*

64.    As previously noted, McIntosh in the fifth position in the January 18th lineup. He wearing a black hoodie over his red shirt. *See* Figure 5. Andrew Vance, James Davis, and Elliott Arthur, and Scott are the remaining participants. (Exhibit 1 p. 207) Vance's inclusion in the lineup supports an argument that the lineup was actually conducted for another case.

65.    Vance, along with a man named Antoine Sanders, were suspects in Noel's murder. (See ¶38-39; Exhibit 1, p. 207) Witnesses to Noel's murder were at the station on the 18th.    (See ¶38)   Specifically, Dietrich Sanders, was being interviewed by detectives that afternoon.    (Exhibit 9)  Vance is the only individual with any identifying information – his birthday – written next to his name on the report. (Exhibit 1, p. 207)



**Figure 9: Section of Crime Scene Processing Report for "Hobson's Lineup"**

**(Exhibit 1 p. 207)**

26

SA 279

66.    In Thompson's "Crime Scene Processing Report," all of the participants have identifying information, and it indicates, with an ＊ that the witness picked McIntosh.   However, Hobson's report does not indicate a suspect was chosen.  (See Figure 9)



**Figure 10: Section of Crime Scene Processing Report for "Thompson Lineup"**

**(Exhibit 1 p. 209)**

67.    In Aaron Smith's "Crime Scene Processing Report," all of the participants have identifying information and again, it indicates, with an ＊, that McIntosh was picked.



**Figure 11: Section of Crime Scene Processing Report for "Smith's Lineup"  (Exhibit**

**1 p. 208)**

68.    Another irregularity with Hobson's lineup is the fact that his crime scene processing report, as tendered to McIntosh's Public Defender, was approved by

27

SA 280

Pages: 469     Filed: 08/19/2022     Document: 28     Case: 21-2166

supervisor "Jarvis" and signed by what appears to be Sergeant Oglesby. (Exhibit 10)

The "same" report, found in McIntosh's basement file (See ¶ 60), is unsigned. (Exhibit 1,

p.207)  Hobson's and Smith's reports are signed by a supervisor in both the basement

and PD file.



**Figure 12: Section of Crime Scene Processing Report for "Hobson's Lineup" from Public Defender's Trial File (see Figure 9 for unsigned version in basement file)**

69.    ET technician photographs of the January 18th lineup differ from the other

lineups.  The below figure illustrates the differences. First, the evidence technician in

Hobson's case, ET Stachon, did not follow protocol and take a photograph of the photo

card at the beginning and end of lineup, whereas every other evidence technician did.

Indeed, every other technician who took photographs in this case, whether the photos

involved lineups or crime scenes, started and ended the series with a photocard that has

the RD number, the type of offense, the date and time, and the evidence technician's

name and star number.  Additionally, the ET took less photographs of the 18th lineup,

and the technician did not take a picture of the men looking to each side. The technicians

did in both of the 17th lineups. Lastly, ET Stachon did not take photographs of McIntosh

SA 281

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

separated from the group, whereas the January 17th technicians did. He also did not take

pictures of McIntosh separated from the other fillers; the other technicians did.



**Figure 13: E.T. photographs of Thompson, Smith, and January 18th lineup as arranged in the order taken**

*The basement files implicate Detective Bach, Evans, and Frugoli in Other Cases with Suspect Lineups*

70. The basement files contain, at a minimum, two other case involving Evans

and Bach and both involve allegations of lineup misconduct on the part of the detectives.

71. In *People v. Young*, 02 CR 16057, Detectives Bach, Evans, Frugoli, and

Svilar conducted an unorthodox "voice lineup" because the offenders were wearing

masks. The detectives believed Deshante Young was among the offenders. Young

SA 282

refused to speak when told, so Evans waited until the participants in the lineup started talking to each other and asked the witnesses to raise their hand when they heard the perpetrator's voice. At some point, the witness raised his hand and said, "That is the guy that shot me... it's Deshante Young." Evans claimed that he saw Young talking at the time witness identified the voice. The detectives again repeated this process with another witness. Evans again reported that Young was talking when the witness raised his hand. (Exhibit 12) Evans explained that he was able to determine that the witnesses were referencing Young's voice despite the fact that Young and the fillers were talking at the same time.

72.   In *People v. Pleasant*, Evans allegedly engaged in similar conduct.[6] In that case, one of the witnesses testified that he had never viewed a lineup containing the defendant. He testified that only time he was asked to identify the defendant, Edward Pleasant, after he was shown a single picture by Detective Evans. However, the State presented evidence of a lineup photograph that Evans asserted that the witness viewed. The witness denied it. Another witness admitted that he had chosen the defendant from a photo array. That witness testified that Evans showed him the photo array in front of other witnesses, and Evans allowed the other witnesses to tell him who to pick.

*Other allegations of misconduct*

73.   Detective Evans and Bach have been sued for falsifying lineups, as well. In 2005, Bach, Evans, and other police officers were named in a lawsuit where Kelwyn Sellers alleged conduct almost identical the the misconduct in this case. In that case, police officers put Sellers in a lineup after holding him over night. When the witness was

---

[6] Pleasant's police reports and transcripts will be provided upon request.

SA 283

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

unable to identify Sellers, police officers manufactured a false police report claiming that the witness has identified Sellers. *Sellers v. Bragg*, 04 C 3663 (N.D. Ill 2005).

74.     Additionally, Detective Evans has an extensive disciplinary record according to CPD police data published on the Invisible Institute's website. Evans received 17 complaints from 2001 through 2005. In three of those complaints Evans was disciplined. (Exhibit 13) In several of the complaints, Evans was implicated with Timothy McDermott and Jerome Finnigan.[7] McDermott was recently fired from CPD after he and Finnigan posed for a picture holding rifles while they stood over an African American man wearing antlers. Finnigan is serving a 12-year prison sentence for robberies and home invasions committed while he was employed with the CPD and for "ordering a hit on a fellow officer who he believed was cooperating with investigators."[8]

75.     Detective Frugoli, the only officer assigned as a primary detective in both the Noel and Hobson investigation (and the officer that was involved in two of McIntosh's lineups) was indicted and found guilty in a drunk driving incident that led to the death of two individuals.  On April 10, 2009, Joseph Frugoli was off duty drinking with fellow officers at a tavern in Chicago. Frugoli got intoxicated, left the tavern, and drove his car southbound on Interstate 94. Two individuals had pulled over on the side of the road and Frugoli struck their car killing both. *Cazares v. Frugoli*, 13 C 5626 (2014). Instead of calling for help, Frugoli got out of his car and fled on foot. Frugoli was eventually apprehended with a blood alcohol level of 0.277 - over three times the legal

---

[7] See Invisible Institute, *Citizens Police Data* https://cpdb.co/data/bMQNyb/citizens-police-data-project (last accessed June 2, 2016)
[8] Steve Schmadeke, *Judge upholds firing of Chicago cop over controversial photo* (last accessed May 31, 2016) http://www.chicagotribune.com/news/local/breaking/ct-chicago-police-antlers-photo-met-20150610-story.html

31

Case: 21-2166    Document: 28    Filed: 08/19/2022    Pages: 469

limit.[9] Notably, Frugoli had been involved in several alcohol related incidents that were covered up by the Chicago police. On January 16, 2005, Frugoli was involved in an auto accident where the contributory causes were speeding and consumption of alcohol. *Cazares v. Frugoli*, 13 C 5626 (2014). On January 21, 2008, Frugoli drove a police car into a concrete barrier. On January 27, 2008, Frugoli was involved in an auto accident in which he failed to stop at a stop sign, struck a Chicago police car, and injured an on-duty Chicago police officer. As with the January 16, 2005 accident, this incident was alcohol related. The Chicago Police failed to discipline Frugoli for either of the incidents. *Cazares v. Frugoli*, 13 C 5626 (2014).

## Forensic Evidence, Viewed in Concert with Fraudulently Concealed Evidence, Entitles Norman McIntosh to a New Trial.

76.    Petitioner re-alleges paragraphs 1-75 of this petition and expressly incorporates them as if they were fully set forth herein.

A.    *Legal standard*

77.    Under 735 ILCS 2/1401, a petitioner may ask for relief from judgement "to correct all errors of fact occurring in the prosecution of a cause, unknown to the petitioner and the court at the time that judgment was entered, which … would have prevented its rendition." *People . Kane*, 2013 IL App (2d) 110594, 1113 (Dec. 5, 2013)

78.    To obtain relief under section 2-1401, a petition must be (1) timely, (2) present new evidence that could not have been previously discovered by due diligence, and (3) that evidence must be material, noncumulative, and so conclusive that it would

---

[9] Megan Twohey, *Drunken driving, cop case: Chicago cop gets bail in fatal crash, angering 2 victims' friends and family*, Chicago Tribune, http://articles.chicagotribune.com/2009-04-13/news/chi-cop-drunk-drivingapr13_1_fatal-crash-chicago-cop-fiery-crash (last visited May 30, 2016)

SA 285

probably change the result if a new trial were granted. *People v. Waters*, 328 Ill.App.3d 117, 127 (1st Dist. 2002). A petitioner is entitled to relief under section 2-1401 if he proves each of the foregoing elements by a preponderance of the evidence. *Id.*

79.     To make a successful showing of fraudulent concealment, a petitioner must allege facts demonstrating that the opposing party affirmatively attempted to prevent the discovery of the evidence and must offer factual allegations demonstrating good faith and due diligence in attempting to uncover such matters before trial or within the limitations period. *People v. Coleman*, 206 Ill. 2d 261, 290-91 (2002); *People v. Thomas*, 364 Ill. App. 3d 91, 99 (1st Dist. 2006).

**B.**     *The forensic evidence and fraudulently concealed evidence could not have been discovered through due diligence*

80.     The forensic fingerprint match to Charles Smith could not have been discovered through due diligence. McIntosh was not informed of the alternate suspect's identity until long after trial. (See ¶48) As soon as counsel learned Eggy's identity, she filed a motion for forensic testing and asked that his prints be compared to the prints lifted from the CD's. *Id.* As such, he was diligent in requesting forensic testing.   In that vein, he could not have known to subpoena Smith's mugshot to see if he matched the description of the offender until Smith was named as the alternate suspect. Furthermore, at the time of McIntosh's trial, AFIS was in its infancy, explaining why the unidentified fingerprints on the CD's were able to be identified after McIntosh requested the testing.

81.     Similarly, the recantations of Hobson, Thompson, and Aaron Smith and evidence of police misconduct could not have been discovered through due diligence.

SA 286

Case: 21-2166     Document: 28     Filed: 08/19/2022     Pages: 469

The affidavits from Hobson, Thompson, and Smith are recantations. *See People v. Steidl*, 142 Ill.2d 204, 261 (1997) (holding that the recantation of trial testimony by a key State witness constituted newly-discovered evidence entitling defendant to an evidentiary hearing). Without the recantations reasonable counsel would not have known to subpoena the arrest reports from all of the witnesses in this case to determine if police manufactured lineup reports or conduct an investigation into whether Bach and Evans framed McIntosh. Additionally, all the evidence contained in McIntosh's basement file could not have been discovered as police hid it in the basement of Wentworth Police Station.

C.  *The forensic evidence and fraudulently concealed evidence is material and non-cumulative.*

82.  "[E]vidence which is 'materially relevant' to a defendant's claim of actual innocence is simply evidence which tends to significantly advance that claim" and "section 116-3 is not limited to situations in which scientific testing of a certain piece of evidence would completely exonerate a defendant." *People v. Savory*, 197 Ill. 2d 203, 312-14 (2001).

83.  The fingerprint match to Charles Smith is material and non-cumulative. At the time of McIntosh's trial, this Court only knew that McIntosh's fingerprints were not found on the perpetrator's CD's. This Court also knew that Devon Hobson's prints were, along with multiple other unidentified fingerprints. Now, forensic science has proven that the alternate suspect's prints are on the CD's. (See ¶¶45, 48-49)  As such, the forensic evidence not only confirms Hobson's identification of the real killer as Charles Smith, a man that matches the shooter's description, but it also buttresses McIntosh's alibi.  (See ¶¶23-25) As such, it is material as it significantly advances

Pages: 469    Filed: 08/19/2022    Document: 28    Case: 21-2166

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

McIntosh's claim of innocence. *See People v. Noble*, 2012 IL App (1st) 113548-U ¶ 22 (Rule 23) (finding that fingerprint match to a third-party suspect that matched the eyewitnesses' description materially relevant evidence)

84.     Additionally, the recantations and fraudulently concealed evidence of police misconduct is also material and noncumulative. At trial, this Court believed all three witnesses saw separate lineups, and all three witnesses testified that they were sure that McIntosh was the shooter. (See §45, 51) Detectives concealed the fact that they fabricated lineup dates and times to cover up their frame-up of McIntosh, so the legitimacy of lineups at trial went unchallenged. (See §§60-68) McIntosh presented no evidence that his car did not match the shooter's, that his car had been towed months before the shooting, and the detective mislead this Court into believing McIntosh's car matched the description of the shooter's vehicle. (See §56) As such, it is noncumulative evidence that his car did not match the shooter's and, as is the evidence that shows police knew it.

**D.    *The forensic evidence and fraudulently concealed evidence would probably change the result on retrial***

85.     McIntosh has also shown, by a preponderance of the evidence, that the recantations, evidence of police misconduct and fingerprint testing results is of such a nature that it would probably change the result on retrial.

**Fingerprint match to previously named alternate suspect — Charles "Eggy" Smith**

86.     When police arrested McIntosh, they instantly requested that his prints be taken and sent to ISP for comparison to the prints on the CD's. (See §33)  Why? Because the detectives knew that if McIntosh's prints were there, it was strong evidence of his guilt. And if McIntosh's prints had been on the CD's, the State unquestionably

35

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

would have argued it was direct evidence of McIntosh's guilt. Indeed, courts have held that a single fingerprint in the absence of other evidence can be sufficient evidence of guilt beyond a reasonable doubt. See e.g., *People v. White*, 241 Ill. App. 3d 291, 293-98 (2d Dist. 1993); *People v. Taylor*, 32 Ill. 2d 165 (1965). Now, McIntosh presents this Court with not only that single fingerprint, but the fingerprint of the man that was named as the suspect before testing was conducted. (See ¶45, 48, 49) Add to that fact the fact that Smith matches the shooter's description, he drove a car just like the shooter's, and he is a Vice Lord (See ¶¶49, 57-59), there is more than a reasonable probability the outcome would be different if this new forensic evidence was presented at trial. *See e.g., People v. Charles Johnson*, Ill.App 120201-U (1ˢᵗ Dist. 2013) (PC Exhibit N)

**Police falsified evidence to justify McIntosh becoming a suspect in Hobson's murder**

87.     The detectives' determination to frame McIntosh as Hobson's killer is clear when one digs a little deeper into how he became a suspect. The purported reasons McIntosh became a "suspect" were all pre-textual. First, Bach claimed that the Hobson shooter matched the description of Rush/Monroe battery perpetrator. However, the only overlap between the descriptions of the shooters was that both were black men with braids, a common hairstyle among young African-American men in the Chicagoland area at the time. Next, Bach claimed that the same gun was potentially used in both offenses, but he knew that the guns did not match. (See ¶29) Lastly, the offenses did occur in the same area (See ¶29), but that similarity is irrelevant as many crimes are committed within the boundaries of Area 1. Notably, police did not question McIntosh about Hobson's murder when he was a suspect in the Rush/Monroe battery on December 21, 2001, one month after Devon Hobson was killed. (See ¶26-28) Logic dictates that Bach

SA 289

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

and Evans determined that McIntosh was a suspect only because they had to release McIntosh after Felony Review rejected charges in the Rush/Monroe case. (See ¶26-29)

## Recantations

88.    Not only have all three eyewitnesses recanted their identification of McIntosh (See ¶44–47, 50-52), but they have also explained why they falsely implicated McIntosh - - police misconduct. The recantations are credible because they are consistent and verified by other evidence. All three said Hobson was at the station on January 17th and told them to pick the man in the red shirt, a fact Hobson's Grand Jury testimony confirmed. McIntosh is wearing a red shirt in the young boys' lineups. (See Figure 2) And when Hobson identified McIntosh from a photo from the January 18th lineup, he testified that McIntosh was the guy in " the black hoodie with the red shirt." (Tr. R. W 61) No reasonable person would identify McIntosh by noting he is wearing a red shirt unless the red shirt had special significance to the witness. Here, the significance is obvious: the red shirt was the key identifying factor he remembered about McIntosh because he told the boys to identify him from it.   Additionally, Hobson and Thompson both report that police told them that McIntosh drove a car like the shooter and was arrested while driving in it. (PC Exhibit A, B) McIntosh has established that this information is false. Both Thompson and Hobson said that McIntosh had just beaten a case, and McIntosh, indeed, had just "beaten" a case, which was the entire reason that he became a suspect in Hobson's murder. (See ¶87) All three witnesses said that Hobson was allowed to tell the younger boys who to pick in their lineups. (See ¶¶44-47, 50-52) And while police reports, if accurate, render this impossible, McIntosh now has evidence

SA 290

to support the witnesses' claims of gross police misconduct (see ¶¶60-68) and evidence that police fabricated lineup times to cover up for their misconduct.   (See ¶¶92-95)

89.     There is no evidence of collusion between the three and McIntosh, either. Smith has not spoken to either Thompson or Hobson since the trial (See ¶55), rendering it nearly impossible for them to fabricate the basis for the false identification.  Indeed, the State subpoenaed, and then tendered to petitioner, all three men's phone records to determine if the records showed collusion between the three.

90.     Furthermore, Hobson's recantation must be viewed in light of the facts of this case.  It defies reason that Hobson would try to falsely exonerate the man who shot him and killed his brother.

91.     In light of all these facts, there is a reasonable probability that the recantations, alone, would change the result upon retrial.

**Lineup falsification**

92.     The lineup sheets and crime scene processing reports offer compelling evidence that Detectives Bach and Evans falsely claimed that Hobson viewed a lineup on January 18th to cover up for the fact that they allowed Hobson, on January 17th, to tell the younger boys whom to identify after he viewed the lineup. The chief support for this assertion is that fact it is impossible that Kevin Scott, a filler in January 18th lineup, was in the lineup at 11:55, as he had not even been arrested yet. (See ¶62-63) Additionally, Detective Evans reported that police fed McIntosh at 12:30 p.m. (Exhibit 1, p.162), at the *exact* same time that the evidence technician's report provides that the he was taking pictures of Hobson's lineup. (Exhibit 1, p.207)  Common sense provides that police would not feed McIntosh in the middle of a lineup, and there is no evidence in

SA 291

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

photographs to corroborate Evan's claim. Also of interest is the fact that Evans' GPR details that police took McIntosh back to lock up at 5:55 p.m. (Exhibit 1, p.162). If McIntosh was in a line up for James Hobson at 11:55 a.m., why would it take 6 hours to take him back to lock up? Simply put, it is impossible that Hobson viewed a lineup containing Kevin Scott at 11:55 a.m. on January 18, 2002.

93.    The irregularities in the "Hobson lineup report" further support this assertion. In the twelve-year-old boys' lineups, all the fillers are identified. (See ¶65-68; Exhibit 1, p.208-209). Andrew Vance is the only person who has any identifying information, his birthdate, next to his name. Additionally, Vance is the only person in the lineup that was a suspect in an Area 1 murder investigation that occurred that day -- Tina Noel's murder. (See ¶38-39)

94.    The fact that Vance is the only person with identifying information, viewed in concert with the aforementioned facts, supports a conclusion that the January 18th lineup was more likely one for the Tina Noel investigation. (Exhibit 1, p.167; See ¶28-29) Indeed, McIntosh wrote a letter to his post-conviction counsel before he knew anything about the Noel murder or Vance's alleged involvement in Noel's murder and told his post-conviction attorney that he was a filler in the lineup, and he remembered the lineup being for the man in the first position. (Exhibit 14). Noel's murder investigation file was also contained in the basement files. The investigation shared one primary detective, Detective Frugoli, and case overlap is clear from police reports. (See ¶65-68) Indeed, John Coppage, the victim/suspect in the Noel murder, was a filler in both Smith's and Thompson's lineups. (See Figures 10 and 11) Lastly, Dietrich Sanders, a witness to Noel's murder, was being interviewed by detectives at the approximate time the January

18th lineup likely occurred (Exhibit 9) Furthermore, Evans left Hobson's statement because he was called into a re-read, which was likely for Sander's. (Exhibit 1, p.167) Logic dictates that the January 18th lineup likely was for her to view, and when she did not identify Vance, police were forced to release him. (Exhibit 9) This fact would also explain why no supervisor signed the report. (See Figure 9)

95.  Irregularities in how the evidence technician photographed the Hobson lineup further support misconduct. As previously noted (See ¶68), Hobson's only contains two photocards at the beginning of the lineup pictures, a fact that is not readily apparent unless you turn over each photograph and understand the sequential order in which the pictures were taken. Because the technician did not take a picture of a card at the end, it leaves open the question of what pictures followed the photos of McIntosh. Obviously, the technician could have taken close-ups of every man in the lineup. The other differences — less photographs of the January 18th lineup, the men not photographed looking to each side, and McIntosh not photographed separated from the group or photographed looking right and left — also raises questions about the validity of the January 18th lineup. At a minimum, it shows a gross deviation from CPD protocol And viewed in concert with the other differences between the lineups, it strongly supports an argument that the January 18th lineup was not viewed by Hobson, and it was not a lineup for Hobson's brother's murderer. Instead, it was likely a lineup for Tina Noel's murder where Vance was not identified.

**Police misconduct centering on the perpetrator's car/McIntosh's car**

96.  Impound records also establish misconduct on behalf of investigative detectives that, if known at the time of trial, would have probably resulted in a different

SA 293

Case: 21-2166          Document: 28          Filed: 08/19/2022          Pages: 469

verdict. McIntosh unquestionably gave Evans the date and area from which his car was towed, as he told post-conviction counsel this information. (PC Exhibit K). Detective Evans purposely did not write down what he was told, and then searched dates that detectives knew would not yield results. (See ¶31-32) Detectives also knew that McIntosh's Oldsmobile did not match the eyewitnesses' description of the shooter's vehicle (See ¶31-33), and he was not arrested driving his car, much less a car like the shooters. Evans and Bach not only ignored this evidence, but they also falsified a police report to support a conclusion that it did. (See ¶34) To cap it off, Detective Evans testified and deceived this Court into believing McIntosh's car was relevant to this case because it did match the description, and McIntosh ditched his car immediately after the murder and lied when he said it had been towed. (See ¶31-32)

**The basement file**

97.     The fact that McIntosh's file is contained in the basement file establishes a *Brady* violation. The basement file contains key evidence never tendered to defense. Before the existence of the basement file was uncovered, McIntosh issued a subpoena for all police reports in his case and received a 57-page response.[10] The basement file contains 236 pages. Additionally, the fact the file was in the basement file, viewed in concert with other files therein, supports an argument that police engaged in lineup chicanery in McIntosh's case in order to rebut any argument that they allowed Hobson to influence the younger witnesses.

98.     In what cannot be considered a coincidence, the investigative file for the Tina Noel murder (See ¶38-39) was also located in the basement files. Notably,

---

[10] Counsel will tender these reports upon request.

McIntosh issued two subpoenas for Noel's "permanent retention file," and both times, CPD did not comply with counsel's request and only tendered supplemental police reports.[11] Thus, if counsel had been unable to conduct investigations separate from CPD's non-compliant subpoena responses, she never would have learned that both McIntosh's and Noel's files were included in the basement file. Notably, the State did not tender post-conviction counsel Noel's basement file, despite knowing of its importance to McIntosh's investigation into the alleged misconduct in his case. Indeed, each time McIntosh's attorney found evidence of police misconduct in this case, she notified the State and told the ASA about the evidence supporting it. Despite this fact, the State denied her request to order the State's trial file in the Noel case so McIntosh's attorney, in concert with the ASA in this case, could investigate if the file had the potential to reveal police misconduct.

99. Not only does Noel's case seem to be linked to McIntosh's, but two other known cases found in the basement file have the same detectives and both involve similar allegations of lineup misconduct.

**Further support for lineup chicanery**

100. Post-conviction counsel has been contacted by two defendants -- Edward Pleasant and DeShanta Young — who both told her that their case was investigated by Bach and Evans and that lineups conducted in their cases were suspect. (See ¶71-72)

101. There are obvious similarities between the allegations of misconduct raised here and by those raised by Young and Pleasant. All three eyewitnesses in this case allege that Bach and Evans allowed Hobson to tell Smith and Thompson who to pick, just

---

[11] Counsel will tender these reports upon request.

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

as detectives allowed the same thing to happen in Pleasant's case. (See ¶72) And in Young's case, detectives allowed unusual lineup procedures to ensure Young was convicted, just as Bach and Evans ensured that all three witnesses would pick McIntosh, despite the fact that absolutely nothing tied him to Hobson's murder. (See ¶71)

**Police misconduct in other cases**

102.  Lastly, McIntosh has presented this Court with evidence that the lead detectives in this case are not above engaging in unethical conduct. In fact, all of the lead detectives in McIntosh's case have either been subject to discipline for misconduct or been accused of strikingly similar misconduct in multiple other cases. (See ¶¶70-75) Additionally, Detective Frugoli, is now in prison. (See ¶75) McIntosh submits that viewing his case, in concert with Pleasant's (see ¶72), Young's (see ¶71), Noel's (see ¶38-39), and *Sellers v. Bragg* (see ¶75), establishes a pattern and practice on the part of these detectives of falsifying evidence to convict defendants.

103.  In sum, the fraudulently concealed and newly discovered evidence revealed since this Court found McIntosh guilty, exonerates McIntosh and provides this Court with the likely identity of the real shooter – Charles Smith. It also uncovers troubling evidence of the police misconduct that was necessary to secure his conviction. Given the overwhelming evidence of McIntosh's innocence (and evidence pointing to Charles Smith being the real perpetrator), McIntosh has establish, by a preponderance of the evidence, that there is a reasonable probability that the outcome of trial would have been different if his trial was held today. McIntosh deserves justice, the police who framed him deserve punishment, and Devon Hobson's real killer should be charged with his murder.

SA 296

## THE STATE MUST RESPOND TO THIS PETITION WITHIN 30 DAYS

104.   McIntosh chose a 2-1401 petition to raise several of his claims to expedite this Court addressing his claims and granting him a new trial. His post conviction case has been pending for years, his father is dying of cancer, and time is of the essence. In no way does his filing a 2-1401 petition impact the claims pending in his post-conviction petition — they remaing pending.

105.   The notice requirements for filing a section 2-1401 petition are governed by Illinois Supreme Court Rule 105 (eff. Jan. 1, 1989). Ill. S. Ct. R. 106 (eff. Aug. 1, 1985). Rule 105 provides that notice may be served by either summons, certified or registered mail, or by publication. Ill. S. Ct. R. 105(b) (eff. Jan. 1, 1989). After notice has been served, the responding party (the State) has 30 days to file an answer. *Id.*

106.   No matter the response by the State within 30 days from the date of filing, petitioner submits that the well-plead facts contained in this petition warrant a new trial — without the necessity of a hearing. Petitioner named an alternate suspect, Charles Smith, and forensic testing conducted after he was named establishes that his fingerprints are on killer's CD's. That fact, alone, warrants this Court ordering a new trial. But petitioner has established more. Petitioner has proven that he did not own a car that matched the description given of the shooter's car. He has also proven that his car was towed, just as he told Detectives Evans and Bach. Additionally, he has proven that the January 18th lineup could not have occurred when detectives said that it did. Lastly, he has proven that his basement file contains documents that were never tendered before trial. Given the totality of this incontrovertible evidence, McIntosh has established, by a preponderance of the evidence, that it would probably change the result on retrial.

Pages: 469

Filed: 08/19/2022

Document: 28

Case: 21-2166

SA 297

107.  Based on the foregoing, Petitioner Norman Mcintosh respectfully requests this Court reverse petitioner's conviction and order a new trial or order such relief as the Court deems appropriate.

Respectfully submitted,

Jennifer L. Blagg
Eric Bisby
Attorneys at Law
Firm number 45099, (773) 859-0081
1333 W. Devon Ave., Suite 267
Chicago, IL 60660
jennifer.blagg@yahoo.com

SA 298

# Exhibits

Exhibit 1:     McIntosh File Contained Area Central Basement Filing Cabinet

Exhibit 2:     Benjamin Rush Police Report (McIntosh Released Without Charges)

Exhibit 3:     Benjamin Rush Supplemental Police Report

Exhibit 4:     Second Supplemental Affidavit of James Hobson

Exhibit 5:     FOIA Arrest Report of Charles Smith - October 26, 2001

Exhibit 6:     Lineup Photos of Hobson, Thompson, and Smith

Exhibit 7:     Kevin Scott Arrest Report

Exhibit 8:     James Hobson's Grand Jury Testimony

Exhibit 9:     Tina Noel Supplemental Report

Exhibit 10:    Crime Scene Processing Report (Hobson Lineup) from PD File

Exhibit 11:    Evidence Submission Form (Submitting CD's for Fingerprint Testing & Norman's prints)

Exhibit 12:    Lineup Report - Deshanta Young

Exhibit 13:    Citizens Police Data – visit https://cpdb.co/data/AQxmVb/citizens-police-data-project and enter "David Evans"

Exhibit 14:    May 31, 2015 Letter from McIntosh to counsel

Exhibit 15:    Rap Sheet for Charles Smith

SA 299

Group Exhibit 2 Attached to case

# Cook County prosecutors bar 10 Chicago cops from testifying because of ties to corrupt ex-Sgt. Ronald Watts

APPENDIX E - Duplex text



Former Chicago police Sgt. Ronald Watts, right, leaves the Dirksen U.S. Courthouse on Oct. 9, 2013, after being sentenced to 22 months in prison. (Rali Velasquez / Chicago Tribune)

By Jason Meisner
Chicago Tribune

APRIL 24, 2018, 6:30 AM

Ten Chicago cops with ties to disgraced former Sgt. Ronald Watts are no longer being called as witnesses in any criminal cases in Cook County out of "concerns about their credibility," according to records released Monday by State's Attorney Kim Foxx.

The unusual move was made five months ago after Foxx's office threw out the convictions of 15 men who were allegedly framed by Watts and his crew, according to a letter sent to the Chicago Police Department's chief legal counsel on Nov. 17.

Joe Magats, chief of the state's attorney's Criminal Prosecutions Bureau, wrote in the letter that after reviewing those cases, it was decided the 10 officers who worked closely with Watts could no longer be used as witnesses in pending or future criminal prosecutions "due to concerns about their credibility and alleged involvement in the misconduct."

EXHIBIT
SA 300
?

A total of 15 police officers associated with Watts' crew over the years were placed on desk duty five months ago pending an internal Police Department investigation.

The decision by Foxx to reject the word of 10 veteran officers marked the latest fallout in a growing scandal over Watts' nearly decadelong run of corruption, which ended in 2012 when he and another member of his team, Officer Kallatt Mohammed, were arrested for shaking down a drug courier who turned out to be an FBI informant.

So far, the scandal has prompted the state's attorney's office to reverse 31 convictions secured by Watts and his team, including the county's first "mass exoneration" in November when cases against the 15 men were dismissed.

Several of those who were allegedly framed have since filed federal civil rights lawsuits against the city, Watts and other officers on his team. Records produced in that litigation show that the city's police disciplinary agency, the Civilian Office of Police Accountability, is currently conducting its own investigations into 22 cases involving Watts.

Asked last week why it was taking months for the internal police investigation to wrap up, Superintendent Eddie Johnson said reviewing nearly two decades worth of records takes time.

"I'm not going to rush to do anything just so that it appeases people that, you know, 'finally something happened,' " Johnson said. "Because I want to get it right."

Watts and his crew of tactical officers were accused of orchestrating a reign of terror at the now-razed Ida B. Wells public housing complex on the South Side, systematically forcing residents and drug dealers alike to pay a "protection" tax and putting bogus cases on those who refused to do so.

In case after case, when Watts' targets complained — to the Police Department or in court — judges, prosecutors and internal affairs investigators all believed the testimony of Watts and other officers over their accusers, records show.

The cases also highlighted a broken system of police discipline that allegedly protected corrupt officers and punished those who tried to expose his corruption. Despite mounting allegations, Watts continued to operate for years amid a lengthy police internal affairs probe as well as investigations by the state's attorney's office and the FBI, according to court records.

In fact, two Chicago police officers who alleged they were blackballed for trying to expose Watts' corruption years ago won a $2 million settlement in their whistleblower lawsuit.

When Watts was finally caught, it was on relatively minor federal charges. He wound up being sentenced to just 22 months in prison.

After his release, Watts moved to Las Vegas, records show. He has made no public comment about the allegations against him. In a recent response in one of the pending lawsuits, Watts invoked his Fifth Amendment protections against self-incrimination more than 40 times, court records show.

*Chicago Tribune's Jeremy Gorner contributed.*

*jmeisner@chicagotribune.com*

*Twitter @jmetr22b*

http://www.chicagotribune.com/news/local/breaking/ct-met-chicago-cops-corruption-ronald-watts  SA0360423...

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH C. BOOKER, B75795, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 10 C 3995 |
| | ) | |
| JACQUELINE LASHBROOK, Warden, | ) | The Honorable |
| | ) | Charles P. Kocoras, |
| Respondent. | ) | Judge Presiding. |

## Response to Amended Habeas Corpus Petition

Pursuant to this Court's December 4, 2018 order, Doc. 26, respondent responds to petitioner's 28 U.S.C. § 2254 amended habeas corpus petition, Doc. 19.

## Procedural Background

In 2003, a Cook County jury convicted petitioner of the first degree murder of Charles Rials, and the court sentenced him to fifty-five years in prison. *People v. Booker*, No. 1-03-3533 (Ill. App. Ct. 2003) (Exh. A). The state appellate court affirmed, rejecting on the merits petitioner's arguments that (1) the trial judge improperly coerced the deadlocked jury to return a guilty verdict by instructing it to continue its deliberations, and (2) the evidence was insufficient. *Id.* Petitioner sought leave to appeal in the Illinois Supreme Court, raising only his jury coercion claim, Exh. E, but the petition was denied, *People v. Booker*, 844 N.E.2d 967 (Ill. 2006) (Table).

Petitioner thereafter filed an amended postconviction petition raising the same arguments that he advances in this Court (listed below), and also asserting that he is innocent.[1]  Exh. F.  Following an evidentiary hearing on the innocence question, the trial court denied relief, and on appeal, petitioner's counseled brief abandoned all claims save for the innocence argument.  Exh. G.  The state appellate court affirmed.  *People v. Booker*, 2017 IL App (1st) 130177-U (Exh. E).  Petitioner's counseled petition for leave to appeal (PLA) in the Illinois Supreme Court, Exh. L, reiterated the innocence claim, but was denied.  *People v. Booker*, 94 N.E.3d 650 (Ill. 2018) (Table).

Petitioner's amended habeas petition raises the following claims:

A.     the trial judge improperly coerced the deadlocked jury to return a guilty verdict by instructing it to continue its deliberations, Doc. 19 at 14;

B.     ineffective assistance of trial counsel (five instances, plus the cumulative effect of counsel's errors), *id.* at 15-18;

C.     ineffective assistance of appellate counsel, *id.* at 18;

D.     insufficient evidence, *id.* at 19;

E.     the State introduced perjured testimony, *id.* at 19-20; and

F.     investigators used coercive line-up identification techniques and fabricated documentary evidence, rendering the admission of that evidence unconstitutional, *id.* at 20.

---

[1] The trial court had dismissed petitioner's original postconviction petition, but the state appellate court reversed that judgment and remanded for further proceedings. Petitioner filed his amended postconviction petition following remand to the trial court.

## **Argument**

This Court should deny the petition because Claim A fails under 28 U.S.C.

§ 2254(d) and Claims B-F are procedurally defaulted.

## I.      **Claim A Fails Under § 2254(d).**

Claim A alleges that the trial judge improperly coerced the deadlocked jury to

return a guilty verdict. The facts underlying this claim are straightforward:

At 3:30 p.m., the jury began deliberating. Exh. A at 4.

At 6:30 p.m., the jury sent a note stating that it was deadlocked 9-3 in favor

of guilt, and requested direction on how to proceed; the judge told the jury to

continue its deliberations. *Id.* 4-5.

At 7:30 p.m., the jury asked to see eyewitness Darnell Brown's testimony,

and the court provided that transcript. *Id.* at 5.

At 9:00 p.m., the jury indicated a second time that it could not reach a

verdict, but did not detail the numeric breakdown of the split, as it had done before.

*Id.* at 5. In response, the judge instructed the jury that the verdict must be

unanimous, and that in rendering a decision they should consult one another;

deliberate with a view toward reaching an agreement; decide the case after

impartial consideration of the evidence with fellow jurors; and not hesitate to

reexamine their views of the evidence, provided that they not change their minds

solely for the purpose of obtaining a verdict. *Id.* at 5-6.

At 10:05 p.m., the jury asked to see eyewitness Kenneth Williams's testimony, and the court provided that transcript. *Id.* at 6. At approximately midnight, the jury returned a guilty verdict. *Id.*; *see also* Exh. Q (transcript from deliberations and verdict).

Petitioner alleges that the judge erred in giving the 9:00 p.m. jury charge after having been informed that the jury was split 9-3 in favor of guilt; that instruction, he contends, coerced the jurors in the minority to switch their verdicts to guilty. On habeas review, this claim is reviewed under § 2254(d), which bars relitigation unless the state appellate court's decision on the merits, Exh. A at 10-13, "was contrary to, or involved an unreasonable application of," clearly-established Supreme Court precedent or "was based on an unreasonable determination of the facts."

The claim fails under these criteria. As an initial matter, the claim is factually baseless: there was no nexus, as petitioner believes, between the judge's 9:00 p.m. jury charge and the jury's notification that it was deadlocked 9-3 in favor of guilt. *See id.* at 12 (state appellate court's factual determination on nexus issue, presumed correct on federal habeas review, *see* 28 U.S.C. § 2254(e)(1)). When, at 7:30 p.m., the jury communicated that 9-3 deadlock, the judge did *not* give the instruction disputed here. Rather, the judge gave that instruction only after the jury notified him a second time, at 9:00 p.m., that it was deadlocked; in this second communication jury did *not* specify (and the judge did not request) the numeric

4

breakdown and nature of the split verdict, and by this time the jury not only had

been deliberating for an additional two-and-a-half hours since its last

communication, but also had been doing so with the transcript of Darnell Brown's

testimony.  Therefore, before he provided the disputed 9:00 p.m. charge, the judge

was unaware of any details, whether quantitative or qualitative, about the nature of

jury's deadlock.

Against this presumptively correct factual backdrop, no clearly established

Supreme Court precedent prohibited the trial court from instructing the jury as it

did, or when it did.  In *Lowenfield v. Phelps*, 484 U.S. 231, 237-41 (1988), the

Supreme Court determined that a jury charge — virtually identical to the

instruction at issue here, and provided to a deadlocked jury whose numeric

breakdown was unknown — was non-coercive "in its context and under all the

circumstances."  And in *Early v. Packer*, 537 U.S. 3, 4-6, 10 (2002), the Court found

on a much closer record that "it was at least reasonable to conclude" that there was

no coercion where the judge, during deliberations, (1) became aware that the jury

was deadlocked 11-1 (but did not know which verdict it favored); (2) spoke with the

holdout juror alone, twice, and told her that unless a verdict was reached, "they

have to start deliberations all over again with another person"; (3) told the jury as a

group that "the juror" had a right to disagree, but that she "must deliberate," and

that the jury "must follow the law and find them either guilty or not guilty of that

charge"; and (4) met alone with the foreman to discuss whether the holdout juror was deliberating appropriately.

If habeas relief was unwarranted in *Lowenfield* (a pre-§ 2254(d) case) and in *Early*, it is unwarranted here.[2]  Because Claim A fails to meet any of the preconditions for relief imposed by § 2254(d), it should be denied.

## II.     Claims B-F Are Procedurally Defaulted.

Petitioner's remaining claims were not properly exhausted, and thus are procedurally defaulted, because they were not presented "in one complete round of the State's established appellate review process," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), or were denied for failure to comply with state pleading rules, *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).

Petitioner raised Claim D on direct appeal in the state appellate court, Exh. B, but after losing there, did not include the argument in his ensuing Illinois

---

[2]   *Brasfield v. United States*, 272 U.S. 448, 450 (1926), which found that the judge's inquiry into the nature and numeric breakdown of the jury's deadlocked verdict was coercive and reversible error, is inapt for two reasons.  First, as demonstrated, the judge in petitioner's case, unlike the *Brasfield* judge, was neither informed of, nor asked for, a numeric breakdown before giving the disputed charge.  Second, and more significantly, *Brasfield* was decided on supervisory, rather than on constitutional, grounds, and no court has determined that "*Brasfield*'s *per se* reversal approach must be followed when reviewing proceedings on habeas corpus." *Lowenfield*, 484 U.S. at 240 n.3.  For this latter reason, *Jenkins v. United States*, 380 U.S. 445 (1965), and *United States v. United States Gypsum Co.*, 438 U.S. 422 (1978), which found that instructions given to deadlocked juries were coercive, are also "off the table as far as § 2254(d) is concerned" because they are "nonconstitutional decisions" that created no "clearly established" rule for habeas purposes.  *Early*, 537 U.S. at 10.

Supreme Court PLA, Exh. E. And petitioner raised Claims B, C, E, and F in his amended postconviction petition, Exh. F, but did not include them in his counseled state appellate court brief, Exh. G, or counseled PLA, Exh. L. Accordingly, these claims are procedurally defaulted. *Boerckel*, 526 U.S. at 845.

This latter set of claims is defaulted on independent and adequate state law grounds as well. On postconviction appeal, petitioner attempted to file a pro se brief containing these arguments, Doc. 19 at 26-42, but the state appellate court disallowed that filing "because of representation by counsel," and hybrid representation is not allowed in Illinois, *id.* at 43. The Illinois Supreme Court subsequently denied petitioner's attempt to file a pro se, postconviction PLA containing these claims, *id.* at 62-72, citing the same rule against hybrid representation, *id.* at 75. These rulings block habeas review for Claims B, C, E, and F. *See Clemons v. Pfister*, 845 F.3d 816, 820 (7th Cir. 2017) (enforcement of Illinois's rule against hybrid representation on appeal was "independent and adequate state law ground of decision" barring federal habeas review of claim); *Coleman*, 501 U.S. at 729-30.

The defaults may be excused if petitioner shows (1) cause and prejudice, or (2) that the absence of federal review will result in a "fundamental miscarriage of justice" because he is innocent. *Coleman*, 501 U.S. at 750. To satisfy this latter exception, petitioner must provide "new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical

evidence — that was not presented at trial" and then establish that in light of all the evidence "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

Petitioner presents an innocence argument in two parts. He cites the affidavits of Antoine Ford and Ellen Anderson, both of whom claimed in affidavits that they saw Kenneth Williams, and not petitioner, shoot the victim. *See* Exh. F at 193-95 & Doc. 19 at 84-86 (Anderson affidavit); Exh. M (Ford affidavit). At the evidentiary hearing on the innocence question, petitioner testified that he was not the shooter, Exh. P at X7-X56, and Williams testified consistently with his affidavit, Exh. O at W7-W54. Ford, however, testified that her affidavit was false: she was not at the scene and did not see the shooting, but signed the affidavit because petitioner asked her to and she loved him. Exh O at V5-V119.

The state court judge denied petitioner's innocence claim after determining that neither petitioner nor Ford was credible. The court found that petitioner "earnestly testified about his innocence" — "of course." Exh. P at Y7. "Ford's rendition of the offense along with his criminal history" caused the court "to doubt his credibility." *Id.* And with respect to Anderson, the court found that she was of no assistance because she "flipped her affidavit and basically said the affidavit was not true, that in fact she was not out there, she did not see the shooting." *Id.*

These witness-credibility and fact-bound determinations, both explicit and implicit, may not be re-evaluated on federal habeas review. *See Parke v. Raley*, 506

8

U.S. 20, 35 (1992) (questions of historical fact, "including inferences properly drawn from such facts," entitled to deference on federal habeas review); *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them"); *Stone v. Farley*, 86 F.3d 712, 718 (7th Cir. 1996) ("Federal courts do not reevaluate the credibility of witnesses when conducting habeas review of state trials."); § 2254(e)(1) (state court's "determination of a factual issue . . . shall be presumed to be correct" unless rebutted by "clear and convincing evidence"). Accordingly, petitioner may not rely on Anderson, Ford, or his own postconviction hearing testimony in pressing his innocence argument.

Second, petitioner alleges that corrupt police officers, with the assistance of eyewitnesses Kenneth Williams and Darnell Brown, conspired to frame him for Rials's murder in retaliation for his refusal to cooperate in the officers' narcotics-skimming operation (petitioner was a large-scale drug dealer). Doc. 18 at 52-61. This theory does not suffice: it is wholly speculative and is not based on the type of affirmative proof of innocence that the standard demands. *Cf. House v. Bell*, 547 U.S. 518, 540-41 (2006) (finding innocence likely where (1) DNA tests; (2) bloodstain evidence; (3) photographs; (4) other physical proof ; (5) third party's confessions; (6) third party's suspicious behavior; and (7) third party's history of abusing victim, all established, when considered as whole, "rare case" where it was more likely than not that jury would acquit petitioner of murder in light of new evidence).

Because petitioner cannot clear the "fundamental miscarriage of justice" bar, this Court should decline to review his defaulted claims.

## III.  Certification Is Unwarranted.

A claim should be certified for appeal only if the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and if the claim is denied on procedural grounds, certification is justified only if the procedural disposition is debatable as well, *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Because it is not debatable that petitioner's claims are procedurally defaulted or barred by § 2254(d), no certificate of appealability should issue.

### <u>Conclusion</u>

This Court should deny petitioner's amended habeas corpus petition, Doc. 19, and decline to issue a certificate of appealability.

January 14, 2019                      Respectfully submitted,

                                      KWAME RAOUL
                                      Attorney General of Illinois

                    By:               /s/ David H. Iskowich
                                      DAVID H. ISKOWICH, Bar No. 6243162
                                      Assistant Attorney General
                                      100 West Randolph Street, 12th Floor
                                      Chicago, Illinois 60601-3218
                                      TELEPHONE: (312) 814-3421
                                      FAX: (312) 814-2253
                                      E-MAIL: diskowich@atg.state.il.us

<u>**Certificate of Service**</u>

I certify that on January 14, 2019, I electronically filed respondent's **Response to Habeas Corpus Petition** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system, and on the same date mailed a copy of this document via United States Postal Service to the following non-registered user:

Joseph C. Booker, B75795
Menard Correctional Center
P.O. Box 1000
Menard, Illinois 62259

<div style="margin-left: 50%;">

/s/ David H. Iskowich
DAVID H. ISKOWICH, Bar No. 6243162
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
TELEPHONE: (312) 814-3421
FAX: (312) 814-2253
E-MAIL: diskowich@atg.state.il.us

</div>

NOTICE
The text of this order may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same.

September 22, 2005

No. 1-03-3533

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| v. | ) | No. 02 CR 25224 |
| JOSEPH BOOKER, | ) | The Honorable John J. Moran Jr. |
| Defendant-Appellant. | ) | Judge Presiding. |

O R D E R

Following a jury trial, defendant Joseph Booker was found guilty of first degree murder and sentenced to 55 years in prison. On appeal, defendant contends that (1) the evidence was not sufficient to prove him guilty beyond a reasonable a doubt; and (2) the trial court erred in giving a *Prim* instruction. For the following reasons, we affirm.

During the evening of September 8, 2002, Charles Rials was shot and killed in the Chicago Housing Authority complex known as Wentworth Gardens. Defendant was subsequently arrested and charged with first degree murder.

At trial, Kenneth Williams testified that he knew defendant from the neighborhood because defendant frequently visited a friend who lived in the complex. Williams stated that defendant drove a blue four-door Pontiac Grand Prix. Sometime between 9:30 and 10 p.m. on September 8, 2002, Williams and defendant got into

1-03-3533

an argument.  Words were exchanged about "gang banging stuff" and
defendant eventually left to visit his friend.  At about 10:30
p.m., defendant and Williams exchanged more words before
defendant got into his blue Grand Prix and left.  A few minutes
later, Williams saw the victim Rials, a long-time friend, walking
on the sidewalk.  A few minutes after that, defendant was running
down the street toward Rials with a gun in his hand.  As Williams
got up to run, he saw defendant point the gun at Rials and shoot.
When Williams looked back to make sure defendant was not coming
after him, he saw defendant standing over Rials and he heard more
gunshots.  According to Williams, defendant was wearing a white
t-shirt and black jogging pants and his hair was in braids.  He
also stated that the area was well lit at the time of the
shooting.  Williams identified defendant in a lineup two days
later.

On cross-examination, Williams stated that he drank two
beers prior to the shooting, but denied that he was drunk.
Williams also repeatedly denied that a tree obstructed his view
of defendant.

Darnell Brown, a resident at Wentworth Gardens, testified
that he ran into Rials sometime after 11 p.m..  The two walked to
the end of a parking lot at 38th Place.  Brown stopped to speak
with a friend, while Rials continued to walk toward Williams who
was sitting on some steps.  As Brown was returning home, he heard

- 2 -

1-03-3533

a single gunshot and four subsequent shots. Brown ducked behind
a car when he heard the second set of shots. When he looked up
from about four or five car lengths away, Brown could see
defendant standing over Rials and he was putting a gun in the
right side of his hip. Defendant was wearing a black jogging
suit. After the shooting, defendant got into the back seat of
the same dark blue Pontiac Grand Prix that Brown had seen
defendant driving on previous occasions. According to Brown, the
area was well lit. Within days of the shooting, Brown identified
defendant in a lineup.

On cross-examination, Brown stated that he could not see the
shooter's face as he stood over Rials because he was turned
sideways. He also stated that he identified defendant in the
lineup based on what he was wearing and his build. However, when
Brown was asked if what he saw was someone who looked like
defendant he responded "no."

On redirect, Brown stated that he picked defendant out of
the lineup because he actually saw defendant shoot the victim.

State's witness Louis Dean also resided at Wentworth
Gardens. Dean was 13 years old at the time of the shooting. Dean
testified that at approximately 11:30 p.m., he was in his bedroom
watching television. At some point he looked out his bedroom
window and saw Rials, a friend from the neighborhood. As Dean
was looking out the window, defendant, who was dressed in black,

- 3 -

1-03-3533

walked up behind Rials and shot him. After Rials fell to the
ground, defendant stood over him and fired additional shots.

On cross-examination, Dean admitted that in a signed
statement he gave two days after the shooting, he told Assistant
State's Attorney Wilson and Detective Evans that he heard the
first gunshot, but did not actually see it. Dean also stated
that he did not remember telling the grand jury that he did not
know where the gunshots came from. Dean, however, stated that
his previous statement was incorrect and that he was telling the
truth when he testified that he actually saw defendant shoot
Rials.

Detective David Evans testified that following defendant's
arrest, it was discovered that he was the owner of a dark-colored
Pontiac Grand Prix.

James Eldridge, a private detective, testified on behalf of
the defense. Eldridge stated that he measured the distance from
the stairs where Williams allegedly sat to the crime scene to be
approximately 35 feet. He also stated that a large tree with a
circumference of 29 feet was located in between the stairs and
the scene. The distance from Dean's home to the spot where Rials
was shot was 144 feet.

Following the close of evidence, the jury began deliberating
at 3:30 p.m. At 6:30 p.m., the jurors sent a note to the court
stating "we seem to be deadlocked, 9 guilty 3 not guilty, no one

- 4 -

SA 316

1-03-3533

wants to change their vote we need direction."  The court
instructed the jury to continue to deliberate.  At 7:30 p.m., the
jury requested to see Darnell Brown's testimony.  The court
tendered the transcript to the jurors over defense counsel's
objection.  At 9 p.m., the jury sent a letter to the judge
indicating that the jurors as a group could not come to an agreed
verdict.  Over defense counsel's objection, the trial court
issued the following *Prim* instruction:

> "Members of the jury, the verdict
> must represent the considered
> judgment of each juror.  In order
> to return a verdict it is necessary
> that each juror agree there to.
> Your verdict must be unanimous.  It
> is your duty as jurors to consult
> with one another and to deliberate
> with a view to reaching an
> agreement if you can do so without
> violence to individual judgment.
> Each of you must decide the case
> for yourselves, but do so only
> after an impartial consideration of
> the evidence with your fellow
> jurors.  In the course of your

- 5 -

SA 317

1-03-3533

> deliberations do not hesitate to
> reexamine your own views and to
> change your opinion if you are
> convinced that it is erroneous, but
> do not surrender your honest
> convictions as to the witnesses or
> effect of evidence solely because
> of the opinion of your fellow
> jurors or for the mere purpose of
> returning a verdict. You are not
> partisans, you are judges, judges
> of the facts. Your sole interest
> is to ascertain the truth of the
> evidence in this case. Your
> continued effort is appreciated."

The court then instructed the jury to continue to deliberate. At
10:05 p.m., the jury requested the testimony of Kenneth Williams.
Over defense counsel's objection, the court tendered the
transcript to the jurors. At approximately 12 a.m., the jury
returned a guilty verdict.

On appeal, defendant first contends that the evidence was
insufficient to prove him guilty beyond a reasonable doubt.

In reviewing a sufficiency of the evidence claim, the
question is whether, after viewing the evidence in the light most

- 6 -

NO. 1-03-3533

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

RECEIVED
CRIMINAL APPEALS

JUN - 3 2005

309 RICHARD J. DALEY CENTER
RICHARD A. DEVINE
STATE'S ATTORNEY'S OFFICE

PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

vs.

JOSEPH BOOKER,

Defendant-Appellant.

Appeal from the Circuit Court of Cook County, Criminal Division
Honorable **John J. Moran**, Judge Presiding

DEFENDANT'S REPLY BRIEF

ROBERT D. KUZAS
Law Offices of Robert D. Kuzas
222 N. LaSalle Street
Suite 200
Chicago, IL 60601
(312) 629-1400

EXHIBIT D

SA 319

NO. 1-03-3553

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

---

PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

vs.

JOSEPH BOOKER,

Defendant-Appellant.

---

## POINTS AND AUTHORITIES

### I.

### THE EVIDENCE PRESENTED BY THE STATE WAS INSUFFICIENT TO PROVE THE DEFENDANT GUILTY BEYOND A REASONABLE DOUBT

*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979)...................................... 2
*People v. Cunningham*, 212 Ill.2d 274, 288 Ill.Dec. 616 (2004)........................ 2, 3, 4
*People v. Schott*, 145 Ill.2d 188, 164 Ill.Dec. 127 (1991)..................................... 4

### II.

### THE COURT ERRED BY GIVING A *PRIM* INSTRUCTION AFTER HAVING BEEN MADE AWARE OF THE NUMERICAL DIVISION OF THE JURY, AND UNDER CIRCUMSTANCES THAT SUGGESTED TO THE JURORS THAT THERE WAS TESTIMONY THAT WOULD SUPPORT THE MAJORITY WHO FAVORED A GUILTY VERDICT

*People v. Novak*, 242 Ill.App.3d 836, 183 Ill.Dec. 555 (1st Dist. 1993)................. 4, 5

1

## ARGUMENT

### I.

### THE EVIDENCE PRESENTE BY THE STATE WAS INSUFFICIENT TO PROVE THE DEFENDANT GUILTY BEYOND A REASONABLE DOUBT.

The State correctly states the standard of review that applies in deciding the sufficiency of the evidence presented at trial.  It is, as stated in *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781 (1979), "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (emphasis in original)  Identifying the correct standard, however, is only the beginning of the inquiry.  Applying the standard to a particular set of facts is the more difficult task. The case cited by the State, *People v. Cunningham*, 212 Ill.2d 274, 288 Ill.Dec. 616 (2004), illustrates how one must go about deciding the sufficiency of the evidence when the credibility of a witness is called into question.

Initially, the court in *Cunningham* noted that "the fact a judge or a jury did accept testimony does not guarantee that it was reasonable to do so.  Reasonable people may on occasion act unreasonably." 212 Ill.2d at 280  The State's argument in *Cunningham* that "the fact finder's determination that a witness is credible is conclusive" was, therefore, flatly rejected.  212 Ill.2d at 279   This holding is particularly instructive in our case.

Juries do not make findings of credibility; they simply vote up or down.  Thus, the State's observation in our case that "the jury chose to believe [Louis] Dean" cannot be

2

correct. It cannot be known. The task upon review is to determine whether it is

reasonable to accept any part of Dean's testimony, for example, or must one find that

"one bad apple spoils the lot." *Cunningham*, 212 Ill.2d at 286

There may be reason to question the testimony of a witness, and if the questions

pile up with no sufficient counterbalance, the testimony becomes endangered.

*Cunningham*, 212 Ill.2d at 281-82  There is a huge reason to question the testimony of

Darnell Brown in our case. The State summarizes his testimony without mentioning that

he testified that he never saw the face of the offender (Peo. Br. 13; Deft. Br. 12)  The

question presented by Brown's testimony is, as the court in *Cunningham* advised, is

whether "the only inference reasonably drawn from flaws in the testimony is disbelief in

the whole..." 212 Ill.2d at 284  It seems difficult to credit any credibility to the

identification made by one who did not earlier see that which must be seen in order that

one is in a position, later, to provide an identification. What we are left with when

examining the question raised by Brown's testimony is that he identified a person already

known to him—not the face of the person seen committing the offending act.

Thus, there is a reason in our case to apply the adage cited in *Cunningham* that

"one bad apple spoils the lot," and to find that the "record requires the inference from

doubts about parts of the testimony to doubt the whole." 212 Ill.2d at 284

The testimony of Louis Dean requires no extended analysis. His testimony was

internally and monumentally inconsistent—admitting on cross-examination that what he

had said on direct-examination, that he had seen the shooting, was not true. (Deft. Br. 16-

17; R. 310)  His claim on direct was entirely at odds with what he had told the ASA on

day one and what he said eight days later before the grand jury. (Deft. Br. 13-14)  Dean's

3

testimony illustrates why the court in Cunningham rejected the idea that the credibility of a witness's testimony is not subject to review.

It does not suffice, as the State suggests, that the jury considered the inconsistencies of Dean's testimony in reaching a verdict. (Peo. Br. 15) As the court in *Cunningham* recognized, "[r]easonable people may on occasion act unreasonably"; the inconsistencies heard by the jury may be so significant that it is "impossible for any fact finder to accept any part" of the witness's testimony. 212 Ill.2d at 283; *see also, People v. Schott*, 145 Ill.2d 188, 206-07, 164 Ill.Dec. 127 (1991) (The impeachment of the witness was so complete that her testimony became unworthy of belief by any reasonable person) The "one bad apple,"—really nearly all of the apples presented by Dean—consumed the entire barrel of his testimony.

The testimony of Kenneth Williams is not without its blemishes, as we have argued. (Deft. Br. 17-20) But the real problem with his testimony is how it was utilized during jury deliberations, how it was suggested by the trial court, however unknowingly, that in conjunction with the *Prim* instruction Williams's testimony would support a guilty verdict.

**II.**

**THE COURT ERRED BY GIVING A *PRIM* INSTRUCTION AFTER HAVING BEEN MADE AARE OF THE NUMERIC DIVISION OF THE JURY, AND UNDER CIRCUMSTANCES THAT SUGGESTED TO THE JURORS THAT THERE WAS TESTIMONY THAT WOULD SUUPORT THE MAJORITY WHO FAVORED A GUILTY VERDICT.**

The State cites *People v. Novak*, 242 Ill.App.3d 836, 183 Ill.Dec. 555 (1st Dist. 1993) as an example of a case in which a court, made aware of the numeric division of a deliberating jury, gave a *Prim* instruction and was found not to have erred. 212

4

Ill.App.3d at 856 *Novak*, notwithstanding one factual similarity, for several reasons provides no guidance in our case.

First, Mr. Novak argued, not that the court erred by giving the supplementary instruction, but rather the court erred because it did not give the instruction at an earlier time. 242 Ill.App.3d at 856 Second, and more important, Mr. Novak never argued, as we are, that the mischief in giving the *Prim* instruction flowed from the important circumstance that the court was made aware of how the jury was split. Finally, and most importantly, the coercive effect of the *Prim* instruction arose, in our case, from circumstances not presented in *Novak*.

In our case, the jury first announced that it was split 9-3 in favor of a guilty verdict. (R. 584) After being told to continue deliberating (R. 585), the jury did so and then asked for Darnell Brown's testimony (R. 586) The jury next told the court that it still was not able to reach a verdict. (R. 587) It was at this point that the *Prim* instruction was given. (R. 587-89) Herein lies the rub, as we have argued, giving the jury the supplemental instruction after it had reviewed Brown's testimony provided an unacceptable risk that the minority on the jury would understand the court to be saying that the jury should continue to seek a verdict because there was other evidence that would support the majority.

Why, the jury surely was asking itself, would the judge be asking us to continue to seek a verdict after we have told him how we are split and after we could not come to an agreement after reviewing Brown's testimony—unless he is telling us that there is *other* evidence to support the nine who favor a guilty verdict? The jury was certainly not thinking that the judge was suggesting to the majority that there was evidence supporting

5

SA 324

the minority. The mischief of the supplemental instruction is that it has an inherently coercive effect on the minority. (Deft. Br. 22-28) Sure enough, after receiving the *Prim* instruction, the jury then asked for Williams's testimony, the *other* evidence. (R.589)

Having to retry a case presents problems of logistics and economics, no doubt. But it becomes necessary sometimes to assume these costs if we are to give real meaning to the right of one to receive a fair trial. Where the risk is real that a jury verdict has not been fairly reached, constitutional rights must trump the cost of a three-day retrial.

Respectfully submitted,

_____

Robert D. Kuzas,
Attorney for Joseph Booker

SA 325

IN THE

## SUPREME COURT OF ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,
          Plaintiff-Appellee,

     v.                      App. Ct. No. 1-03-3533

JOSEPH BOOKER,
          Defendant-Appellant.

## **DEFENDANT'S PETITION FOR LEAVE TO APPEAL**

Robert D. Kuzas
222 N. LaSalle Street
Suite 200
Chicago, IL 60601
312.629.1400

Attorney for Defendant-Appellant

EXHIBIT E

SA 326

IN THE

SUPREME COURT OF ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,
           Plaintiff-Appellee,

    v.                           App. Ct. No. 1-03-3533

JOSEPH BOOKER,
           Defendant-Appellant.

## PRAYER

The defendant prays that this court grant him leave to appeal the decision of the Illinois Appellate Court affirming his conviction.

## JURISDICTION

This petition is filed pursuant to Supreme Court Rule 315. The judgment of the Illinois Appellate Court in this cause was entered on September 22, 2005 (received September 24, 2005) An affidavit of intent to seek review in the Supreme Court was filed in the Appellate Court on October 11, 2005.

## POINTS RELIED UPON FOR REVERSAL

The Appellate Court incorrectly ruled that the trial court did not err by giving a *Prim* instruction after it had been made aware of the numerical division of the jury.

## STATEMENT OF FACTS

Wentworth Gardens is a CHA housing project three blocks south of White Sox Park. (R. 170) It includes a series of row houses on 38th Place between Princeton (a through street on the west) and Wells (a pedestrian walkway on the east). (R. 180, 181,

1

SA 327

249, 265) The residents of the housing project refer to 38th Place as the "parking lot" and the cul-de-sac on the east end of the street as the "horseshoe." (R. 180, 183) On September 8, 2002, around 11:30 p.m., Charles Rials was walking down Wells Street with his friend, Darnell Brown. The two approached the horseshoe from the north. (R. 248, 249) Brown stopped at the horseshoe and struck up a conversation with a girl he knew. (R. 250)

Rials continued walking westbound on the north side of 38th Place, toward Princeton. (R. 181) As he neared an area about one building east of Princeton, Rials was shot and killed. (R. 181) Joseph Booker was indicted for the murder and was later tried by a jury. Darnell Brown was one of three occurrence witnesses who told the jurors what he had seen on the night Charles Rials was shot and killed.

Brown, 25 years old, worked at Wentworth Gardens as a janitor. (R. 247, 248) Some time after 11:00 p.m., Brown and his lady friend returned from a laundromat to their apartment at 3716 S. Wells, which is on the north end of the housing project. (R. 249) Brown told his lady friend to take their laundry into the apartment (R. 249); he was going to "walk down the lane (Wells) and hang out." (R. 249) As Brown spoke to the girl at the horseshoe, Rials continued on toward Princeton, and "started talking to Kenny Williams." (R. 250) Williams was by some steps that lead up to a courtyard on the north side of 38th Place, just east of Princeton. (R. 181) At this point, Brown decided to go home and began walking north, toward 37th Street. (R. 250-51)

As Brown was walking back home, he neared a tree north of the horseshoe. (R. 250-51) He heard a shot. (R. 251) From where he was standing, he could not see down 38th Place because a building on the north side of the street blocked his view. (R. 271)

2

Upon hearing the shot, Brown trotted back toward the horseshoe. (R. 272)  At this time, he heard more shots. (R. 273)  He ducked down behind a car. (R. 274)  When he looked up, Brown testified, he saw someone standing over his friend, Charles Rials. (R. 277)

Brown could not see the face of the person standing over the fallen Rials. (R. 278) He described the person as "a dark, tall, about 6 feet fellow, wide," dressed in an all black jogging suit. (R. 252)  Brown testified that he saw this person "putting the gun away." (R. 252)

In court, Brown identified the defendant as the man whose face he did not see. (R. 253)  Brown had made an earlier "identification."  On September 13, 2002, Brown testified, he was at a lineup, where the police "ask[ed] [him] to point out the person [he] had seen commit the shooting." (R. 258-59)  He identified the defendant. (R. 259)  This identification, Brown said, was based "on the way he was built." (R. 278)

Brown testified that the car behind which he had ducked was about 15 to 18 feet from the tree north of the horseshoe, where he was when he heard the first shot. (R. 276) The defense investigator, James Eldridge, a former Chicago Police Officer for 30 years R. 477, 483), testified that the distance from the horseshoe to the spot where Rials had gone to the ground was 173 feet. (R. 483)  The tree, Eldridge testified, was 43 feet north of the horseshoe. (R. 483)

Brown told the jury that he had seen the defendant "about five times" before the shooting. (R. 255)  He had seen the defendant at the home of Missy Westmoreland (R. 255), who lived on the south side of 38th Place, across the street from the spot where Rials had been shot. (R. 183)  When the defendant would come to Westmoreland's house, said Brown, the defendant drove a dark blue, four-door Grand Prix. (R. 255)

3

After the shooting, Brown testified, he saw the offender run south, down

Princeton, to 39th Street (Pershing Road). (R. 256)  Upon seeing this, Brown said that he

ran down Wells toward 39th. (R. 256)  From some distance, Brown testified, he saw the

offender get in the back seat of a Grand Prix that was parked on 39th Street. (R. 256)

Brown identified a photograph of an automobile, People's Exhibit 7, as the Grand Prix he

saw on 39th Street. (R. 257)  Other evidence established that the automobile in the

photograph belonged to the defendant. (R. 412)  Brown said that the car entered by the

offender had tinted windows, so he was unable to see the face of the offender. (R. 283)

The police officer who later recovered the defendant's car testified that it did not have

tinted windows. (R.385)  After he saw the car drive eastbound toward the expressway (R.

257), Brown said he went back to the crime scene. (R. 258)  About 10 minutes later, he

said, the police arrived. (R. 284)

Brown did not tell the police that he was a witness to the killing of Charles Rials,

whom he had known for 18 years, and to whom he was "like a brother." (R.258)  Instead,

Brown went home. (R. 258)

Darnell Brown denied that it was the victim's brother, Michael Rials, who had

asked him to go to the police station after the shooting. (R. 287)  The lead detective on

the case, David Evans, testified that on September 10, 2002, he had spoken to Michael

Rials and "based on [the] telephone call from [Michael] Rials…two individuals came

in…Kenny Williams and…Darnell Brown." (R. 384)

Kenneth Williams, as Brown, was a friend of Charles Rials. (R. 179)  Williams

testified that he saw Rials on the night of the shooting at about 11:00 p.m. (R. 180)  Rials

was walking down 38th Place toward Princeton. (R. 181)  Williams at this time was

4

sitting on the stairs leading to a courtyard on the north side of 38th Place, east of

Princeton. (R. 181) Williams testified that he was "drinking, kicking it, talking" with

some of his friends in the parking lot. (R. 178-79, 181) Suddenly, he said, he saw a man

come running up with a gun in his hand. (R. 191)

The gunman, who was a short distance from the victim, said to Rials, "Where

them N.....s at," Williams testified. (R. 191) At this point, Williams related, he knew

"what time it was," and he started to get up to run. (R. 192) Williams testified that "[the

offender] shot the gun at CC." (R. 192) Rials fell to the ground. (R. 192) Williams was,

at this time, running back into the courtyard. (R. 193) There were 20 other people in the

courtyard, said Williams. (R. 216) Williams looked back over his shoulder, he said, and

saw the offender standing over the victim. (R. 222) Williams did not see the person do

anything else, but he heard more shots fired. (R. 193) The man that he had seen with the

gun, Williams testified, was the defendant. (R. 182)

Williams testified that he had seen the defendant "at least 20 times" prior to the

shooting. (R. 184) The defendant, said Williams, would visit Melissa Westmoreland. (R.

184) He would arrive in a "blue four-door Grand Prix," Williams testified. (R. 184) The

last time Williams had seen the defendant was earlier on the night of the shooting, at

about 9:30 or 10:00 p.m. (R. 185)

The defendant had arrived at Westmoreland's house, said Williams, with about

eight other people. (R. 186) The defendant's group and Williams's group had words—

"jawjacking." (R. 186) The defendant and his group went into Westmoreland's house.

(R. 187) About 10:30 p.m., Williams testified, the defendant's group came out of the

house. (R. 188) Again, there were words exchanged—swear words. (R. 189) The

5

defendant then drove off in his blue Grand Prix, and his cohorts drove off in three other

cars. (R. 213)  It was two or three minutes later that the defendant returned and Rials was

shot, said Williams. (R. 190)

After Williams heard the last shots fired, he went through the courtyard to

Princeton. (R. 193)  Looking to the south, Williams said that he saw the defendant

"running...toward Pershing Road." (R. 194)  Williams went back to where his friend lay

dying on the sidewalk. (R. 194)

Many police officers came to the scene. (R. 226)  Williams spoke to none of them

about what he would later say he had seen happen to his friend of ten years. (R. 179, 226)

On September 10, 2002, Williams went to the police station to view a lineup. (R.

367)  "[The police] wanted me to pick the one out between the five or six guys they had

standing up there who did the shooting," Williams testified. (R. 195)  He identified the

defendant, the only person in the lineup with braids. (R. 196, 232)

Williams, previously convicted of possessing a controlled substance (R. 178), said

that he had drunk two beers at the time he and his friends had words with the defendant at

about 9:00 p.m. (R. 209)  At that time, Williams said, he had been "hanging out [a]

couple of minutes." (R. 209-10)  Asked if had drunk two beers in a couple of minutes,

Williams explained that "a couple of minutes means an hour or two." (R. 210)  "Couple

of beers" means "two beers," Williams further explained. (R. 210)

The State's final occurrence witness was fourteen year-old Louis Dean. (R. 300)

At the time of the Rials murder, Dean lived at 237 W. 38th Place, which is on the east

end of the block. (R. 303)  Dean's bedroom was on the second floor, and its window

overlooked the horseshoe. (R. 303)  At about 11:30 p.m. on the night of the shooting,

6

SA 332

Dean testified that he was in his bedroom. (R. 303)  Dean gave various accounts of what happened at that time.

On direct-examination, he said that he was looking out his window and saw "someone in all black walk up behind [the victim] and shoot him." (R. 304B) Asked how many shots were fired, Dean said he "forgot." (R. 304) The victim, said Dean in contradiction of Brown and Williams, was "walking to the cars across the street from my window." (R. 305)

A couple of days after the shooting, Dean identified the defendant in a lineup. (R. 306)  ) He had never seen the defendant before the shooting, he said (R. 306)  In court, Dean identified the defendant as the person he had seen shoot Charles Rials. (R. 304B)

On cross-examination, Dean stated that he had not seen anyone shoot Rials.  Dean said that he heard shots, but "never watched anyone shoot [Rials]." (R. 310)

The Felony Review Assistant, in memorializing Dean's statement made just days after the shooting, wrote that Dean had identified the defendant in a lineup as the "man that was running with the gun." (R. 314)  Dean corrected this by having the ASA write that the man in the lineup "look[ed] like the man." At trial, Dean agreed that the person in the lineup only "looked like the man [he had seen running]." (R. 314)

Dean said in his handwritten statement to the ASA "that [he] just heard shots." (R. 321) Dean did not claim in his handwritten statement that he had seen anyone shooting a gun. (R. 325A)  Asked why he would sign a statement, which he did, "if it wasn't the truth," Dean replied, "I don't know." (R.321)

7

When Dean testified before the Grand Jury shortly after the shooting, he was asked "What did you see or hear?" (R.323) Dean told the grand jurors "I heard gunshots." (R.323) Dean was then asked, "Where did those gunshots come from, do you know?" (R.323) He answered, "No, not then." (R.323) Dean was asked, "When you heard the gunshots, what did you do?" Dean answered, "I ducked down." (R. 323)

The jury began its deliberations on August 20, 2003, at 3:30 p.m. (R. 584) At 6:00 p.m., the jury sent out a note that read:

> We seem to be deadlocked, 9 guilty, 3 not guilty. No one wants to change their vote in any way.

(R. 584)

Defense counsel's request for a mistrial was denied, and the jury was told "to please continue to deliberate." (R. 585)

At approximately 7:30 p.m., the jury requested to see Darnell Brown's testimony. (R. 585) The request was allowed. (R. 586)

At 9:00p.m. (R. 586), the jury sent out a note that read:

> Your Honor, unfortunately we are at an impasse. We as a group cannot come to a verdict.

(R. 587)

The court "suggest[ed]...we call the jurors out and instruct them pursuant to the Prim instruction." (R. 587) Defense counsel's objection to the giving of the instruction was "noted." (R. 587) The court then read the following instruction:

Members of the jury, the verdict must represent the considered judgment of each juror. In order to return a verdict it is necessary that each juror agree thereto. Your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment.

8

SA 334

Each of you must decide the case for yourselves, but do so only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations do not hesitate to reexamine your own views and to change your opinion if you are convinced that it is erroneous, but do not surrender your honest convictions as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You are not partisans, you are judges, judges of the facts.

Your sole interest is to ascertain the truth of the evidence in this case. Your continued effort is appreciated.

(R. 588-89)

At 10:05 p.m., the jury sent out a note that read: "Your honor, if you please, we have one last request, we need to see Kenny's testimony. Thank you." (R. 589) Defense counsel's objection was noted by the court, who provided the requested transcript. (R. 590) At approximately 11:50 p.m., the jury returned a verdict of guilty. (R. 590-91, 593)

## ARGUMENT

### THE APPELLATE COURT INCORRECTLY RULED THAT THE TRIAL COURT DID NOT ERR BY GIVING A *PRIM* INSTRUCTION AFTER IT HAD BEEN MADE AWARE OF THE NUMERIC DIVISION OF THE JURY.

When one is called upon to announce his judgment of the merits of an argument presented by another, one must first accurately restate the argument that has been presented. Ih other words if argument A has been presented, and the judge to whom the argument has been presented misstates the argument as B, the judgment rendered will be that of B and not of A. This is what has occurred in our case.

The opinion of the Appellate Court initially misapprehends the argument presented by the defendant. The opinion states: "Contrary to defendant's assertion, the court here did not issue the *Prim* instruction immediately after the jury sent its first note indicating the numeric breakdown of the jurors." (Slip Opinion at 12) The defendant in

9

fact never made such a claim. The gravamen of the trial court's error was not that it gave the *Prim* instruction immediately after the jury announced how it was split. Rather, it was that the instruction was given to the jury after it had: (a) announced that it was deadlocked 9-3 in favor of guilty; (b) reviewed the testimony of Darnell Brown; (c) announced again that it was unable to reach; and (d) been told to continue to deliberating after being given the *Prim* instruction. (R. 584-89)

The giving of the *Prim* instruction was error in our case, not because it was given immediately, but because it was given after the jury, that had previously announce its 9-3 split, had reviewed the testimony of Darnell Brown and announced a second time that it was still unable to reach a verdict. The danger, then, in giving the *Prim* instruction at this point is that the jury could very well have understood the *Prim* instruction to mean the following: "We have already told the judge that we are split 9-3 in favor of guilty and cannot reach a verdict; we were told to continue to deliberate, and we did; we still could not come to a verdict, and we reviewed the testimony of Darnell Brown; after reviewing Brown's testimony, we again told the judge that we could not come to a verdict; the judge now tells us that we should continue our efforts to reach a verdict. "Why is the judge giving us this instruction unless he is telling us that there is testimony beyond that of Brown that will support the majority."

The defendant argued that it was the particular circumstances of our case that made the *Prim* instruction coercive. By misapprehending defendant's argument (the argument was A and not B), the Appellate Court found itself led to authority resolving an issue different than the one we have raised.

10

The court below, noting the "three hours of deliberations following the *Prim* instruction before the jury reached a verdict…" (Slip Opinion at 12), cites a case, *People v. Novak*, 242 Ill.App.3d 836, 856 (1993), that holds that the length of jury deliberations can indicate that the giving of the *Prim* instruction did not have a coercive effect on the jury. (Slip Opinion at 12) This may be so, but it is not the issue we have raised. The question raised in our case is: whether the *Prim* instruction was coercive because it was given after the jury had made the court aware of the jury's numerical division and preference, and after the jury had announced (a second time) that, after having reviewed the testimony of one prosecution witness, that it was still unable to reach a verdict. In other words, could the jury in our case have understood the court to be saying that it should continue to deliberate and attempt to reach a unanimous verdict, because there was testimony other than that of Darnell Brown that supports the majority? The question of whether the jury could have understood the *Prim* instruction, given particular circumstances having occurred, to mean that there was testimony that supported the majority was not raised in *Novak*.

It is not newsworthy to report that no two criminal cases are exactly alike. It does not follow, however, that a sound legal principal announced in one case is not to be applied in a following case because the facts of the second case vary from the seminal case. The differences, however, may be significant enough to indicate fairly that the principal was not meant to apply in the subsequent case. For example, one has a right to contest the search of an area in which he has a reasonable expectation of privacy. Another individual may have some relationship to an area that has been searched, but it does not mean that the relationship is such so as to give rise to a reasonable expectation

11

of privacy, and hence a right to contest the search. *See, e.g. Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421 (1978) (Driver of car may contest, passenger may not) In our case, the Appellate Court finds that the principle announced in two supplementary instruction cases upon which the defendant relies is not to be applied presently because the facts of those two cases are different than ours. The differences, however, do not relate to the issue we have raised and thus the principle should have been applied by the Appellate Court.

The appellate court notes, for example, that in *People v. Danielly*, 274 Ill.App.3d 358 (1st Dist. 1995), the trial court "engaged in an *ex parte* communication with the jury in response to the jury's notice of numerical divide." Slip Opinion at 12 It was "the *ex parte* communication, coupled with an immediate *Prim* instruction [that] could have led the jury to conclude that the trial judge favored a conviction." Slip Opinion at 12 It is true that this did not occur in our case. But there was another circumstance that occurred in our case that could have provided a coercive effect upon the jury—the jury's being given the supplementary instruction after it had reviewed the testimony of a state witness and after it had announced that it was still deadlocked. Thus, the common feature of our case and *Danielly* is what becomes important, and not the differences between the specific facts of the two cases. That common feature is that the court was made aware of the numerical division of the jury.

It is recognized that when the court is made aware of the numerical division of the jury and its preference—guilty versus not guilty—the possibility that the *Prim* instruction will have a coercive effect is heightened. *Danielly*, 274 Ill.App.3d at 366 The appellate court suggests that it is of importance whether the numerical division is

SA 338

solicited, as it was in *People v. Santiago*, 108 Ill.App.3d 787, 806-07 (1st Dist. 1982), or

unsolicited as it was in our case. Slip Opinion at 12-13  This difference we suggest is of

no importance.  The court in *Santiago* in fact found that it makes no difference whether

the numerical division was solicited by the court or unsolicited when it comes to deciding

whether the supplemental instruction could have had a coercive effect upon the jury

> 'Most cases wherein adjuratory remarks have been held coercive
> are those in which the court, *either through its own questioning or
> through volunteered statements of jurors,* has become informed
> not only as to the numerical division of the jury but also as to
> how many stand on each side...The urging of agreement in such
> circumstance of course creates in the jury the impression that the
> court, which has also heard the testimony in the case, agrees with
> the majority of the jurors.'

*Santiago*, 108 Ill.App.3d at 807 (emphasis added) (citation omitted)

Thus, the difference between *Santiago* and our case is not such that the principle

announced in *Santiago* should not apply presently; it should apply.

The ABA advisors who promulgated Standard 15-5.4 of the ABA Standards for

Criminal Justice, from which the *Prim* instruction is derived, *Prim*, 53 Ill.2d at 76,

recognized that the supplemental instruction to deadlocked juries is not without some

coercive effect. Commentary, Standard 15-5.4 ("Standard [15-5.4], *less coercive than the

Allen charge*, is more likely to result in an impartial jury verdict.")  Our task must be

identifying those situations in which a *Prim* instruction, neutral perhaps in the abstract, is

demonstrably not neutral.  We must be aware of the dynamics that allow a trial court's

otherwise admirable effort to guide a jury to instead provide an unintended consequence.

Our case provides those very dynamics: the jury, having announced how it was divided

(9-3 favoring guilty), and after having reviewed the testimony of a state witness and

remaining deadlocked was given a supplemental instruction.  The court's urging the jury

13

to come to agreement in this circumstance impermissibly suggested to the jury that there

was other testimony that supported those in the majority.

Respectfully submitted,

_____
Robert D. Kuzas
Attorney for Joseph Booker

14

CHA PARKING LOT

LAST, FIRST M.I.: **RIATS, CHARLES**

HOME ADDRESS: 3820 S. WENTWORTH

25 SEX: M   RACE: 1   AGE: 20   PHONE: 548-5311

DATE OF OCCURRENCE: 01 SEP 02

DISCOVERER: RIAD SMAGEL / BLK SMAGEL = 310 190 STRACT
BROWN HAIR / BROWN EYES

OFFICER: ANDERSON ★ #14305 406 BLK

**RACE CODES:**
1 BLACK
2 WHITE

**OFFENDER/VICTIM RELATIONSHIP CODES**

**Narrative:**

EVENT # 21592   IN SUMMARY, R/O RESPONDED TO A C/N OF A PERSON SHOT AT ABOVE ADDRESS. UPON ARRIVAL R/O LEARNED THAT AFTER SHOTS WERE. C/PD 335 ON SCENE. AN UNARMED WITNESS WITNESSED A M/1 FLEEING THE SCENE IN A 4 DR. BLK OL MONTE CARLO W/FRONT LOCATION. VICTIM SUSTAINED GUN-SHOT WOUNDS FROM A 40 CALIBER. VICTIM REMOVED D.O.A. @ CUOO HRS OF SEP BY DE. BULLING-HAM.

OFFICER'S NAME (PRINT): ANDERSON
STAR NO: #14305
DATE: 01 SEP 02

HH 635313

Exh. "B2"

HANDGUN / AS FOLLOWS - 1 TO THE R.I. PECTORAL RECTION
2 TO THE RT. TEMPORAL LOBE SE HEAD, 1 TO THE FEMORAL
WRE. BEAT 950 ON SCENE. 5 SHELL CASINGS 40 CAL.
SHU RECOVERED FROM SCENE A4 BT 9602. R. GAHAGAN # 16346
C. BLASIC # 10210

NOTIFICATIONS: DUP DESK KNIGHT #8331 @ 0035 hrs
W/C CAPT CLUTTY #12 @ 0035 hrs
AL. V/C. MATACH # 1869 @ 0040 hrs
CRIME LAB GT 9602. ON SCENE
1 SGT. BONZ AREA #18695 @ 0095 hrs
ME'S OFFICE CARELLI # 139 @ 0058 hrs

ME # 139 PZ/C GARELLI #23 (SEP 02)

FOR USE BY BUREAU OF INVESTIGATIVE SERVICES ONLY

SA 342

Case: 1:10-cv-03995 Document Filed: 01/24/11 Page 106 of 111 PageID #:783
Case by Chicago Police - Bureau of Investigative Services Case id 2336681
Document: 28     Filed: 08/19/2022     Page 316 of 469 1738582 CASR301

| Offense Classification/Re-Classification | IUCR Code | Original Offense Classification | | | IUCR Code |
|---|---|---|---|---|---|
| HOMICIDE / First Degree Murder | 0110 | HOMICIDE / First Degree Murder | | | 0110 |

| Address of Occurrence | Beat of Occur | No of Victims | No of Offenders | No of Arrested | |
|---|---|---|---|---|---|
| 6 W 38TH PL | 925 | 1 | 1 | 0 | |

| Location Type | Location Code | Secondary Location | | | |
|---|---|---|---|---|---|
| na Parking Lot/Grounds | 123 | | | | |

| Date of Occurrence | Unit Assigned | Date RO Arrived | Fire Related? | Gang Related? | Domestic Related? |
|---|---|---|---|---|---|
| -SEP-2002 23:35 | 0925 | 08-SEP-2002 23:37 | NO | NO | NO |

| Reporting Officer | Star No | Approving Supervisor | Star No | Primary Detective Assigned | Star No |
|---|---|---|---|---|---|
| PADILLA, Anthony | 20071 | CERVENKA JR, Richard | 1354 | PADILLA, Anthony | 20071 |

| Date Submitted | Date Approved | Assignment Type |
|---|---|---|
| -SEP-2002 05:00 | 11-SEP-2002 05:55 | FIELD |

## THIS IS A FIELD INVESTIGATION PROGRESS-VIOLENT(SCENE) REPORT

Exh "C 1"

**VICTIM(S) :**       **RIALS, Charles L**
Male / Black / 20  Years
**DOB:**   07-JUN-1982
**RES:**   3820 S Wentworth Ave
Chicago IL
773-548-5311
**EMPLOYMENT:**   Unemployed
**SSN:**   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
**DLN/ID:**  IR#1277793

**GANG AFFILIATED TO:**  Gangster Disciples

**OFFENDER(S):**       **UNKNOWN, Unknown**
Male / Black Years
**DESCRIPTION:**    Black Hair, Braids Hair Style,

HH635313

**VICTIM INJURIES:**       **RIALS, Charles L**
Shot,  Fatal 'Gsw'S To Head, Chest And Back
Injured by Offender

SCENE

#1354
11 SEP 02

106

Exh. "C2"

**NSPORTED TO:**     <u>RIALS, Charles L</u>    ( Victim )

Transported to Michael Reese

**HICLE INFO:**     <u>Automobile , 2002 / Chevrolet / Monte Carlo / Hardtop, 4-Door</u>

Offenders Vehicle

COLOR (TOP/BOTTOM): Black / Black

**CATION OF INCIDENT :**     256 W 38th Pl

Chicago IL

123 - Cha Parking Lot/Grounds

**TE & TIME OF INCIDENT :**     08-SEP-2002 23:35

**TH INFORMATION:**     <u>RIALS, Charles L</u>      ( Victim )

DATE OF DEATH:   09-SEP-2002 00:00

PRONOUNCED BY:   Dr. Buckingham

on   09-SEP-2002 00:00

**TOPSY INFORMATION:**

| | |
|---|---|
| AUTOPSY DATE: | 09-SEP-2002 |
| PERFORMED BY: | Dr. Chira |
| CAUSE OF DEATH: | Fatal Gsw'S To The Head, Chest And Back |
| MEDICAL EXAMINER #: | 139SEP02 |

**EATHER AND**
**SHTING:**

| | |
|---|---|
| WEATHER: | Humid/Clear |
| TEMPERATURE: | 70-75 |
| LIGHTING: | Artificial |
| LIGHTING SOURCE: | Halogen Streetlights |
| DISTANCE: | 25 Feet |

**IVE CODE(S):**     Gangs

SA 344

Exh. "C 3"

AUSE CODE(S):              Dna

ETHOD CODE(S):             Person(S) Shot

AU CODE(S).                DNA

ERSONNEL ASSIGNED:         Detective/Youth Investigator
                           PADILLA, Anthony. J          # 20071

                           Reporting Officer
                           ANDERSON, Rhonda M          # 14309      BEAT: 0925

ITNESSES :                 UNKNOWN
                           Male / Black

ME CODES SUMMARY:          0110 - Homicide - First Degree Murder

CR ASSOCIATIONS:           0110 - Homicide - First Degree Murder

                           RIALS, Charles, L      ( Victim )
                           RIALS, Charles, L      ( Victim )
                           UNDETERMINED           ( Suspect )
                           UNKNOWN, Unknown       ( Suspect )

EPORT DISTRIBUTIONS:       Public Housing Administration

VESTIGATIONS:

   THIS IS AN AREA ONE VIOLENT CRIMES PROGRESS-SCENE REPORT

   RD#HH- 635313

   VICTIM:
   Charles RIALS M/1/20 DOB:07 June 1982

SA 318



Exh. "C4"

3820 S. Wentworth
Chicago, Illinois 60609
Hm#(773)548-5311
SS#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,IR#1277793
ME#139Sep02
Fatal GSW's to head, chest and back as follows/1 to right pectoral area ,2 to the right temporal lobe of the head , 1 to the frontal lobe of the head and 1 to the mid back.

Pronounced at Michael Reese Hospital ER at 0000 Hrs by Dr. Buckingham

Clothing:
White T-shirt cut in the ER (bloody)
Blue denim shorts (long)
Black leather belt
Red checked boxer shorts
White "Converse" low cut leather gym shoes
White sox


WANTED:
Unknown M/1 with braids wearing all black/ No further description at this time.


WEAPON:
Probable .40 caliber semi-automatic based on casings recovered on the scene.


LOCATION:
256 W. 38th St.- Wentworth Gardens CHA facility


DATE & TIME:
08 September 2002 @ 2335 Hrs


WEATHER & LIGHTING:
Warm and humid/ 75 to 80 degrees with artificial lighting


MANNER/MOTIVE: Victim was shot by an unknown assailant/Unknown motive


IDENTIFIED BY:
Margaret RIALS F/1/42 DOB: 14 January 1959
3820 S. Wentworth
Chicago, Illinois 60609
SS#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, IR#471546

Exh."C 5"



Mother of the victim identified on scene and at Michael Reese.

VEHICLE USED:
2002 Chevy Monte Carlo ,black, 4 door

EVIDENCE:
Photography-
A)  O/A & C/U of the scene and surrounding area @ 256 W. 38th Place.

B)  O/A & C/U of cartridge cases underneath Olds @ 256 W. 38th Place.(M1)

C) O/A & C/U of cartridge case and metal fragment found on the curb.(M2)

D) O/A & C/U of cartridge case near blood on sidewalk.(M3)

E) O/A & C/U of cartridge case on sidewalk.(M4)

F) O/A & C/U of metal fragments near blood and baseball cap.(M5)

G) O/A & C/U of victim's wounds to head , chest and back.

H) ID photo of the victim.

I)  O/A & C/U of metal fragment between victim's back & T-shirt.

Physical evidence-
Inv#10026848/177     2 Winchester 40 S&W cartridge cases on the street(M1)
                     1 Winchester 40 S&W cartridge case on curb(M2)
                     1 Winchester 40 S&W cartridge case on sidewalk near blood(M3)
                     1 Winchester 40 S&W cartridge case on sidewalk(M4) from
                     256 W. 38th Place

Inv#10026851/177     3 metal fragments on sidewalk near blood(M5)
                     1 metal fragment on sidewalk(near M2)@ 256 W. 38th Place.

Inv#10026854/177     1 fluid collection kit w/blood swabs from sidewalk @ 256 W. 38th
                     Place.

Inv#10026856/177     1 dark blue baseball type cap, size 7 3/8 from sidewalk @ 256 W.
                     38th Place.

Inv#10026857/177     1 CTA transit card on sidewalk 6 feet west of blood @ 256 W.
                     38th Place.

SA 347



Inv#10026859/177     1 metal fragment found between victim's back and T-shirt @
                     Michael Reese Hospital ER.

NOTIFIED:
Area One Violent Crimes

PERSONNEL ASSIGNED:

Bt 5123-Unit 610
Det. A. Padilla #20071
Det. J. Castellanos #21195

Bt.5121-Unit 610
Det. R. Giradi#20479
Det. J. Struck#20857

Bt. 931- Crime scene protection
PO D. Tencza#9048
PO K. Norris#19886

Bt. 925-Papercar
PO R. Anderson#14309

Bt. 9602
FI C. Brasic#10201
FI K. Gahagan#14346

WITNESSES:
Monica Ramsey  F/1/30
237 W. 38th Place
Chicago, Illinois  60609
(773)538-2963

INTERVIEWED:

Toni MIDDLETON  F/1/26  DOB: 08 January 1976
3801 S. Princeton  Apt 300
Chicago, Illinois  60609
Hm#(773)451-0518
SS#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,FBI#329636WA8
Unemployed

Monique MAHONE  F/1/21  DOB:20 December 20 1980

SA 348

Exh. "C 7"

259 W. 37th Place
Chicago, Illinois  60609
Hm#(773)285-3930
SS#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
Unemployed

Karen LLOYD  M/1/17  DOB:25 January 1985
3801 S. Princeton  Apt 298
Chicago, Illinois  60609
 Hm#(773)373-0724
Unknown SS#
Student at Richards HS

April TUKER  F/1/35  DOB: 05 September 1967
2825 E. 77th St.
Chicago, Illinois  60649
Hm#(773)768-1870
SS#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, IR#860363

TO BE INTERVIEWED:
Melissa WESTMORELAND  F/1/23  DOB:01 February 1969
257  W. 38th Place

CANVASS:
237 W. 38th Place
Monica RAMSEY: See witness section

239 W. 38th Place
Tenant in hospital/No response

241 W. 38th Place
No response

243 W. 38th Place
No response

245 W. 38th Place
No response

247 W. 38th Place
Carla FLEMING  F/1 (NFI)
Was asleep -didn't hear or see anything

SA 349 (12

HN033313

Exh. "C.8"

249 W. 38th Place
No response

251 W. 38th Place
No response

253 W. 38th Place
Prudence DAVIS  F/1/68 (NFI)
Was asleep -didn't hear or see anything

255 W. 38th Place
Victor- refused further information  M/1/25
Related that he was inside and heard 2 or 3 shots but didn't see anything

257 W. 38th Place- No response(see to be interviewed section)

234-236 W. 38th Place
All 3 floors that face the crime scene are vacant

238 W. 38th Place -2nd Floor
Charetha WALTON  F/1/40  DOB: 25 November 1961
Hm#(773)624-1317
SS#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
Related that she was in the bathroom and heard 2 or 3 gunshots, looked out of the window and
saw a crowd standing around looking at the victim on the ground:

238 W. 38th Place- 1st Floor
Cheryl THOMAS  F/1/36  DOB: 22 January 1966
Hm#(773)268-3286
SS#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
Heard 4 to 5 shots but didn't look out of the window

238 W. 38th Place- 1st Floor
Jonathan JOYCE  M/1/16  DOB: 14 October 1985
Unknown SS#
Heard 4 to 5 shots but didn't look out of the window

254-256 W. 38th Place
All 3 floors that face the crime scene are vacant

258-260 W. 38th Place
All 3 floors that face the crime scene are vacant

SA 350 113



## INVESTIGATION:
### Narrative:

R/D's were assigned to the Aggravated Battery/Homicide which occurred at 256 W. 38th Place.
R/D's were assigned this investigation by Sgt. Matuch of this command.

R/D's relocated to the above location and observed that the crime scene had been cordoned off
with yellow crime scene tape and was in the parking lot area of the Wentworth Garden CHA public
housing project. The actual sight where the victim was on the ground was the north sidewalk of
38th Place where a large pool of blood was located.

R/D's were met on the scene by Bt. 931, who was guarding the crime scene and Bt. 9602 who had
been processing the scene for evidence. R/D's learned from Bt. 931 that the victim had been
transported to Michael Reese Hospital ER by CFD#35 and that Bt. 925 was at Michael Reese with
the victim. Bt. 9602 had already finished processing he scene when the R/D's arrived and briefly
related to R/D's what the had recovered(See crime scene processing report). Bt. 9602 then related
to R/D's that they were relocating to Michael Reese Hospital to process the victim for any possible
evidence.

R/D's learned from Bt. 931 that they had tried to look for witnesses while on the scene but that the
people that they spoke with would only say that the offender was a M/1 with braids and that he
drove a black 2002 Chevy Monte Carlo, Bt. 935 also related that the people that they spoke with
related that the offender was from the area of 29th and Dearborn and that he has a girlfriend
named Missy WESTMORELAND that lives at 257 W. 38th Place. Bt. 931 also related that none of
the people that they spoke with in the area would give their names and were reluctant to become
involved in the investigation.

R/D's conducted the canvass of the area(See canvass section) and with people that were in the
area around the crime scene. In the canvass, Det. Castellanos located a witness, Monica RAMSEY
, who related that she was across the street form the shooting and saw a M/1 subject wearing all
black with the victim and then saw the offender shoot and flee on foot W/B on 38th Place and S/B
on Princeton.

During the canvass, Det. Girardi located April TUKAR who related that she bought drugs in the
area and after using said narcotics was walking toward 39th and Princeton when she heard
several shots from close by and saw a black car leaving the area with 3 occupants and that the
driver appeared to be large while sitting in the driver's seat. TUKAR also related that she saw the
vehicle flee E/B from 39th and Princeton.

Det. Padilla had the opportunity to speak Toni MIDDLETON who related that she was standing
outside of her apartment at 38th and Princeton and heard a single gunshot followed by
approximately 6 more gunshots seconds later. MIDDLETON related that she didn't see anyone.

Det. Padilla then spoke with Monique MAHONE who related that she was walking N/B in the
courtyard north of the shooting and heard a single shot which caused her to run from the area,
while running MAHONE related that she heard 5 to 6 more gunshots.

Det. Padilla then spoke with Karen LLOYD who related that she heard the gunshots and looked out

HH033313

Exh. "C 10"

of her kitchen window but did not see anyone at which point she went outside and to the area where the shots came from and saw the victim on the ground with a crowd all around him.

R/D's then attempted to interview Melissa WESTMORELAND at 257 W. 38th Place but found that she was not at home or refused to open the door to speak with R/D's.

R/D's then relocated to Michael Reese Hospital and met with Bt. 9602 who related that they recovered another spent bullet/fragment from the clothing of the victim.

R/D's returned to Area One in furtherance of this investigation and submitted the request for the evidence recovered by Bt. 9602 from the scene and the hospital to be analyzed by the ISP crime lab.

The investigation continues.........


Report of:
Det. A. Padilla
Det. J. Castellanos
Det. R. Girardi
Det. J. Struck

RECEIVED
CRIMINAL APPEALS

SEP 1 8 2016

309 RICHARD J. DALEY CENTER
ANITA ALVAREZ
STATE'S ATTORNEY'S OFFICE

Nos. 1-13-0177, 1-13-2279, 1-15-2995 (Consolidated)

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County, Illinois |
| Respondent-Appellee, | ) ) | |
| -vs- | ) ) | No. 02 CR 25224, 02 CR 25224 (01) |
| JOSEPH BOOKER, | ) ) | Honorable Arthur F. Hill, Jr., |
| Petitioner-Appellant. | ) | Judge Presiding. |

## BRIEF AND ARGUMENT FOR PETITIONER-APPELLANT

MICHAEL J. PELLETIER
State Appellate Defender

PATRICIA MYSZA
Deputy Defender

BRYON M. REINA
Assistant Appellate Defender
Office of the State Appellate Defender
First Judicial District
203 N. LaSalle St., 24th Floor
Chicago, IL 60601
(312) 814-5472
1stdistrict.eserve@osad.state.il.us

COUNSEL FOR PETITIONER-APPELLANT

### ORAL ARGUMENT REQUESTED

EXHIBIT G

## POINTS AND AUTHORITIES                    Page

I.    **This Court Should Remand Joseph Booker's Case For A New Trial Where The New Evidence of Innocence Implicating Kenneth Williams As The Shooter Would Probably Change The Result On Retrial.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*People v. Ortiz*, 235 Ill. 2d 319 (2009) . . . . . . . . . . . . . . . . . . . . . . . . .   20

*People v. Coleman*, 2013 IL 113307 . . . . . . . . . . . . . . . . . . . . . . .   20, 21

*People v. Molstad*, 101 Ill. 2d 128 (1984) . . . . . . . . . . . . . . . . . . . . . . .   20

*People v. Washington*, 171 Ill. 2d 465 (1996) . . . . . . . . . . . . . . . . . .   20

Ill. Const. 1970, art. I, §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

725 ILCS 5/122-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

*People v. Pendleton*, 223 Ill. 2d 458 (2006) . . . . . . . . . . . . . . . . . . . . .   21

A.    **The overwhelming weight of the evidence elicited below established the result on retrial would probably be different.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

*People v. Coleman*, 2013 IL 113307 . . . . . . . . . . . . . . . . . . . . . . . . . .   21

*People v. Washington*, 256 Ill. App. 3d 445 (1st Dist. 1993) . . . . . . .   21

*People v. Ortiz*, 235 Ill. 2d 319 (2009) . . . . . . . . . . . . . . . . . . . . . . . . .   21

*People v. Molstad*, 101 Ill. 2d 128 (1984) . . . . . . . . . . . . . . . . . .   21, 22

1.    *Affidavits and testimony from Antione Ford and Ellen Anderson, who were too scared to come forward before trial, is newly discovered evidence, materially relevant, and not cumulative.* . . . . . . . . . . . . . . . . . . . . . . . . . **22**

*People v. Ortiz*, 235 Ill. 2d 319 (2009) . . . . . . . . . . . . . . . . . . . . . .   22, 23

*People v. Coleman*, 2013 IL 113307 . . . . . . . . . . . . . . . . . . . . . . . . . .   23

*People v. Molstad*, 101 Ill. 2d 128 (1984) . . . . . . . . . . . . . . . . . . . . .   23

*People v. Booker*, No. 1-06-2581, 4-7(unpublished order of March 31, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

-i-

SA 354

2.    *Antione Ford's testimony, alone, would probably change
      the result on retrial.* ........................... **24**
*People v. Moffat,* 202 Ill. App. 3d 43 (1st Dist. 1990) ............   26

*People v. Rodriguez,* 2012 IL App (1st) 072758-B ...............   26

*People v. Coleman,* 2013 IL 113307 ................... 26, 27, 29

*People v. Molstad,* 101 Ill. 2d 128 (1984) ..................... 27

3.    *The probability of a different verdict is bolstered where
      Booker could present Ellen Anderson's affidavit on retrial,
      and evidence of the dubious circumstances of her
      recantation testimony.* ......................... **29**

*People v. McCarter,* 2011 IL App (1st) 092864 ..................   29

725 ILCS 5/115-10.1 .......................................   29

*People v. Steidl,* 177 Ill. 2d 239 (1997) ..................... 29, 33

*People v. Deloney,* 341 Ill. App. 3d 621 (1st Dist. 2003) ..........   29

*People v. Tolliver,* 347 Ill. App. 3d 203 (1st Dist. 2004) ...........   30

*People v. Thigpen,* 306 Ill. App. 3d 29 (1st Dist. 1999) ...........   30

*People v. Gunn,* 15 Ill. App. 3d 1050 (1st Dist. 1973) ............   33

*People v. Robinson,* 301 Ill. App. 3d 634 (2nd Dist. 1998) .........   33

*People v. McBounds,* 182 Ill. App. 3d 1002 (1st Dist. 1989) .......   33

*People v. Coleman,* 2013 IL 113307 ........................   33

4.    *Antione Ford's affidavit and testimony and Ellen
      Anderson's affidavit cast doubt on the evidence at
      trial.* ....................................... **33**

*People v. Booker,* No. 1-06-2581, 4-7(unpublished order of March 31,

2008) .............................................. 34, 35

*People v. Hughes,* 17 Ill. App. 3d 404 (1st Dist. 1974) ............   34

*People v. Tabb,* 374 Ill. App. 3d 680 (1st Dist. 2007) .............   34

*People v. Green,* 118 Ill. App. 3d 227 (1st Dist. 1983) ............   34

-ii-

*People v. Gardner,* 35 Ill. 2d 564 (1996) . . . . . . . . . . . . . . . . . . . . . . .   35

*People v. Rodriguez,* 2012 IL App (1st) 072758-B . . . . . . . . . . . . . . .   35

>  5.    *Additional evidence improperly excluded from the evidentiary hearing would further support a different result on retrial.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

*In re Marriage of Gordon,* 233 Ill. App. 3d 617 (1st Dist. 1992) . . . .   36

*People v. Jones,* 2016 IL App (1st) 123371 . . . . . . . . . . . . . . . . . . . . .   36

Ill. R. Evid. 1101 (b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

725 ILCS 5/122-6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

*People v. Anderson,* 291 Ill. App. 3d 843 (1st Dist. 1997) . . . . . . . . .   36

*People v. Morales,* 339 Ill. App. 3d 554 (1st Dist. 2003) . . . . . . . . . .   37

*People v. Sanchez,* 115 Ill. 2d 238 (1986) . . . . . . . . . . . . . . . . . . . . . .   37

*People v. Harper,* 2013 IL App (1st) 102181 . . . . . . . . . . . . . . . . . . .   37

725 ILCS 5/122-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

>  B.    **The Circuit Court Applied The Wrong Standard In Determining Whether A New Trial Was Warranted.** . . . . . . . . . . . . . . . . **38**

*People v. Ortiz,* 235 Ill. 2d 319 (2009) . . . . . . . . . . . . . . . . .   38, 39, 40

*People v. Molstad,* 101 Ill. 2d 128 (1984) . . . . . . . . . . . . . . . . . .   38, 39

*People v. Coleman,* 2013 IL 113307 . . . . . . . . . . . . . . . . . . . . . .   38, 39

*People v. Washington,* 171 Ill. 2d 465 (1996) . . . . . . . . . . . . . . . . . .   38

*People v. Davis,* 2012 IL App (4th) 110305 . . . . . . . . . . . . . . . . .   38, 39

*People v. Dominguez,* 366 Ill. App. 3d 468 (2nd Dist. 2006) . . . . . . .   40

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **40**

*People v. Coleman,* 2013 IL 113307 . . . . . . . . . . . . . . . . . . . . . . . . . .   40

> II.   **The Circuit Court Erred In Denying Joseph Booker's Motion For DNA Testing Under 725 ILCS 5/116-3 Because Identity Was The Central Issue At Booker's Trial, The Evidence To Be Tested Has**

-iii-

**Been Subject To A Sufficiently Secure Chain Of Custody, And The Requested Testing Has The Potential To Produce Noncumulative Evidence Materially Relevant To Booker's Actual Innocence Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41**

725 ILCS 5/116-3 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41

*People v. Gecht,* 386 Ill. App. 3d 578 (1st Dist. 2008)  . . . . . . . . . . . .   41

725 ILCS 5/116-3 (b) (1), (2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41

*People v. Johnson,* 205 Ill. 2d 381 (2002) . . . . . . . . . . . . . . . . . . . . . . .   41

725 ILCS 5/116-3(c) (1-2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41

*People v. Moore,* 377 Ill. App. 3d 294 (1st Dist. 2007) . . . . . . . . . . . .   42

*People v. O'Connell,* 227 Ill. 2d 31 (2007) . . . . . . . . . . . . . . . . . . . . . .   42

*People v. Rozo,* 303 Ill. App.3d 787 (2nd Dist. 1999)  . . . . . . . . . . . . .   42

*People v. Pope,* 284 Ill. App. 3d 695 (4th Dist. 1996) . . . . . . . . . . . .   42

*People v. Booker*, No. 1-06-2581, 4-7(unpublished order of March 31,

2008)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

**A.      The requested testing has the potential to produce noncumulative evidence materially relevant to Booker's actual innocence claim.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43**

725 ILCS 5/1163(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

*People v. Johnson,* 205 Ill. 2d 381 (2002) . . . . . . . . . . . . . . . . . . . . . . .   43

*People v. Waters,* 328 Ill. App. 3d 117 (1st Dist. 2002)  . . . . . . . . . . .   43

*People v. Molstad,* 101 Ill. 2d 128 (1984)  . . . . . . . . . . . . . . . . . . . . . .   44

*People v. Hockenberry,* 316 Ill. App. 3d 752 (2nd Dist. 2000) . . .   44, 45

*People v. Rokita,* 316 Ill. App. 3d 292 (5th Dist. 2000)  . . . . . . . .   44, 45

*People v. Shum,* 207 Ill. 2d 47 (2003) . . . . . . . . . . . . . . . . . . . . . .   44, 45

*People v. Henderson,* 343 Ill. App. 3d 1108 (1st Dist. 2003) . . . .   44, 45

725 ILCS 5/116-3(c)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45

**B.    The recovered casings have been subject to a sufficiently secure chain of custody.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **45**

725 ILCS 5/116-3(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

*People v. Bailey,* 386 Ill. App. 3d 68 (1st Dist. 2008) . . . . . . . . . .  45, 46

*People v. Johnson,* 205 Ill. 2d 381 (2002) . . . . . . . . . . . . . . . . . . .  45, 46

*People v. Travis,* 329 Ill. App. 3d 280 (4th Dist. 2002) . . . . . . . . . . .  46

*People v. Henderson,* 343 Ill. App. 3d 1108 (1st Dist. 2003) . . . . . . .  46

**C.    The State failed to rebut a** *prima facie* **showing of a sufficient chain of custody.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **46**

*People v. Caffey,* 205 Ill. 2d 52 (2001) . . . . . . . . . . . . . . . . . . . . . . . . .  47

*United States v. Washington,* 498 F. 3d (4th Cir. 2007) . . . . . . . .  47-48

*People v. McCarter,* 385 Ill. App. 3d 919 (1st Dist. 2008) . . . . . . . . .  48

*People v. Leach,* 2012 IL 111534 . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

Shawn Montpetit and Patrick O'Donnell, *"An Optimized Procedure for obtaining DNA from Fired and Unfired Ammunition,"* . . . . . . . . .  48-49

SA 358

## NATURE OF THE CASE

Joseph Booker, Petitioner-Appellant, appeals from a judgment dismissing his petition for post-conviction relief after an evidentiary hearing. He raises no issue concerning the charging instrument, but he does raise an issue concerning the sufficiency of the post-conviction pleadings.

## ISSUES PRESENTED FOR REVIEW

I.     At a third-stage evidentiary hearing on Joseph Booker's actual innocence claim, Booker presented new evidence from Antione Ford and Ellen Anderson, two independent eyewitnesses, indicating Booker did not shoot Charles Rials, and that the State's primary eyewitness at trial, Kenneth Williams, was the real shooter. While Anderson recanted her exculpatory affidavit at the evidentiary hearing, overwhelming evidence showed she was intimidated into doing so, and that she had motives to testify favorably for the State. Moreover, the allegations of her recanted affidavit were substantially corroborated by evidence elicited both at trial and during the hearing below. Where, on retrial, a fact finder would probably find testimony and statements implicating someone other than Booker as the shooter sufficient to create a reasonable doubt of Booker's guilt, should this Court remand Booker's case for a new trial?

II.    In denying Booker's *pro se* motion for DNA testing of fingerprints left on five spent shell casings from the scene, the circuit court found that DNA samples on the casings would be too contaminated to yield reliable results. Where the court's finding of contamination was purely speculative, and where the requested testing could identify the shooter, should this Court reverse the denial of Booker's motion for DNA testing?

## JURISDICTION

Joseph Booker, Petitioner-Appellant, appeals the denial of post-conviction relief after a third-stage evidentiary hearing, and the denial of a *pro se* motion

SA 359

for forensic testing. The judgments being appealed were entered on June 17, 2013, and September 11, 2015. (PC4. R3. Y8; PC3. R. I29-30, Y8).[1] Booker filed timely notices of appeal on June 27, 2013, and September 11, 2015, respectively. (PC4. C. 213; PC3. C. 36-37). Jurisdiction lies in this Court pursuant to Article VI, Section 6, of the Illinois Constitution, and Supreme Court Rule 651(a).

## STATUTE INVOLVED

**Post-Trial Motions**, 725 ILCS 5/116-1, *et seq.* (West 2012).

\*\*\*

### § 116-3. Motion for fingerprint, Integrated Ballistic Identification System, or forensic testing not available at trial regarding actual innocence.

(a) A defendant may make a motion before the trial court that entered the judgment of conviction in his ... case for the performance of ... forensic DNA testing, including comparison analysis of genetic marker groupings of the evidence ... collected by criminal justice agencies pursuant to the alleged offense, to those ... those maintained under subsection (f) of Section 5-4-3 of the Unified Code of Corrections, on evidence that was secured in relation to the trial which resulted in his or her conviction, and:

(1) was not subject to the testing which is now requested at the time of trial;

\*\*\*

(b) The defendant must present a *prima facie* case that:

(1) identity was the issue in the trial which resulted in his or her conviction; and

(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect.

(c) The trial court shall allow the testing ... upon a determination that:

---

[1]Citations to the common law record, and report of proceedings, under Appellate Case No. 1-15-2995, are indicated by (PC4. C. __) and (PC4. R__.__) citations, respectively. Citations to the same under Case Nos. 1-13-2279, and 1-13-0177, are indicated by (PC3. C.__) and (PC3. R.__), and (PC2. C__.__) and (PC2. R__. __) citations, respectively. Citations to documents and proceedings related to the initial post-conviction proceedings (Case No. 1-06-2581) are indicated by (PC1. C. __) and (PC1. R. __) citations, respectively. Citations to the common law record, and report of proceedings, from trial are indicated by (Tr. __) and (Tc. __) citations, respectively.

SA 360

(1) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence even though the results may not completely exonerate the defendant;

(2) the testing requested employs a scientific method generally accepted within the relevant scientific community. ***

## STATEMENT OF FACTS

Joseph Booker is an admitted drug dealer who, at the time he was charged in this case, had no prior convictions for violence or weapons. (PC4. R3. X14). He was found guilty of first-degree murder based primarily on the testimony of Kenneth Williams, a high-ranking Gangster Disciple whom other witnesses have since identified as the actual shooter. *People v. Booker*, No. 1-06-2581, 5-6 (unpublished order of March 31, 2008). The State presented no forensic evidence linking Booker to the gun or crime scene, and Booker made no inculpatory statement. The jury engaged in prolonged deliberations and was issued a *Prim* instruction before returning its verdict. *Booker*, No. 1-06-2581 at 6. In the post-conviction proceedings below, Booker maintained his innocence and presented evidence from two new eyewitnesses who were too scared to accuse Williams earlier. (PC4. R3. X14; PC1. C1. 238-40; PC4. C. 139-44; PC4. R2. V7-118). The circuit court denied Booker's innocence claim after an evidentiary hearing. (PC4. R3. Y8). Booker now appeals.

### Trial

Kenneth Williams testified that he grew up in the same neighborhood as the decedent, Charles "CC" Rials, and that he had known him for about 10 years. (Tr. 179). On September 8, 2002, Williams was drinking beer in the Wentworth Gardens Housing project with about 20 of his friends. (Tr. 212, 186). At about 9:00 p.m., he was standing on the corner of W. 38th and S. Princeton, near his friend, Melissa Westmoreland's, home when he saw Booker and about eight of his friends arrive in four cars. (Tr. 179-80, 209, 183-86, 213). Williams had seen Booker before and recognized his blue, four-door Pontiac Grand Prix. (Tr. 184).

-3-

According to Williams, Booker's group argued with Williams's group about "gang banging stuff." (Tr. 186). Westmoreland told Booker to come inside. (Tr. 187). At about 10:30 p.m., Booker and his friends left Westmoreland's and words were again exchanged between the two groups. (Tr. 188-89). Williams saw Booker drive away afterward. (Tr. 189).

Some of Williams's group then left to get beer while Williams remained on the stairs. (Tr. 189-90, 215). Around 11:00 p.m., Williams saw Charles Rials approach. (Tr. 180, 190). Three minutes later, Williams saw Booker running down "the middle of the street" toward Rials with a gun. (Tr. 190-91, 216, 228). Williams did not alert Rials of Booker's approach. (Tr. 229, 191).

Williams got up to run and saw Booker point the gun at Rials and shoot. (Tr. 192). When Williams looked back, he saw Booker standing over Rials. He heard more gunshots as he ran. (Tr. 193). Williams testified Booker was wearing a white t-shirt and black jogging pants, and that his hair was in French braids. (Tr. 196). "[M]any police" arrived at Wentworth Gardens that night, but he did not talk to any of them. (Tr. 226). Two days later, on September 10, 2002, Williams went to the station and identified Booker from a lineup. (Tr. 195, 202, 227-28).

Darnell Brown testified that his friend of 18 years, Charles Rials, was "like a brother" and that he saw him everyday. (Tr. 286-87). On September 8, 2002, Brown bumped into Rials in Wentworth Gardens and walked down W. 38th Place with him. (Tr. 249-50). Williams was sitting on some stairs nearby. Brown stopped to talk to a woman named Ella while Rials continued toward Williams. (Tr. 250, 268). Brown talked to Ella for about five minutes while Rials talked to Williams. (Tr. 250, 269). When Brown turned to go back home he heard a shot behind him, and then four more shots. (Tr. 251-52). When Brown looked up, he saw a "dark tall fellow," wearing an "all black jogging suit" putting a gun in his waistband. He did not see the shooter's face. (Tr. 252, 252-53, 272, 278-79). Brown saw the

-4-

shooter get in the back seat of a blue Grand Prix. (Tr. 256).

Brown did not tell police that night that he saw his friend's murder. (Tr. 287). Two days later, he went to a police station at the request of Kenneth Williams and identified Booker as the shooter from a lineup. Brown testified he fingered Booker because his clothes and build matched the shooter's. (Tr. 287, 278).

Fourteen-year-old Louis Dean testified he was Westmoreland's neighbor, and that he knew Rials from the neighborhood. (Tr. 300-02, 304A). On the night of the shooting, Dean was in his bedroom watching television. (Tr. 302-03). Around 11:30 p.m., he looked out the window and saw someone dressed in all black walk up behind Rials and shoot him several times. (Tr. 302-304B).

Dean did not positively identify Booker in a lineup, but described him as someone who looked like the shooter. (Tr. 314-15). On direct examination, Dean testified he saw Booker approach from behind and shoot Rials; on cross-examination, he testified he saw Booker approach with a gun, but he did not see a shooting. (Tr. 304B, 309-10). Dean was impeached with his grand jury testimony indicating he did not know from where the gunshots came. (Tr. 323-24). The lawyers questioned whether someone coached Dean from the gallery by nodding yes and no. (Tr. 312).

The jury began deliberating at 3:30 p.m. At 6:30 p.m., they sent a note stating they were deadlocked, with nine jurors voting guilty and three jurors voting not guilty. (Tr. 584). The court advised the jurors to continue deliberating. (Tr. 585). At 9:00 p.m., the jury sent another note stating that it was at an impasse. (Tr. 586-87). Over defense counsel's objection, the court issued a *Prim* instruction. (Tr. 588-89). At 11:45 p.m., the jury found Booker guilty of first-degree murder. (Tr. 593). The trial court sentenced Booker to 55 years in prison. (Tr. 615-16).

### Proceedings Leading to Current Appeals

On direct appeal, Booker argued that the eyewitness identification testimony was too unreliable to prove him guilty beyond a reasonable doubt, and that issuance

-5-

of a *Prim* instruction pressured the jury to convict. This Court affirmed. *People v. Booker*, No. 1-03-3533 (unpublished order of September 22, 2005).

Booker filed a *pro se* post-conviction petition in May of 2006, alleging actual innocence, and that counsel was ineffective at trial and on appeal. In support of his innocence claim, Booker attached an affidavit from Ellen Anderson stating she saw the shooting in 2002, and that Kenneth Williams was the shooter. (PC1. C1. 238-40; PC2. C2. 193-94). The court summarily dismissed. (PC1. C2. 267).

On appeal, this Court reversed and remanded for further post-conviction proceedings, finding Booker had alleged the gist of an actual innocence claim based on newly discovered evidence, that the identification evidence was "weak evidence of [Booker's] guilt" in light of Anderson's affidavit, and that the probability of a different verdict was "bolstered" by the difficulty the original jury had in reaching its verdict. *People v. Booker*, No. 1-06-2581 (unpublished order of March 31, 2008); (PC2. C1. 205-12); *see also* page 5, *supra*.

## Post-Remand Post-Conviction Proceedings

*Second-Stage Dismissal Proceedings*

Booker proceeded *pro se* on remand. (PC2. R. C2; PC2. C2. 300-01). He filed an amended petition for post-conviction relief, alleging, *inter alia*, that he is actually innocent, and that counsel was ineffective for failing to call Melissa Westmoreland and Monica Ramsey to testify. (PC2. C1. 6-212). Booker later filed a *pro se* supplemental petition for post-conviction relief, containing two additional claims relating to counsel's deficient performance. (PC2. C2. 286-99). Several months later, the circuit court denied Booker leave to file his *pro se* amended and supplemental pleadings (PC2. C2. 346; PC2. R1. C4),[2] and it subsequently denied his multiple requests to reconsider its ruling. (PC2. R1. C5, F6-9; PC4. R1. A36).

---

[2] The record does not contain transcripts from the proceedings that occurred on May 17, 2011.

SA 364

At the hearing on the State's motion to dismiss Booker's initial *pro se* pleading, the prosecutor argued that, had counsel called Westmoreland, the State would have been able to establish through her that Booker "was at the scene and he left shortly before the murder." The State would also have questioned Westmoreland "about the phone call that [Booker] made to her shortly after the murder." (PC2. C2. 307; PC4. R1. A20). In response, Booker argued that Westmoreland would have contradicted Kenneth Williams's testimony that Booker argued with him that night, thus impeaching the State's motive evidence and theory of the case. (PC4. R1. A27-28). Booker further argued that, if the State questioned Westmoreland about talking to him on the phone, Westmoreland would have testified that she called Booker, told him there had been a shooting, and asked him to pick her up because she was scared. (PC4. R1. A29).

On July 24, 2013, the trial court granted the State's motion, finding Booker's ineffective assistance claims could have been raised on direct appeal, and that he failed to make a substantial showing that trial counsel was ineffective. (PC4. R1. A43-44; PC4. C. 17, 54-61; PC4. R1. B3).

### Pro Se Motions for Forensic Testing

On February 7, 2012, Booker filed a *pro se* motion for forensic testing, requesting DNA and fingerprint testing of, *inter alia*, five spent cartridge casings found at the scene. (PC2. C2. 391-402). The State moved to dismiss the motion in part, but agreed to test the casings. (PC2. C2. 423). The court granted the State's motion. (PC2. C2. 449; PC2. R. F6-7). Later, the State indicated the agreed-upon testing had been done before trial. (PC2. R. L2).

That same day, December 10, 2012, Booker filed a second motion for forensic testing, asking for Polymerase Chain Reaction ("PCR") amplification of DNA from fingerprints left on the recovered cartridge casings. (PC3. C. 25-33; PC2. C2. 474-86; PC2. R. L4-6). At a hearing on the motion, Illinois State Police ("ISP") latent

-7-

fingerprint examiner Christy Fischer testified she conducted fingerprint tests on five fired cartridge casings in 2002. While conducting the tests, she wore gloves, a coat, and eye wear. However, she did not wear anything covering her mouth because it was not "common practice." (PC3. R. I4-5).

ISP forensic scientist Caryn Tucker testified that, in 2002, she conducted a "firearms analysis" on the recovered casings. (PC3. R. I6-7). She did not wear gloves or protective face wear. (PC3. R. I6-7). Tucker also handled the "outside packaging" of the casings sometime in 2012, while conducting a "paperwork examination." (PC3. R. I8).

Tucker further testified that other people in firearm and toolmark unit tested the casings. One of the casings was handled by an unnamed evidence technician when she imaged them for the IBIS database. Another unnamed examiner also touched the casings. Additionally, the casings were sent to an ISP lab in Carbondale on another, unidentified case at a later, unspecified time. Tucker testified an examiner in Carbondale "would have" handled the casings, and that "normal procedure" would "not typically" require the use of protective gloves or face wear during the named tests. To her knowledge, none of the other examiners wore protective gear. (PC3. R. I7).

DNA expert Greg Didomenic testified that it is possible to extract DNA from cartridge casings. (PC3. R. I10).[3] Because several people handled the items in question without "clean technique," he would expect them "to be potentially contaminated." (PC3. R. I9). Had the examiners worn gloves, Didomenic would expect to be able to extract DNA from the casings. (PC3. R. I11).

The circuit court found that DNA testing was not requested in 2002, that ISP personnel followed procedure for the requested tests, and that the potential

---

[3]Didomenic worked for the federal Drug Enforcement Agency at the time of the hearing. (PC3. R. I25).

destruction of the DNA evidence was not malicious. The court concluded that, because of the "way" the "cartridges" were "handled" in 2002, "DNA testing would not yield probative results[.]" (PC3. R. I28-29). Booker filed timely notices of appeal relating to the denial of both of his DNA motions. (PC2. C2. 484; PC3. C. 36-37).

### Third-Stage Evidentiary Hearing

On October 8, 2014, the State revealed it had received 185 pages of reports relating to Booker's case from the Chicago Police Department. (PC4. R1. N2-3). Among the new discovery was a handwritten statement from Melissa Westmoreland given to Assistant State's Attorney ("ASA") Dan Klapman and Detective Bach. (PC4. C. 128-33; PC4. R1. O3-5). Westmoreland told ASA Klapman that Booker was at her home the night of the shooting, and that he left about 30 minutes before she heard gunshots. Moreover, Westmoreland's neighbor, a woman named "Teda," said she saw Kenneth Williams argue with a man named W.K. before the shooting. (PC4. C. 128-33). Booker then supplemented his petition with an affidavit from Teda's fiancé at the time, Antione Ford, with help from an exoneration project. (PC4. R1. O3).

### Antione Ford's affidavit

Antione Ford's affidavit stated that he and Teda were on their front porch around 6:30 or 7:00 p.m., on September 8, 2002, when Booker arrived in a blue Grand Prix. (PC4. C. 140). Booker briefly spoke to Ford and Teda before entering Melissa Westmoreland's house, which was next door to Teda's house. Twenty or 30 minutes later, two men arrived in a white Chevy Tahoe. They walked past Kenneth Williams, whom Ford knew as the Senior Regent for the Gangster Disciples in Wentworth Gardens. People called Williams "Kenny Wayne," and "Godzilla" because he had survived multiple shootings. (PC4. C. 139-40).[4] One of the men

---

[4]The record shows Ford testified that Williams's nickname was "Kenny Wang," but this is likely a typographical error. Ford's affidavit states that Williams's nickname was "Kenny Wayne." (PC4. C. 139-44; PC4. R2. V10).

asked Williams "what the fuck he was looking at," and Williams told him to straighten his hat. The men from the Tahoe then entered Westmoreland's house. (PC4. C. 139-40).

Ford saw Williams and 15 or 20 of his Gangster Disciple friends "drinking and smoking weed" across the street. (PC4. C. 140). At some point, Williams yelled, "Who the fuck putting on for the 'omegas' and 'blue dolphins[?]," which Ford explained were ecstacy pills. Williams then sent some of his guys to buy the ecstacy and liquor, and when they returned 20 or 25 minutes later, "Everybody that drink was drinking, [e]verybody that pop pills was popping pills and [e]verybody that smoked weed was smoking weed."(PC4. C. 141).

Around 10:00 or 10:15 p.m., Ford saw Booker and the men from the Tahoe leave Westmoreland's house. Booker got in his car and drove off without talking to Williams or the other Gangster Disciples, and the other men entered their car and did the same. About 15 or 20 minutes later, Ford saw Charles Rials arrive. (PC4. C. 141). Williams and the other gang members were happy to see Rials because he had just gotten out of prison, but Rials started arguing with Williams. Ford stated that Rials was upset with Williams and the other Gangster Disciples because they had failed to post bond for him, provide him with a lawyer, or send him money while he was incarcerated. (PC4. C. 141-42). Rials said he "was gone [*sic*] cooperate with the police and send them all to jail, from the top to the bottom," meaning "from the shot caller's [*sic*] to the foot soldiers." Williams swung at Rials but missed. A woman then removed Rials and walked off with him. (PC4. C. 142).

Sensing tension, Ford and Teda went inside and Ford looked out the window. He saw Williams walk toward W. 37th Place and out of sight while the other gang members continued partying. Shortly thereafter, Ford saw Williams walk back toward the crowd with Darnell Brown. (PC4. C. 142). After Williams grabbed a beer, Williams, Brown, and Rials met in the middle of the block. A woman then

-10-

yelled to Brown and he crossed to the side of the street on which Ford lived. Williams and Rials "stepped off a few paces" before Williams shot Rials in the head and again while he was on the ground. (PC4. C. 143).

<div align="center">Antione Ford's testimony</div>

At the evidentiary hearing, Antione Ford acknowledged that he was serving a 60-year sentence for an unrelated murder and armed robbery at the time of the hearing (PC4. R2. V48), and that he was a Black Disciple until 2001. (PC4. R2. V11). Ford testified he never had any problems with anyone in Wentworth Gardens. (PC4. R2. V11). Ford recounted the facts of his affidavit and testified: he saw Booker enter Westmoreland's house around 7:00 p.m., without interacting with Williams; that Williams was partying with about 20 other gang members; that Williams sent some people to buy liquor and ecstacy; that about 30 minutes after Booker entered Westmoreland's two men arrived in a Tahoe; that one of those men exchanged words with Williams; that Booker left Westmoreland's house around 10:00 p.m., and drove off without talking to anyone; that the two men from the Tahoe left at the same time without incident; that Charles Rials arrived about 20 minutes later and threatened to "take everybody down" in Williams's gang because they failed to support him in prison; and that a woman removed Rials when he and Williams started arguing. (PC4. R2. V7-27).

In describing the shooting, Ford testified he saw Williams walk toward 37th Place before losing sight of him. Williams returned shortly thereafter with Darnell Brown. (PC4. R2. V22-23). While Brown and Williams were talking, Rials returned and met up with them in the middle of W. 38th Place. Brown then went to the south side of W. 38th Place to talk to a woman Ford did not know, and Williams and Rials went to the north side of the street. (PC4. R2. V23-24, 26-27). Rials tried to walk away, but Williams shot him. (PC4. R2. V27). Ford talked to police that night, but denied seeing the shooting because he was scared for himself,

Teda, and her three children. (PC4. R2. V28). When Ford saw Williams two days later, he no longer had braided hair. (PC4. R2. V34).

Ford further testified that, on September 10, 2002, Westmoreland visited him and Teda at their home. Westmoreland told Ford she had heard Williams told police that he argued with Booker before the shooting. Ford responded that he had seen Williams arguing with two people that night, and that Booker was not one of them. Ford told Westmoreland that Williams first argued with one of the men from the Tahoe. He told her the second argument was "amongst themselves." (PC4. R2. V29-31). Ford did not say that the second argument was between Williams and Rials, or what it was about, because he was scared Williams would retaliate if he implicated him as the shooter. (PC4. R2. V31-32).

On cross-examination, Ford testified he was imprisoned at Menard Correctional Center from 2006 until May of 2011, when he was transferred to Stateville Correctional Center. (PC4. R2. V49). He had no contact with Booker, or anyone on his behalf, at Stateville. (PC4. R2. V60). On the morning of the evidentiary hearing, Ford was transported on the same bus as Booker and was in the bullpen with him. (PC4. R2. V64). Ford acknowledged he had received disciplinary citations while in prison. (PC4. R2. V65-70). Ford further testified that ASA Terrance Reilly visited him at Stateville on March 4, 2015. (PC4. R2. V5-6, 38-40). Ford told ASA Reilly that the allegations in his affidavit are true; he refused to answer any questions without consulting Booker or his legal representative. (PC4. R2. V38-40).

In response to questioning by ASA Reilly, Ford testified that the shooting "happened in the street." (PC4. R2. V90). Ford further testified that State's Exhibit 4 was a picture of W. 38th Place from the night of the shooting, and that it showed blood and other items on the sidewalk on the north side of the street. (PC4. R2. V102). He stated that the photograph did not contradict his testimony that the

-12-

shooting occurred in the street. (PC4. R2. V103). On redirect examination, Ford testified that the shooting occurred in the middle of the block, but on the north side of the street. (PC4. R2. V112-13).

### Ellen Anderson's affidavit and testimony

Ellen Anderson testified at the hearing that she and Booker started an off-and-on relationship in 1995 that lasted about 10 years. They were together in 1995 and 1996, but not involved from 1997 through 2000. In 2001, they dated again for a month or two, but they did not date in 2002 or 2003. (PC4. R2. W10). Anderson thought Booker was a "good guy" and "cool." (PC4. R2. W10). On January 12, 2006, she submitted a sworn affidavit stating that she saw Kenneth Williams shoot Charles Rials. (PC4. R2. W7). She drafted the affidavit herself and was not pressured in any way to write it. (PC4. R2. W21, 53). Anderson testified the affidavit was false, and that she signed it because she loved Booker and did not want to see him in prison. (PC4. R2. W47).

In her affidavit, Anderson averred that she had arrived at a friend's house in Wentworth Gardens around 8:00 p.m., on September 8, 2002. She left her friend's house around 11:05 p.m., and walked west on W. 38th Place to meet a cab. Anderson saw Kenneth Williams and Darnell Brown talking to a man she did not know, later identified as Charles Rials. (PC1. C1. 238; PC2. C1. 193). Williams was wearing black leather gloves. Anderson talked to Brown while Williams and Rials walked away. While ending her conversation with Brown, Anderson heard a gunshot. She ducked behind Brown and looked in the direction in which he was looking to see Rials's body on the ground. Williams was standing over Rials firing more shots into his body. (PC1. C1. 239; PC2. C1. 194).

Anderson ran to Pershing Road while Brown followed her. Brown told her "to keep [her] mouth shut if [she] didn't want to get [her]self hurt," and that she "didn't see nothing" and "don't know nothing." Anderson was "traumatized" and

-13-

"feared for [her] life," so she moved to a different part of town and never returned to Wentworth Gardens. (PC1. C1. 239; PC2. C1. 194). Anderson later ran into Booker's mother at a church they both attended and told her Booker had been "wrongfully convicted." (PC1. C1. 239-40; PC2. C1. 194-95).

In explaining the origins of her affidavit at the evidentiary hearing, Anderson testified she learned sometime in 2003 that Booker was in prison. (PC4. R2. W10, 34). In 2005, Booker's mother called Anderson, and Anderson went to her house, told her Booker was innocent, and went with her to visit Booker at Stateville. (PC4. R2. W14-15, 34-36). Anderson denied telling Booker's mother he was innocent while they were at church, as she stated in her affidavit, but testified she did meet Booker's mother at a church one time. (PC4. R2. W14, 49). Anderson visited Booker about 10 times before drafting her affidavit, but she never talked about this case with him. Anderson thought Booker was innocent, so when he asked her to draft an affidavit, she drafted one and sent it to an investigator named Patti Dalton Krashesky. (PC4. R2. W36-38, 16).

In 2006, Anderson met Krashesky and told her the statements in her affidavit were true. Krashesky typed up Anderson's affidavit without making any changes to what she had written. (PC4. R2. W17-18, 39). Krashesky gave Anderson a copy, and told her she would have to testify about its contents. (PC4. R2. W40).

Sometime around August 15, 2014, after this Court reversed the summary dismissal of Booker's *pro se* petition and remanded for further proceedings, ASA Reilly and Detective Brannigan "ke[pt] coming to [Anderson's] job," wanting to discuss the case. Even after Anderson "switched [her] number," Riley and Brannigan came "to look for [her] again." Anderson "just got tired[,]" so she "finally talked to them." (PC4. R2. W23). Anderson sat in Brannigan's car and told them she did not see the shooting. (PC4. R2. W24, 41). She agreed to make a videotaped statement recanting her affidavit because she "couldn't remember nothing" in it and did not

-14-

want to testify about "anything she wrote," so she would not "end up in prison." (PC4. R2. W24-26). Anderson testified that she told ASA Reilly she made up the allegations in her affidavit during her video statement. (PC4. R2. W31). Anderson wanted nothing to do with this case and thought making a video statement would end her involvement. She was promised nothing in exchange for her statement. (PC4. R2. W42).

Anderson confirmed that, in September of 2002, she visited a girlfriend who lived in Wentworth Gardens more than once, and that she, her girlfriend, and Darnell Brown had attended Wendell Phillips High School together. (PC4. R2. W18, 29). Anderson denied being at Wentworth Gardens the night of the shooting and talking to Brown. (PC4. R2. W31). Anderson testified she had seen Brown several times since the shooting, most recently at a nightclub in 2012. (PC4. R2. W28). She denied that Brown or "anybody on the streets" had talked to her about her affidavit since she submitted it. (PC4. R2. W28).

Anderson testified that she did not know Kenneth Williams, and that she did not recall the names Monica Ramsey and Melissa Westmoreland. (PC4. R2. W18-20). Booker sent her information about two people, but Anderson could not remember if they were Ramsey and Westmoreland. She could not remember if that information influenced her affidavit. (PC4. R2. W20).

On cross-examination, Anderson testified that Booker sent her police reports containing details about what happened, who was shot, and who the witnesses were. (PC4. R2. W37). She did not write her affidavit based on those reports. (PC4. R2. W38). On re-direct examination, Anderson testified she was unsure what details were in those reports, and that she did write her affidavit based on them. (PC4. R2. W47-48). Anderson also testified that the reports did not contain information appearing in her affidavit, and that her affidavit must have been based on information obtained from Booker, either on the phone or during their prison visits.

-15-

(PC4. R2. W48-49). Anderson then repeated that she did not remember discussing the case during prison visits. (PC4. R2. W51).

In January of 2015, shortly after Anderson gave her videotaped statement recanting her affidavit, she was arrested and charged with several misdemeanor offenses, including driving with a broken tail light, driving on a suspended license, and possession of a small amount of marijuana. (PC4. R2. W42-43). After Anderson appeared in court, the charges were dismissed. (PC4. R2. W43).[5]

### Joseph Booker's testimony

Booker testified in his own defense. He proclaimed his innocence, stating, "I did not shoot Charles Rials." (PC4. R3. X14). Booker continued:

> My reputation in the street was known for selling drugs and I'm not slinging that around in a proud manner. Or like it is any less of an evil than the charges I stand convicted of, but it is the truth. That's what I did.
>
> I've never had a reputation for shooting and killing. This is facts [sic] supported by my rap sheet. If you was [sic] to review my rap sheet, all you see is several arrests for narcotics and one conviction for simple possession, possession with intent to deliver, concurrent. And, if you will, selling drugs is my *modus operandi*.

(PC4. R3. X14).

Booker testified that before being charged in this case, he had never seen Charles Rials, Kenneth Williams, Darnell Brown, Louis Dean, or Monica Ramsey. He denied arguing with Williams or anyone from Wentworth Gardens. The only people he knew there were Westmoreland and her family. (PC4. R3. X14).

On September 8, 2002, Booker visited Westmoreland's house because he had arranged to sell drugs there. He arrived alone in a blue Pontiac Grand Prix. On his way inside, he greeted her neighbors, Belinda "Teda" Brown and Antione Ford.

---

[5]The circuit court clerk's computer shows that Anderson was additionally charged with operating a motor vehicle without insurance in the same case (case# 15119426901). That charge was also dismissed. *See People v. Steward*, 406 Ill. App. 3d at 93 (Illinois courts may take judicial notice of public records).

Booker did not know Ford's last name at the time. He testified that a man named W.K. and his associate arrived at Westmoreland's house in a white Chevy Tahoe for the drug deal. While W.K. and his associate were using Westmoreland's kitchen, she braided Booker's hair. Booker did not know W.K. had exchanged words with Williams before entering Westmoreland's house until he received additional discovery from the State in December of 2014, and read the handwritten statement Westmoreland gave to an ASA on September 11, 2002. (PC4. R2. WX15-16).

After the deal, W.K. and his associate drove off in their Tahoe and Booker drove off in his car. Booker returned to his fiancée and three daughters at 2931 S. Federal around 10:45 p.m. (PC4. R2. W16-17). Booker's mother-in-law arrived shortly thereafter with tea for his youngest daughter, who was feeling ill. Booker stayed home until about 1:00 a.m. (PC4. R2. W17-18).

Around then, Booker called Westmoreland and told her he was coming to get her. Westmoreland told Booker not to come to Wentworth Gardens because someone had been shot and police were everywhere. Booker picked up Westmoreland and took her to the Amber Motel. (PC4. R3. X18).

Booker further testified he had an intimate relationship with Ellen Anderson in 1995 that only lasted a couple of months. (PC4. R3. X19). In late 2005, Booker asked his mother to call Anderson because she had previously told Booker's mom that he was innocent. Booker's mom called the cell phone number listed in Anderson's affidavit, which Anderson had given to Booker's partner, Chuck Wick, to give to Booker's mother. During that call, Booker asked Anderson to submit an affidavit based on her independent statement to his mom that he was innocent. (PC4. R3. X20). Had Anderson not come forward, Booker would never have known she visited Wentworth Gardens, or that she knew Brown and Williams. (PC4. R3. X21-22).

SA 375

Booker testified he had never discussed the details of his case with Anderson in person, by phone or mail, or otherwise. At some point, he sent her police reports related to Monica Ramsey and Melissa Westmoreland so she could give them to investigator Patti Krashesky, who Booker hoped would get affidavits from them. (PC4. R3. X21-22). Booker argued that the reports did not indicate that Kenneth Williams was the shooter. (PC4. R2. W51-53; PC4. R3. X75).

Booker watched Anderson's video interview with ASA Reilly in which she denied that he had told her what to write in her affidavit, and stated she had come up with those allegations on her own. (PC4. R3. X22). Booker asked the court to watch the video, but the court declined, stating that Booker's testimony about the video was "sufficient for the court at this stage of the proceeding." (PC4. R3. X57). The court also declined Booker's request to admit Westmoreland's handwritten statement into evidence, finding it was hearsay. (PC4. R3. X7-8, 62).

On cross-examination, Booker testified he saw guys he knew to be Gangster Disciples near W. 38th Place whenever he went to Wentworth Gardens. He was not acquainted with any of them and did not want to be involved with them. (PC4. R3. X30-31). Booker denied being a Mickey Cobra in 2002 and claimed the "MC" tattoo on his right arm represents his name. (PC4. R3. X31). Booker told police he arrived at Wentworth Gardens around 7:00 p.m. on the night of the shooting, and that he left between 9:00 and 10:00 p.m. (PC4. R3. X37).

Booker testified he knew Teda and Ford in 2002. He did not know how many kids Teda had. (PC4. R3. X52). After September 8, 2002, Booker did not see Ford until July 15, 2015, when they arrived at court together. Booker had no contact with Ford at Stateville. (PC4. R3. X55-56).

In closing, Booker argued that the new evidence of innocence warranted a new trial. At trial, the State theorized Booker had shot Rials over an altercation he had with Williams. Ford's new affidavit and testimony contradicted that theory

by establishing that Williams argued with W.K. and Rials that night, not Booker. (PC4. R3. X63-65). Ford's testimony that Booker never argued with Williams was corroborated by Westmoreland's statement. (PC4. R3. X64-65). Moreover, Ellen Anderson's recanted allegations were corroborated by other evidence and thus more likely to be true than her testimony at the evidentiary hearing. (PC4. R3. X74). Anderson's affidavit gave the exact time, place, and sequence of shots, which was corroborated by Williams and Brown's trial testimony, and Ford's new testimony. (PC4. R3. X73-74). Additionally, Brown's trial testimony that he talked to "Ella" right before the shooting corroborated Anderson's recanted allegation that she talked to Brown before the shooting, and Ford's testimony at the evidentiary hearing indicated he saw Anderson talking to Brown at that time. Finally, Ford's new testimony, Brown's trial testimony, and Anderson's affidavit, indicated Rials and Williams were together right before the shooting. (PC4. R3. X75-77).

In dismissing Booker's petition, the circuit court found that Ford's testimony was unreliable because he was in prison for murder, and because he misidentified the location of the shooting. The court then stated it was "unfortunate" this Court had remanded this case where Anderson recanted her affidavit. The court concluded there would be no possibility of a different verdict on retrial. (PC4. R3. Y8).

## ARGUMENT

**I.    This Court Should Remand Joseph Booker's Case For A New Trial Where The New Evidence of Innocence Implicating Kenneth Williams As The Shooter Would Probably Change The Result On Retrial.**

At an evidentiary hearing on Joseph Booker's actual innocence claim, Booker presented affidavits from two new, unacquainted witnesses, Ellen Anderson and Antione Ford, establishing they saw the shooting, that Booker was not the shooter, and that they were too scared to come forward before trial. (PC2. C1. 193-95; PC4. C. 139-44; PC4. R2. V5-118). According to Anderson and Ford's affidavits, the actual shooter was the State's primary eyewitness at trial, Kenneth Williams,

-19-

a Senior Regent for the Gangster Disciples—one of Chicago's most notoriously violent street gangs. (PC2. C1. 194; PC4. C. 139-42). Ford's testimony was utterly consistent with his detailed affidavit, and he was not impeached regarding the details of the shooting. While Anderson recanted her affidavit at the evidentiary hearing (PC4. R2. W7-53), the evidence indicated she was intimidated into doing so, and that she had motives to testify favorably for the State. Moreover, the allegations of her recanted affidavit were largely corroborated by evidence from trial and the evidentiary hearing. A finder-of-fact would probably find on retrial, therefore, that Anderson's affidavit is more credible than her recantation testimony. Even though the new evidence drastically alters the strength of each side's case, the circuit court declined to remand for a new trial. (PC4. R3. Y8-9).

In denying Booker's innocence claim, the court found that Booker had failed to prove there "would be" a different result on retrial. (PC4. R. Y8). The applicable standard, however, was whether the new evidence "would probably" change the result. *People v. Ortiz*, 235 Ill. 2d 319, 331-33 (2009); *People v. Coleman*, 2013 IL 113307, ¶84; *People v. Molstad*, 101 Ill. 2d 128, 134 (1984). While a new trial is warranted under either standard, application of the wrong standard influenced the court's ruling and unfairly stacked the deck against Booker. As such, this Court should reverse the circuit court's denial of post-conviction relief and remand for a new trial. *See Ortiz*, 235 Ill. 2d at 337 (remanding for a new trial where new evidence would probably change the result on retrial); *Coleman*, 2013 IL 113307 at ¶116-18 (same); *Molstad*, 101 Ill. 2d at 137 (same).

"[N]o person convicted of a crime should be deprived of life or liberty given compelling evidence of actual innocence." *People v. Washington*, 171 Ill. 2d 465, 489 (1996); *Coleman*, 2013 IL 113307 at ¶94. The continued imprisonment of an innocent person violates the due process clause of the Illinois Constitution. Ill. Const. 1970, art. I, §2; *Washington*, 171 Ill. 2d at 489; *Ortiz*, 235 Ill. 2d at 331-33.

-20-

Because an actual innocence claim alleges the violation of a constitutional right, it may be brought under the Post-Conviction Hearing Act ("the Act"). 725 ILCS 5/122-1; *Coleman*, 2013 IL 113307 at ¶84 (recognizing that actual innocence claims are cognizable under the Act). At the third stage of proceedings under the Act, the circuit court holds an evidentiary hearing on the petitioner's innocence claim. 725 ILCS 5/122-6; *People v. Pendleton*, 223 Ill. 2d 458, 472-73 (2006).

A circuit court's decision to deny relief after an evidentiary hearing is reversed on appeal if it is manifestly erroneous. *Coleman*, 2013 IL 113307 at ¶98. "[A] decision is manifestly erroneous when the opposite conclusion is clearly evident." *Id.*

### A.    The overwhelming weight of the evidence elicited below established the result on retrial would probably be different.

An actual innocence claim warrants a new trial where a petitioner presents evidence that is (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *Coleman*, 2013 IL 113307 at ¶96. "Under this standard, the new evidence need not prove actual innocence[.]" *People v. Washington*, 256 Ill. App. 3d 445, 448 (1st Dist. 1993). The question is whether the new evidence would "probably create a *reasonable doubt* of defendant's guilt at retrial." *Ortiz*, 385 Ill. App. 3d at 13 (emphasis added). Reviewing courts are to "balance the testimony" of the new witnesses in light of the evidence presented at trial (*Molstad*, 101 Ill. 2d at 135-36), and make a practical judgment about how jurors would react to the relative "shift in strength of each side's case." *Ortiz*, 385 Ill. App. 3d at 13.

In this case, the new, non-cumulative evidence elicited at the evidentiary hearing seriously undermines the credibility of witnesses who implicated Booker at trial, making it reasonably likely he would probably be acquitted on retrial. *See Ortiz*, 235 Ill. 2d at 336-37 (remanding for a new trial where testimony from a new witness contradicted the eyewitness testimony from trial and no other evidence linked defendant to the offense); *see also Coleman*, 2013 IL 113307 at

-21-

¶¶102-03, 116-17 (remanding for a new trial where new eyewitness testimony establishes defendant was not involved in the offense, contradicting the eyewitness testimony at trial); *Molstad*, 101 Ill. 2d at 137 (same).

1.    *Affidavits and testimony from Antione Ford and Ellen Anderson, who were too scared to come forward before trial, is newly discovered evidence, materially relevant, and not cumulative.*

<u>Antione Ford</u>

Antione Ford is a newly discovered witness. Booker did not know Ford had seen the shooting until the State tendered additional discovery on October 8, 2014. That day, Assistant State's Attorney ("ASA") Terrance Reilly explained that the Chicago Police Department had recently discovered cabinets containing "major case files," including 185 pages of reports relating to Booker's case. (PC4. R1. N2-3). After reviewing the new discovery, Booker found a handwritten statement from Melissa Westmoreland indicating he had left her house about 30 minutes before she heard gun shots, and that her neighbor, "Teda," had seen some of the events that night. (PC4. R1. O3-4; PC4. C. 171-72). "[W]ith help from the exoneration project," (PC4. R1. O3), Booker then obtained an affidavit from Teda's ex-fiancé, Ford, who lived with her in 2002. (PC4. R3. X16, 52-53).

Ford further confirmed that, although he spoke to police that night, he actively concealed his knowledge until 2014 because he feared Gangster Disciple Senior Regent Kenneth Williams. Williams saw Ford on his porch the night of the shooting, leading Ford to think he would have been putting his life, and the lives of his family members, "in jeopardy" by telling police what he really saw. (PC4. C. 139-44; PC4. R2. V28-32). Because Ford only recently came forward, and there is no indication Booker knew he had seen the shooting, Ford's affidavit and testimony constitute newly discovered evidence. *See Ortiz*, 235 Ill. 2d at 334 (finding that a witness's testimony was newly discovered where he did not admit seeing the shooting until 10 years after trial).

-22-

Ford's affidavit and evidentiary hearing testimony are materially relevant because they provide a first-hand account of the incident that directly contradicts the testimony of the State's eyewitnesses at trial. At trial, Kenneth Williams, Darnell Brown, and 14-year-old Louis Dean identified Booker in court as the shooter. (Tr. 182, 253, 304B). Ford's affidavit and testimony establish, however, that Williams–the only eyewitness who claimed to have seen the shooter's face–was the real shooter. Ford also supplied a motive for the shooting, stating that Rials threatened to cooperate with police to take down Williams's Gangster Disciple set. (PC4. C. 139-44; PC4. R2. V4-118); *see aslo Ortiz,* 235 Ill. 2d at 335 (finding new eyewitness testimony materially relevant where it directly contradicted the prior statements of the State's two eyewitnesses); *Coleman,* 2013 IL 113307 at ¶103 (finding new testimony of witnesses present for, or involved in, the offense materially relevant where they insisted the defendant was not involved).

Finally, Ford's affidavit and testimony are not cumulative. Cumulative evidence "adds nothing to what is already before the jury" (*Molstad,* 101 Ill. 2d at 135), but here there was no eyewitness identification evidence at trial exculpating Booker while implicating Williams.

<u>Ellen Anderson</u>

In its 2008 decision remanding this case for further post-conviction proceedings, this Court found that Ellen Anderson's exculpatory affidavit of 2006–alleging she also saw Kenneth Williams shoot Charles Rials (PC2. C1. 193-95)–was non-cumulative "newly discovered evidence ... material to the issue of whether [Booker] shot Rials." *People v. Booker,* No. 1-06-2581, 4-7(unpublished order of March 31, 2008); (PC2. C1. 208-11). Because Anderson's affidavit, and Ford's affidavit and testimony, are new, materially relevant and not cumulative, Booker established the first two elements of his innocence claim. He established the final element of his claim by showing that the new, non-cumulative evidence

-23-

was of such conclusive character that it would probably change the result on retrial. *See* pages 24-38, *infra.*

> 2.    *Antione Ford's testimony, alone, would probably change the result on retrial.*

At a 2015 evidentiary hearing, Antione Ford testified that Kenneth Williams shot Charles Rials on September 8, 2002, more than 20 minutes after he saw Booker leave Westmoreland's house, get in his car, and drive off. (PC4. C. 139-45; PC4. R2. V14-16). Specifically, Ford testified he was on his porch that night with his ex-fiancée Teda Brown.(PC4. PC4. R2. V12). He saw Booker arrive around 7:00 p.m. while Williams was partying with about 20 of his Gangster Disciple friends across the street from Ford's house. (PC4. R2. V12-13). Around 10:00 p.m., Booker left Westmoreland's house and drove away. (PC4. R2. V15-16). Charles Rials arrived about 20 minutes later and argued with Williams about the gang's failure to support him while in prison. (PC4. R2. V18-19). Rials threatened to cooperate with police to "take everybody down from the top to the bottom," referring to the Gangster Disciple organization. (PC4. R2. V20). Shortly thereafter Williams, a high ranking Gangster Disciple, shot Rials. (PC4. R2. V28). Because the new evidence implicates Williams as the actual shooter while completely exculpating Booker, it casts significant doubt on the reliability of Booker's conviction.

A different result is likely on retrial because a new finder-of-fact would probably believe Ford's testimony, which is substantially corroborated by other evidence. Ford stated, for instance, that he saw a woman walking on the south side of W. 38th Place while Williams, Brown, and Rials were talking in the middle of the street. (PC4. C. 143; PC4. R2. V22-27). He then saw Brown cross to the south side of the street to talk to the woman, while Williams and Rials "stepped off" toward the north side of W. 38th Place. Williams shot Rials as he started to walk away. (PC4. C. 144; PC4. R2. V27).

SA 382

At trial, Brown testified he was talking to Williams and Rials in the middle of W. 38th Place when a woman named "Ella" approached. (Tr. 250, 268-70). Brown spoke to Ella while Rials walked toward Williams, who was sitting on some steps. (Tr. 250-51). Williams testified those steps were on the north side of W. 38th Place. (Tr. 198; St. Tr. Ex. 3). Thus, Brown and Williams's trial testimony corroborate Ford's new testimony that Brown was talking to a woman on the south side of W. 38th Place immediately before the shooting, and that Williams and Rials were on the north side of W. 38th at that time. The version of events described by Ford was nearly identical to the version of events described by Brown and Williams, up until Williams's claim—not given to police at the scene—that Booker came "out of the blue" and shot Rials for no apparent reason. Williams's trial testimony suggested he would have had to have been able to see through "a big tree" with "pretty thick leaves," around a corner, and through the tinted window of an SUV to have seen the shooting he described. (Tr. 218-26; St. Tr. Ex. 10). After considering Ford's testimony and the totality of the evidence from trial, a new fact finder would probably view Williams's already dubious testimony in a new light. *See Coleman*, 2013 IL 113307 at ¶113 ("We believe that the evidence presented by the defendant at the evidentiary hearing, together with the evidence presented by the defendant at trial, places the evidence presented by the State in a new light and undermines our confidence in ... the result[.]").

A new fact finder would have an additional reason to believe Ford. His extremely detailed affidavit and testimony evidence familiarity with the shooting and the scene at Wentworth Gardens that night. Not only did Ford state that he heard Williams order his Gangster Disciple buddies to get ecstacy pills, he recalled the specific type of ecstacy Williams wanted, "omegas and blue dolphins." (PC4. C. 141; PC4. R2. V14, 83). He also recalled the conversation between Williams and Charles Rials with precision, stating Rials threatened to help police "take

-25-

everybody down." (PC4. R2. V20). He remembered that Williams swung at Rials; that other gang members broke up the fight; that a woman removed Rials from the fray; that Rials met with Darnell Brown and Williams in the middle of the street; that Brown walked to the south side of W. 38th Place to talk to a woman; that Williams and Rials walked to the north side of W. 38th Place; and that Williams shot Rials in the head before shooting him on the ground. (PC4. C. 142; PC4. R2. V20-27, 91-92); *see People v. Moffat*, 202 Ill. App. 3d 43, 54 (1st Dist. 1990) (finding State's witnesses credible where "defendant impeached" their testimony about "dates, times and other inconsistencies," but their testimony "was otherwise clear, specific, and detailed[.]").

The circuit court found that Ford's testimony was incredible. However, its finding was based primarily on Ford's criminal history, and the court's erroneous finding that he "misidentified where the shooting happened." (PC4. R3. Y7). While Ford had convictions for murder and armed robbery (PC4. R2. V46-48), the only eyewitness at trial who supposedly saw the shooter's face, Williams, was also a felon. (Tr. 178). As such, Ford's criminal history did nothing to make his testimony less credible than the identification testimony at trial. Indeed, the State routinely uses testimony of convicted felons to prove its case. *See, e.g., People v. Rodriguez,* 2012 IL App (1st) 072758-B, ¶¶42-44 (affirming the defendant's convictions, even though the only positive identification evidence was the eyewitness testimony of a convicted felon). The court completely overlooked that Ford's version of events was corroborated by Brown and Williams's trial testimony, and other evidence discussed below. *See* pages 33-38, *infra*; *see also Coleman*, 2013 IL 113307 at ¶106 (considering that the allegations of the new witnesses were remarkably consistent on certain key details[.]"). Moreover, Ford's testimony about the facts of the shooting went unimpeached and was entirely consistent with the allegations in his affidavit. He had absolutely nothing to gain by disclosing what he saw on the night of the

-26-

shooting; on the other hand, Brown and Williams both had a motive to pin the blame on Booker, *i.e.*, to avoid culpability for their own actions.

Even if this Court somehow finds that there are unresolved questions about Ford's credibility, it should remand for a new trial. In *People v. Coleman*, the Illinois Supreme Court found that a new trial was warranted, even where the new eyewitnesses were "discredited by their criminal backgrounds, intoxication, and acquaintance with the defendant." 2013 IL 113307, ¶ 113. In so finding, the Court observed that the new eyewitness testimony "all directly contradicted" the eyewitness testimony at trial "on the ultimate issue before the jury: who was involved in the attack." *Id.* The Court concluded that on remand, "[t]he fact finder will be charged with determining the credibility of the witnesses in light of the newly discovered evidence and with balancing the conflicting eyewitness accounts." *Id.* at ¶ 114. As with the new eyewitness testimony in *Coleman*, Ford's testimony "directly contradicted" the evidence at trial regarding the shooter's identity. Ford's testimony, alone, makes a new verdict probable and thus warrants a new trial. *See Id.* at ¶¶ 104-18 (remanding for a new trial based on newly discovered eyewitness testimony exculpating the defendant and implicating someone else); *Ortiz*, 235 Ill. 2d at 322-24 (same); *Molstad*, 101 Ill. 2d at 135-37 (same).

Regarding Ford's testimony about where the shooting occurred, the record contradicts the court's finding that he misidentified the location of the shooting. (PC4. R3. Y7). On direct examination, Ford testified that he saw Williams, Rials, Brown, and a woman (Ella) "[i]n the middle of the street," shortly before the shooting. After Brown and Ella walked off, Williams shot Rials "in the street." (PC4. R2. V90). On cross-examination, ASA Reilly showed Ford State's Exhibit 4; a photo of a hat, a shirt, and blood on the sidewalk. (PC4. R2. V101-02).[6] Ford testified

---

[6]The court file only contained the exhibits impounded after trial. Appellate counsel is thus trying to obtain the exhibits introduced at the evidentiary hearing from the State, including St. Ex. 4. However, based on the

the photo truly and accurately depicted the scene on the night of the shooting.
(PC4. R2. V102).

The following exchange then occurred between Ford and the prosecutor:

| | |
|---|---|
| [ASA]: | Is it fair to say, sir, that that [*sic*] blood represents where Charles Rials was shot? |
| [Ford]: | It could. |
| [ASA]: | So that would be at difference, at variance with the fact that you said he was shot in the street? |
| [Ford]: | Absolutely not. |

(PC4. R2. V103). Thus, ASA Reilly's questions implied the photo evidence contradicted Ford's testimony that the shooting "happened in the street." During closing arguments, Reilly asserted that "the shooting clearly happened on the sidewalk," which was all the circuit court needed to know to "conclude that" Ford's testimony was "a pack of lies[.]" (PC4. R3. X98-99). The circuit court apparently agreed.

There was no inconsistency. Each of the five eyewitnesses who have testified in this case—Williams, Brown, Dean, Anderson, and Ford—stated the shooter was in the street. (Tr. 191-92, 252, 262, 264-65, 302-05; St. Tr. Exs. 3, 13; PC4. R2. V90; PC2. C1. 193-94). The blood on the sidewalk in State's Exhibit 4 does not contradict Ford's testimony that the shooting occurred in the street. Rials was shot in the back of the head (Tr. 421-23), so if the shooter was on the street behind him, it could have caused Rials to fall onto the sidewalk or blood to spatter there. Indeed, Williams testified at trial that the shooter was "in the middle of the street," (Tr. 191, 225), while Rials was on the sidewalk. (Tr. 180-81).

On redirect, Ford explained he simply meant the shooting occurred in the middle of the block (*i.e.*, the middle of W. 38th Place), which is consistent with

---

parties's description of that exhibit (PC4. R2. V102; PC4. R3. X98), counsel believes it is the same photo introduced at trial as St. Ex. 14.

the evidence presented at trial. (St. Tr. Ex. 3, 13). The circuit court overlooked that Ford's testimony on redirect--that the shooting occurred in the middle of the block--was consistent with his testimony on direct exam that Williams and Rials were arguing on the north side of W. 38th Place right before the shooting, not in the middle of the street. (PC4. R2. V22-28). This "impeachment," heavily relied upon by the circuit court (PC4. R3. Y7), is negligible.

Ford's testimony warrants a new trial on its own. By identifying Kenneth Williams as the shooter, and explaining his motive to shoot Rials, Ford called into question the "factual correctness of the guilty verdict." *Coleman*, 2013 IL 113307 at ¶97. Because Ford's specific and detailed testimony was corroborated by other evidence, a new fact finder would probably accept it.

> 3. *The probability of a different verdict is bolstered where Booker could present Ellen Anderson's affidavit on retrial, and evidence of the dubious circumstances of her recantation testimony.*

The likelihood of a different verdict is further bolstered where, on retrial, Booker could substantively introduce Ellen Anderson's recanted affidavit as a prior inconsistent statement. A prior inconsistent statement of a witness may be admitted as substantive evidence if it "narrates, describes, or explains an event or condition of which the witness had personal knowledge," (*People v. McCarter*, 2011 IL App (1st) 092864, ¶41), and "the statement is proved to have been written or signed by the witness." 725 ILCS 5/115-10.1. Anderson admitted executing the affidavit, it meets the requirements for admissibility under section 5/115-10.1, and there are several reasons a fact finder would probably find it more credible than her "inherently unreliable" recantation testimony on retrial. *See People v. Steidl*, 177 Ill. 2d 239, 254 (1997) ("The recantation of testimony is regarded as inherently unreliable[.]"); *see also People v. Deloney*, 341 Ill. App. 3d 621, 632 (1st Dist. 2003) ("[R]ecantation evidence is generally regarded as unreliable.").

Critically, a new fact finder would hear evidence about the highly dubious circumstances surrounding Anderson's recantation testimony. In her affidavit, Anderson stated that, after the shooting, Gangster Disciple Darnell Brown told her to "keep [her] mouth shut if [she] didn't want to get [herself] hurt," and that she "didn't see nothing" and "don't know nothing." Brown's threat so traumatized Anderson that she never returned to Wentworth Gardens; she even moved to a different part of Chicago to avoid him. (PC2. C1. 194). At the evidentiary hearing, Anderson admitted she had run into Brown several times since 2002 at events hosted by their "mutual friends." (PC4. R2. W28). She saw Brown in 2012, *after* she had submitted her affidavit but *before* she testified at the evidentiary hearing. (PC4. R2. W27-28). Anderson's admission that she routinely encountered Brown during her normal social interactions supports an inference that she recanted her affidavit because she was terrified he would find out if she implicated Williams at the evidentiary hearing. *See, e.g., People v. Tolliver*, 347 Ill. App. 3d 203, 222 (1st Dist. 2004) (holding that evidence of threats to a witness made by Gangster Disciples after she testified before a grand jury explained why she recanted that testimony at trial); *see also People v. Thigpen*, 306 Ill. App. 3d 29, 39 (1st Dist. 1999) (recognizing that attempts to intimidate may show a motive for a witness to recant testimony).

The allegations of Anderson's recanted affidavit are substantially corroborated by her own testimony at the evidentiary hearing, Brown's trial testimony, and Ford's testimony at the evidentiary hearing. Anderson's affidavit states, for instance, that she visited a friend in Wentworth Gardens on the night of the shooting, before talking to Brown. (PC2. C1. 193). At the evidentiary hearing, Anderson admitted she went to Wentworth Gardens repeatedly in September of 2002 to visit a girlfriend, and that she knew Brown from high school. (PC4. R2.W17-19, 29). Combined with the evidence of intimidation, Anderson's allegations and testimony support a

reasonable inference she was at Wentworth Gardens on September 8, 2002, talking to Brown before the shooting.

The above inference is supported by the fact Brown placed Anderson at the scene *years before she wrote her affidavit*. As discussed on page 25, above, Brown testified at trial that he was talking to "Ella" immediately before the shooting. (Tr. 250, 68). Anderson's first name is Ellen, and she goes by the nickname "Ella." (PC4. R2. W7; PC4. R3. X80). The odds that Brown admitted talking to a *another Ella* immediately before the shooting are staggering considering Anderson admitted knowing Brown and visiting Wentworth Gardens. (PC4. R2. W18, 31). A rational fact finder could certainly conclude that Ellen Anderson was the girl Brown was with at the scene, particularly where Brown is not the only person who put Anderson there that night. At the evidentiary hearing, Ford testified he saw Brown talking to "some girl" on W. 38th Place right before the shooting (PC4. R2. V23-27, 86), which is exactly when and where Brown testified he was talking to "Ella." (Tr. 261-68; St. Tr. Exs. 3, 13).

Anderson further averred that she saw decedent Rials talking to Williams just before the shooting (PC2. C1. 194), which is, again, corroborated by Brown's trial testimony. At trial, Brown admitted he saw Williams talking to Rials immediately before the shooting. (Tr. 250-51). Ford's affidavit and testimony from the evidentiary hearing indicate he saw the same thing. (PC4. C. 143; PC4. R2. V18-24, 27). Had Anderson manufactured the allegations in her affidavit, they would not have been so thoroughly corroborated by other evidence. Where other witnesses have separately testified that Anderson was present for the shooting, that Williams was talking to Rials right before it occurred, and that Williams was the shooter, a finder-of-fact is likely to find the allegations of Anderson's affidavit more credible than her testimony recanting them.

While the State argued below that Booker "fed" Anderson the information in her affidavit (PC4. R3. X99-101), its argument is unsupported by any evidence, including Anderson's own testimony. At the evidentiary hearing, Anderson admitted she told ASA Reilly during her videotaped statement that she made up the allegations in her affidavit. (PC4. R2. W31). Anderson further admitted she told Booker's mom he was innocent *before* she visited him in prison. (PC4. R2. W14-15). Anderson also testified that she did not write her affidavit based on information Booker had mailed her. (PC4. R2. W37). While Anderson later testified that she did write her affidavit based on information sent by Booker (PC4. R2. W47), she ultimately conceded she could not even remember what that information was; she merely assumed Booker had mailed information appearing in her affidavit. (PC4. R2. W48-49). She was unable to identify any time she and Booker had talked about this case in person, by phone, or otherwise. (PC4. R2. W48-51).

Even if this Court finds that Anderson's testimony somehow established that Booker mailed her information to construct her affidavit, her testimony would be contradicted by other evidence. Specifically, Booker presented a copy of the documents he mailed Anderson from prison–general progress reports summarizing interviews with Melissa Westmoreland and Monica Ramsey. The State did not dispute Booker's argument that these reports contain none of the details appearing in Anderson's affidavit. (PC4. R2. W51-53; PC4. R3. X75, 85-103). In short, no reliable evidence was presented below establishing Booker fed Anderson the information contained in her affidavit; the details of Anderson's affidavit came from her memory of what she saw on September 8, 2002.

Further, by giving a videotaped statement recanting her affidavit, Anderson locked herself into testifying favorably for the State, regardless of whether her recantation testimony was true. Where Anderson has given two completely different versions of events under oath, it is, at the very least, possible that she recanted

-32-

her statement because she was scared of Darnell Brown, or because she felt pressured by the State, or a combination of both. That being so, if she had a crisis of conscience before the hearing, she would have been unable to adopt the allegations in her affidavit without the possibility of perjury charges. Anderson admitted at the evidentiary hearing, in fact, that she believed she would be imprisoned if she testified that the allegations in her affidavit were true. (PC4. R2. W26). While recantation testimony is "inherently unreliable," an even "stronger assumption of unreliability arises" where, as here, "the recantation involves a confession of perjury." *Steidl*, 177 Ill. 2d at 254.

Finally, while Anderson claimed she was not pressured into recanting her affidavit (PC4. R2. W22-24), her own testimony describing her decision to do so evidences coercion. At the evidentiary hearing, Anderson admitted ASA Reilly and Detective Brannigan called her so many times at work that she changed her phone number. The only reason Anderson ultimately met with Reilly and Brannigan—in Brannigan's car—is because they repeatedly showed up at her place of employment and she "got tired" avoiding them. (PC4. R2. W23). While Anderson denied any explicit threats to cooperate by Reilly or Brannigan, "[s]ubtle pressures on a person" can be "as telling as coarse and vulgar ones." *People v. Gunn*, 15 Ill. App. 3d 1050, 1055 (1st Dist. 1973); *see also People v. Robinson*, 301 Ill. App. 3d 634, 642 (2nd Dist. 1998) ("[T]he absence of overt coercions does not necessarily mean that the statement was voluntary under the circumstances."). Because Anderson had several reasons to recant her affidavit unrelated to whether she saw the shooting, and because her affidavit is substantially corroborated by other evidence, a new fact finder would probably find her 2006 allegations credible. *See, e.g., People v. McBounds*, 182 Ill. App. 3d 1002, 1014 (1st Dist. 1989) (where the trial court found witnesses's prior inconsistent statements more trustworthy than their trial testimony). Combined with Ford's new testimony, Anderson's

-33-

affidavit increases the likelihood of an acquittal on retrial, particularly in light of the extremely weak identification evidence presented at trial. *See Coleman*, 2013 IL 113307 at ¶¶104-13 (remanding for a new trial where the new evidence cast doubt on the evidence presented at trial).

4.    *Antione Ford's affidavit and testimony and Ellen Anderson's affidavit cast doubt on the evidence at trial.*

The evidence at trial was full of holes, making the probability of a different verdict quite strong. Booker never implicated himself in the shooting; the State did not establish that he had a motive to kill Rials, or that they even knew each other. Booker was not connected to the gun or the crime scene by forensic evidence. The only evidence against Booker was the eyewitness testimony of Kenneth Williams, Darnell Brown, and Louis Dean, which in light of Anderson's affidavit, this Court previously found to be "weak evidence of [Booker's] guilt." *Booker*, No. 1-06-2581 at 6; (PC2. C1. 210). While this Court identified several deficiencies in the identification testimony, such as that Brown did not see the shooter's face and that Dean did not see the shooting (*Booker*, No. 1-06-2581 at 5-6; PC2. C1. 209-10), there were additional problems this Court did not specifically address.

For example, Williams, Brown, and Dean were each present for the shooting (Tr. 179-81, 249-53, 301-306), but none of them talked to police that night. (Tr. 226-27, 285-97, 316); *see People v. Hughes*, 17 Ill. App. 3d 404, 410 (1st Dist. 1974) (finding that the occurrence witness's delay in speaking to police diminished her credibility). Moreover, Detective Evans testified at trial that Williams only went to police after Rials's brother "brought [him] to [their] attention." (Tr. 366, 383-84; PC2. C2. 321). In other words, Williams did not implicate Booker until he became a suspect himself. *See, e.g., People v. Tabb*, 374 Ill. App. 3d 680, 701 (1st Dist. 2007) (finding that a witness's "credibility was at issue because he was also a suspect[.]"). Furthermore, Brown admitted that he only went to police after Williams told him to. (Tr. 258, 287-88; PC2. C2. 321). Brown's already tenuous identification

testimony can hardly be considered independent or reliable where he said nothing to police about his friend's murder for days, and only implicated Booker after Senior Regent Williams ordered him to the station when Williams would have benefitted from someone corroborating his story to police. *See People v. Green*, 118 Ill. App. 3d 227, 233 (1st Dist. 1983) (finding that a witness's testimony may be discredited where the witness "fails to state a particular fact under circumstances rendering it natural or probable that he would state such a fact").

Further, the eyewitness testimony at trial was inconsistent. Williams testified, for instance, that the shooter was wearing a white t-shirt (Tr. 196), but Brown and Dean testified he was wearing all black. (Tr. 293, 304B). Brown testified Williams talked to Rials immediately before the shooting, but Williams denied talking to Rials at all that night. (Tr. 250, 181); *see also People v. Gardner*, 35 Ill. 2d 564, 571 (1996) (finding a witness's identification of the defendant unreliable, in part, because she initially stated the offender was wearing a blue shirt, but then testified at trial that he was wearing a white shirt). Additionally, Dean was impeached with his grand jury testimony and his written statement indicating he did not see the shooting and did not know where the shots came from. (Tr. 323-24, 325A-326). Dean's impeachment further undermines the reliability of the eyewitness identification testimony. *See Rodridguez*, 312 Ill. App. 3d at 933 (holding that "multiple impeachments" undermined the reliability of the identification testimony).

Finally, as this Court previously recognized, the probability of a different verdict is "bolstered by the fact" the initial "jury had difficulty in reaching its verdict." *Booker*, No. 1-06-2581 at 6; (PC2. C1. 210). Even though all three of the State's eyewitnesses identified Booker in-court as the shooter (Tr. 182, 253, 304B), "the jury deliberated for eight hours, twice indicated that they were deadlocked, requested transcripts of Williams and Brown's testimony, and received a *Prim* instruction before convicting [.]" *Id.*; (PC2. C1. 210). In light of the "weak evidence"

-35-

of Booker's guilt at trial (*Booker*, No. 1-06-2581 at 6), the bar for establishing the probability of a different verdict on retrial was not particularly high, and the new evidence of innocence convincingly cleared that hurdle. Because the new evidence made Booker's case "much stronger," it "would probably change the result upon retrial." *Booker*, No. 1-06-2581 at 6; (PC2. C1. 210).

5.    *Additional evidence improperly excluded from the evidentiary hearing would further support a different result on retrial.*

In determining whether the circuit court's ruling was "against the manifest weight of the evidence," this Court "may consider improperly excluded evidence." *See In re Marriage of Gordon*, 233 Ill. App. 3d 617, 651 (1st Dist. 1992) (finding the appellate court may consider improperly excluded evidence in determining manifest weight of evidence). Here, the post-conviction record contains compelling evidence improperly excluded from the evidentiary hearing that further corroborates the new evidence of innocence presented below. For example, the circuit court precluded Booker from introducing Melissa Westmoreland's seven-page handwritten statement of September 11, 2002 (PC4. R3. X7-8, 62), even though it was admissible as evidence corroborating Ford's testimony and Anderson's affidavit.

In April of 2013, more than two years before the hearing below, the legislature amended Rule 1101 of the Illinois Rules of Evidence to include "postconviction hearings" on the list of proceedings to which the rules of evidence do not apply. *People v. Jones*, 2016 IL App (1st) 123371, fn. 12; *see also* Ill. R. Evid. 1101(b)(3) ("These rules ... do not apply in ... postconviction hearings[.]"); 725 ILCS 5/122-6 ("The court may receive proof by affidavits, depositions, oral testimony, or other evidence."). Thus, "admissibility is not the standard in postconviction proceedings ... not even ... at the later third-stage postconviction hearing." *Jones*, 2016 IL App (1st) 123371 at ¶92. "The question is whether the documentation that the defendant does present could lead" to "admissible evidence at a future retrial." *Id.*

SA 394

In this case, Westmoreland's handwritten statement further bolsters Booker's innocence claim because, like Ford's testimony and Anderson's recanted affidavit, it exculpates Booker while implicating Williams. Westmoreland's statement indicates Booker left her house about 30 minutes before the shooting (PC4. C. 131), thus corroborating Ford's affidavit and testimony. (PC4. C. 141-43; PC4. R2. V18-19). Because Westmoreland gave her statement to an ASA and a detective, it should have been presumed reliable. *See People v. Anderson,* 291 Ill. App. 3d 843, 850 (1st Dist. 1997) (finding a "telling mark of trustworthiness" where a statement was made to a police officer). While Booker did not present Westmoreland as a witness below, he may be able to present her on retrial with counsel's help, if the State chooses to move forward with its significantly weakened case.

Westmoreland's statement also contains a hearsay statement from Ford's ex-fiancée, Teda Brown, indicating Williams argued with a man named W.K. that night, not Booker, contradicting Williams's trial testimony. (PC4. C. 126-34). While the Illinois Supreme Court has held that hearsay affidavits "[g]enerally ... cannot be used to support postconviction claims" (*People v. Morales,* 339 Ill. App. 3d 554, 565 (1st Dist. 2003)), it has explained that rule should not be applied "inflexibly." *People v. Sanchez*, 115 Ill. 2d 238, 284 (1986). This Court should consider Teda's statement, if not for the truth of the matter asserted, as further evidence regarding the possibility of even more exculpatory evidence on retrial.

Further, the circuit court erroneously precluded Booker from filing amended and supplemental pleadings at the second-stage of post-conviction proceedings. (PC2. R. A2). At the second-stage, counsel, in this case Booker, should have "an opportunity to amend the defendant's *pro se* postconviction petition." *People v. Harper*, 2013 IL App (1st) 102181, ¶33; 725 ILCS 5/122-5. Here, Booker attached a police report to his stricken pleadings indicating Monica Ramsey told police on the night of the shooting that Rials was "with" the shooter immediately before

-37-

the shooting. (PC4. C. 122). Ramsey's statement corroborates Ford's affidavit and testimony, and Anderson's recanted affidavit, each indicating Williams–*and only Williams*–was talking to Rials right before the shooting. (Tr. 250-51; PC4. C. 143; PC4. R2. V18-24; PC2. C1. 194). Ramsey's statement also contradicts Williams's testimony that the shooter approached "out of the blue." (Tr. 228). Booker additionally attached police reports showing that at least one "unnamed witness" told police that night the shooter left in a black 2002 Chevrolet Monte Carlo (PC2. C1. 104; PC4. C. 122), not the blue Pontiac Grand Prix Williams and Brown saw Booker driving earlier. (Tr. 184, 255).[7]

Finally, if this Court orders DNA testing of cartridge casings found at the scene pursuant to Argument II of this brief, Booker may be able to present DNA evidence on retrial showing Williams, or a third party, loaded the gun used to shoot Rials, which would surely lead to a different verdict. *See* pages 41-50, *infra*.

### B.     The Circuit Court Applied The Wrong Standard In Determining Whether A New Trial Was Warranted.

In denying Booker's actual innocence claim, the circuit court concluded that it did not think "there *would be* a different result during the course of a trial." (PC4. R. Y8) (emphasis added). The court's comment reflects an erroneous belief that Booker was required to prove, with certainty, that there would be a different result on retrial. However, to obtain a new trial based on newly discovered evidence, a post-conviction petitioner must only prove the new evidence "would *probably*" change the result on retrial. *People v. Ortiz*, 235 Ill. 2d 319, 336 (2009); *People v. Molstad*, 101 Ill. 2d 128, 134 (1984); *People v. Coleman*, 2013 IL 113307, ¶84.

---

[7]According to Brown, Williams, Ford, and Booker himself, his Grand Prix had four doors. (Tr. 184, 255; PC4. R2. V12, 80, PC4. R3. X15). However, "[t]he Chevrolet Monte Carlo is a two-door coupe[.]" https://en.wikipedia.org/wiki/Cheverolet_Monte_Carlo.

At the third-stage of post-conviction proceedings, "the new evidence need not prove actual innocence." *People v. Washington*, 171 Ill. 2d 475, 486-90 (1996). "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do[.]" *Coleman*, 2013 IL 113307 at ¶97; *see also People v. Davis*, 2012 IL App (4th) 110305, ¶¶62-64 ("New evidence need not be completely dispositive of an issue to be likely to change the result upon retrial."). To prove a sufficient probability of a different result, the petitioner must establish that "all of the facts and surrounding circumstances, including the testimony of [defendant's witnesses], should be scrutinized more closely to determine" his culpability. *Ortiz*, 235 Ill. 2d at 337 (quoting *Molstad*, 101 Ill. 2d at 136). By considering whether there "would" be a different result on retrial, the circuit court applied an overly burdensome legal standard inconsistent with the standard set forth in *Ortiz*, *Coleman*, *Molstad*, and *Davis*.

Further, in determining whether new evidence of innocence warrants a new trial, a circuit court should "consider[ ] all the evidence, both new and old, *together*." *Coleman*, 2013 IL 113307 at ¶97 (emphasis added). Here, the circuit court mentioned Booker had been convicted after a trial, and summarized the new evidence and post-conviction proceedings, but never discussed the relationship between the new evidence and the trial evidence. The court never mentioned, for example, that Ford's affidavit and testimony, and Anderson's recanted affidavit, completely contradict the identification evidence at trial. The court failed to discuss the evidence presented at trial at all, and never considered whether it might have corroborated Ford's testimony or Anderson's affidavit. (PC4. R3. Y2-9). In concluding it was "unfortunate" this Court remanded Booker's case based on Anderson's recanted affidavit (PC4. R3. Y8), the court demonstrated overreliance on Anderson's "inherently unreliable" recantation testimony and an inability to see the big picture.

As discussed in sub-sections (a)(2-5) of this argument, above, the new evidence in this case casts serious doubt on the reliability of Booker's conviction and significantly advances his claim of innocence. *See* pages 24-38, *supra*. Two new eyewitnesses have come forward to contradict the eyewitness testimony presented at trial. While Ellen Anderson recanted her exculpatory allegations under pressure by Gangster Disciples and the State, the statements in her affidavit are corroborated by other evidence. *See* pages 30-31 and 36-37, *supra*. The jury should have the opportunity, therefore, to weigh the credibility of Anderson's affidavit against her recantation testimony in light of the evidence presented at trial. *See Coleman*, 2013 IL 113307 at ¶114 (finding new witness credibility would be judged on retrial).

The circuit court's application of a higher standard than was required by law contributed to its manifestly erroneous decision not to grant a new trial. Manifest error may occur where a court's conclusion is frustrated by the adoption of an erroneous standard. *Ortiz*, 235 Ill. 2d at 333-35. This Court should apply the correct standard and remand for a new trial. *See, e.g., People v. Dominguez*, 366 Ill. App. 3d 468, 473 (2nd Dist. 2006) (finding, where the circuit court applied the wrong standard for summary dismissal, the reviewing court should "apply the proper standard" and determine *de novo* whether petitioner satisfied it).

## Conclusion

The evidence of guilt at Booker's initial trial was extremely weak, consisting only of eyewitness identification testimony that is being directly called into question by new evidence implicating the only actual eyewitness at trial, Kenneth Williams. Antione Ford, who was too scared of Williams to come forward earlier, testified he saw Williams shoot Charles Rials over an internal gang dispute after Booker left Wentworth Gardens. Although Ellen Anderson recanted her affidavit indicating she saw the same thing, the record contains a plethora of evidence establishing that, on retrial, a fact finder could find her recanted affidavit reliable and more

-40-

credible than her recantation testimony. Anderson was terrified of testifying against
Williams, had motives to cooperate with the State, and her recanted allegations
are independently corroborated by Ford's new testimony, documents attached
to Booker's post-conviction pleadings, and Brown's trial testimony. Because the
new evidence unquestionably "places the evidence presented at trial in a different
light and undercuts ... confidence in the factual correctness of the guilty verdict,"
(*Coleman*, 2013 IL 113307 at ¶97), this Court should reverse the third-stage denial
of Booker's innocence claim and remand for a new trial.

II.     **The Circuit Court Erred In Denying Joseph Booker's Motion
        For DNA Testing Under 725 ILCS 5/116-3 Because Identity
        Was The Central Issue At Booker's Trial, The Evidence To Be
        Tested Has Been Subject To A Sufficiently Secure Chain Of
        Custody, And The Requested Testing Has The Potential To
        Produce Noncumulative Evidence Materially Relevant To
        Booker's Actual Innocence Claim.**

On December 10, 2012, Joseph Booker filed a second *pro se* motion for forensic
testing pursuant to 725 ILCS 5/116-3, requesting DNA testing of fingerprint
impressions left on five spent cartridge casings found at the scene. (PC3. C. 25-33).
After a hearing on whether the State contaminated the DNA evidence while
performing ballistic and fingerprint tests prior to trial, the circuit court denied
Booker's motion, finding the requested tests would be "too fruitless" because "of
the way that evidence was handled." (PC3. R. I29). The evidence elicited below
showed, however, that testing could yield materially relevant results, and that
the circuit court's finding that the DNA samples were contaminated was purely
speculative. This Court should, therefore, reverse the denial of Booker's motion,
and order performance of the requested DNA testing.

Section 116-3 of the Illinois Code of Criminal Procedure allows a criminal
defendant to file a motion with the circuit court requesting DNA testing "on evidence
that was secured in relation to the trial which resulted in his or her conviction,"

but which was not subject to testing prior to trial. 725 ILCS 5/116-3 (a); *People v. Gecht*, 386 Ill. App. 3d 578, 581 (1st Dist. 2008). To warrant testing, the petitioner must show that identity was an issue at trial, that the evidence subject to testing was subject to a sufficient chain of custody, and that the evidence is new, non-cumulative, and "materially relevant" to his actual innocence claim. 725 ILCS 5/116-3 (b) (1), (2); *People v. Johnson*, 205 Ill. 2d 381, 393 (2002). Then, if the testing method is generally accepted in the scientific community, the circuit court *shall* allow it. 725 ILCS 5/116-3(c) (1-2); *Johnson*, 205 Ill. 2d at 393. Because Booker met each of these statutory elements, he is entitled to the DNA testing he requested.

A circuit court's ruling on a motion brought pursuant to section 116-3 of the Code of Criminal Procedure is reviewed *de novo. People v. Moore,* 377 Ill. App. 3d 294, 298 (1st Dist. 2007); *People v. O'Connell*, 227 Ill. 2d 31, 35 (2007).

Three of the elements set forth in section 116-3 are uncontroversial in this case and can be easily addressed: first, the recovered casings were not subject to DNA testing at the time of trial. This is evident both from the State's answer to discovery and from the evidence it presented at trial, which did not include any mention of DNA testing. (Tc. 19-23; Tr. 12-454). Second, many types of DNA testing–including Polymerase Chain Reaction ("PCR") testing, mentioned in Booker's motion (PC3. C. 31)–are now generally accepted in the relevant scientific community. *See, e.g., People v. Rozo*, 303 Ill. App. 3d 787, 793 (2nd Dist. 1999) ("DNA evidence has long been held accepted within the relevant scientific fields involved and [is] admissible at trial."); *see also People v. Pope*, 284 Ill. App. 3d 695, 703 (4th Dist. 1996) ("PCR-based methods of DQ–Alpha typing and polymarker typing for DNA identification are now generally accepted in the relevant scientific communities involved, and trial courts need not conduct future [admissibility] hearings on this issue."). Additionally, the State implicitly conceded both of these points in the proceedings below by not arguing that the requested testing was previously

-42-

conducted or that it was not generally accepted in the scientific community.

Booker established the third element of section 116-3 where his trial clearly revolved around the question of identity. As this Court has previously recognized, three eyewitnesses testified against Booker at trial, but only one of them–Kenneth Williams–testified he actually saw Booker shoot Rials. *People v. Booker*, No. 1-06-2581, 5-6 (unpublished order of May 31, 2008); (PC2. Cl. 209-10). Both of the other eyewitnesses, Darnell Brown and Louis Dean, admitted they did not see the shooter's face, and Dean failed to positively identify Booker as the shooter. *Id.* The weak identification evidence was the only evidence implicating Booker, and the State never disputed that identity was the main issue at trial during the post-conviction proceedings. Because the identity of the shooter was the central issue at trial, Booker satisfied that element of section 116-3.

A.    **The requested testing has the potential to produce noncumulative evidence materially relevant to Booker's actual innocence claim.**

Both the legislature and the Illinois Supreme Court have specifically stated that the results of testing requested under section 116-3 need not have the potential to completely exonerate a defendant, but rather must be "materially relevant" to a claim of actual innocence. 725 ILCS 5/1163(c)(1); *Johnson*, 205 Ill. 2d at 395. Evidence is "materially relevant" to such a claim if it "tend[s] to 'significantly advance'" the claim (*Id.* at 395), by, for instance, "present[ing] a state of facts which differs from that to which the witness testified [at trial]." *People v. Waters*, 328 Ill. App. 3d 117, 128 (1st Dist. 2002). Booker met that standard here.

DNA testing of the recovered cartridge casings could have been materially relevant in either of two ways. First, the discovery of Kenneth Williams's DNA on those casings would have established that he loaded the gun used to shoot Charles Rials. Second, the absence of Booker's DNA on the casings would have established he did not load the gun. Either of those results would have corroborated Antione

-43-

Ford's affidavit and evidentiary-hearing testimony, and Ellen Anderson's affidavit, alleging Williams was the actual shooter. (PC2. C1. 193-95; PC4. C. 139-44; PC4. R2. V28). Moreover, those results would have contradicted the eyewitness identification evidence at trial indicating Booker was the shooter. (Tr. 182, 253, 304B). As discussed on page 43, above, the eyewitness testimony was the only evidence against Booker at trial. The requested tests thus had the potential to significantly advance Booker's innocence claim.

Furthermore, a test result linking the cartridge casing to Williams, or excluding Booker as the person who loaded the gun, would not be cumulative. Cumulative evidence, by definition, "adds nothing to what is already before the jury." *People v. Molstad*, 101 Ill. 2d 128, 135 (1984). At trial, there was no forensic evidence linking Williams to the casings, or distancing Booker from them. DNA evidence supporting Booker's theory that Williams was the real shooter would have contributed immeasurably to the strength of his case.

While it is possible that the person who loaded the gun was not the shooter, test results identifying the DNA of someone other than Booker on the casings would still support his claim that he did not commit the shooting, and that someone else did. *People v. Hockenberry*, 316 Ill. App. 3d 752, 757 (2nd Dist. 2000), is instructive on this point. In *Hockenberry*, the defendant sought DNA testing of the victim's vaginal swabs as well as stains on her panties and bed sheets. *Hockenberry*, 316 Ill. App. 3d at 754, 756. The victim testified that she had sexual intercourse with another man prior to the alleged offense, so the State argued that "even if the DNA testing established that the seminal material did not match the defendant, it could not establish the defendant's actual innocence." *Id*. at 757-58.

The appellate court recognized the possibility the defendant may have committed the crime even if DNA testing revealed another donor, but acknowledged that such evidence would still "corroborate the defendant's assertion that he did

-44-

not commit an act of sexual assault upon the victim" and be "materially relevant" to his claim of innocence. *Hockenberry*, 316 Ill. App. 3d at 757-59; *see also People v. Rokita*, 316 Ill. App. 3d 292 (5th Dist. 2000) (rejecting the State's argument that because the offender did not ejaculate the results of any DNA test would not have been conclusive); *People v. Shum*, 207 Ill. 2d 47, 63-67 (2003) (reversing the trial court's denial of the defendant's request for DNA testing where results favorable to the defendant could have significantly advanced his claim of actual innocence, notwithstanding the fact that the sexual assault victim knew the defendant and immediately identified him as her attacker); *People v. Henderson*, 343 Ill. App. 3d 1108, 1112, 1116-20 (1st Dist. 2003) (holding that the defendant was entitled to DNA testing of bloodstained pants found in his bedroom, where the State's evidence indicated that the blood was the victim's, despite "overwhelming" evidence of the defendant's guilt, including the victim's identification). As in *Hockenberry*, *Rokita*, *Shum*, and *Henderson*, the results of DNA testing on the casings in this case could significantly advance Booker's claim of actual innocence, even if they could not completely exonerate him. Booker satisfied section 116-3's requirements that the requested testing have the "scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence." 725 ILCS 5/116-3(c)(1).

**B.     The recovered casings have been subject to a sufficiently secure chain of custody.**

Booker also satisfied section 116-3's chain of custody requirement. Forensic investigator Kathleen Gahagan testified at trial that she recovered five spent casings at the scene. (Tr. 331-33). She then inventoried the casings under Inventory No. 10026848. (Tr. 334-35). Forensic scientist Caryn Tucker testified she received five casings in a sealed evidence bag under Inventory No. 10026848. (Tr. 444-47). Tucker identified State's Exhibit 29 as the evidence bag containing the casings. (Tr. 445). Because the casings sought to be tested were introduced at trial, Booker

made a *prima facie* showing they had not been "substituted, tampered with, replaced, or altered in any material aspect." 725 ILCS 5/116-3(b)(2); *see also People v. Bailey*, 386 Ill. App. 3d 68, 74-75 (1st Dist. 2008) (finding the defendant made a *prima facie* showing of a proper chain of custody by alleging the evidence was admitted at trial); *Johnson*, 205 Ill. 2d at 394 ("Though the State contends that the defendant has presented no evidence of the kit's location since his 1984 trial, such evidence would not be available to the defendant. The ... kit, as a piece of real evidence admitted at trial, would have remained in the custody of the circuit court clerk after the defendant's conviction."). Finally, in its motion to dismiss part of Booker's first motion for forensic testing, the State agreed to conduct ballistics tests on the same casings Booker later sought to test for DNA. (PC2. C2. 423-26). Because the State did not challenge the chain of custody for the casings at that time, it implicitly conceded they were subject to a proper chain of custody.

As in *Bailey* and *Johnson*, Booker's allegations satisfy the chain of custody requirement of section 116-3 because he cannot reasonably be expected to know the exact whereabouts of evidence in the State's possession. *See People v. Travis*, 329 Ill. App. 3d 280, 285 (4th Dist. 2002) ("It asks too much to require [the] petitioning defendant in these cases to plead and prove proper chain of custody at the outset, for the evidence at issue will undoubtedly have been within the safekeeping of the State, not the defendant."); *see also Henderson*, 343 Ill. App. 3d at 1116 (holding the defendant established a sufficient chain of custody where the record indicated the evidence in question was impounded by the trial court). There is simply no reason to think that the evidence here–which was properly inventoried by investigators and impounded by the trial court–has been lost or misplaced by the State, and every reason to believe that it could and would have been produced if the circuit court had ordered it to be tested. Consequently, Booker has established a sufficient chain of custody.

**C.    The State failed to rebut a *prima facie* showing of a sufficient chain of custody.**

In denying Booker's DNA request, the circuit court found:

> It appears very clear to this court that to order DNA analysis of the cartridge casings at this point would be too fruitless because of the way that the evidence was handled ... So I'm going to specifically say, and this court ruled, that DNA testing would not yield probative results in this case.

(PC3. R. I29). Put differently, the court found the requested testing would be "fruitless" because the State had contaminated the DNA evidence. (PC3. R. I29). In reaching its conclusion, the court blindly accepted the highly speculative hearsay testimony of Illinois State Police ("ISP") latent fingerprint examiner Christy Fischer and ISP ballistic examiner Caryn Tucker. Contrary to the court's conclusion, Fischer and Tucker's testimony failed to establish that DNA samples on the casings were so contaminated that no viable results could be obtained.

Initially, Fischer testified she wore protective gloves while testing the cartridges for fingerprints in 2002. (PC3. R. I5). While she did not wear a protective mask over her mouth (PC3. R. I5-6), there was no evidence indicating that the absence of a mask could have contaminated DNA samples on the cartridges. Fischer's testimony thus failed to establish any possibility of contamination.

Tucker testified that she handled the cartridges without gloves and protective face wear while conducting ballistics tests in 2002. (PC3. R. I6-7). She also touched the "outside" of "packaging" containing the casings about a year before the evidentiary hearing. (PC3. R. I8). There was no evidence indicating, however, that failing to wear protective face wear, or touching the outside of packaging, could contaminate DNA samples. While Tucker said she handled the cartridges without gloves (PC3. R. I6), and DNA expert Gregory Didomenic testified that the use of gloves would have helped prevent contamination (PC3. R. I11), Tucker did not describe how she handled each of the five casings, and it is unlikely she handled each in exactly the same manner, for the same amount of time. Further,

-47-

Didomenic never testified about what degree of touching would have been required to contaminate a DNA sample.

The remainder of Tucker's testimony was hearsay, failed to establish contamination with any certainty, and should have had no evidentiary value. *See People v. Caffey,* 205 Ill. 2d 52, 88 (2001) ("Hearsay evidence ... is generally inadmissible due to its lack of reliability[.]"). According to Tucker, two other technicians in the firearm and toolmark unit handled the casings without gloves, as did an examiner at an ISP lab in Carbondale. (PC3. R. I7). However, Tucker failed to identify those people so that Booker could question them. *See United States v. Washington,* 498 F. 3d 225, 230 (4th Cir. 2007) (recognizing that statements from "out-of-court technicians" would violate the confrontation clause). Tucker was not qualified as an expert in ISP testing procedures, and never testified she was present when any of those unidentified people handled or tested the casings. *See People v. McCarter,* 385 Ill. App. 3d 919, 934 (1st Dist. 2008) ("[T]he testimony of a lay witness must be confined to statements of fact of which the witness has personal knowledge."). While Tucker stated that the two unidentified firearm and toolmark examiners conducted IBIS imaging and cartridge identification (PC3. R. I7), there was no evidence about what IBIS imaging or cartridge identification entails. She never identified any of the supposed tests performed in Carbondale.

"[I]t is likely that the sole purpose of each technician [was] simply to perform his or her task in accordance with accepted procedures." *People v. Leach,* 2012 IL 111534, ¶119. However, there was no reliable evidence of what procedures the ISP have in place for examiners conducting ballistics tests, IBIS imaging, cartridge identification, or any other kind of forensic test. While Tucker testified that "normal procedure" would "*not typically*" have required the unidentified examiners to wear protective gloves (PC3. R. I7), there was no evidence about Tucker's familiarity with ISP protocols, or what was the basis of her testimony

-48-

about "normal procedure." Tucker's testimony failed to create any certainty that anyone other than her handled the casings without gloves. Without any evidence of the extent to which Tucker handled each item, or the extent to which she would have had to handle each item to contaminate a DNA sample, the circuit court's conclusion that testing the casings would necessarily yield unreliable results was nothing more than a guess.

Finally, Didomenic testified that it is possible to extract DNA from fingerprints left on cartridge casings. (PC3. R. I10); *see also* Shawn Montpetit and Patrick O'Donnell, *"An Optimized Procedure for obtaining DNA from Fired and Unfired Ammunition,"* Forensic Science International: Genetics (March 12, 2015) ("DNA profiles were successfully obtained from both cartridges and casings in this study.").[8] He further testified that the ISP *does not* have a policy to reject requests for DNA testing because the evidence was previously subject to fingerprint and ballistic testing. (PC3. R. I9). While Didomenic concluded that he would expect contamination based on Tucker and Fischer's testimony, their testimony failed to establish contamination with any certainty. *See* pages 47-49, *supra*. Further, Didomenic never testified that the presence of additional DNA samples would destroy DNA left from the night of the shooting.

If the only effect of contamination is the presence of additional fingerprints from ISP lab examiners, they could easily be excluded as suspects. State crime labs have all employee DNA on file. While it is theoretically possible the casings were contaminated with the DNA of a person unrelated to the commission of the crime, it is also possible a third person, such as Williams, could be identified who committed the crime. It was overly speculative to conclude, without any testing, that the casings must have been so contaminated they will yield only unreliable results. Because testing could yield materially relevant results that significantly

---

[8]available at: http://dx.doi.org/10.1016/j.fsigen.2015.03.012

-49-

advance Booker's innocence claim, the court erred in denying his DNA motion.

### D.    Conclusion

Booker's motion for DNA testing met all of section 116-3's statutory requirements and should have been granted. First, the requested testing was not performed at the time of trial and is commonly accepted in the scientific community. Second, identity was at issue in Booker's trial, and the State failed to rebut a *prima facie* showing that the evidence in question has been subject to a sufficiently secure chain of custody. Finally, the requested testing has the potential to produce new, noncumulative evidence materially relevant to Booker's actual innocence claim. This Court should, therefore, reverse the denial of Booker's 116-3 motion and remand with instructions for the circuit court to order the requested DNA testing.

### CONCLUSION

For the foregoing reasons, Joseph Booker, Petitioner-Appellant, respectfully requests that this Court reverse the third-stage denial of post-conviction relief and remand his case for a new trial (*see* Argument I, *supra*), and reverse the denial of his second motion for forensic testing and order the requested DNA tests. *See* Argument II, *supra*.

Respectfully submitted,

PATRICIA MYSZA
Deputy Defender

BRYON M. REINA
Assistant Appellate Defender
Office of the State Appellate Defender
First Judicial District
203 N. LaSalle, 24th Floor
Chicago, IL 60601
(312) 814-5472
1stdistrict.eserve@osad.state.il.us

COUNSEL FOR DEFENDANT-APPELLANT

SA 408

## CERTIFICATE OF COMPLIANCE

I, Bryon M. Reina, certify that this brief conforms to the requirements of Rules 341(a) and (b). The length of this brief, excluding the pages containing the Rule 341(d) cover, the Rule 341(h)(1) statement of points and authorities, the Rule 341(c) certificate of compliance, the certificate of service, and those matters to be appended to the brief under Rule 342(a), is 50 pages.

BRYON M. REINA
Assistant Appellate Defender

## APPENDIX TO THE BRIEF
### Appeal No. 13-0177

Index to the Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

*Pro Se* Motion to Reconsider 116-3 - Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4

## APPENDIX TO THE BRIEF
### Appeal No. 13-2279

Index to the Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-5

DNA Testing - Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-6

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-7

## APPENDIX TO THE BRIEF
### Appeal No. 15-2995

Index to the Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-8

*Pro Se* Defendant's Post-Conviction Petition - Denied . . . . . . . . . . . . . . . . . . . . . A-12

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-13

Index to the Direct Appeal (Appeal No. 03-3553) . . . . . . . . . . . . . . . . . . . . . . . . . A-14

Index to the Record (Appeal No. 06-2581) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-17

# INDEX TO THE RECORD
**Appeal No. 13-0177**

<u>**Common Law Record ("C")**</u>                                                                                      <u>**Page**</u>

**Vol. 1 of 2**

*Pro Se* Motion to Proceed Informa Pauperis (January 27, 2010) . . . . . . . . . . . . . . . . 2

Petition for Writ of Habeas Corpus Ad Testificandum (January 27, 2010) . . . . . . . 4

Amended Petition for Post-Conviction Relief (January 27, 2010) . . . . . . . . . . . . . . 6

Leave to File Petition of Mandamus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

Amended Petition for Writ of Habeas Corpus . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

**Vol. 2 of 2**

Amended Petition for Writ of Habeas Corpus Continued . . . . . . . . . . . . . . . . . . . . 241

State's Motion to Dismiss (October 18, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307

*Pro Se* Response to State's Motion to Dismiss (December 20, 2011) . . . . . . . . . . . 342

*Pro Se* Motion for Forensic Testing (February 7, 2012) . . . . . . . . . . . . . . . . . . . . . 391

State's Motion to Dismiss in Part Petitioner's Motion for DNA Testing
(April 2, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 423

State's Motion to Dismiss in Part Petitioner's Motion for DNA Testing
(April 26, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 427

Court's Order to Establish IBIS Testing Protocol and to Release Evidence for
Forensic Testing (May 9, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 449

*Pro Se* Motion to Reconsider Section 116-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 451

*Pro Se* Motion for Substitution of Judge - Denied (December 1, 2012) . . . . . . . . . 461

*Pro Se* Motion for Forensic Testing  (December 10, 2012) . . . . . . . . . . . . . . . . . . . 474

Notice of Appeal (December 17, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 484

Motion for Appointment of Counsel (December 17, 2012) . . . . . . . . . . . . . . . . . . . 485

Circuit Court Appoints Office of the State Appellate Defender to Represent
Defendant on Appeal (December 21, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 491

A-1

## Report of Proceedings ("R")

|  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|
| December 9, 2011 | | | | |
| *Pro Se* Motion for Permission to File a Late Interlocutory Appeal - Denied | | | | A2 |
| December 20, 2011 | | | | |
| *Pro Se* Response to State's Motion to Dismiss Filed | | | | B2 |
| February 7, 2012 | | | | |
| State's Filed Response to Defendant's Motion | | | | C2 |
| Defendant's Files a 116-3 Motion | | | | C6 |
| March 9, 2012 | | | | |
| 116-3 Motion | | | | |
| Arguments | | | | |
| Defendant | | | | F3 |
| Mr. Reilly - State | | | | F6 |
| Court's Ruling | | | | F6 |
| July 18, 2012 | | | | |
| Motion to Reconsider 116-3 Filed | | | | |
| December 10, 2012 | | | | |
| Motion to Reconsider 116-3 - Denied | | | | L2 |

A-2

```
 1          THE CLERK:   Joseph Booker, IDOC.

 2          THE COURT:   The case of Mr. Joseph Booker.  Good

 3     morning.

 4          THE DEFENDANT:  Good morning.

 5          THE COURT:  Mr. Booker is here.  He's in IDOC

 6     custody.

 7              Mr. Ertler, can you identify yourself?

 8          MR. ERTLER:  Mark Ertler, E-r-t-l-e-r, on behalf of

 9     the People.

10          MR. REILLY:  Terry Reilly, R-e-i-l-l-y, also on

11     behalf of the State of Illinois.

12          THE COURT:  I believe at least the first order of

13     business here is the Court's decision on the Defendant's

14     motion to reconsider my decision regarding his many 116-3

15     issue or motion.

16              The Court has considered this actually and I've

17     delayed -- not delayed, but I was unable to consider the

18     Defendant's motion for reconsideration just because of

19     scheduling issues in the past, but I have looked at it.

20              Mr. Booker, respectively, I'm going to deny

21     your motion for reconsideration of my decision on the

22     116-3 motion.  So that's the Court's order at this time.

23          THE DEFENDANT:  I have another motion I need to

24     file, Judge.
```

A-3

IN THE
CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, )<br>Respondent, )<br> )<br> )<br> )<br>v. )<br> )<br> )<br>JOSEPH BOOKER, )<br>Petitioner. ) | Case No.: 02 CR 25224<br><br>Honorable<br>Arthur Hill Jr.,<br>Presiding Judge. |

### NOTICE OF APPEAL

An appeal is taken from the order or judgment described

below.

1) Court to which appeal is taken: Appellate Court of
   Illinois, First Judicial District;

2) Name of Appellant and Address to which notices shall
   be sent:

   Name: Joseph Booker B75795

   Address: P.O. Box 112, Joliet, Il 60434

3) Date of Judgment of Order: December 10, 2012 ✓

4) Offense of which convicted: First degree murder;

5) Sentence: 55 years;

6) If appeal is not from a conviction, nature order appeal
   from:  From Circuit Court's denial of 116-3 motion to
   reconsider.

Joseph Booker
Petitioner, Pro se
Joseph Booker
B75795
P.O. Box 112
Joliet, Il 60434

FILED
CRIMINAL APPEALS

DEC 17 2012

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

A-4

489

## Index to the Record
## Appeal No. 13-2279

### Common Law Record ("C")                                             Page

Memorandum of Orders ("Half Sheet") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Pro Se* Motion for Forensic Testing (December 10, 2012) . . . . . . . . . . . . . . . . . . . . 25

Letter from Illinois State Police . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Notice of Appeal (June 27, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Motion to Appoint Counsel/Motion to Proceed in Forma Pauperis (June 27, 2013) 38

Circuit Court Appoints Office of the State Appellate Defender to Represent
Defendant on Appeal (July 12, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

### Report of Proceedings ("R")

| | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|
| December 18, 2012 | | | | |
| Motion for SOJ Filed | | | | A3 |
| Case Tranferred to Rm 504 Instanter | | | | A4 |
| January 8, 2013 | | | | |
| Motion for SOJ - Denied | | | | D4 |
| Case Transferred Back Judge Hill | | | | D4 |
| June 17, 2013 | | | | |
| DNA Testing | | | | |
| State Witness | | | | |
| Miss Fischer | I5 | I10 | | |
| Arguments | | | | |
| Mr. Ertler - State | | | | I25 |
| Defendant | | | | I27 |
| DNA Testing - Denied | | | | I29 |

*A-5*

1    would be questionable because of the way that it was

2    handled in the beginning.

3         But let me say this.  It appears very

4    clear to this court that to order DNA analysis of the

5    cartridge casings at this point would be too fruitless

6    because of the way that the evidence was handled.  Even

7    assuming that this was a situation where the burden was

8    on the State to prove lack of maliciousness, this court

9    finds no ill will at all in terms of the way the evidence

10   was handled.  It was handled consistent with scientific

11   procedures based on the requests that were on file at the

12   time.

13        So I'm going to specifically say, and this

14   court rules, that DNA testing would not yield probative

15   results in this case.

16        Okay.  What's our next move, folks?

17   MR. ERTLER:  Your Honor, to my knowledge, that is,

18   as far as any 116-3 motions, the DNA request, was the

19   last thing pending.  So I would ask on the court's denial

20   of that today, that at least that portion of the case be

21   taken off call.  I think Mr. Reilly can speak to any

22   other post convictions issues if there are.

23   THE COURT:  Let me make this more formal.  The court

24   denies the defendant's 116-3 motions.  We were towards

A-6

Circuit Court of Cook County

County Department - Criminal Division

People of the State of Illinois, )
                    Respondent, )   Case No.:
                                )   02 CR 25224
                                )
            V.                  )   Honorable Judge
                                )   Arthur F. Hill,
                                )   Judge Presiding
Joseph Booker,                  )
                    Petitioner. )

Notice of Appeal

An appeal is taken from the order or judgment described below:

1) Court to which appeal is taken: Appellate Court of Illinois, First Judicial District;

2) Name of Appellant and address to which notices shall be sent:

Name: Joseph Booker B75795

Address: Illinois Department of Corrections (Currently: Pontiac Correctional Center, P.O. 99, Pontiac, Illinois 61764);

FILED
CRIMINAL APPEALS
JUN 27 2013
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

A-7

SA 417

**Index to the Record**
**Appeal No. 15-2995**

**Common Law Record ("C")**                                                    **Page**

Memorandum of Orders ("Half Sheet") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Circuit Court Appoints Office of the State Appellate Defender to Represent
Defendant on Appeal (July 12, 2013, September 18, 2015) . . . . . . . . . . . . . 52, 220

*Pro Se* Motion to Reconsider Partial Dismissal of Post-Conviction Petition (August
7, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

State's Motion for Discovery and Witness Information (September 4, 2013) . . . . . 62

State's Answer to Petitioner's Post-Conviction Petition (September 4, 2013) . . . . 65

*Pro Se* Petitioner's Response to the State's Answer to Post-Conviction Petition
(January 9, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Pro Se* Petitioner's Objection in Part/Agreement in Part to State's Motion for
Discovery and Witness Information (January 9, 2014) . . . . . . . . . . . . . . . . . . . . . 60

*Pro Se* Motion to Amend Petitioner's Answer to Respondent's Motion for Discovery
and Witness Information and Motion to Submit Additional Information on Witness
Ellen Anderson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

State's Answer to Discovery (September 10, 2014) . . . . . . . . . . . . . . . . . . . . . . 104

State's Answer to Discovery (January 22, 2003) . . . . . . . . . . . . . . . . . . . . . . . . 106

*Pro Se* Motion to Reconsider Claims Based On Newly Submitted Documents that
Petitioner Never Possessed at no Time Prior to Filing his Post-Conviction Petition
(December 22, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Pro Se* Motion for Discovery and Witness Information (March 20, 2015) . . . . . . . 189

State's Supplemental Motion for Discovery and Witness Information
(April 3, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

*Pro Se* Answer to State's Supplemental Motion for Discovery and Witness
Information (May 5, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

Notice of Appeal (September 11, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

*Pro Se* Motion to Appoint Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

A- 8

## Report of Proceedings ("R")

|  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|

**Vol. 1 of 3**

July 24, 2013

State's Motion to Dismiss

Arguments

|  |  |
|---|---|
| Mr. Reilly - State | A4 |
| Mr. Booker - Defendant | A24 |
| Mr. Reilly - State | A42 |

State's Motion to Dismiss - Mostly
Granted in Part ........................................ A43

September 27, 2013

*Pro Se* Motion to Reconsider Partial
Granting State's Motion to Dismiss
Filed ........................................ C7

Arguments

|  |  |
|---|---|
| Defendant | C8 |
| Mr. Reilly - State | C14 |

*Pro Se* Motion to Reconsider Partial
Granting State's Motion to Dismiss -
Denied ........................................ C17

State's Answer to the Actual Innocence
Claim and Motion for Discovery Filed ........................................ C19

April 3, 2015

Motion to Reconsider

Arguments

|  |  |
|---|---|
| Defendant | S6 |
| Mr. Reilly - State | S32 |

A-9

## Report of Proceedings ("R")

|  | Direct | Cross | Redir. | Recr. |  |
|---|---|---|---|---|---|
| Defendant |  |  |  |  | S38 |
| Motion to Reconsider - Denied |  |  |  |  | S42 |
| **Vol. 2 of 3** |  |  |  |  |  |
| July 15, 2015 |  |  |  |  |  |
| Third Stage Evidentiary Hearing |  |  |  |  |  |
| Defense Witness |  |  |  |  |  |
| Antione Ford | V5 |  |  |  |  |
| Examination by the Court |  |  |  |  | V24 |
| Antoine Ford |  | V37 | V112 |  |  |
| Commenced and Continued |  |  |  |  | V120 |
| August 20, 2015 |  |  |  |  |  |
| Third Stage Evidentiary Hearing |  |  |  |  |  |
| Defense Witness Continued |  |  |  |  |  |
| Ellen Anderson | W7 | W31 | W48 |  |  |
| Commenced and Continued |  |  |  |  | W55 |
| **Vol. 3 of 3** |  |  |  |  |  |
| Defense Witness Continued |  |  |  |  |  |
| Defendant | X13 | X23 |  |  |  |
| Closing Arguments |  |  |  |  |  |
| Defendant |  |  |  |  | X63 |
| Mr. Reilly - State |  |  |  |  | X86 |
| Defendant |  |  |  |  | X104 |
| Commenced and Continued |  |  |  |  | X111 |
| September 11, 2015 |  |  |  |  |  |

A-10

## Report of Proceedings ("R")

|  | Direct | Cross | Redir. | Recr. |  |
|---|---|---|---|---|---|
| Defendant's Post-Conviction Petition - Denied |  |  |  |  | Y8 |
| Notice of Appeal Filed and State Appellate Defender is Appointed |  |  |  |  | Y10 |

## Exhibits

### Vol. 1 of 4

Photos

## Supplemental Report of Proceedings (S.R.)

### Vols. 2 thru 4

Poster Maps

A-11

 2   own behalf in the third stage hearing and he denied

 3   committing the murder.

 4          THE DEFENDANT:  Yes, sir.

 5          THE COURT:  And that was what it was.

 6          This Court has looked at and weighed the

 7   credibility of the witnesses as they testified here.

 8   The defendant, of course, earnestly testified about

 9   his innocence.  Ellen Anderson flipped her affidavit

10   and basically said the affidavit was not true, that

11   in fact she was not out there, she did not see any

12   shooting.  Antione Ford's rendition of the offense

13   along with his criminal history causes this Court to

14   doubt his credibility.  In essence, this Court does

15   not think that there would be a different result

16   during the course of a trial.  It is unfortunate that

17   the reason that the Appellate Court brought this case

18   back here in 2008 was based on an affidavit that the

19   supposed author of it says that was a lie.  2008.

20   This is 2015.  So it was over seven years ago.

21   After considering all the factors here, I am going to

22   deny the defendant's postconviction petition.

23          Now, Mr. Booker, you probably know this,

24   but I have to say this for the record.  You have



A-12

CIRCUIT COURT OF COOK COUNTY SEP 1 1 2015

COUNTY DEPARTMENT, CRIMINAL DIVISION DOROTHY BROWN
CLERK OF CIRCUIT COURT

)
People of the State of ) Post Conviction Relief
Illinois, )
Respondent, ) Case No.: 02 CR 25224
)
) Honorable
V. )
) Arthur F. Hill Jr.,
Joseph Booker, ) Presiding Judge
Petitioner. )

---

## Notice of Appeal

An appeal is taken to the First District
Appellate Court of Illinois:

Appellant Name: Joseph Booker

Appellant Address: P.O. Box 112, Joliet, IL 60434

Offense of which convicted: First Degree Murder

Date of Judgment or Order: September 11, 2015 ✓

Sentence: 55 years

If appeal is not from conviction, nature of
order appealed: Denial/Dismissal of Post
Conviction Relief Petition

Joseph Booker
Petitioner, Pro Se

A-13

SA 423

## INDEX TO THE DIRECT APPEAL
### Appeal No. 03-3553

**Direct Appeal Record Common Law Record ("SC")**                    **Page**

Memorandum of Orders ("Half Sheet") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Indictment /Information (October 2, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Complaint for Preliminary Examination (September 12, 2002) . . . . . . . . . . . . . . . . . . . 13

Arrest Report (September 10, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Appearance (September 12, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Motion for Substitution of Judges (October 30, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

State's Motion for Discovery (November 6, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

State's Answer to Discovery (January 22, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Defendant's Answer to Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Motion for Continuance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

People's Motion in Limine to Bar Use of Defendant's Videotape of Scene
(August 12, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Jury Instructions (August 20, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Signed Jury Verdict Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Witness List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Jury Notes to Judge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Notice of Investigation Order (August 21, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Motion in Limine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Motion for New Trial (September 22, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Presentence Investigative Report (September 22, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 57

Sentencing Order (October 3, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Memorandum in Support of Motion for New Trial (October 3, 2003) . . . . . . . . . . . . . . 83

Motion to Reconsider Sentence (October 30, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

Notice of Appeal (November 18, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

A-19

## Direct Appeal Report of Proceedings ("SR")

|                                      | Direct | Cross | Redir. | Recr. |
|--------------------------------------|--------|-------|--------|-------|
| **VOL I**                            |        |       |        |       |
| August 18, 2003                      |        |       |        |       |
| **Jury Trial**                       |        |       |        |       |
| Jury Selection                       |        |       |        | 5     |
| **VOL II**                           |        |       |        |       |
| August 19, 2003                      |        |       |        |       |
| Opening Statements                   |        |       |        |       |
|     Mr. Dewald (State) |   |       |        | 165   |
|     Mr. Kuzas (Defense) |  |       |        | 170   |
| State Witnesses                      |        |       |        |       |
|     Jeanette Woodhouse | 172 |    |        |       |
|     Kenneth Williams | 177 | 208 | 238   | 239   |
| **VOL III**                          |        |       |        |       |
| August 19, 2003                      |        |       |        |       |
|     Darnell Brown | 247  | 265  | 298    |       |
|     Louis Dean   | 300    | 309  | 325    | 325   |
|     Kathleen Gahagan | 328 | 347 |       |       |
|     David Evans  | 362    | 376  | 402    |       |
| **VOL IV**                           |        |       |        |       |
| August 20, 2003                      |        |       |        |       |
|     Dr. Edmond Donoghue | 413 | 429 | 435 |     |
|     Caryn Tucker | 436    | 448  |        |       |
| State Rests                          |        |       |        | 455   |
| Motion for Directed Finding - Denied |        |       |        | 455   |

A-15

|                                    | Direct | Cross | Redir. | Recr. |     |
|------------------------------------|--------|-------|--------|-------|-----|
| Defense Witness                    |        |       |        |       |     |
|     James Eldridge | 476    | 485   | 488    |       |     |
| Defense Rests                      |        |       |        |       | 493 |
| Closing Arguments                  |        |       |        |       |     |
|     Mr. Lynch (State) |        |       |        |       | 500 |
|     Mr. Harrison (Defense) |   |       |        |       | 509 |
|     Mr. DeWald (State) |       |       |        |       | 537 |
| Jury Instructions                  |        |       |        |       | 562 |
| Finding of Guilty                  |        |       |        |       | 593 |
| October 3, 2003                    |        |       |        |       |     |
| Motion for a New Trial - Denied    |        |       |        |       | 597 |
| **Sentencing Hearing**             |        |       |        |       |     |
|     Allocution |        |       |        |       | 599 |
|     Argument in Mitigation |   |       |        |       | 605 |
|     Argument in Aggravation |  |       |        |       | 606 |
| Imposition of Sentence             |        |       |        |       | 613 |
| October 30, 2003                   |        |       |        |       |     |
| Motion to Reconsider Sentence - Denied |    |       |        |       | 620 |

A-16

## Index to the Record
## Appeal No. 06-2581

**Common Law Record ("C")**                                     **Page**

**VOL I**

Memorandum of Orders ("Half Sheet") ........................................ 2

*Pro Se* Notice to Amend Petition (May 31, 2006) ............................... 12

*Pro Se* Petition for Post-Conviction Relief (May 31, 2006) ......................... 14

*Pro Se* Motion for Leave to Proceed in Forma Pauperis (May 31, 2006) ............. 24

*ProSe* Application, Certification and Order to Sue or Defend as an Indigent Person
(May 31, 2006) ......................................................... 25

*ProSe* Motion for Appointment of Counsel (May 25, 2006) ....................... 27

Sentencing Order ........................................................ 28

Exhibits ............................................................... 29

**VOL II**

Exhibits ............................................................... 245

Certified Report of Disposition (June 20, 2006) ................................ 257

Order Dismissing Petition for Relief 9june 16, 2006) ............................ 258

Notification to Defendant Denying Petition for Relief (August 3, 2006) ............ 268

*Pro Se* Motion to Reconsider ................................................ 272

Notice of Appeal (August 22, 2006) .......................................... 314

**Supplemental Common Law Record (S.C.)**

July 24, 2006

PC Order Denying ProSe Motion to Reconsider ................................ 1

**Report of Proceedings ("R")**

                                    **Direct    Cross    Redir.    Recr.**

March 14, 2006

A-17

## Report of Proceedings ("R")

|  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|
| Continued |  |  |  | A3 |
| June 5, 2006 |  |  |  |  |
| Continued |  |  |  | B3 |
| June 16, 2006 |  |  |  |  |
| Petition for Post-Conviction Relief - Denied |  |  |  | C2 |
| July 24, 2006 |  |  |  |  |
| Motion to Reconsider Denied |  |  |  | G3 |

### Supplemental Report of Proceedings (S.R.)

| March 14, 2006 |  |  |  |  |
|---|---|---|---|---|
| Circuit Court Affirmed |  |  |  | A3 |

A+18

Nos. 13-0177, 13-2279, 15-2995 (consolidated)

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

PEOPLE OF THE STATE OF ILLINOIS,

Respondent-Appellee,

vs.

JOSEPH BOOKER,

Petitioner-Appellant.

Appeal from the Circuit Court of Cook County, Criminal Division.
Honorable **ARTHUR F. HILL, Jr.**, Judge Presiding.

BRIEF AND ARGUMENT FOR
RESPONDENT-APPELLEE

KIMBERLY M. FOXX,
State's Attorney,
County of Cook,
Room 309 - Richard J. Daley Center,
Chicago, Illinois 60602
eserve.CriminalAppeals@cookcountyil.gov
(312) 603-5496

Attorney for Respondent-Appellee

ALAN J. SPELLBERG,
MILES J. KELEHER,
HAREENA MEGHANI-WAKELY
Assistant State's Attorneys,
Of Counsel.

EXHIBIT H

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

PEOPLE OF THE STATE OF ILLINOIS,

Respondent-Appellee,

vs.

JOSEPH BOOKER,

Petitioner-Appellant.

## POINTS AND AUTHORITIES

### I.

**THE CIRCUIT COURT PROPERLY DENIED PETITIONER'S CLAIM OF ACTUAL INNOCENCE AFTER AN EVIDENTIARY HEARING** .......................... **23**

People v. Harris, 224 Ill. 2d 115 (2007) ........................................................ 23

People v. Pendleton, 223 Ill. 2d 458 (2006) .................................................. 24

People v. Johnson, 206 Ill. 2d 348 (2002) ...................................................... 24,29

People v. Coleman, 183 Ill. 2d 366 (1998) ..................................................... 24

People v. Harris, 206 Ill. 2d 293 (2002) ........................................................ 24

People v. Gonzalez, 407 Ill. App. 3d 1026 (2nd Dist. 2011) .......................... 24

People v. Coleman, 2013 IL 113307 ............................................................... 28

People v. Edwards, 2012 IL 111711 ................................................................ 31

Schlup v. Delo, 513 U.S. 298 (1995)............................................................... 31

People v. Lofton, 2011 IL App (1st) 100118.................................................... 31

i

People v. Ortiz, 235 Ill. 2d 319 (2009) ........................................................... 31

People v. Molstad, 101 Ill. 2d 128 (1984) ....................................................... 31

People v. Coleman, 206 Ill. 2d 261 (2002) ...................................................... 34

People v. Morales, 339 Ill. App. 3d 554 (1st Dist. 2003) ................................ 35

People v. Sanchez, 115 Ill. 2d 238 (1986) ....................................................... 35

People v. Demeron, 153 Ill. App. 3d 440 (1st Dist. 1987) ............................... 36

In re C.R., 191 Ill. 2d 338 (2000) .................................................................... 36

725 ILCS 5/122-1, *et seq.* (2012) ................................................................... 23

## II.

### THE CIRCUIT COURT PROPERLY DENIED PETITIONER'S SECTION 116-3 MOTION FOR PCR DNA TESTING ON THE DISCHARGED CARTRIDGE CASINGS FOUND AT THE CRIME SCENE ................................................................................ **37**

People v. Slover, 2011 IL App (4th) 100276 .................................................... 39

People v. O'Connell, 227 Ill. 2d 31 (2007) ...................................................... 39

People v. English, 2013 IL App (4th) 120044 .................................................. 39

People v. Brooks, 221 Ill. 2d 381 (2006) ......................................................... 40

People v. Rozo, 2012 IL App (2d) 100308 ........................................................ 41

People v. Savory, 197 Ill. 2d 203 (2001) ......................................................... 44

People v. Gecht, 386 Ill. App. 3d 578 (1st Dist. 2008) .................................... 46

People v. Jones, 334 Ill. App. 3d 61 (1st Dist. 2002) ...................................... 46

People v. Urioste, 316 Ill. App. 3d 307 (5th Dist. 2000) ................................. 46

People v. Hockenberry, 316 Ill. App. 3d 752 (2nd Dist. 2000) ...................... 47

People v. Rokita, 316 Ill. App. 3d 292 (5th Dist. 2000) .................................. 47

ii

People v. Shum, 207 Ill. 2d 47 (2003) ............................................................ 47

People v. Henderson, 343 Ill. App. 3d 1109 (1st Dist. 2003)......................... 48

725 ILCS 5/116-3 (West 2012)....................................................................... 37

725 ILCS 5/116-3(c)(1) ................................................................................... 38

iii

## ISSUES PRESENTED FOR REVIEW

Whether the circuit court properly denied petitioner's post-conviction petition claim of actual innocence after an evidentiary hearing.

Whether the circuit court properly denied petitioner's section 116-3 motion for PCR DNA testing on the discharged cartridge casings found at the crime scene.

## STATEMENT OF FACTS

Petitioner, Joseph Booker, was charged under Indictment 02 CR 25224 with six counts of first degree murder, in connection with the shooting and killing of the victim, Charles Rials. (C.L. #03-3533: 7-12) Following a jury trial before the Honorable John J. Moran, petitioner was found guilty of first degree murder. (C.L. #03-3533: 46; R. #03-3533: 593) The trial court sentenced petitioner to 30 years for first degree murder and 25 years for the mandatory enhancement for personal discharge of a firearm, totaling 55 years in the Illinois Department of Corrections. (C.L. #03-3533: 82; R. #03-3533: 615-616)

The Trial

At trial, the following evidence was adduced:[1]

During the evening of September 8, 2002, Charles Rials was shot and killed in the Chicago Housing Authority complex known as Wentworth Gardens. [Petitioner] was subsequently arrested and charged with first degree murder.

At trial, Kenneth Williams testified that he knew [petitioner] from the neighborhood because [petitioner] frequently visited a friend who lived in the complex. Williams stated that [petitioner] drove a blue four-door

---

[1] The People are referencing the facts as outlined by this Court in its Rule 23 order affirming petitioner's convictions and sentence on direct appeal. *See* People v. Booker, No. 03-3533, pp. 1-4 (1st Dist. September 22, 2005) (unpublished order under Supreme Court Rule 23).

1

Pontiac Grand Prix. Sometime between 9:30 and 10:00 p.m. on September 8, 2002, Williams and [petitioner] got into an argument. Words were exchanged about "gang banging stuff" and [petitioner] eventually left to visit his friend. At about 10:30 p.m., [petitioner] and Williams exchanged more words before [petitioner] got into his blue Grand Prix and left. A few minutes later, Williams saw the victim Rials, a long-time friend, walking on the sidewalk. A few minutes after that, [petitioner] was running down the street toward Rials with a gun in his hand. As Williams got up to run, he saw [petitioner] point the gun at Rials and shoot. When Williams looked back to make sure [petitioner] was not coming after him, he saw [petitioner] standing over Rials and he heard more gunshots. According to Williams, [petitioner] was wearing a white t-shirt and black jogging pants and his hair was in braids. He also stated that the area was well lit at the time of the shooting. Williams identified [petitioner] in a lineup two days later.

On cross-examination, Williams stated that he drank two beers prior to the shooting, but denied that he was drunk. Williams also repeatedly denied that a tree obstructed his view of [petitioner].

Darnell Brown, a resident at Wentworth Gardens, testified that he ran into Rials sometime after 11:00 p.m. The two walked to the end of a parking lot at 38th Place. Brown stopped to speak with a friend, while Rials continued to walk toward Williams who was sitting on some steps. As Brown was returning home, he heard a single gunshot and four subsequent shots. Brown ducked behind a car when he heard the second set of shots. When he looked up from about four or five car lengths away, Brown could see [petitioner] standing over Rials and he was putting a gun in the right side of his hip. [Petitioner] was wearing a black jogging suit. After the shooting, [petitioner] got into the back seat of the same dark blue Pontiac Grand Prix that Brown had seen [petitioner] driving on previous occasions. According to Brown, the area was well lit. Within days of the shooting, Brown identified [petitioner] in a lineup.

On cross-examination, Brown stated that he could not see the shooter's face as he stood over Rials because he was turned sideways. He also stated that he identified [petitioner] in the lineup based on what he was wearing and his build. However, when Brown was asked if what he saw was someone who looked like [petitioner] he responded "no."

On redirect, Brown stated that he picked [petitioner] out of the lineup because he actually saw [petitioner] shoot the victim.

State's witness Louis Dean also resided at Wentworth Gardens. Dean was 13 years old at the time of the shooting. Dean testified that at approximately 11:30 p.m., he was in his bedroom watching television. At some point he looked out his bedroom window and saw Rials, a friend from the neighborhood. As Dean was looking out the window, [petitioner], who was dressed in black, walked up behind Rials and shot him. After Rials fell to the ground, [petitioner] stood over him and fired additional shots.

2

On cross-examination, Dean admitted that in a signed statement he gave two days after the shooting, he told Assistant State's Attorney Wilson and Detective Evans he heard the first gunshot, but did not actually see it. Dean also stated that he did not remember telling the grand jury that he did not know where the gunshots came from. Dean, however, stated that his previous statement was incorrect and that he was telling the truth when he testified that he actually saw [petitioner] shoot Rials.

Detective David Evans testified that following [petitioner's] arrest, it was discovered that he was the owner of a dark-colored Pontiac Grand Prix.

James Eldridge, a private detective, testified on behalf of the defense. Eldridge stated that he measured the distance from the stairs where Williams allegedly sat to the crime scene to be approximately 35 feet. He also stated that a large tree with a circumference of 29 feet was located in between the stairs and the scene. The distance from Dean's home to the spot where Rials was shot was 144 feet.

People v. Booker, No. 03-3533, pp. 1-4 (1st Dist. September 22, 2005) (unpublished order under Supreme Court Rule 23). After hearing all the evidence, the jury found petitioner guilty of first degree murder. (R. #03-3533: 593) Subsequently, the trial court sentenced petitioner to 30 years for first degree murder and 25 years for the mandatory enhancement for personal discharge of a firearm, totaling 55 years in the Illinois Department of Corrections. (C.L. #03-3533: 82; R. #03-3533: 615-616)

Direct Appeal # 03-3533

On direct appeal, petitioner contended: (1) that the evidence was insufficient to prove him guilty beyond a reasonable doubt; and (2) that the trial court erred in issuing a *Prim* instruction after the jury had informed the court that they were split nine to three. This Court rejected petitioner's claims and affirmed his conviction. Booker, 03-3533 (Rule 23 order, pp. 6-13). With respect to petitioner's sufficiency of the evidence claim, this Court noted that "at trial all three witnesses provided unwavering testimony that they actually observed petitioner shoot the victim." Booker, 03-3533 (Rule 23 order, p. 10).

3

Further, this Court noted that the jury was not swayed by the alleged inconsistencies of the witnesses' testimonies and found them to be credible. Booker, 03-3533 (Rule 23 order, p. 10). Accordingly, this Court found that petitioner's arguments were insufficient "to render the identifications vague or doubtful such that no rational jury could have concluded that petitioner committed the offense of first degree murder." Booker, 03-3533 (Rule 23 order, p. 10).

Post-Conviction Proceedings

On May 31, 2006, petitioner filed a petition for post-conviction relief. (C.L. #06-2581: 14-23) Petitioner's petition alleged that: (1) trial counsel was ineffective for failing to raise the issue of petitioner's illegal seizure, failing to object and lay proper foundation for known perjured testimony, failing to recognize, object to, or file motions against double enhancement during sentencing, failing to carefully scrutinize police reports, handwritten statements and Grand Jury testimony, and failing to interview or call certain witnesses; (2) appellate counsel was ineffective for not raising the issue of double enhancement at sentencing on direct appeal; (3) the State withheld a material witness and information from the defense, and allowed perjured testimony at trial; and (4) newly discovered evidence proved his actual innocence. (C.L. #06-2581: 14-23)

In support of his claim of actual innocence, petitioner attached an affidavit of Ellen Anderson. (C.L. #06-2581: 238-239) According to this affidavit, while Anderson was visiting a friend at Wentworth Gardens on September 8, 2002, she saw two men she knew, Kenny Williams and Darnell Brown, and a third man she did not know, "standing around drinking and talking." (C.L. #06-2581: 238) It was around 11:05 p.m. at the time. (C.L. #06-2581: 238) Anderson engaged in a short conversation with Brown at which

4

time Kenny and the other man began to walk away. (C.L. #06-2581: 239) Anderson noticed that Kenny was wearing black leather gloves. (C.L. #06-2581: 239)  Anderson then heard a gunshot and saw the man she did not know lying on the ground. (C.L. #06-2581: 239) According to the affidavit, Anderson then saw Kenny approach the man on the ground and shoot several more times at him. (C.L. #06-2581: 239) Following the shooting, Anderson ran to meet her cab and Brown followed her and told her to "keep [her] mouth shut if [she] didn't want to get [her]self hurt, that [she] didn't see [any]thing and that [she] don't know [any]thing." (C.L. #06-2581: 239)  Traumatized, Anderson never went back to the Wentworth Gardens again and relocated to a different address because she feared for her life. (C.L. #06-2581: 239) According to the affidavit, Anderson later learned of petitioner's conviction at a church she attended with petitioner's mother and informed the mother that she had information that would prove petitioner was wrongfully convicted. (C.L. #06-2581: 239-240)

On June 16, 2006, the circuit court summarily dismissed petitioner's post-conviction petition after finding that petitioner's claims were frivolous and patently without merit. (C.L. #06-2581: 257-265)  With respect to petitioner's claim of actual innocence, the circuit court stated:

> Petitioner does provide an affidavit from Ellen Anderson claiming that Kenny Williams was the shooter.  However, a freestanding claim of innocence based on newly discovered evidence must be more than an attempt to re-litigate a case.  Petitioner must provide the court with new evidence.  Clearly, evidence available at the time of trial is not now considered new evidence.  Petitioner has failed to give any explanation of why this witness was not able to testify at his trial.  Furthermore, it has taken this eye-witness over two years to come forward and proclaim the petitioner's innocence.
> Even if Petitioner presented this new evidence through the exercise of due diligence this court does not find that the evidence provided in the petition would likely change the outcome of the trial.  At trial, this court

5

had the opportunity to assess the credibility of the witnesses. As stated in the appellate court decision, there were three eyewitnesses to this shooting who all identified the petitioner as the shooter the night of September 8, 2002. Therefore, this claim is dismissed.

(C.L. #06-2581: 264) (emphasis in original). Petitioner then filed a motion to reconsider the dismissal of his post-conviction petition. (C.L. #06-2581: 272-285) On July 24, 2006, the circuit court denied petitioner's motion to reconsider. (C.L. #06-2581: 267)

On March 31, 2008, this Court reversed the summary dismissal and remanded for further post-conviction proceedings. People v. Booker, No. 06-2581 (unpublished order of March 31, 2008). (C.L. #13-0177: 205-212) In so doing, this Court found that petitioner had alleged the gist of an actual innocence claim based on newly discovered evidence, that the identification evidence was "weak evidence of [petitioner's] guilt" in light of Anderson's affidavit, and that the probability of a different verdict was "bolstered" by the difficulty the jury had in reaching its verdict. Booker, No. 06-2581 (Rule 23 order, pp. 4-8); (C.L. #13-0177: 208-212)

On January 27, 2010, petitioner filed an amended petition for post-conviction relief, alleging, *inter alia*, actual innocence and ineffective assistance of trial counsel for failing to call Melissa Westmoreland and Monica Ramsey to testify. (C.L. #13-0177: 6-212) Petitioner later filed a *pro se* supplemental petition for post-conviction relief, containing two additional claims relating to trial counsel's deficient performance. (C.L. #13-0177: 286-99) Ultimately, the circuit court denied petitioner leave to file his *pro se* amended and supplemental pleadings (R. #13-0177: C4),[2] and also denied petitioner's numerous requests to reconsider this denial. (R. #13-0177: C5, F6-9; R. #15-2995: A36)

---

[2] The record does not contain transcripts from the proceedings that occurred on May 17, 2011.

6

On October 18, 2011, the State filed a motion to dismiss all of the allegations in petitioner's initial *pro se* petition except for the claim of actual innocence. (C.L. #13-0177: 307-337; R. #15-2995: A43-44, EE3)  The State filed an answer to the actual innocence claim. (C.L. #15-2995: 65-66; R. #15-2995: A43-44, C19, EE3)

On July 24, 2013, the circuit court granted the State's motion to dismiss, finding petitioner's ineffective assistance of trial counsel claims could have been raised on direct appeal, and that he failed to make a substantial showing that trial counsel was ineffective. (R. #15-2995: A43-44, C6-19) An evidentiary hearing was ordered on the actual innocence claim. (R. #15-2995: H2, I2, J2, K2)

On September 10, 2014, the State informed the court that the potential witness on petitioner's actual innocence claim, Ellen Anderson, had recently given a videotaped statement recanting her affidavit. (R. #15-2295: K2) Consequently, while in court, petitioner was given the opportunity to view this statement and take notes. (R. #15-2295: K2)

On December 8, 2014, the State informed the court that it had received 185 pages of reports relating to petitioner's case from the Chicago Police Department. (R. #15-2295: N2-3) These reports were tendered to petitioner in open court. (R. #15-2295: N4-5) Among these reports was a handwritten statement from Melissa Westmoreland given to Assistant State's Attorney ("ASA") Dan Klapman and Detective Bach. (C.L. #15-2295: 128-133; R. #15-2295: O3-5) Westmoreland told ASA Klapman that petitioner was at her home the night of the shooting, and that he left about 30 minutes before she heard gunshots. Westmoreland also said that her neighbor named "Teda," said she saw Kenneth Williams argue with a man named W.K. before the shooting. (C.L. #15-2295: 128-133)

7

Upon reviewing these additional documents, petitioner filed a motion to reconsider the circuit court's granting of the State's motion to dismiss. (C.L. #15-2295: 111-121) Petitioner attached to this motion a signed handwritten statement from Teda's fiance at the time, Antione Ford. (C.L. #15-2295: 139-145; R. #15-2295: 03, Q3-4) It was dated December 12, 2014. (C.L. #15-2295: 145) In his statement, Ford stated that he and Teda were on their front porch at around 6:30 or 7:00 p.m., on September 8, 2002, when petitioner arrived in a blue Grand Prix. (C.L. #15-2295: 140) Petitioner spoke to Ford and Teda briefly before entering Melissa Westmoreland's house, which was next door to Teda's house. (C.L. #15-2295: 140) Twenty or thirty minutes later, two men arrived in a white Chevy Tahoe. (C.L. #15-2295: 140) They walked past Kenneth Williams, whom Ford knew as the Senior Regent for the Gangster Disciples in Wentworth Gardens. (C.L. #15-2295: 139) One of the men asked Williams "what the fuck he was looking at," and Williams told him that he was looking at him and that he needed to straighten his hat. (C.L. #15-2295: 140) The two men from the Tahoe then entered Westmoreland's house. (C.L. #15-2295: 140)

Ford further stated that he saw Williams and 15 or 20 of his Gangster Disciple friends "drinking and smoking weed" across the street. (C.L. #15-2295: 140-141) At some point, Williams yelled, "[w]ho the fuck putting on for the 'omegas' and 'blue dolphins'" which Ford explained were ecstasy pills. (C.L. #15-2295: 140-141) Williams then sent some of his guys to buy the ecstasy and liquor, and when they returned 20 or 25 minutes later, "[e]verybody that drink [sic] was drinking, [e]verybody that pop pills [sic] was popping pills and [e]verybody that smoked weed was smoking weed." (C.L. #15-2295: 141)

8

According to Ford, around 10:00 or 10:15 p.m., he saw petitioner and the men from the Tahoe leave Westmoreland's house. (C.L. #15-2295: 141) Petitioner got in his car and drove off without talking to Williams or the other Gangster Disciples, and the other men entered their car and did the same. (C.L. #15-2295: 141) About 15 or 20 minutes later, Ford saw Charles Rials arrive. (C.L. #15-2295: 141) Williams and the other gang members were happy to see Rials because he had just gotten out of prison, but Rials started arguing with Williams. (C.L. #15-2295: 141-142) Ford stated that Rials was upset with Williams and the other Gangster Disciples because they had failed to post bond for him, had failed to provide him with a lawyer, and had failed to send him money while he was incarcerated. (C.L. #15-2295: 141-142) Rials said he "was gone [sic] cooperate with the police and send them all to jail, from the top to the bottom," meaning "from the shot caller's [sic] to the foot soldiers." (C.L. #15-2295: 142) Ford then saw Williams swing at Rials but miss. (C.L. #15-2295: 142) A woman then removed Rials and walked off with him. (C.L. #15-2295: 142)

According to Ford, he and Teda then went inside but Ford continued to look out the window. (C.L. #15-2295: 142) He saw Williams walk toward West 37th Place and out of sight while the other gang members continued partying. (C.L. #15-2295: 142) Shortly thereafter, Ford saw Williams walk back toward the crowd with Darnell Brown. (C.L. #15-2295: 142) After Williams grabbed a beer, Williams, Brown, and Rials met in the middle of the block. (C.L. #15-2295: 143) A woman then yelled to Brown and he crossed to the side of the street on which Ford lived. (C.L. #15-2295: 143) Williams and Rials "stepped off a few paces" before Ford saw Williams shoot Rials in the head and shoot him a second time while Rials was on the ground. (C.L. #15-2295: 143)

9

Ford admitted in his statement that he spoke to the police on the night of the shooting and told them that he and Teda did not see anything and only heard shots. (C.L. #15-2295: 143) According to Ford, he knew that Williams had seen him outside that evening and was afraid and did not want Williams to think that he or Teda had spoken to the police. (C.L. #15-2295: 143) Ford further stated that a few days after the shooting, "Missy" came to their apartment all upset because she had overheard Williams tell the police that petitioner was the shooter. (C.L. #15-2295: 143) Ford admitted that he did not tell Missy that he had seen Williams shoot Rials. (C.L. #15-2295: 144) Ford claimed that he was sorry for not coming forward earlier and naming the real shooter as being Williams but that he had been afraid for himself and his family and that he was wrong for letting an innocent man go to prison. (C.L. #15-2295: 144)

On April 3, 2015, the State informed the court that they were unsuccessful in trying to locate "Teda" and that they attempted to talk to Ford but that he would not talk to them without petitioner's permission. (R. #15-2295: S2-5, S42) Subsequently, the court heard arguments on petitioner's motion to reconsider the dismissal of his ineffective assistance of trial counsel claims based on new information and denied the motion. (R. #15-2295: S5-42) The court then informed the parties that at the evidentiary hearing on petitioner's actual innocence claim, it would like to hear testimony from not only Ellen Anderson but also from Antoine Ford. (R. #15-2295: S43-44)

Evidentiary Hearing

At the evidentiary hearing on petitioner's actual innocence claim, Antione Ford testified that he was serving a 60-year sentence for an unrelated murder and armed robbery at the time of the hearing and that he was a Black Disciple gang member until

10

SA 442

2001. (R. #15-2295: V11, V46, V48)  Ford stated that he never had any problems with anyone in Wentworth Gardens and testified consistently with his handwritten statement: that he saw petitioner enter Westmoreland's house around 7:00 p.m., without interacting with Williams; that Williams was partying with about 20 other gang members; that Williams sent some people to buy liquor and ecstasy; that about 30 minutes after petitioner entered Westmoreland's home two men arrived in a Tahoe; that one of those men exchanged words with Williams; that petitioner left Westmoreland's house around 10:00 p.m., and drove off without talking to anyone; that the two men from the Tahoe left at the same time without incident; that Charles Rials arrived about 20 minutes later and threatened to "take everybody down" in Williams' gang because they failed to support him in prison; and that a woman removed Rials when he and Williams started arguing. (R. #15-2295: V7-27)

In describing the shooting, Ford testified he saw Williams walk toward 37th Place before losing sight of him. (R. #15-2295: V21)  Williams returned shortly thereafter with Darnell Brown. (R. #15-2295: V22-23) While Brown and Williams were talking, Rials returned and met up with them in the middle of the street at West 38th Place. (R. #15-2295: V23)  Brown then went to the south side of West 38th Place to talk to a woman Ford did not know, and Williams and Rials went to the north side of the street. (R. #15-2295: V23-27)  According to Ford, when Rials tried to walk away, Williams shot him. (R. #15-2295: V27)  Ford admitted that when he spoke to the police that night, he denied witnessing the shooting because he was scared for himself, Teda, and her three children. (R. #15-2295: V28)

Ford further testified that on September 10, 2002, Missy Westmoreland visited

11

him and Teda at their home. (R. #15-2295: V28-31) Westmoreland told Ford she had heard that Williams told police that he argued with petitioner before the shooting. (R. #15-2295: V29-31) Ford told her that he had seen Williams arguing with two people that night, and that petitioner was not one of them. (R. #15-2295: V28-31) Ford also told Westmoreland that Williams first argued with one of the men from the Tahoe and that the second argument was "amongst themselves." (R. #15-2295: V29-31) Ford admitted that he did not mention that the second argument was between Williams and Rials, or what it was about, because he was scared Williams would retaliate if he implicated Williams as the shooter. (R. #15-2295: V31-32) According to Ford, after being locked up himself and knowing what it was like to have someone lie about you, he decided to tell the truth about what he saw on the night of the shooting and that Williams was the shooter. (R. #15-2295: V35) Consequently, he wrote out his statement and sent it to a cousin who knew how to get in touch with petitioner's family. (R. #15-2295: V70)

On cross-examination, Ford admitted that he was housed at Stateville since 2011 and that he came to the hearing on the same prison bus as petitioner. (R. #15-2295: V49, V64) Ford also admitted that when the prosecutor visited him at Stateville on March 4, 2015, he refused to answer any questions about his affidavit other than saying that it was true and informed the prosecutor that he would have to talk to petitioner before answering any questions. (R. #15-2295: V37-40) Ford further admitted that since being at the Stateville prison, he has received six major disciplinary violations for things such as fighting, making threats, disobeying orders, and possessing contraband. (R. #15-2295: V65-70) Ford testified on cross-examination that the shooting occurred in the "middle of the street" and when shown a crime scene photo of blood on the sidewalk (People's

12

Exhibit 4), claimed that this was consistent with where he saw the shooting take place. (R. #15-2295: V90, V96, V102-103) On redirect examination, Ford clarified that the shooting occurred in the middle of the block and by that he meant that it was closer to the curb. (R. #15-2295: V112-113)

Ellen Anderson testified at the evidentiary hearing that her affidavit dated January 12, 2006, in which she claimed that petitioner was innocent and that Williams was the shooter, was a lie and that on August 18, 2014, she gave a videotaped statement recanting her affidavit and saying that she did not witness the shooting. (R. #15-2295: W31, W40-47, W53) According to Anderson, she and petitioner started an off-and-on romantic relationship in 1995 that lasted about 10 years. (R. #15-2295: W10) Anderson thought petitioner was a "good guy" and "cool." (R. #15-2295: W9-I0) Anderson testified she learned sometime in 2003 that petitioner was in prison. (R. #15-2295: WI1, W34) In 2005, petitioner's mother called Anderson, and Anderson went to her house, told her petitioner was innocent, and then went with her to visit petitioner at Stateville. (R. #15-2295: WI4-15, W34-36) According to Anderson, she visited with petitioner in prison about ten times before drafting her affidavit, and that although she never talked about the case with him, petitioner did send her police reports containing details about what happened, who was shot, and who the witnesses were. (R. #15-2295: W36-37) Anderson thought petitioner was innocent, so when he asked her to draft an affidavit, she drafted one and sent it to a defense investigator named Patti Dalton Krashesky. (R. #15-2295: W16-18, W36-40) In this affidavit, dated January 12, 2006, Anderson stated that she saw Kenneth Williams shoot Charles Rials. (C.L. #13-0177: 193-195; R. #15-2295: W7-8, W21)

13

Anderson further testified that sometime around August 15, 2014, after petitioner's case was set for further proceedings, ASA Reilly and Detective Brannigan came to talk to her and she told them that she did not see the shooting. (R. #15-2295: W21-24, W40-41)  According to Anderson, her affidavit was false, that she did not witness the murder, that she got the details to include in the affidavit from petitioner, and that she only signed the affidavit because she loved petitioner and did not want to see him in prison. (R. #15-2295: W31-32, W44-47)  Anderson admitted that she gave a videotaped statement on August 18, 2014, recanting her affidavit and that she was not promised anything in exchange for doing this. (R. #15-2295: W8, W24-26, W31, W42)  Anderson further testified that in January of 2015, shortly after she gave her videotaped statement recanting her affidavit, she was arrested and charged with several misdemeanor offenses, including driving with a broken tail light, driving on a suspended license, and possession of a small amount of marijuana. (R. #15-2295: W42-44)  Although these charges were dismissed, this had nothing to do with petitioner's case. (R. #15-2295: W42-44)

Petitioner testified in his own defense at the hearing and claimed that he "did not shoot Charles Rials." (R. #15-2295: X14)  Petitioner also testified that while he did sell drugs and had several drug arrests, he was not a killer. (R. #15-2295: X13-14)  According to petitioner, before being charged in this case, he had never seen Charles Rials, Kenneth Williams, Darnell Brown, Louis Dean, or Monica Ramsey. (R. #15-2295: X14)  Petitioner also denied arguing with Williams or anyone from Wentworth Gardens. (R. #15-2295: X14)  The only people he knew there were Missy Westmoreland and her family. (R. #15-2295: X14)

14

Petitioner testified that on September 8, 2002, he visited Westmoreland's house because he had arranged to sell drugs there. (R. #15-2295: X15) He arrived alone in a blue Pontiac Grand Prix. (R. #15-2295: X15) On his way inside, he greeted her neighbors, Belinda "Teda" Brown and Antione Ford. (R. #15-2295: X15) According to petitioner, shortly thereafter, a man named W.K. and his associate arrived at Westmoreland's house in a white Chevy Tahoe for the drug deal. (R. #15-2295: X15) While W.K. and his associate were using Westmoreland's kitchen, Westmoreland braided petitioner's hair. (R. #15-2295: X15) According to petitioner, he did not know that W.K. had exchanged words with Williams before entering Westmoreland's house. (R. #15-2295: XI5-16) After the drug deal, W.K. and his associate drove off in their Tahoe and petitioner drove off in his car and got to his fiancee's house at around 10:45 p.m. and was there until about 1:00 a.m. (R. #15-2295: XI6-18) Petitioner then called Westmoreland and told her that he was coming to get her. (R. #15-2295: X18) Westmoreland told petitioner not to come to Wentworth Gardens because someone had been shot and that the police were everywhere. (R. #15-2295: X18) According to petitioner, he did end up picking up Westmoreland later that night and they went to the Amber Motel. (R. #15-2295: X18)

Petitioner further testified that he had an intimate relationship with Ellen Anderson in 1995 and that it only lasted a couple of months. (R. #15-2295: XI9) In late 2005, petitioner asked his mother to call Anderson because she had previously told petitioner's mom that he was innocent. (R. #15-2295: X20) After getting in touch with her, petitioner asked Anderson to submit an affidavit based on her independent statement to his mom that he was innocent. (R. #15-2295: X20) According to petitioner, if

15

Anderson had not come forward, he would not have known she visited Wentworth Gardens, or that she knew Brown and Williams. (R. #15-2295: X21-22) Petitioner denied that he ever discussed the details of his case with Anderson in person, by phone or by mail, but admitted that he did send her police reports related to Monica Ramsey and Melissa Westmoreland so that she could deliver them to investigator Patti Krashesky. (R. #15-2295: X21-22) Petitioner admitted that he watched Anderson's video interview with ASA Reilly and noted that during her statement even Anderson denied that petitioner told her what to write in her affidavit, and that she claimed to have come up with the details on her own. (R. #15-2295: X22)[3]

On cross-examination, petitioner admitted that he was a convicted felon but denied being a member of the Mickey Cobras gang in 2002 and claimed the "MC" tattoo on his right arm represented the initials of his name, Joseph Booker. (R. #15-2295: X31, X39-40) Petitioner also admitted that he was in the area of the murder that night visiting Westmoreland and that he told the police that he arrived at Wentworth Gardens around 7:00 p.m. on the night of the shooting, and that he left between 9:00 and 10:00 p.m. (R. #15-2295: X37) Petitioner further admitted that he knew Teda and Ford in 2002 and that after the shooting he did not have any contact with Ford, even while they were both housed in Stateville together and that the next time that he saw Ford was on July 15, 2015, when they arrived to court together. (R. #15-2295: X52, X55-56)

For purposes of the evidentiary hearing, the circuit court admitted into evidence

---

[3] The circuit court denied petitioner's request to have the court watch Anderson's videotaped statement noting that it had not been admitted into evidence and that petitioner's testimony about what was said by Anderson in the video was "sufficient for the court at this stage of the proceeding." (R. #15-2295: X57) The court also declined petitioner's request to admit Westmoreland's handwritten statement into evidence, finding it was hearsay. (R. #15-2295: X7-9, X62)

16

Ellen Anderson's affidavit (Defense Ex. 1), Antoine Ford's affidavit (Defense Ex. 5),

excerpts from the trial testimony of Kenny Williams (Defense Ex. 3), excerpts from the

trial testimony of Darnell Brown (Defense Ex. 6), and the GPRs of Melissa

Westmoreland and Monica Ramsey (Defense Ex. 2). (R. #15-2295: X4-12, X62)

The State opted not to present any live testimony at the hearing and instead

introduced into evidence a photo of the housing project where the murder took place, a

photo of the location on the street where the body was found, and the trial testimony of

prosecution witnesses Kenneth Williams, Darnell Brown, Louis Dean, Kathleen

Gahagan, and Detective David Evans. (R. #15-2295: X58-60) As noted by the State,

these items rebutted the defense evidence presented at the hearing. (R. #15-2295: X58-

60)

After hearing arguments, the circuit court denied petitioner's petition. (R. #15-

2295: Y2-8)   In so doing, the circuit court stated, in pertinent part:

> We had a third stage hearing. It is significant to note that Ellen
> Anderson, as she testified in the third stage hearing, said the affidavit was
> a lie, that she was not out there, that she did not see any shooting, that she
> had had a relationship with [petitioner] and she felt badly for him, she
> wanted to help him. She had had conversations with [petitioner's] mother.
> She, Ellen Anderson, had gone up to Illinois Department of Corrections to
> visit with [petitioner] and through those visits and contact with
> [petitioner], according to her testimony here, she put together the affidavit
> and that it was not true.
> The third stage hearing also featured the testimony of Antione Ford,
> who was in custody doing time for murder at the time that he testified here
> in this Court. Mr. Ford in his testimony through cross-examination kind of
> misidentified where the shooting happened. He also -- I mentioned the
> murder conviction and there were -- he has other criminal history. Of
> course, [petitioner] testified in his own behalf in the third stage hearing
> and he denied committing the murder.
> 
> * * *
> 
> This Court has looked at and weighed the credibility of the witnesses
> as they testified here. [Petitioner], of course, earnestly testified about his
> innocence. Ellen Anderson flipped her affidavit and basically said the

17

affidavit was not true, that in fact she was not out there, she did not see any shooting. Antione Ford's rendition of the offense along with his criminal history causes this Court to doubt his credibility. In essence, this Court does not think that there would be a different result during the course of a trial. It is unfortunate that the reason that the Appellate Court brought this case back here in 2008 was based on an affidavit that the supposed author of it says that was a lie. 2008. This is 2015. So it was over seven years ago. After considering all the factors here, I am going to deny [petitioner's] postconviction petition.

(R. #15-2295: Y7-8)

*Pro Se* Section 116-3 Motion for Forensic Testing

On February 7, 2012, while his post-conviction proceedings were taking place, petitioner filed a *pro se* section 116-3 motion for forensic testing, requesting IBIS testing and fingerprint testing of the five spent cartridge casings found at the scene, fingerprint testing of the CTA card found at the scene and DNA testing of the baseball cap found at the scene. (C.L. #13-0177: 391-402)  The State moved to dismiss the motion in part, but agreed to do IBIS testing of the casings. (C.L. #13-0177: 423-430; R. #13-0777: F2-6, H2) As later argued by the State, fingerprint analysis of the casings had already been done and no suitable latent prints had been found, and testing on the card and hat were not necessary since they were not evidence used at trial. (R. #13-0177: H3)  The court granted the State's motion to dismiss and later affirmed that ruling when it denied petitioner's motion to reconsider. (C.L. #13-0177: 449; R. #13-0177: F6-7, L2)

On December 10, 2012, petitioner filed a second motion for forensic testing, asking for Polymerase Chain Reaction ("PCR") amplification of DNA from any smudges left on the recovered cartridge casings. (C.L. #13-0177: 474-483; R. #13-0177: L4-6) In response, the State expressed concern that such testing might not even be possible "in light of the fact that the evidence has already been subjected to handling in

18

both fingerprint analysis and ballistic analysis." (R. #13-0177: L4) The State, however, informed the court that they would call the lab and look into the matter. (R. #13-0177: L4-6)

On January 8, 2013, the State informed the court that they had spoken to Caryn Tucker and the DNA supervisor at the Illinois State lab, Cecilia Doyle, and they informed him that during the ballistic testing a "clean technique" was not used during the testing of the casings since it was not anticipated that later DNA testing would be sought on the evidence. (R. #13-2279: E4, E8) As the prosecutor explained, a clean technique meant the use of gloves, masks or anything else that would prevent contamination of the evidence and that in this case "it was handled extensively in the ballistic testing phase" and therefore, the DNA supervisor had indicated to the State that they would object to any DNA testing on the casings. (R. #13-2279: E4) Based on this, the State informed the court that they would be objecting to petitioner's DNA request and that petitioner is unable to meet his burden under section 116-3 of establishing that the evidence has been properly preserved. (R. #13-2279: E4)   The court ordered a hearing on the issue and asked to hear testimony from the lab personnel. (R. #13-2279: E5-8) The parties agreed that ballistic expert Caryn Tucker, a DNA supervisor, and fingerprint expert Christy Fischer would be called to testify at the hearing. (R. #13-2279: E8-12) The court denied petitioner's request to call Detective Padilla as a witness finding that his testimony would not be relevant to the issue of whether DNA testing was feasible on the casings. (R. #13-2279: E10-12)

On June 17, 2013, a hearing was held on petitioner's 116-3 motion for PCR DNA testing on the casings. Illinois State Police ("ISP") latent fingerprint examiner Christy

19

Fischer testified that in 2002, she conducted fingerprint analysis testing on the five fired cartridge casings in 2002. (R. #13-2279: I5) Specifically, Fischer processed the casings with UV light, did cyanoacrinate fuming, applied black powder, applied ardox which is a stain that fluoresces rhodamine and applied another dye that fluoresces with laser light. (R. #13-2279: I14)  While conducting these tests, Fischer wore latex gloves, a coat, and eye wear. (R. #13-2279: I5-6, I13) However, she did not wear anything covering her mouth because it was not "common practice."  (R. #13-2279: I5-6)  According to Fisher, if DNA testing had been initially requested then it would have been done first prior to any other testing. (R. #13-2279: I13)

ISP forensic scientist Caryn Tucker testified that, in 2002, she conducted a "firearms analysis" on the recovered casings to see if they were fired from the same gun. (R. #13-2279: I6-8, I21) This was done after the latent fingerprint analysis on the casings and because there was black powder residue on the casings, Tucker cleaned them with acetone. (R. #13-2279: I19, I22) Tucker also handled the "outside packaging" of the casings sometime in 2012, while conducting a "paperwork examination." (R. #13-2279: I8) According to Tucker, she did not wear gloves or protective face wear during her examinations. (R. #13-2279: I6-7)  Tucker further testified that numerous other people also handled and tested the casings and to her knowledge, none of these people wore protective gear either. (R. #13-2279: I6-7)  Specifically, Tucker noted that an evidence technician at her lab touched and imaged the casings for the IBIS database, and that an examiner at the ISP lab in Carbondale also handled the casings. (R. #13-2279: I7)  As specifically testified to by Tucker, the "normal procedure" would "not typically" require the use of protective gloves or face wear during these examinations. (R. #13-2279: I7)

20

Tucker further testified that she did not decide which tests to do on evidence and that it was the investigating officer that made the request. (R. #13-2279: I17-18)

DNA expert Greg Didomenic testified that he reviewed the lab reports generated in petitioner's case pertaining to the shell casings and listened to the testimony given by Fischer and Tucker at the hearing regarding their handling of the casings at issue. (R. #13-2279: I8) As Didomenic explained, by their very nature cartridge casings are "a very small source of DNA" and the small size "does not lend itself very well to much DNA being deposited [there]." (R. #13-2279: I9) Based on this, Didomenic opined that in his expert opinion this, coupled with the fact that numerous individuals handled these casings without protective gear, the casings were "potentially contaminated" and he would not "expect meaningful DNA" on the casings. (R. #13-2279: I8-9) Didomenic further testified that although PCR DNA testing does amplify even small amounts of DNA to a more "usuable" amount, the amount of DNA from a cartridge casing would be so small that such a test would not yield any relevant results. (R. #13-2279: I11) Didomenic noted that had "clean technique precautions" been taken with the casings, then getting DNA evidence would have been "more likely." (R. #13-2279: I11)

After hearing the testimony and arguments, the circuit court denied petitioner's motion for PCR DNA testing of the cartridge cases. (R. #13-2279: I28-29) In so doing, the court stated:

> It appears very clear to this court that at the time the physical evidence was handled, there was no request for DNA testing, therefore, testimony that it was handled by latent prints where gloves were used, and then firearm, and tool marks was handled, those things, they were handled properly. They were handled in a manner that was consistent with the way the scientists do their tests.
> Had there been a request for DNA at that time, at that time, then the handling might have been different. In fact, it sounds like it would have

21

gone to DNA first for a clean technique to have been used. Clean technique was not used in this case from the beginning through no malicious actions for no fault of the Crime Lab or the State police, because there was no request for DNA at that time.

It sounds as though defendant in some ways is conceding that at this point DNA, to test for DNA would be questionable because of the way that it was handled in the beginning.

But let me say this. It appears very clear to this court that to order DNA analysis of the cartridge casings at this point would be too fruitless because of the way that the evidence was handled. Even assuming that this was a situation where the burden was on the State to prove lack of maliciousness, this court finds no ill will at all in terms of the way the evidence was handled. It was handled consistent with scientific procedures based on the requests that were on file at the time.

So I'm going to specifically say, and this court rules, that DNA testing would not yield probative results in this case.

(R. #13-2279: I28-29)

Petitioner now appeals the third-stage denial of his post-conviction claim of actual innocence and the circuit court's denial of his request for DNA testing.

## ARGUMENT

### I.

### THE CIRCUIT COURT PROPERLY DENIED PETITIONER'S POST-CONVICTION CLAIM OF ACTUAL INNOCENCE AFTER AN EVIDENTIARY HEARING.

Petitioner contends that the circuit court committed manifest error in denying his post-conviction petition and alleges that the evidentiary hearing revealed newly discovered evidence of his actual innocence that would likely change the result on retrial. (Pet. Br. 19-41) The People disagree. The circuit court made a reasonable, objective determination, based on all of the facts and surrounding circumstances in the case— including the trial evidence and the live testimony before it—that the disavowed affidavit of Ellen Anderson, the testimony of convicted murderer, Antoine Ford, and the testimony of petitioner were unworthy of belief and that, it was not likely that its substantive introduction at a retrial would change the result. Therefore, the circuit court's denial of petitioner's collateral plea for a new trial was proper and should be affirmed on appeal.

The Illinois Post-Conviction Hearing Act (hereinafter the Act) provides a method by which a defendant may challenge his conviction or sentence for violations of federal or state constitutional rights. 725 ILCS 5/122-1, *et seq.* (2012); People v. Harris, 224 Ill. 2d 115, 124-25 (2007). A proceeding under the Act is not intended to be a continuation of or substitute for direct appeal. Rather, it is a collateral proceeding that is limited to claims that were not, and could not have been, previously litigated. Harris, 224 Ill. 2d at 124-25. Thus, all issues decided on direct appeal are *res judicata*, and all issues that could have been raised are forfeited. Id.

23

A post-conviction proceeding contains three distinct stages. Id. at 125. The instant proceeding involves a denial of relief following a third-stage evidentiary hearing. After an evidentiary hearing where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous. People v. Pendleton, 223 Ill. 2d 458, 473 (2006). Manifest error is that which is "clearly evident, plain, and indisputable." People v. Johnson, 206 Ill. 2d 348, 360 (2002). This is based on "the understanding that the post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a 'position of advantage in a search for the truth which is infinitely superior to that of a tribunal where the sole guide is the printed record.'" People v. Coleman, 183 Ill. 2d 366, 384 (1998).

Courts may consider a free-standing claim of actual innocence in a post-conviction proceeding if the claim is based on newly discovered, material and noncumulative evidence that the defendant is innocent of the crime for which he has been tried, convicted and sentenced. People v. Harris, 206 Ill. 2d 293, 301 (2002). Newly discovered evidence is evidence that was unavailable at trial and could not have been discovered sooner through due diligence. Id. A defendant is only entitled to relief on his claim of actual innocence if the evidence is of such a conclusive character that it would probably change the result of retrial. Id.

For example, in People v. Gonzalez, 407 Ill. App. 3d 1026, 1035-37 (2nd Dist. 2011), the court upheld the trial court's denial of a post-conviction claim of actual innocence after an evidentiary hearing, where the circuit court determined that the recantation testimony was not credible. In Gonzalez, the defendant claimed actual

24

innocence based on the affidavit of his co-defendant Lewis, who averred that the defendant was not present and did not participate in the murder of the victim. Id. at 1029. After a third-stage evidentiary hearing, the circuit court found that Lewis' testimony was not "the slightest bit credible and verge[d] on being worthless," where it was completely at odds with his own trial testimony, and the testimony of two disinterested witnesses at trial who placed [petitioner] at the scene of the crime. Id. at 1034. The court upheld the trial court's ruling, stating that where the trial court found that Lewis' recantation testimony was not credible, and there was no basis in the record for second guessing the trial court's judgment, it was unlikely that the testimony would change the result on retrial. Id. at 1035-37. The Court noted, "[a]n allegation of newly discovered evidence of innocence is not intended to question the strength of the State's case. An allegation of newly discovered evidence of innocence seeks to establish the defendant's actual innocence of the crimes for which he has been tried and convicted." Id. at 1037. Thus, where the co-defendant's testimony was not conclusive as to the defendant's alleged actual innocence, the trial court's decision was not manifestly erroneous. Id.

Here, as in Gonzalez, the circuit court's ruling denying petitioner's post-conviction petition was not manifestly erroneous. The circuit court held an evidentiary hearing on petitioner's claim of actual innocence where it assessed the demeanor and testimony of the witnesses as it did in Gonzalez, and found Anderson's affidavit, Ford's testimony, and petitioner's testimony not credible. (R. #15-2295: Y2-8) These credibility determinations were made after the circuit court listened to Anderson's, Ford's and petitioner's testimonies and observed their demeanor. (R. #15-2295: V5-116, W7-52, X13-55) Additionally, the circuit court also reviewed the record of petitioner's trial,

25

reviewed the affidavits and documents submitted by petitioner and the State, and weighed petitioner's claim of innocence against this contrary evidence. (R. #15-2295: X4-12, X58-62) The record wholeheartedly supports the circuit court's credibility determinations.

The credibility of Anderson's affidavit in support of petitioner's innocence was fatally undermined by her own admission at the evidentiary hearing that she had lied in her affidavit. (R. #15-2295: W31, W40-47, W53) In her affidavit Anderson claimed that she did witness the shooting and that petitioner was not shooter. (R. #13-0177: 193-195) However, at the hearing, Anderson admitted that she was not at Wentworth Gardens that night and did not witness the shooting. (R. #15-2995: W31-32) Anderson also went through the allegations in her affidavit and disavowed each and every claim she made in support of petitioner's innocence. (R. #15-2995: W40-47) Anderson testified at the hearing that petitioner asked her to write the affidavit and she did it out of loyalty to petitioner because she loved him and believed him to be innocent based on what he told her. (R. #15-2995: W36-37, W47) Anderson further testified that, while she did write the affidavit and lie in it for petitioner, once she realized she was going to have to testify, under oath, at the evidentiary hearing and faced possible perjury consequences, she opted to tell the truth and not lie for petitioner. (R. #15-2995: W25-27, W42) In fact, Anderson even gave a videotaped statement disavowing her affidavit when contacted by the State's Attorney's office prior to the evidentiary hearing. (R. #15-2995: W40-42)

In view of Anderson's testimony at the hearing disavowing her affidavit, the circuit court's conclusion that Anderson's affidavit was not credible was entirely proper and justified. Additionally, based on this, petitioner's contention that Anderson's change

26

of heart at the evidentiary hearing was motivated by her fear of Brown and the threats he allegedly made to her was properly rejected by the circuit court. (Pet. Br. 30)  The only mention of any threats being made by Brown was in the affidavit that Anderson admitted was a total lie.

Moreover, the circumstances surrounding the making of Anderson's affidavit also severely undermined its credibility and supported the circuit court's conclusion that the affidavit was not believable.  Anderson, who had a previous romantic relationship with petitioner, knew that petitioner was incarcerated in 2003. (R. #15-2995: W11, W34)  Anderson drafted her affidavit in 2006, three years later. (R. #13-077: 193-195)  Additionally, Anderson only wrote her affidavit after petitioner asked to see her in prison and after Anderson met with petitioner almost ten times. (R. #15-2995: W35-39)  Anderson testified that the only person she spoke to about the shooting was petitioner and that petitioner supplied her with numerous police documents which allowed her to write out the details in her affidavit regard the shooting. (R. #15-2995: W37-39, W47-49)  Importantly, petitioner corroborated Anderson's claims that he initiated contact with Anderson, that she visited with petitioner numerous times in prison, and that petitioner provided her with documents. (R. #15-2995: X20-21)   In fact, in 2006, the year Anderson's affidavit was drafted, petitioner admitted that he had in his possession un-redacted copies of the police incident report, several police supplemental reports, several police general progress reports, the police closing report on the shooting, the handwritten statements of Darnell Brown and Kenneth Williams, the grand jury transcript of Darnell Brown and Kenneth Williams, and the trial testimony of Kenneth Williams, Darnell Brown, and Louis Dean. (R. #15-2995: X42-47) Thus, Anderson's affidavit was clearly

27

made under suspicious circumstances that undermined its credibility. *See* People v. Brooks, 187 Ill. 2d 91, 132-33 (1999) (where the Court affirmed the lower court's credibility determination of a recantation witness where the recantation "was made under suspicious circumstances"). In view of all this, the circuit court's determination that Anderson's affidavit was not credible was not a "clearly evident, plain, and indisputable" error. *See* Johnson, 206 Ill. 2d at 360.

Similarly, the circuit court's determination that Antoine Ford's testimony and affidavit in support of petitioner's claim of actual innocence were not credible was also supported by the record. In his affidavit and at the hearing, Ford claimed that he witnessed the shooting and saw Williams, not petitioner, shoot Rials. (C.L. #15-2995: 139-145; R. #15-2995: V27-28) Yet, by his own admission, Ford never told the police what he saw even though they allegedly spoke to him on the night of the shooting. (R. #15-2995: V28) Instead, Ford waited almost 12 years before telling anyone that he witnessed the shooting. (R. #15-2995: V61) It was only after being convicted of murder and armed robbery and being transferred from Menard prison to Stateville prison did Ford execute his affidavit in support of petitioner. (R. #15-2995: V46-49, V61) Notably, Ford's status as a convicted murderer was a factor that could be considered by the circuit court in gauging credibility and as the circuit court properly concluded, weighed against Ford. (R. #15-2995: Y8) *See* People v. Coleman, 2013 IL 113307, ¶¶ 105-106 (recognizing that the criminal background of a witness affects their credibility). By coincidence, petitioner happened to also be housed in Stateville with Ford when Ford executed his affidavit on behalf of petitioner. (R. #15-2995: V49, X55) Further, Ford's stated excuse for his 12-year delay in not coming forward earlier – too scared to say

28

anything until he got to prison – was fatally undermined by the fact that Ford was imprisoned in 2004 and still did not come forward until 2014. (R. #15-2995: V35, V46-49, V63) Ford also refused to talk to prosecutors about his affidavit until he cleared it with petitioner first. (R. #15-2995: V37-40) Thus, the circumstances surrounding Ford's affidavit severely undermined its credibility as well as Ford's later testimony consistent with his affidavit, and supported the circuit court's conclusion that Ford was not a believable witness.

Ford's inability to expand on critical details of the shooting beyond what was outlined in his affidavit further supported the circuit's court's credibility determination. According to Ford, he wrote out the details in his 2014 affidavit from memory. (R. #15-2995: V78-79)  In his affidavit, Ford stated that he saw Williams with a gun. (C.L. #15-2995: 143) Yet, when asked at the hearing, Ford could not give any further details on the gun. (R. #15-2995: V91)  Ford also said in his affidavit that Williams shot Rials in the head first. (C.L. #15-2995: 143) Yet, when asked at the hearing, he was unable to be specific whether Rials was shot in the front of the head or the back of the head. (R. #15-2995: V91-92)  Ford also claimed that Rials was shot in "the middle of the street" and that after Rials was shot, he fell to the ground. (R. #15-2995: V23-27, V96)  Yet, when asked at the hearing and shown crime scene photos, Ford acknowledged that the victim's blood was on the curb and not the street. (R. #15-2995: V101-103)  It was stipulated at trial that the body was on the sidewalk. (R. #03-3533: 378)  In view of all this, the circuit court's determination that Ford was not credible was not a "clearly evident, plain, and indisputable" error. *See* Johnson, 206 Ill. 2d at 360.

29

In the same vein, the circuit court's determination that petitioner's self-serving claim of innocence was not believable was justified. At the hearing, petitioner testified for the first time to an alibi at the time of the shooting and admitted that he did not testify at his trial or present an alibi defense. (R. #15-2995: X13-18) Petitioner blamed his trial attorney for this and claimed that he was prevented from testifying since "that decision was waived by [his] trial attorney." (R. #15-2995: X18-19)  This was contradicted by the trial record which clearly demonstrated that petitioner was admonished of his right testify and voluntarily opted not to do so. (R. #03-3533: 489-492) Petitioner also denied being a member of the Mickey Cobras gang in 2002, a rival gang to the Gangster Disciples that hung out at the Wentworth Gardens and attempted to explain away his tattoo which read "MC" by claiming that it represented the initials of his name, Joseph Booker. (R. #15-2995: X31) Yet, in his 2003 pre-sentence investigation report, petitioner admitted that he was a member of the Mickey Cobras. (C.L. #03-3533: 62)  Additionally, petitioner's assertion that he did not tell Anderson or Ford what to say in their respective affidavits was fatally undermined by Anderson's testimony, found to be credible by the circuit court, that petitioner was instrumental in the drafting of her affidavit and provided her with the details, as well as the suspicious circumstances under which both affidavits came about.

Accordingly, for the reasons stated, the circuit court's determination that Anderson's affidavit, Ford's affidavit and testimony, and petitioner's testimony were not credible was not manifestly erroneous and should be affirmed.

Furthermore, as in Gonzalez, the evidence presented at the evidentiary hearing was not of such conclusive character that it would probably change the result at retrial.

30

SA 462

In People v. Edwards, 2012 IL 111711, ¶ 32, *citing* Schlup v. Delo, 513 U.S. 298, 324 (1995), the Illinois Supreme Court recognized that to meet this standard the [petitioner] must provide "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Additionally, the proffered evidence must support total vindication or exoneration, not merely present a reasonable doubt as to a defendant's guilt. People v. Lofton, 2011 IL App (1st) 100118, ¶ 40.

In this case, petitioner failed to present the required "trustworthy eyewitness accounts" which would support total vindication or exoneration. As the circuit court properly found, none of petitioner's "newly discovered" evidence was credible and in view of this, it was not of a sufficiently conclusive character such that the result on retrial would probably change. (R. #15-2295: Y8) *Contrast* People v. Ortiz, 235 Ill. 2d 319, 335 (2009) (the circuit court did not assess the credibility of the evidence provided by the defendant in support of a new trial); People v. Molstad, 101 Ill. 2d 128, 134-35 (1984) (same). As stated, Anderson's affidavit was disavowed by Anderson herself who admitted that she lied in it and that she did not witness the shooting. Thus, on retrial, Anderson's affidavit would have no discernable impact on the outcome since the trier-of-fact would not be viewing her affidavit in a vacuum but in conjunction with her recantation of the affidavit. Likewise, the impact of Ford's affidavit/testimony at the hearing would also be negligible and fatally undermined by the fact that he did not say anything for over 12 years in conjunction with the suspicious circumstances that did prompt Ford into breaking his silence. Further, on re-trial, the trier-of fact would also be presented with evidence from three eyewitnesses who positively identified petitioner as

31

the shooter at a line-up and in court in the original trial. (R. #03-3533: 196, 201, 259, 298, 306-308) Notably, in affirming petitioner's conviction on direct appeal, this Court noted that "at trial all three witnesses provided unwavering testimony that they actually observed petitioner shoot the victim." Booker, 03-3533 (Rule 23 order, p. 10).    Thus, petitioner has failed to show that the evidence he presented at the hearing, already deemed incredible, was of such conclusive character that it would probably change the result on retrial. Therefore, the circuit court's denial of post-conviction relief was proper and should be affirmed.

On appeal, the bulk of petitioner's challenge to the circuit court's denial of his claim stems from his personal assessment regarding what evidence was and was not credible. (Pet. Br. 19-40) However, as stated, it was the role of the circuit court to make credibility determinations at the hearing and petitioner is unable to establish that the circuit court's credibility determinations were manifestly erroneous. Instead, petitioner simply ignores the credibility findings made by the circuit court against him and continues to center his entire argument on his own assessment that Anderson's and Ford's affidavits, which claimed that he was not the shooter, were true and that a different result is likely on retrial because a new trier-of fact "would probably believe" these claims that he was not the shooter. (Pet. Br. 24-34) Yet, like the circuit court in this case, any new-trier-of fact would also be fully apprised of the totality of the circumstances surrounding how these affidavits came to fruition and would also reach the reasonable and very plausible conclusion that petitioner orchestrated this evidence and it was not true.

32

Petitioner's contention that Brown's testimony at trial regarding a woman named "Ella" corroborated the fact that Anderson was present at the time of the shooting and that her affidavit was true, is unavailing. (R. #15-2995: X79-80); (Pet. Br. 31) Ella and Anderson were not the same person. At trial, Brown testified that prior to the shooting, he was talking to a young lady named Ella. (R. #03-3533: 268-270) Brown also testified that he knew Ella, and knew that she lived in Wentworth Gardens. (R. #03-3533: 268-269) In sharp contrast, Anderson did not live at Wentworth Gardens. Indeed, at the hearing, Anderson testified that she "visited" the Wentworth Gardens and knew people there (R. #15-2995: W29), and even in her affidavit she claimed that she visited a friend at Wentworth Gardens on the night of the offense and had called a cab to take her home. (C.L. #13-0177: 193) Thus, the record indicates that the "Ella" Brown spoke to was not Anderson.

Petitioner further notes that, in granting him second stage review of his actual innocence claim, this Court has already noted that the identification testimony at trial, "when considered in conjunction with Anderson's proffered account of the incident, provides weak evidence of [petitioner's] guilt" and that "if Anderson testifies, the weight of the evidence in favor of [petitioner's] innocence would be much stronger and would probably change the result upon retrial." (Pet. Br. 35-36) However, in gauging whether petitioner met his burden to proceed to second stage review, the claims in Anderson's affidavit were necessarily taken as true by this Court at that juncture. *See* People v. Brown, 236 Ill. 2d 175, 193 (2010) (at first stage review the court must "accept as true…the allegations of the pro se petition"). It was under this legal premise that this Court concluded that the result on retrial would probably change if Anderson testified

33

consistently with her affidavit. Booker, No. 06-2581 (Rule 23 order, pp. 4-8). In sharp contrast, the instant appeal involves a third stage review of petitioner's actual innocence claim and Anderson's affidavit (and Ford's affidavit for that matter) no longer has the presumption of being true but can be challenged and deemed not credible, as it was in this case by the circuit court.

Petitioner next claims that he was prevented from presenting certain evidence (either in an amended post-conviction petition or at the evidentiary hearing) which supported his claim of actual innocence; namely, Melissa Westmoreland's statement and a statement made by Monica Ramsey to the police and recorded in a police report. (Pet. Br. 36-38) However, the circuit court's decision not to allow such evidence was proper. A circuit court has wide discretion to limit the type of evidence it will admit at a post-conviction evidentiary hearing. People v. Coleman, 206 Ill. 2d 261, 278 (2002). Neither Westmoreland nor Ramsey witnessed the shooting and therefore, had no relevant information in support of petitioner's claim of actual innocence. (C.L. #15-2995: 128-134, 155) *See* Lofton, 2011 IL App (1st) 100118 at ¶ 40 (to prevail on an actual innocence claim the proffered evidence must support total vindication or exoneration, not merely present a reasonable doubt as to a defendant's guilt). Moreover, as petitioner acknowledges, they could have been called as witnesses by him but were not. (Pet. Br. 37) Notably, on this point, because petitioner was *pro se*, the circuit court and the State were very accommodating to him and therefore, there was no excuse for petitioner not to ask for assistance in getting these witnesses to appear at the hearing if he really wanted the court to consider their testimony.

34

Additionally, the import of the evidence at issue was mainly inadmissible hearsay statements made to these witnesses by others and as such, was not "admissible evidence at a future retrial." (Pet. Br. 36-37) Hearsay evidence generally cannot be used to support a post-conviction claim. People v. Morales, 339 Ill. App. 3d 554, 565 (1st Dist. 2003). Petitioner's reliance on People v. Sanchez, 115 Ill. 2d 238 (1986), does not mandate a different result. (Pet. Br. 37) In Sanchez, the defendant in a capital case filed a petition pursuant to Section 2-1401 of the Code of Civil Procedure and supported it with an investigator's hearsay affidavit. 115 Ill. 2d at 283. In the affidavit, the affiant stated that material facts were known to a witness, but that the witness' affidavit could not be procured due to the witness' invocation of the Fifth Amendment. Id. at 283. Under these facts, the Supreme Court declined to apply the rule concerning hearsay affidavits and examined Illinois Supreme Court Rule 191, which governs affidavits filed in proceedings brought under section 2-1005 (summary judgment), 2-619 (involuntary dismissal), and 2-301(b) (special appearances). Id. at 284-85. The Supreme Court determined that Rule 191(b) provides an exception to the general rule against hearsay affidavits where "material facts which ought to appear in the affidavit are known only to persons whose affidavits affiant is unable to procure by reason of hostility or otherwise." Id. at 285. The court concluded that the reasoning behind the rule's exception was applicable in a setting concerning a capital case. In sharp contrast, the instant case is not a capital case and does not involve a 2-1401 petition and therefore, the reasoning applied by the Sanchez court in allowing the hearsay affidavit does not apply in this case. For the sake of argument, if any error occurred by the circuit court, it was harmless where the excluded evidence was, in essence, cumulative (or as characterized by petitioner – corroborative (Pet. Br. 37-38))

35

to other evidence considered at the evidentiary hearing. *See* People v. Demeron, 153 Ill. App. 3d 440, 446 (1st Dist. 1987) (harmless error found where the excluded evidence was, *inter alia*, cumulative to other evidence).

Lastly, petitioner argues that the circuit court applied the wrong legal standard in determining whether a new trial was warranted. (Pet. Br. 38-39) However, petitioner's argument imbues the circuit court's harmless articulation, at best, for not using terms like "probably" or "likely" in its ruling with undeserved gravity. The court is "presumed to know the law and apply it properly, absent an affirmative showing to the contrary in the record." In re C.R., 191 Ill. 2d 338, 345 (2000). Here, a review of the entire record demonstrates that without question the circuit court was fully aware of the proper standard of review on actual innocence claims at third stage. In fact, at one point during the evidentiary hearing, the circuit court explained to petitioner what the purpose of a third-stage evidentiary hearing was and stated: "It is to determine whether or not there is going to be competent evidence to show that maybe the result in the trial would have been different." (R. #15-2995: X9) (emphasis added). The proper standard was also stressed to the circuit court by both parties during their respective closing argument at the hearing. (R. #15-2995: X84, X103) Thus, the record, viewed as a whole, establishes that the circuit court applied the correct legal standard.

In the same vein, petitioner's attempt to find fault with the circuit court's ruling for not mentioning certain evidence (i.e., the trial evidence) is meritless. Importantly, petitioner's argument is bereft of any legal authority that more detail in the ruling was required. Furthermore, contrary to petitioner's assertion, it is evident that the circuit court did consider not only the evidence from the evidentiary hearing but also from the trial.

36

The parties argued the trial evidence during their closing arguments at the hearing. Additionally, transcripts of the trial evidence were admitted into the evidence by the circuit court and the court clearly stated that it wanted to review the documents that it had received prior to ruling. (R. X111)

In conclusion, the circuit court's ruling denying petitioner's the post-conviction petition should be affirmed.

## II.

**THE CIRCUIT COURT PROPERLY DENIED PETITIONER'S SECTION 116-3 MOTION FOR PCR DNA TESTING ON THE DISCHARGED CARTRIDGE CASINGS FOUND AT THE CRIME SCENE.**

Petitioner contends that the circuit court improperly denied his motion for PCR DNA testing on the five discharged cartridge casings found at the crime scene entered into evidence against him at trial because he established a prima facie case under 725 ILCS 5/116-3 for each statutory element for such testing. (Pet. Br. 41-50) However, the section 116-3 motion was properly denied where petitioner failed to satisfy his burden under subsection (a) that the DNA test requested was unavailable at the time of trial and where, after an evidentiary hearing, the circuit court properly concluded that subsection (c)(1) was also not met where there was no scientific potential with further testing to produce new, noncumulative evidence materially relevant to petitioner's assertion of actual innocence. Accordingly, this Court should affirm the circuit court's denial of petitioner's 116-3 motion.

At the outset, despite petitioner's assertions to the contrary, the proper standard of review is whether the circuit court's ruling denying the 116-3 motion was manifestly

37

erroneous. (Pet. Br. 42)  In People v. Slover, 2011 IL App (4th) 100276, ¶¶ 13-16, the

appellate court noted that a *de novo* review is appropriate where the circuit court's

decision is necessarily based upon its review of the pleadings and the trial transcripts and

not on the assessment of the credibility of the witnesses. However, where as in this case,

an evidentiary hearing is held, and factual findings and credibility determinations are

made, the circuit court's decision should not be reversed unless it is manifestly erroneous,

i.e., error that is "clearly evident, plain, and indisputable." Id. As the appellate court in

Slover explained, this deferential standard reflects the understanding that the circuit court

is in the best position to observe and weigh the credibility of the witnesses. Id.

Accordingly, the People maintain that the manifestly erroneous standard is applicable,

but note that, the same result would be reached under either standard – that the denial of

petitioner's section 116-3 motion was proper.

> Section 116-3 provides:
>
> Motion for fingerprint, Integrated Ballistic Identification System, or forensic testing not available at trial regarding actual innocence.
>
> (a) A defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of fingerprint, Integrated Ballistic Identification System, or forensic DNA testing, including comparison analysis of genetic marker groupings of the evidence collected by criminal justice agencies pursuant to the alleged offense, to those of the defendant, to those of other forensic evidence, and to those maintained under subsection (f) of Section 5-4-3 of the Unified Code of Corrections, on evidence that was secured in relation to the trial which resulted in his or her conviction, and:
>
> (1) was not subject to the testing which is now requested at the time of trial;
>
> or
>
> (2) although previously subjected to testing, can be subjected to additional testing utilizing a method that was not scientifically available at the time

38

of trial that provides a reasonable likelihood of more probative results. Reasonable notice of the motion shall be served upon the State.

(b) The defendant must present a *prima facie* case that:

(1) identity was the issue in the trial which resulted in his or her conviction;

and

(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect.

(c) The trial court shall allow the testing under reasonable conditions designed to protect the State's interests in the integrity of the evidence and the testing process upon a determination that:

(1) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence even though the results may not completely exonerate the defendant;

(2) the testing employs a scientific method generally accepted within the relevant scientific community. 725 ILCS 5/116-3 (West 2012).

Thus, section 116-3 allows convicted defendants who maintain their innocence to request forensic testing, subject to the criteria established therein. The defendant bears the burden of establishing that he is entitled to obtain the testing sought under section 116-3. People v. O'Connell, 227 Ill. 2d 31, 36 (2007).

In this case, the People concede that for purposes of a section 116-3 motion, identity was an issue at trial, that the PCR DNA testing sought by petitioner is generally accepted in the scientific community, that such a test was not performed at trial and that the chain of custody for the shell casings was proper. (Pet. Br. 42-43) However, the denial of petitioner's 116-3 motion was still justified on several, but equally availing, grounds. *See* People v. English, 2013 IL App (4th) 120044, ¶ 14 (a trial court's ruling on a

39

section 116-3 motion can be affirmed on any ground in the record regardless of whether the trial court relied on it).

First, denial of the section 116-3 motion was justified where petitioner was unable to satisfy subsection (a) of section 116-3 and show that the PCR DNA testing was not done at trial because such technology was not available at the time. For example, in People v. Brooks, 221 Ill. 2d 381, 391-94 (2006), the defendant filed a section 116-3 motion seeking additional PCR DNA testing on evidence that was tested for DNA using other tests at trial. According to the defendant, "[t]he DNA technology available today was not available at the time of trial." Id. at 391. The trial court denied the motion. The appellate court affirmed the trial court's denial of the motion on the grounds that the defendant could not show that his evidentiary sample had not been previously subjected to PCR DNA testing at the time of his trial. Id. at 392. On appeal to the Illinois Supreme Court, the defendant argued that he made a *prima facie* case as required under section 116-3 by asserting that identity was at issue at the trial; that the vaginal swab was not subject to PCR DNA testing at the time of the trial; and that the evidence to be tested had been subject to a chain of custody sufficient to establish that it had not been substituted, tampered with, replaced, or altered in any material respect. Id.

In rejecting the defendant's argument and affirming the denial of the motion, the Brooks court held that the plain language of subsection (a) of section 116-3 required the defendant to show that the evidence in question was not subject to the requested test at the time of the trial and that the reason it was not subject to such testing was because the technology for the requested test was unavailable at that time. Id. at 393-94. In finding that the defendant had not met his burden under subsection (a), the Brooks court noted

40

that the trial took place in 2000 and that the technology for PCR DNA testing was available at that time and that this scientific method was recognized by the judiciary nationwide, including Illinois.[4] Id. Consequently, the Court concluded that because unavailability of the testing at the time of trial is the only reason the 116-3 statute allows for granting a request, the trial court did not err in denying the defendant's section 116-3 motion. Id. *See also* People v. Rozo, 2012 IL App (2d) 100308, ¶¶ 9-10 (where the appellate court found that the trial court did not err by denying the defendant's request for DNA-STR testing pursuant to 725 ILCS 5/116-3 of bloodstains found on the glove and jacket because his own experts opined that the requested test was available and in use at the time of trial).

The holding in Brooks is dispositive to the issue in the instant case and readily supports the circuit court's denial of petitioner's section 116-3 motion. Petitioner's trial took place in 2003. At that time, the PCR DNA testing requested by petitioner in his 116-3 motion was available and as noted in Brooks, a recognized and accepted scientific method. Moreover, defendant knew about the casings as potential evidence against him at trial from the State's answer to discovery. (C.L. #03-3533: 19-23) As such, like the Brooks defendant, petitioner was unable to satisfy subsection (a) of section 116-3 and

---

[4] The following cases were cited to by the Brooks court in support: People v. Pope, 284 Ill. App. 3d 695, 703-05 (1996) (noting that PCR testing accepted by the scientific community and collecting cases); United States v. Beasley, 102 F.3d 1440, 1448 (8th Cir. 1996) (concluding that courts in the Eighth Circuit can take judicial notice of the general reliability of PCR DNA testing); Harmon v. State, 908 P.2d 434, 440 (Alaska App. 1995) (holding that there is little question concerning the scientific acceptance of the theory underlying PCR DNA testing); State v. Brown, 949 S.W.2d 639, 641 (Mo. App. 1997) (same); Wood v. State, 1998 OK CR 19 (Okla. 1998); Spencer v. Commonwealth, 240 Va. 78 (1990).

41

denial of his section 116-3 motion was entirely justified on this ground and should be affirmed.

Second, denial of petitioner's section 116-3 motion was also proper where petitioner was unable to satisfy subsection (c)(1) and show that the requested testing had the scientific potential to produce relevant evidence. For example, in Slover, the defendant filed a section 116-3 motion seeking AFIS testing on a guardrail fingerprint found at the bridge where the victim's body was dumped into the water. 2011 IL App (4th) 100276, ¶¶ 4-10. At an evidentiary hearing the circuit court heard testimony from two fingerprint experts who gave contrary opinions on the "suitability" of the guardrail fingerprint for AFIS testing. Id. Defense expert Kenneth Moses testified that the guardrail print was suitable to be run through AFIS, that the print came from the upper part of a thumb and that there were 13 points for identification. Id. In contrast, the State's expert Mary McCarthy testified that the guardrail print was unsuitable for AFIS testing, that she only found six points on the print for identification, and that the other possible points were unclear or obscured. Id. She further testified that she was unable to determine a pattern type of the fingerprint and that latent fingerprints with no identifiable pattern type should not be searched in AFIS. After hearing the testimony, the trial court denied the section 116-3 motion. Id. In so doing, the trial court stated that it found the State's expert's testimony more credible and that based on her testimony, the quality of the guardrail print was unsuitable for AFIS testing and therefore, "there [was] no potential to produce new evidence materially relevant to the defendants' assertion of actual innocence." Id. As such, the defendants had failed to satisfy subsection (c)(1) and the criteria for relief under section 116-3 was not met. Id.

42

On appeal, the trial court's denial of the motion was affirmed and found not to be manifestly erroneous. Id. at ¶¶ 21-24. In reaching this conclusion, the appellate court noted that the trial court executed its function, as trier of fact, of resolving conflicts between the parties' experts, and its reliance on the State's expert over defendants' does not render its decision erroneous. Id. The appellate court further noted that if, as the trial court determined, the fingerprint was of insufficient quality to perform an adequately controlled AFIS search, then, within the meaning of the 116-3 statute, the requested testing lacked the scientific potential to produce relevant evidence. Id. That is, while the requested AFIS search could conceivably result in the discovery of material evidence, this discovery would not be attributable to the scientific rigors of the testing and "[s]uch a shot in the dark is not the kind of forensic testing required in appropriate circumstances by section 116-3." Id.

Here, as in Slover, the circuit court's denial of the section 116-3 motion was also justified based on expert testimony regarding the non-feasibility of obtaining any relevant DNA evidence from the cartridge casings. Specifically, the circuit court heard testimony from latent fingerprint examiner Christy Fischer, firearms expert Caryn Tucker, and DNA expert Greg Didomenic. DNA expert Didomenic testified that the small size of the casings was not conducive to DNA being deposited on it and that even if a small amount of DNA was found on the casings, the amount of DNA would be so small that PCR DNA testing would not result in any relevant results. (R. #13-2279: I8-10) According to Didomenic, the better test for finding potential evidence on such surfaces was fingerprint analysis. (R. #13-2279: I8-10) Notably, fingerprint analysis of the casings was performed by Fischer but no latent prints were found. (C.L. #13-2279: 34) DNA expert Didomenic

43

further testified that based on his review of the lab reports and the testimony he heard from Fischer and Tucker at the hearing, it was clear that many people had handled the casings, some without wearing gloves and face masks, and that this would have contaminated the casings such that in his expert opinion, he would not expect to find "any meaningful DNA on these items." (R. #13-2279: I8-10) This opinion was buttressed by Tucker's testimony that during her examination she even cleaned the casings with acetone to get the black powder from the fingerprint analysis off. (R. #13-2279: I19, I22) Based on this expert testimony, as in <u>Slover,</u> the circuit court's conclusion that further testing for PCR DNA on the casings "would be too fruitless because of the way that the evidence was handled" (R. #13-2279: I28-29), was not manifestly erroneous and as such, justified the denial of the 116-3 motion.

Third, for the sake of argument, even if DNA was able to be retrieved from the casings, denial of the section 116-3 motion was still justified where petitioner was unable to establish that such evidence would be "materially relevant to [his] assertion of actual innocence." 725 ILCS 5/116-3(c)(1). The Illinois Supreme Court has explained that:

> [r]elevant evidence is "evidence tending to prove or disprove a matter in issue." Black's Law Dictionary 579 (7th ed. 1999). The term "materially" modifies the term "relevant" and means "to a significant extent or degree." Webster's Third New International Dictionary 1392 (1993). Thus, evidence which is "materially relevant" to a defendant's claim of actual innocence is simply evidence which tends to significantly advance that claim.

<u>People v. Savory,</u> 197 Ill. 2d 203, 213 (2001). In determining whether evidence is materially relevant, a reviewing court must examine the evidence introduced at trial, as well as the evidence the defendant seeks to test. <u>Id</u>. at 214.

The Illinois Supreme Court's decision in <u>People v. Savory,</u> 197 Ill. 2d 203 (2001),

44

demonstrates that the sought after testing would not be materially relevant here. In Savory, the defendant was convicted of two counts of first degree murder and eventually filed a section 116-3 motion for the DNA testing of bloodstained trousers that the defendant was wearing at the time of the murders. 197 Ill. 2d at 208-09. The defendant argued that if the testing of the bloodstains revealed that it was not the blood of one of the victims, that "would thus eliminate one of the pieces of physical evidence introduced by the State at trial." Id. at 209. The Savory court disagreed with the defendant's assertion and held:

> [T]hat the evidence defendant seeks to test is not "materially relevant" to his claim of actual innocence. We have carefully reviewed the transcript of defendant's second trial, conducted in 1981, which resulted in the convictions he now challenges. Our examination of the record shows that the testimony regarding the possible source of the bloodstain on the pair of trousers was only a minor part of the State's evidence in this case.

Id. at 214-15. The Court then recounted how the bloodstained pants were utilized at trial, and referenced in closing arguments, in order to demonstrate that they were not integral evidence of the defendant's guilt. Id. at 215-16.

Here, the DNA testing would be similarly immaterial. There is no requirement that petitioner load the gun to shoot the victim. Furthermore, the fact that petitioner did not leave prints on the casings does not exclude petitioner from the shooting. Instead, petitioner asks this Court to believe that if the shell casings did not bear his DNA, then the rest of the evidence adduced at trial, including three positive eyewitness identifications of people who positively identified him in a line-up and in-court, would be diminished. Such an argument is belied by logic. Additionally, as this Court held on petitioner's direct appeal, the positive identifications of three eyewitnesses that petitioner was the shooter was sufficient for the murder conviction. Booker, No. 03-3533 (Rule 23

45

order, pp. 8-9).

Petitioner's attempt to challenge the credible testimony of these three eyewitnesses with the affidavits of Ellen Anderson and Antoine Ford is meritless and completely ignores the nature of the testimony given by these witnesses at the third stage evidentiary hearing and the credibility findings made at that hearing. (Pet. Br. 44) As discussed in People's argument I, Anderson testified under oath at the evidentiary hearing that she lied in her affidavit, that she did not witness the shooting, and that she only submitted the affidavit in support of petitioner's alleged innocence at his urging. The circuit court found Anderson's recantation of her affidavit credible. Similarly, the circuit court found Ford's claim that petitioner was not the shooter completely incredible where, in addition to being a convicted murderer, Ford did not come forward until 12 years after the shooting and only after he and petitioner just happened to be housed at Stateville prison together. *See* People v. Gecht, 386 Ill. App. 3d 578, 584 (1st Dist. 2008) ("we must take into consideration the evidence introduced at trial and assess the evidence defendant is seeking to test. In the instant case, biological evidence played no significant role in defendant's trial and the evidence of defendant's guilt is overwhelming. Accordingly, any DNA testing would not significantly advance defendant's claim of actual innocence or produce evidence materially relevant to defendant's assertion of actual innocence."). *See also* People v. Jones, 334 Ill. App. 3d 61, 66 (1st Dist. 2002) (the defendant was not entitled to DNA testing on evidence where the reviewing court did "not find that the evidence in this case is sufficient to show that a forensic test favorable to [the defendant] would significantly advance his claim."); People v. Urioste, 316 Ill. App. 3d 307, 318 (5th Dist. 2000) (DNA testing not available to the defendant where the

46

results would not be "materially relevant" in light of sound identification and corroborating evidence).

In sum, the circuit court's denial of petitioner's section 116-3 motion was proper where petitioner failed to satisfy his burden under subsection (a) that the DNA test requested was unavailable at the time of trial and where, after an evidentiary hearing, the circuit court properly concluded that subsection (c)(1) was also not met where there was no scientific potential with further testing to produce new, noncumulative evidence materially relevant to petitioner's assertion of actual innocence.

Petitioner's analogy to the cases of People v. Hockenberry, 316 Ill. App. 3d 752 (2nd Dist. 2000), People v. Rokita, 316 Ill. App. 3d 292 (5th Dist. 2000), People v. Shum, 207 Ill. 2d 47 (2003), and People v. Henderson, 343 Ill. App. 3d 1109 (1st Dist. 2003), is unavailing. (Pet. Br. 44-45)  Unlike the instant case, Hockenberry, Rokita, Shum, and Henderson all involved sexual assault offenses and unlike the instant case, the DNA testing requested in these cases went to the heart of the identity of the perpetrator and was thus, relevant.

In Hockenberry, the defendant was convicted of home invasion and the aggravated criminal sexual assault of his ex-wife.  316 Ill. App. 3d at 754. The defendant sought DNA testing of semen found in the victim's vaginal swabs and on the victim's underwear and bed sheet, pursuant to section 116-3.  Id. Although this type of DNA testing was available at the time of the defendant's trial, a State expert testified that the laboratories in Illinois were not doing such testing. Id.  In overturning the lower court's denial for the DNA testing, the appellate court found that because the defendant was denying that he had any sexual contact with the victim, identity was an issue at trial and

47

that if further DNA testing showed "that the semen found in the vaginal swabs and the stains on the victim's panties and bed sheet did not belong to the defendant, such results would corroborate the defendant's assertion that he did not commit an act of sexual assault upon the victim." Id. at 756-57.

In Rokita, the defendant was found guilty of breaking into the victim's home and sexually attacking her. 316 Ill. App. 3d at 294. After the attack, a rape kit revealed sperm cells on the rectal swabs and the vaginal swabs tested positive for semen. Id. at 295. Subsequently, the defendant moved for testing under section 116-3, arguing that STR DNA testing of seminal samples taken from the defendant and the victim should be done. Id. at 296-97. In overturning the lower court's denial of DNA testing under section 116-3, the appellate court noted that STR DNA testing was not available at the time of trial (1994) and could potentially provide evidence relevant to the defendant's claim that no sexual contact occurred. Id. at 296, 298-302.

In Shum, the defendant was convicted of murder, feticide, attempted murder and two counts of rape and was sentenced to death. 207 Ill. 2d 52-54. The surviving victim identified the defendant as the assailant and had been acquainted with him through her boyfriend. Id. The defendant raised a claim for DNA testing of the rape kit in his post-conviction petition and the supreme court found that such testing was not available at the time of trial and that it should be allowed because identity of the perpetrator was an issue especially in the face of the defendant's denial of any involvement in the attack. 207 Ill. 2d at 63-67.

In Henderson, the defendant and another man were convicted of rape and kidnapping. 343 Ill. App. 3d at 1110-14. The defendant made no admissions, his alibi

48

was supported by his wife and son, and the rape kit tested positive for sperm. Id. In that

factual context, the appellate court found that the defendant was entitled to further DNA

testing under section 116-3 of the bloodstain on the pants recovered in the defendant's

bedroom and the swabs in the rape kit. Id. at 1115-21. The court noted that DNA testing

was not available at the time of trial (1984) and that such testing had the potential of

producing new evidence materially relevant to the defendant's assertion of actual

innocence. Id.

In sharp contrast to Hockenberry, Rokita, Shum, and Henderson, it cannot be said

that the PCR DNA testing of shell casings in this case have the same magnitude as testing

the DNA recovered from a victim's body or from clothes found at the location of the

sexual attack. There is a very clear distinction between the two types of DNA evidence.

The instant petitioner could have easily shot and killed the victim with a bullet loaded

into the gun by another person. Thus, the results of DNA testing on the shell casings

would not have been relevant to a claim of innocence. However, the DNA testing of the

materials sought by the defendants in Hockenberry, Rokita, Shum, and Henderson was

relevant to the claim of innocence because, for the sake of argument, these defendants

would be hard pressed to explain why their DNA would have been found inside of the

victim or inside of her clothes if they were not present at the time of the crime since this

type of DNA could not have come from anyone but the defendant. Furthermore, unlike

in Rokita, Shum, and Henderson, the PCR DNA testing being requested was available at

the time of trial and therefore, as stated, the instant petitioner was unable to meet his

burden under subsection (a) for relief under section 116-3.

In conclusion, this Court should affirm the circuit court's order dismissing

49

petitioner's request for PCR DNA testing pursuant to section 116-3.

## CONCLUSION

The People of the State of Illinois respectfully request that this Honorable Court affirm the third-stage denial of petitioner's post-conviction petition and the denial of petitioner's section 116-3 motion.

Pursuant to People v. Nicholls, 71 Ill. 2d 166 (1978) and relevant statutory provisions 725 ILCS 5/110-7(h)(West 2004) and 55 ILCS 5/4-2002.1 (West 2004), the People of the State of Illinois respectfully request that this Court grant the People costs and incorporate as part of its judgment and mandate a fee of $100.00 for defending this appeal. In addition, pursuant to People v. Agnew, 105 Ill. 2d 275 (1985) and 55 ILCS 5/4-2002.1 (West 2004), the People respectfully request that this Court also grant the People an additional fee of $50.00 in the event oral argument is held in this case.

Respectfully Submitted,

KIMBERLY M. FOXX,
 State's Attorney,
 County of Cook,
 Room 309 - Richard J. Daley Center,
 Chicago, Illinois 60602
 eserve.CriminalAppeals@cookcountyil.gov
 (312) 603-5496

Attorney for Respondent-Appellee

ALAN J. SPELLBERG,
MILES J. KELEHER,
HAREENA MEGHANI-WAKELY,
Assistant State's Attorneys.
 Of Counsel.

50

## CERTIFICATE OF COMPLIANCE

I certify that this brief conforms to the requirements of Rules 341 (a) and (b). The length of this brief, excluding the pages containing the Rule 341 (d) cover, the Rule 341 (h)(1) statement of points and authorities, the Rule 341 (c) certificate of compliance, the certificate of service, and those matters to be appended to the brief under Rule 342(a), is 50 pages.

By: *Hareena Meghani - Wakely*
HAREENA MEGHANI-WAKELY,
Assistant State's Attorney

SA 483

## PETITION FOR LEAVE TO APPEAL

### Prayer For Leave To Appeal

Joseph Booker, Petitioner-Appellant, hereby petitions this Court, pursuant to Supreme Court Rules 315 and 612, for leave to appeal the judgment of the First District Appellate Court, affirming the dismissal of his *pro se* post-conviction petition after a third-stage evidentiary hearing.

### Proceedings Below

On August 8, 2017, the appellate court affirmed the circuit court's ruling denying Booker post-conviction relief in an unpublished order. *People v. Booker*, 2017 IL App (1st) 130177-U. Booker filed a petition for rehearing on August 29, 2017, which was denied on September 12. A copy of the appellate court's decision, and its order denying rehearing, are appended to this petition.

### Compelling Reason For Granting Review

This Court should grant review to clarify that *People v. Molstad*, 101 Ill. 2d 128, 135-36 (1984), and *People v. Coleman,* 2013 IL 113307, ¶¶104-14, require that, on appeal from the third-stage dismissal of a post-conviction claim alleging actual innocence based on new eyewitness testimony, a reviewing court must balance the new testimony against the evidence from trial in order to determine the likelihood of a different verdict on retrial.

Joseph Booker, who had no prior convictions for weapons or violence, was convicted of shooting a man he did not know for no apparent reason based on highly dubious identification testimony from the man two new witnesses have since identified as the real shooter. In affirming the third-stage dismissal of Booker's innocence claim, the First District Appellate Court failed to balance the new eyewitness testimony against the eyewitness testimony from trial as required by *Molstad* and *Coleman. People v. Booker*, 2017 IL App (1st) 130177-U, ¶¶35-39. The appellate court inexplicably failed to even discuss the two

SA 484

versions of events that would be presented to a new trier of fact on retrial.

Because of the prevalence of wrongful convictions in Illinois, it is critical that the appellate court reviewing the denial of actual innocence claims based on new eyewitness testimony apply the correct analysis. This Court should intervene to ensure the consistent application of precedent and to prevent a fundamental miscarriage of justice.

## STATEMENT OF FACTS

Joseph Booker was found guilty of first-degree murder based primarily on the testimony of Kenneth Williams, a high-ranking Gangster Disciple whom other witnesses have since identified as the actual shooter. *People v. Booker*, No. 1-06-2581, 5-6 (unpublished order of March 31, 2008). The State presented no forensic evidence linking Booker to the gun or crime scene, and no inculpatory statement. The jury was issued a *Prim* instruction before returning its verdict. *Booker*, No. 1-06-2581 at 6. In the post-conviction proceedings below, Booker maintained his innocence and presented evidence from two new eyewitnesses who were too scared to accuse Williams earlier. (PC4. R3. X14; PC1. C1. 238-40; PC4. C. 139-44; PC4. R2. V7-118). The circuit court dismissed Booker's innocence claim after an evidentiary hearing. (PC4. R3. Y8).

### Trial and Direct Appeal

Kenneth Williams testified that, around 9:00 p.m., on September 8, 2002, he was at the corner of W. 38th and S. Princeton, near Melissa Westmoreland's home in the Wentworth Gardens Housing Project, when he saw Joseph Booker and several friends arrive in four cars. (Tr. 179-80, 209, 183-86, 212-13); *People v. Booker*, 2017 IL App (1st) 130177-U, ¶6 (unpublished order of August 8, 2017). Booker's group argued with Williams's group before entering Westmoreland's home. (Tr. 186); *Id.* Around 10:30 p.m., Booker and his friends emerged and words were again exchanged. Booker drove off. (Tr. 188-89); *Id.*

State of Illinois)
County of Will )

## Sworn Affidavit of Antione Ford

I Antione Ford, being duly sworn under oath depose and state that everything's stated in this sworn affidavit is true and accurate, that I am willing to come forward and testify to the same.

I further attest that:

In September of 2002 I was engaged to be married to Belinda "Teda" Brown, and we lived at 255 W. 38th place, Chicago, IL;
The Housing Complex we lived in is the "Wentworth Garden's";

Me and my fiancé "Teda" was very social with our neighbor's especially "Melissa Westmoreland" who lived at 257 W. 38th place in the 'Wentworth Garden's";

Melissa Westmoreland introduce me and my fiance to here boyfriend "Grudge" who I know now is "Joseph Booker";

I also know "Kenneth Williams", who is also known as "Kenny Wayne" and "Godzilla";

We called Kennth Williams "Godzilla" because he got shot-up a bunch of time's and he survived;

I also knew Kenny Wayne from being the Senior Regent for the Gangster Disciple's in the "Wentworth Garden's", he called the shot's for the entire neighborhood;

EXHIBIT M

C: 00155
SA 486

Before I start, pronounces my affiliation, I used to be a Black Disciple, I haven't participated or been apart of any activities since 2001 when I got shot- up;

I was cool with everybody that lived in the Wentworth Garden's, I've never had a problem with anybody in that neighborhood;

On September 8th, 2002 I was sitting on my front porch with my ex-fiance Teda around 6:30-7:00 p.m. when I seen a Navy blue pontiac grand prix park in front of us, it was "Grudge" (Joseph Booker)

Grudge spoke to me and Teda and went straight into melissa's house, which is what he usually do, Grudge never hung out over in the Wentworth Garden's, he was the quiet type, he didn't say much;

While I was sitting on my porch I observed Kenny wayne across the street drinking and smoking weed with about 15 - 20 of his guy's

20 - 30 minute's after Grudge went in missy's (melissa westmoreland) house a white SUV (Chevy Tahoe) pulled up behind Grudge pontiac Grand prix, the driver was a light-shinned dude with long braid's, and the passenger was a medium complexed dude;

The light- shinned dude asked Kenny Wayne "what the fuck was he looking at", and Kenny Wayne told him "he was looking at him and he need to straighten his motherfuckin hat", nothing else was said after that, the two guy's then went in missy's house;

While Grudge and the other 2 guy's were in missy's house

kenny wayne ⬛⬛⬛⬛ ⬛⬛⬛⬛ continued to drink and smoke weed, kenny wayne is a very loud and aggr●ve person when he's ●inking and doing drug's, At one point kenny wayne was yelling at the top of his lung's "who the fuck putting on for the "omegas" and "Blue Dolphin's"!

Omegas and Blue Dolphins are the name of ecstacy pill's, after they anted-up, kenny wayne sent his guy's to get more liquor and the ecstacy pill's;

kenny wayne's guy's was on the errand no longer than 20-25 minute's, when they came back with the pill's and liquor the crowd got excited and even louder;

Everybody that drink was drinking, Everybody that pop pill's was popping pill's and Everybody that smoked weed was smoking weed;

They played music from a car, and cracked joke's all night;

At about 10:00-10:15 p.m, Grudge and the other 2 guy's came out of missy's house, and missy came out as well, I noticed that Grudge had just got his hair braided, he had 2 french braid's in his head;

Grudge got in his Grand prix by him-self and the other 2 guy's got in the suv and they all left, there was no exchange of word's between kenny wayne and the light-skinned guy or Grudge for that matter;

About 15-20 minute's later lil-chuck walked-up, Lil-chuck, who's real name I now know is Charles Rials;

kenny wayne and the guy's was happy to see Lil-chuck, but Lil-chuck wasn't happy to see them, Lil-chuck was just getting out of the

SA488

penitentiary that day for a drug Conviction and was mad because nobody did nothing for him in regard's to bond money, a lawyer, or send him money while he was in jail;

Lil-Chuck also stated that "he was gone Cooperate with the police and send them all to jail, from the top to the bottom";

From top to bottom meaning: from the Shot Caller's to the foot-Soldier;

Kenny Wayne and Lil-Chuck then begin arguing back and forth, saying what they would do to each-other, Kenny Wayne took a swing at Lil-Chuck but missed and the other guy's jumped in between them, ~~some~~ girl came and grabbed Lil-Chuck and told him to come on;

Lil-chuck and the girl left. At this point me and my fiance knew it was time for us to go in the house, so me and Teda went in the house She went to get the kid's Clothe's and Stuff ready for School, and I sat on the couch, looking out the window;

I noticed that Kenny Wayne had left the crowd and started walking toward's 37th place, I watched him walk down the sidewalk until I couldn't see him anymore, but I stayed in the window watching the group of guy's across the street continue to party;

A little while later I looked to my right out of the window and I was able to see Kenny Wayne again and he was talking to Sugar Bear also known as Suge, who's real name is Darnell Brown;

I know Suge (Darnell Brown) from the neighborhood, he worked for Chicago Housing Authority, he was a janitor;

SA 489

Case: 1:10-cv-03995 Document #: Filed: 09/9/2012 Pages: 4th

After kenny wayne Duca huge he went ojgs/2012 whese the crowd was and grabbed another drink ( beer), no longer than ● minute's later Suge came walking towards 38ᵗʰ place with Lil-Chuck, Lil-Chuck, kenny wayne and Suge met up in the middle of the block;

While they was standing there talking Some girl walked on the oppisite side of the street from them ( but on the side of the street I lived on) Suge walked across the street and talked to the girl, kenny wayne an Lil-Chuck stepped off a few pace's;

Lil-Chuck was about to walk away and kenny wayne shot him in th head, and then shot him some more while he was on the ground;

When the police came to our house we told them we didn't see anything, we just heard shot's, I know kenny wayne seen me sitting on the front porch of my house, and I thought that he would figure out that it was me or Teda that told the police what we seen and I didn't want to get involved knowing I could put my life and my family live's in jepordy;

A couple of day's later Missy came to our house to talk to Teda anc she was very upset, she said that the guy's in the neighborhood broke in her hou vandalized it, and stole stuff out of her house. She also stated that she's been to the police station being interviewed about a shooting that happened across the street;

Missy said that kenny wayne was at the police station accusing Grudge of doing the shooting's and that he argued with Grudge. Missy called kenny wayne a lying little bitch because didn't nobody argue out there that night;

Me and Teda told Missy that there was two arguments occured out

SA 490

there but ~~Case: 21-2166~~ ~~the document~~ ~~Grudye 02/19/2012~~ ~~her Page: 460~~ the light-skinned dude with the long braid's exchanged words with Kenny Wayne but it couldn't be categorized as an argument, the light-skinned dude said what he said and Kenny Wayne said what he said and it was nothing else to it;

We simply told missy that the other argument was amongst themselve's because again we didn't want to get involved and we had to live there. I knew those guy's would do whatever Kenny Wayne told them to do and I knew they was watching the neighborhood for people who was talking to the police so we didn't tell missy that Lil-Chuck and Kenny Wayne was the one's out there arguing and I didn't tell her I seen Kenny Wayne shoot Lil-Chuck

A few hour's after missy left I seen Kenny Wayne back on the block, I noticed that he had cut his hair, Kenny Wayne had shoulder length braid's a couple day's ago when he shot Lil-Chuck;

I'm coming forward today because I realize that I was wrong for no speaking up and letting an innocent man go to prison for a crime I know he didn't commit, at that time I was in a compromising situation and chose my life and the live's of my family over going to the police to tell them I witnessed Kenny Wayne shoot and kill Lil-Chuck;

I apologize to Grudye (Joseph Booker) and his family for the incarceration/inconvenience I have caused them; and I apologize to Lil-Chuck family for not being honest and for not telling them who actually killed Lil-Chuck, I extend my deepest sympathy and regrets to both families, I'am truely SORRY.

I submit this sworn affidavit in the interest of justice, when called to testify, I will testify to the same. I submit this sworn

affidavit voluntarily, I have not been promised anything, I have not been threatened in anyway, I'm submitting this statement on my own Free will.

(Further Affiant Sayeth Not)

I declare under the penalty of perjury that the above information is true and correct.

On This 12th day of December, 2014.

/s/ Antione Ford
Affiant, Antione Ford

*SM*

IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

**FILED**

JUN 23 2021 JTK

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Joseph C. Booker, B75795,
          Petitioner-Appellant,

          -vs-

Christine Brannon-Dortch,
          Respondent-Appellee.

Case No. 10 cv 3995

The Honorable Judge
Charles P. Kocoras

## Notice of Appeal

May it Pleases the Court:

Notice is hereby given that Joseph C.
Booker, Petitioner in the above-named case,
hereby appeals to the United States Court of
Appeals for the Seventh Circuit from the
final judgment entered by the Court in this
action on the 13th day of May, 2021.

Dated: 6-10-21

                              Joseph C. Booker
                              Joseph C. Booker
                              Petitioner-Appellant,
                              Pro Se

SA 493

STATE OF ILLINOIS )
                  )  SS
COUNTY OF _Knox_   )

## AFFIDAVIT

I, _Joseph C. Booker_, hereby declare under penalty of perjury that the following is true and correct based upon my personal knowledge, and that I am competent to testify thereto if called upon as a witness.

_I attest that on the date below I placed a Notice of Appeal (1 page), a Docketing Statement (2 pages), and a Certificate of Appealability (17 pages) in a manila envelope addressed to the United States District Court of Illinois for the Northern District, Eastern Division at 219 S. Dearborn, Chicago, IL 60604_

PLEASE TAKE NOTICE that on _June 10th_, 20_21_, I placed the attached or enclosed documents in the institutional mail at _Hill_ Correctional Center, properly addressed to the parties listed above for mailing through the United States Postal Service.

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5 1-109, I declare, under penalty of perjury, that I am a named party in the above action, that I have read the above documents, and that the information contained therein is true and correct to the best of my knowledge.

Dated: _6-10-21_

/s/ _Joseph C. Booker_
Name: _Joseph C. Booker_
IDOC# _B75795_
Address: _P.O. Box 1700_
_Galesburg, IL 61402_

SA 494

STATE OF ILLINOIS          )
                           )          SS
COUNTY OF _____  )

## AFFIDAVIT

I, _____, hereby declare
under penalty of perjury that the following is true and correct based upon my personal
knowledge, and that I am competent to testify thereto if called upon as a witness.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

PLEASE TAKE NOTICE that on _____, 20___, I placed the attached or
enclosed documents in the institutional mail at _____ Correctional Center,
properly addressed to the parties listed above for mailing through the United States Postal
Service.

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5 1-109, I declare, under penalty of
perjury, that I am a named party in the above action, that I have read the above documents,
and that the information contained therein is true and correct to the best of my knowledge.

Dated: _____          /s/_____

                                     Name: _____

                                     IDOC#_____

                                     Address:_____

                                              _____

                                              _____

SA 495

06/23/2021-18

THIS CORRESPONDENCE IS FROM
AN INMATE IN THE ILLINOIS
DEPARTMENT OF CORRECTIONS

Joseph Booker
B75795
P.O. Box 1700
Galesburg, IL 61402

Confidential Legal Mail

United States District Court
for the Northern District of Illinois
Eastern Division
219 S. Dearborn St,
Chicago, IL 60604

Confidential Legal Mail

US POSTAGE >> PITNEY BOWES
ZIP 61401
02 4W
0000873481 JUN 14 202
$ 002.00°



SA 496